UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                        CASE NO. 8:21-MJ-1246-JSS

KENDRICK TAYLOR WALLACE

## NOTICE OF FILING

The United States of America, by Karin Hoppmann, Acting United States

Attorney for the Middle District of Florida, and states that at the Initial Appearance

that took place on April 12, 2021 there was mention of documents that were

referenced in the Complaint as Exhibit 1. At the hearing the Government and the

Defense agreed that the Government would produce these documents for the

inspection and review by Defendant. The Defense was provided these documents

electronically shortly following the conclusion of the hearing. The Government now

files these documents with the court.

Respectfully submitted,

KARIN HOPPMANN
Acting United States Attorney

By:    /s/ John Cannizzaro
       John Cannizzaro
       Assistant United States Attorney
       Florida Bar No. 25790
       400 N. Tampa St., Ste. 3200
       Tampa, FL 33602-4798
       Telephone: (813) 274-6000
       Facsimile: (813) 274-6358
       E-mail: John.Cannizzaro@usdoj.gov

**U.S. v. Kendrick Taylor Wallace**                    **Case No. 8:21-MJ-1246-JSS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 13, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Matthew J. Mueller, Esquire

*/s/ John Cannizzaro*
John Cannizzaro
Assistant United States Attorney
Florida Bar No. 25790
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: John.Cannizzaro@usdoj.gov

Exhibit 1

DISTRICT OF COLUMBIA, ss:

## DECLARATION OF TOM HEINEMANN

I, Tom Heinemann, declare and say as follows:

1. I am an Assistant Legal Adviser in the Office of the Legal Adviser for the Department of State, Washington, D.C. This office has responsibility for extradition requests, and I am charged with the extradition case of Kendrick Taylor Wallace. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and Norway are found in the Extradition Treaty between the United States of America and the Kingdom of Norway, signed on June 9, 1977 (the "Extradition Treaty"). A copy of the Extradition Treaty is attached to this declaration.

3. In accordance with the provisions of the Extradition Treaty, the Royal Norwegian Embassy has submitted Diplomatic Note No. 53/2018, dated July 6, 2018, formally requesting the extradition of Kendrick Taylor Wallace. A copy of the diplomatic note is attached to this declaration.

4. In accordance with Article 19 of the Extradition Treaty, the United States represents the interests of Norway in proceedings in U.S. courts arising out of extradition requests made by Norway, and Norway provides similar representation in its courts for extradition requests made by the United States.

5. The offenses for which extradition is sought are covered by Article 2(1) of the Extradition Treaty.

-2-

6.   The documents submitted by Norway in support of its extradition request were certified on June 29, 2018, by William W. Whitaker, Consult of the United States at the United States Embassy in Oslo, in accordance with 18 U.S.C. 3190.  Mr. Whitaker, at the time of certification, was the principal consular officer of the United States in Norway.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 7th, 2020.

_____
TOM HEINEMANN

Attachments:
   1.  Copy of Note
   2.  Copy of Extradition Treaty



**L/LEI**OYAL NORWEGIAN EMBASSY

2018 JUL 12  A 10 50

DEPARTMENT OF STATE

No. 53/2018

The Royal Norwegian Embassy presents its compliments to the Department of State and has the honor to bring to the attention of the Office of the Legal Advisor, Law Enforcement Section (L-LEI) the enclosed letter with enclosures from the Royal Norwegian Ministry of Justice and Public Security in Oslo.

The Embassy would appreciate the assistance of the Department of State in bringing the above to the attention of the relevant American authorities.

The Royal Norwegian Embassy avails itself of this opportunity to renew to the Department of State the assurance of its highest consideration.

**Washington D.C., July 06, 2018**



**Department of State**
**Washington, D.C.**

# NORWAY

## Extradition

*Treaty signed at Oslo June 9, 1977;*
*Ratification advised by the Senate of the United States of America*
*     November 30, 1979;*
*Ratified by the President of the United States of America Decem-*
*     ber 13, 1979;*
*Ratified by Norway January 18, 1980;*
*Ratifications exchanged at Washington March 7, 1980;*
*Proclaimed by the President of the United States of America April 9,*
*     1980;*
*Entered into force March 7, 1980.*

---

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

## A PROCLAMATION

CONSIDERING THAT:

The Extradition Treaty between the United States of America and the Kingdom of Norway was signed at Oslo on June 9, 1977, the text of which, in the English and Norwegian languages, is hereto annexed;

The Senate of the United States of America by its resolution of November 30, 1979, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty;

The Treaty was ratified by the President of the United States of America on December 13, 1979, in pursuance of the advice and consent of the Senate, and was duly ratified on the part of the Kingdom of Norway;

It is provided in Article 20 of the Treaty that the Treaty shall enter into force on the date of the exchange of instruments of ratification;

The instruments of ratification of the Treaty were exchanged at Washington on March 7, 1980; and accordingly the Treaty entered into force on that date;

Now, THEREFORE, I, Jimmy Carter, President of the United States of America, proclaim and make public the Treaty, to the end that it be observed and fulfilled with good faith on and after March 7, 1980, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this ninth day of April in the year of our Lord one thousand nine hundred eighty and of the [SEAL]   Independence of the United States of America the two hundred fourth.

JIMMY CARTER

By the President:
CYRUS VANCE
*Secretary of State*

### EXTRADITION TREATY

between

### THE UNITED STATES OF AMERICA

and

### THE KINGDOM OF NORWAY

The Government of the United States of America and the Government of the Kingdom of Norway;

Desiring to make a new treaty for the reciprocal extradition of offenders;

Have agreed as follows:

### Article 1

Each Contracting State agrees to extradite to the other, in the circumstances and subject to the conditions specified in this Treaty, any person found in its territory who has been charged with or convicted of any offense within Article 2, committed within the jurisdiction of the other State or outside thereof under the conditions specified in Article 3.

### Article 2

1.   Extradition shall be granted for any offense described in the Schedule annexed to this Treaty, which forms an integral part of the Treaty, only when both of the following conditions exist:

TIAS 9679

a. The law of the requesting State, in force when the offense was committed, provides a possible penalty of deprivation of liberty for a period of more than one year, or by the death penalty; and

b. The law in force in the requested State generally provides a possible penalty of deprivation of liberty for a period of more than one year, or by the death penalty, which would be applicable if the offense were committed in the territory of the requested State.

2. When the person sought has already been sentenced in the requesting State, extradition shall only be granted when the detention originally imposed is for a period of at least four months, and the amount of time remaining to be served is for a period of at least four months.

3. Extradition shall also be granted for preparation or attempts to commit, conspiracy to commit, or participation in any offenses within paragraph 1 of this Article. Preparation or attempts include conspiracy to commit such offenses according to the law in the United States. The provisions of this paragraph shall be qualified on the basis that the offense is punishable under the laws of both States by imprisonment or other form of detention for more than one year or by the death penalty.

4. An offense shall be extraditable whether or not the laws of both Contracting States would place that offense within the same category of offenses made extraditable by the first or third paragraph of this Article and whether or not the laws of the requested State denominate the offense by the same terminology.

5. Extradition shall also be granted for an offense when the use of the mails or means of interstate communication or transport may be required for the purpose of granting jurisdiction to a federal tribunal of the United States.

6.    If the request for extradition includes several separate offenses each of which is punishable under the laws of the requesting and the requested State by deprivation of liberty, but of which some do not fulfill the condition with regard to the amount of punishment which may be awarded, the executive authority of the requested State shall have the power to grant extradition for the latter offenses.

### Article 3

1.    For the purpose of this Treaty, the territory of each Contracting State comprises all the territory over which it exercises jurisdiction, including air space and territorial waters as well as vessels and air craft registered in that Contracting State if any such aircraft or vessels are on the high seas or in flight when the offense is committed. An aircraft shall be considered to be in flight from the moment when power is applied for the purpose of take-off until the moment when the landing run ends. In the case of a forced landing, the flight shall be deemed to continue until the competent authorities take over the responsibility for the aircraft and for the persons and property on board.

2.    The provisions of the preceding paragraph do not exclude the application of penal jurisdiction exercised in accord with the legislation of the requested State.

3.    When the offense for which the extradition has been requested has been committed outside the territory of the requesting State, the executive authority of the requested State shall have the power to grant extradition provided that its jurisdiction would extend to such an offense in similar circumstances.

### Article 4

1.   Neither Contracting State shall be bound to deliver up
its own nationals, but the executive authority of the
requested State shall, if not prevented by the laws of that
State, have the power to deliver them up if, in its discretion,
it be deemed proper to do so.

2.   If extradition is not granted in pursuance of paragraph
1 of this Article, the requested State shall submit the case
to its competent authorities for the purpose of prosecution.

### Article 5

1.   Extradition shall be granted only if the evidence be
found sufficient according to the law of the requested
State either to justify the committal for trial of the
person sought if the offense of which he is accused had
been committed in the territory of the requested State or
to prove that he is the identical person convicted by the
courts of the requesting State.

2.   In the case of a request made to the Government of Norway,
the Norwegian authorities shall, in accordance with Norwegian
extradition law, have the right in exceptional cases to
request evidence to establish a presumption of guilt of
a person previously convicted. Extradition may be refused
if such additional evidence is found to be insufficient.

### Article 6

The person whose extradition has been requested may
advise the appropriate authority of the requested State,
if not prevented by the laws of that State, that he waives
the necessity for a hearing on his extraditability. The
requested State may thereupon cause the issuance of an order
authorizing surrender of the person sought to agents of
the government of the requesting State.

TIAS 9679

### Article 7

1.   Extradition shall not be granted in any of the
following circumstances:

a.   When the person whose surrender is sought is being
     proceeded against or has been tried and discharged or
     punished in the territory of the requested State for
     the offense for which extradition is requested. If
     the charge against the person sought has been waived
     in Norway, or the proceedings discontinued due to lack
     of evidence, extradition may be granted only if the
     conditions of applicable Norwegian law permit.

b.   When the prosecution or the enforcement of the penalty
     for the offense for which extradition is sought has
     become barred by lapse of time according to the laws
     of the requesting or requested State.

c.   If the offense for which extradition is requested is
     regarded by the requested State as a political offense
     or if the person sought proves that the request for
     his extradition has in fact been made with a view to
     try or punish him for an offense of a political character.

d.   In respect of a military offense, unless it is punishable
     in accordance with non-military penal legislation as
     prescribed in Article 2.

2.   Extradition may be refused in any of the following
circumstances:

a.   When the person whose surrender is sought has been
     tried and acquitted, or has undergone punishment, or
     has been pardoned, in a third State.

b. . If, in special circumstances, having particular regard
to the age, health or other personal conditions of
the person concerned, the requested State has reason
to believe that extradition will be incompatible with
humanitarian considerations.

3.   Extradition may be refused on any other grounds provided
for by the law of the requested State.

### Article 8

If the offense for which extradition is requested is
punishable by death under the laws of the requesting State
and the laws of the requested State do not provide for the
death penalty for that offense, extradition may be refused
unless the requesting State provides assurances satisfactory
to the requested State that the death penalty shall not be
imposed, or, if imposed, shall not be carried out.

### Article 9

When the person whose extradition is requested is being
proceeded against or is lawfully detained in the territory
of the requested State for an offense other than that for
which extradition has been requested, the decision whether
or not to extradite him may be deferred until the conclusion
of the proceedings and the full execution of any punishment
he may be or may have been awarded.

### Article 10

The determination that extradition based upon the request
therefore should or should not be granted shall be made in
accordance with the law of the requested State and the
person whose extradition is sought shall have the right
to use such remedies and recourses as are provided by such
law.

### Article 11

1.   The request for extradition shall be made through the diplomatic channel.

2.   The request shall be accompanied by:

a.   The data necessary to prove the identity of the person sought, including, when possible, photographs and fingerprints or copies thereof, and information as to his nationality and residence, if available;

b.   A statement of the facts of the case for which extradition is requested;

c.   The text of the laws defining the offense, the law prescribing the punishment for the offense, and the law relating to the limitation of the legal proceedings or the enforcement of the penalty for that offense.

3.   If the request relates to a person charged but not yet convicted, it must also be accompanied by a warrant of arrest issued by a judge or other competent authority in the territory of the requesting State and by such evidence as, according to the law of the requested State, would justify his committal for trial if the offense had been committed in the territory of the requested State.

4.   If the request relates to a person who has been convicted but who has not served all of his or her sentence, it must also be accompanied by the judgment of conviction and sentence, if any, imposed in the territory of the requesting State, and by a certification indicating that the sentence has not been served or indicating the part of the sentence yet to be served.

5.     The warrant of arrest and deposition or other evidence,
given under oath, and the judicial documents establishing
the existence of the conviction, as well as any supplementary
evidence requested by the Norwegian authorities under
Article 5, paragraph 2, or certified copies of these documents,
shall be admitted in evidence in the examination of the
request for extradition when, in the case of a request emanating
from Norway, they bear the signature or are accompanied by
the attestation of a judge, magistrate or other official or
are authenticated by the official seal of the Ministry of
Justice and, in any case, are certified by the principal
diplomatic or consular officer of the United States in Norway,
or when, in the case of a request emanating from the United
States, they are sealed by the official seal of the Department
of State. Any deposition or other evidence which has not
been given under oath but which otherwise meets the requirements
set forth in this paragraph shall be admitted in evidence
as a deposition or evidence given under oath when there is
an indication that the person, prior to deposing before
the judicial authorities of the requesting State, was
informed by those authorities of the penal sanctions to
which he would be subject in the case of false or incomplete
statements.

6.     The documentation referred to in paragraph 5 of this
Article shall also be received in evidence if it is authenti-
cated in such other manner as may be permitted by the law of
the requested State.

7.     The requested State may require that the documentation
be translated into the language of that State.

                           Article 12

1.     In case of urgency, the Contracting States may request,
through the diplomatic channel, the provisional arrest of

an accused or convicted person. This request may be honored
if the request includes identification of such a person,
a description of the offense of which he is accused, an
indication of the purpose for the request of extradition
and a statement of the existence of an order of arrest or
an outstanding conviction or sentence.

2.   Upon the granting of the request for provisional arrest,
the requesting State shall present to the Executive Authority
of the other State the formal request for extradition within
four weeks. The requesting State may request, specifying
the reasons therefor, an extension of the period of detention
for a period not to exceed thirty days, and the appropriate
judicial authority of the requested State shall have the
authority to extend the period of detention. The release
from custody pursuant to this provision shall not prevent
the institution of proceedings with a view of extraditing
the person sought if the request is subsequently received.

### Article 13

1.   If the requested State requires additional evidence
or information to enable it to decide on the request for
extradition, it shall request the same of the requesting
State, and the requesting State shall furnish it within
such time as the requested State indicates.

2.   If the requested evidence or information is not
received within the specified period or if such evidence
is insufficient, the person sought, if under arrest, shall
be released immediately. This fact shall not bar the
requesting State from renewing its request for extradition,
with new documentation, with respect to the same person
and for the same offense.

### Article 14

1.   The requested State shall promptly communicate to the
requesting State, through the diplomatic channel, the
decision on the request for extradition.

TIAS 9679

2.   If the extradition has been granted, the authorities
of the requesting and the requested States shall agree
on the time and place of surrender of the person sought.

3.   If a warrant or order for the extradition of a person
sought has been issued by the competent authority and he
is not removed from the territory of the requested State
within such time as may be agreed, he shall be set at
liberty and the requested State may subsequently refuse
to extradite him for the same offense.

### Article 15

1.   A person extradited shall not be detained or proceeded
against in the territory of the requesting State for any
offense, other than an extraditable offense established by
the facts in respect of which extradition has been granted,
nor be extradited by that State to a third State unless:

a)   he has left the territory of the requesting State
     after his extradition and has voluntarily returned
     to it;

b)   he has remained in the territory of the requesting
     State for forty-five days after being free to depart; or

c)   the requested State has consented to his detention,
     trial, punishment, or to his extradition to a third
     State for an offense other than that for which extra-
     dition was granted.

2.   The provisions of paragraph 1 of this Article shall
not apply to offenses committed, or matters arising, after
the extradition has been granted.

### Article 16

If the extradition of a person is requested concurrently
by one of the Contracting States and by another state or

states, either for the same offense or for different
offenses, the requested State shall make its decision having
regard to all the circumstances, including the provisions
in this regard in any Agreements in force between the
requested State and the requesting states, the relative
seriousness and place of commission of the offenses, the
respective dates of the requests, the nationality of the
person sought and the possibility of subsequent extradition
to another state.

### Article 17

To the extent permitted under the law of the requested
State and subject to the rights of third parties, which
shall be duly respected, all articles, instruments, objects
of value or documents relating to the offense, whether or
not used for its execution, or which in any other manner
may be material evidence for the prosecution, shall be sur-
rendered upon the granting of the extradition even when
extradition cannot be effected due to the death, disappear-
ance, or escape of the accused.

### Article 18

1.   Transit through the territory of one of the Contracting
States of a person whose extradition has been granted to
the other Contracting Party by a third state shall be
granted under the following conditions:

a.    that the State of transit be given prior notice of
      the route said person will use;

b.    that the agents escorting said person carry with them
      the original or an authenticated copy of the warrant
      or order of extradition; and

c.    that such transit will not be in violation of the
      applicable laws of the State of transit.

2.   The requesting State shall reimburse the State of
transit for any expenses incurred in connection with such
transportation.

### Article 19

1.   The requested State shall provide review of documen-
tation in support of an extradition request for its legal
sufficiency prior to presentation to the judicial authorities
and shall provide for representation of the interests of
the requesting State before the competent authorities of
the requested State.

2.   Expenses related to the translation of documents and
to the transportation of the person sought shall be paid
by the requesting State. No pecuniary claim, arising out
of the arrest, detention, examination and surrender of
persons sought under the terms of this Treaty, shall be
made by the requested State against the requesting State.

### Article 20

1.   This Treaty shall be subject to ratification, and the
instruments of ratification shall be exchanged at Washington
as soon as possible. It shall come into force on the date
of the exchange of instruments of ratification.[1]

2.   This Treaty shall apply to any offense governed by
this Treaty committed before or after this Treaty enters
into force, provided that extradition shall not be granted
for an offense committed before this Treaty enters into
force, which was not an offense under the laws of both
Contracting States at the time of its commission.

---

[1] Mar. 7, 1980.

TIAS 9679

3.    Either of the Contracting States may terminate this
Treaty at any time by giving notice in writing to the
other through the diplomatic channel. Termination shall
become effective six months after the date of such notice.


      IN WITNESS WHEREOF the undersigned, being duly authorized
thereto by their respective Governments, have signed this
Treaty.


      DONE in duplicate at Oslo this ninth day of June
1977, in the English and Norwegian languages, both texts
being equally authentic.


For the Government of the          For the Government of the
United States of America:          Kingdom of Norway:

*[signature]* [1]                  *[signature]* [2]

---
[1] William A. Anders.
[2] Knut Frydenlund.

TIAS 9679

## SCHEDULE OF OFFENSES

1. Murder, including assault with intent to murder.

2. Manslaughter.

3. Malicious wounding or grievous bodily harm.

4. Assault upon a public official.

5. An offense against the laws relating to the use of any corrosive or injurious substance upon a person.

6. An offense against the laws relating to sexual offenses with or upon a minor or other person, including rape, unlawful intercourse, indecent assault, procuration, illegal abortion.

7. An offense against the laws relating to kidnapping, abduction and false imprisonment.

8. An offense against the laws relating to the abandonment of a dependent person which causes grave injury or death.

9. Extortion or threats.

10. An offense relating to prison mutiny; escape from confinement of a person charged, convicted, or sentenced, for an offense punishable by a term in excess of one year.

11. Larceny or theft.

12. Embezzlement.

13. Robbery.

14. Burglary.

15. Arson.

16. An offense against the laws relating to damage to property.

17. Offenses against the safety of a means of transportation or communication, especially when endangering persons making use of such means; piracy and any act of mutiny or revolt on board a vessel or aircraft against the authority of the captain or commander of such aircraft or vessel; any seizure or exercise of control or deviation of routes committed by force, violence, or threat of force or violence, of an aircraft or vessel; destruction or damage of aircraft in flight which

renders it incapable of flight or which is likely to endanger its safety in flight; and any act which could endanger the life or physical integrity of the passengers or crew.

18. An offense against the laws relating to counterfeiting and forgery.

19. An offense against the laws relating to the obtaining, transporting, receiving and fraudulent use of property, money, commodities, securities or similar interests.

20. Fraud, including that by creditors, debtors, bankers, directors, company officials and others, whether or not in a fiduciary relationship.

21. An offense against the laws relating to bankruptcy.

22. False statements to a government agency or official.

23. An offense against the laws relating to commodities, securities or similar interests, including their issuance, registration, marketing, trade, or sale.

24. An offense against the laws relating to international trade and transfers of funds.

25. An offense against the laws relating to importation, exportation or transit of goods, articles, or merchandise, including violations of the customs laws.

26. An offense against the laws relating to narcotic drugs, cannabis, cocaine and its derivatives, psychotropic drugs, and other dangerous drugs, and chemicals.

27. An offense against the laws for protection of public health.

28. An offense against the laws relating to bribery, including soliciting, offering and accepting bribes.

29. An offense against the laws relating to the abuse of official authority.

30. An offense against the laws relating to perjury, subornation of perjury; false testimony.

31. An offence against the laws relating to obstruction of justice.

32. Offenses relating to willful evasion of taxes and duties.

33. Violation of financial laws when such violation is committed in furtherance of an enumerated offence.

*Embassy of the United States of America*

U.S. Department of State

## CERTIFICATE TO BE ATTACHED TO DOCUMENTARY EVIDENCE ACCOMPANYING REQUISITIONS IN THE UNITED STATES FOR EXTRADITION

### AMERICAN FOREIGN SERVICE

**Oslo, Norway**
**June 29, 2018**

I, **William W. Whitaker, Consul**

of the United States of America at United States Embassy in Oslo, Norway, hereby certify that the annexed papers, being **Request for Extradition of United States Citizen Mr. Kendrick Taylor Wallace** proposed to be used upon an application for the extradition from the **United States of America to the Kingdom of Norway**, charged with the crime of two instances of gross corruption in violation of Penal Code section 276a, cf. section 276b, cf. Penal Code section 62 alleged to have been committed in the **Kingdom of Norway** are properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by the tribunals of **the United States of America and the Kingdom of Norway,** as required by Title 18, United States Code, Section 3190.

In witness whereof I hereunto sign my name and cause my seal of office to be affixed this **Friday, 29 June 2018.**

**William W. Whitaker**
Consul of the United States of America

DS-36
06-2004



L/LEI **ROYAL NORWEGIAN EMBASSY**

2018 JUL 12  A 10: 50

DEPARTMENT OF STATE

No. 53/2018

The Royal Norwegian Embassy presents its compliments to the Department of State and has the honor to bring to the attention of the Office of the Legal Advisor, Law Enforcement Section (L-LEI) the enclosed letter with enclosures from the Royal Norwegian Ministry of Justice and Public Security in Oslo.

The Embassy would appreciate the assistance of the Department of State in bringing the above to the attention of the relevant American authorities.

The Royal Norwegian Embassy avails itself of this opportunity to renew to the Department of State the assurance of its highest consideration.

**Washington D.C., July 06, 2018**



**Department of State**
**Washington, D.C.**



**ROYAL NORWEGIAN
MINISTRY OF JUSTICE AND PUBLIC SECURITY**

To the competent authorities
in the United States of America

Your ref.                Our ref.                           Date
                         18/3416 - CAW                      3.7.2018

**Request for Extradition of Kendrick Taylor Wallace**

The Royal Norwegian Ministry of Justice and Public Security presents its compliments
to the Ministry of Justice of United States of America and has the honour to request the
extradition of Kendrick Taylor Wallace in accordance with the OECD Convention on
Combating Bribery of Foreign Public Officials in International Business Transactions
Article 10 and Extradition Treaty between Norway and the United States of America
9 June 1977.

Kendrick Taylor Wallace is an American national and he is born on 3 August 1945.

The request is issued by the Norwegian National Authority for Investigation and
Prosecution of Economic and Environmental Crime, and is approved of by the Director
of Public Prosecutions.

Mr. Wallace has been convicted of two instances of gross corruption and sentenced to
seven – 7 – years of imprisonment, none of which has been served.

Please find enclosed the following documents in duplo either issued or translated into
English:

1. Request for extradition from the Norwegian National Authority for Investigation and
   Prosecution of Economic and Environmental Crime (ØKOKRIM), dated 5 June 2018.
2. Statement by Senior Public Prosecutor Marianne Djupesland, including affidavit
   confirming the identity of Mr. Wallace.
3. Judgement by Oslo District Court dated 7 July 2015 in Norwegian (certified copy)
   and translated version

Postal address      Office address      Telephone              Department of Civil Affairs     Reference
PO Box 8005 Dep     Gullhaug Torg 4A    +47 22 24 90 90        Telefax                        Cathrine Westbye-Wiese
N-0030 Oslo         0484 Oslo           Org.no.: 972 417 831   +47 23 26 44 00                +47 22 24 55 33
Norway

4. Judgement by Borgarting Court of Appeal dated 17 January 2017 in Norwegian (certified copy) and translated version
5. Judgement by the Norwegian Supreme Court dated 15 September 2017, upholding the sentence of seven years imprisonment in Norwegian (certified copy) and translated version

The Ministry of Justice and Public Security also kindly requests the provisional arrest of Kendrick Taylor Wallace. Provided that extradition is granted, we kindly ask to be informed how long Kendrick Taylor Wallace has been kept in custody solely on the ground of this request for extradition.

The Norwegian Ministry of Justice and Public Security avails itself of this opportunity to renew to the competent authorities in the United States of America the assurances of its highest and most distinguished consideration.


Yours sincerely

Liv Christina Egseth
Policy Director

Cathrine Westbye-Wiese
Senior Adviser

EXT- WALLACE-00004



### ROYAL NORWEGIAN
### MINISTRY OF JUSTICE AND PUBLIC SECURITY

### ADDENDUM

I, Fredrik Bøckman Finstad, Director General at the Norwegian Ministry of Justice and Public Security, hereby certify that the attached documents are documents in the extradition case against American citizen Kendrick Taylor Wallace, born 3 August 1945, from the United States of America to Norway. The documents are issued by the appropriate authority according to Norwegian law, and are to be considered as part of the case documents.

I also certify that the attached documents are translated by an authorized translator.

Oslo, 18 June 2018

Fredrik Bøckman Finstad
Director General





**ROYAL NORWEGIAN**
**MINISTRY OF JUSTICE AND PUBLIC SECURITY**

## Table of contents

1. Request for extradition from the Norwegian National Authority for Investigation and Prosecution of Economic and Environmental Crime (ØKOKRIM), dated 5 June 2018

2. Statement by Senior Public Prosecutor Marianne Djupesland, including affidavit confirming the identity of Mr. Wallace

3. Judgement by Oslo District Court dated 7 July 2015 in Norwegian (certified copy) and translated version

4. Judgement by Borgarting Court of Appeal dated 17 January 2017 in Norwegian (certified copy) and translated version

5. Judgement by the Norwegian Supreme Court dated 15 September 2017, upholding the sentence of seven years imprisonment in Norwegian (certified copy) and translated version

6. Acknowledgement of Service

7. Relevant provisions from the Norwegian General Civil Penal Code

8. Picture of Mr. Wallace



**ØKOKRIM**
THE NORWEGIAN NATIONAL AUTHORITY FOR INVESTIGATION
AND PROSECUTION OF ECONOMIC AND ENVIRONMENTAL CRIME





**Office of International Affairs**
**Department of Justice, Criminal Division**
**1301 New York Avenue NW**
**Washington, DC 20530**
**U.S.A**

| Your reference: | Our referanse: | Date: |
|---|---|---|
| | 56/11 MDJ004 | 5 June 2018 |

# REQUEST FOR EXTRADITION OF U.S. CITIZEN MR. KENDRICK T. WALLACE

## 1. Introduction

The Kingdom of Norway hereby asks for the extradition of a citizen of the United States of America,

**Mr. Kendrick Taylor Wallace**
**born August 3, 1945**
**Residing at 100 North Tampa Street, Suite 3200**
**Tampa, Florida, FL 33611**
**USA**

Mr. Wallace has been convicted of two instances of gross corruption and sentenced to seven – 7 – years of imprisonment by Norwegian courts. The sentence was confirmed by the Supreme Court of Norway, by judgment dated 17th of September 2017. The sentence is thus final and enforceable under Norwegian law.

The sentence has been duly served upon Mr. Wallace, and he has been summoned to appear before the prison authorities of Norway in order to start serving the sentence.

Mr. Wallace has, however, not appeared as summoned. He has, via his US lawyer, informed the Norwegian prison authorities and ØKOKRIM that he intends to stay in the US.

Consequently, ØKOKRIM finds it necessary to seek his extradition to Norway.

| Postal address | Street address | Telephone/Telefax | Org. no.: 874 761 532 |
|---|---|---|---|
| Postboks 8193 Dep | C.J. Hambros plass 2 C | (+47) 23 29 10 00 | post.okokrim@politiet.no |
| NO-0034 OSLO | NO-0164 OSLO | (+47) 23 29 10 01 | www.okokrim.no |

 

## 2. Legal basis for the request for extradition

Reference is made to the Bilateral Extradition Treaty between the United States of America and the Government of the Kingdom of Norway dated June 9th, 1977.

According to its Article 2, extradition shall be granted for offenses described in the schedule annexed to the treaty (bribery is listed in the schedule as # 28) if the conditions in litra a and b are met.

According to Norwegian law the offense of gross corruption provides a maximum penalty of 10 years of imprisonment.

Mr. Wallace was sentenced to seven years' imprisonment and has served no time.

Mr. Wallace is a national of the USA, and according to Article 4 of the bilateral treaty, neither contracting party shall be bound to deliver up its own nationals, but have the power to extradite if it deems proper to do so.

In this case the USA is encouraged to extradite Mr. Wallace. Mr. Wallace was a resident of Norway for several years (from May 2004 to December 2008), during which time the acts of corruption were committed. The acts were committed in his capacity as Legal Director and member of the top management of Yara International ASA, a company registered on the Oslo Stock Exchange, and partly owned by the Norwegian State and with headquarters in Oslo, Norway.

Additionally. reference is made to the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transaction (OECD Convention), Article 10. According to Article 10(3)

> "Each Party shall take any measures necessary to assure either that it can extradite its nationals or that it can prosecute its nationals for the offence of bribery of foreign public official. A party which declines a request to extradite a person for bribery of a foreign public official solely on the ground that the person is its national shall submit the case to its competent authorities for the purpose of prosecution."

## 3. The conviction of Mr. Wallace – the facts of the case.

Enclosed is a statement made by the undersigned, which contains necessary information with respect to the request for extradition, see **Annex 1**. Attached to Annex 2 are several "tabs" enclosed.

Mr. Wallace was convicted by the District Court of Oslo by its judgement of July 7th 2015, see certified copy and the English translation of this judgement in Tab 1 to Annex 1.



2



The conviction was upheld by the Borgarting Court of Appeals, see certified copy of the judgement dated January 17th 2017 the the English translation of this judgement follows as Tab 2 to Annex 1.

The sentence of seven years of imprisonment was upheld by Norway's Supreme Court by judgement of September 15th 2017, see certified copy and the English translation of this judgement is enclosed as Tab 3 to Annex 1.

### 4.  The laws defining the offence

Mr. Wallace is convicted of two acts of gross corruption as defined in the 1902 Penal Code §§ 276 a and b. Gross corruption carries a maximum sentence of 10 years' imprisonment. The maximum sentence is increased if the person is convicted for more than one act of corruption. Copies of the relevant provisions in English translation are enclosed as Tab 5 to Annex 1.

### 5.  Affidavit confirming the identity of the convicted person as Mr. Wallace

An affidavit confirming the identity of Mr. Wallace is included in the statement in Annex 1, page 3, ref. Tab 6.

### 6.  Assistance sought

On the basis of the above, Norwegian authorities respectfully request US authorities:

a.  **To extradite to Norway Mr. Kendrick Taylor Wallace.**

b.  **Subject to domestic law; take Mr. Wallace into custody or take other appropriate measures (such as seizure of passport) to ensure his presence in the US for the purpose of the extradition procedure in accordance with UNCAC Article 44 (10).**

c.  **If extradition should be refused; enforce under domestic law the sentence imposed on him in accordance with UNCAC Article 44 (13), or try him under US law for the offences in question, according to UNCAC Article 44 (11) and the OECD Convention Article 10(3).**

\* \* \* \* \* \* \*

Any questions in connection with the request may be directed to Special Investigator Ms Randi Bang (randi.bang@politiet.no) or Senior Public Prosecutor, Ms. Marianne Djupesland (marianne.djupesland@politiet.no).



We thank you in advance for your assistance.

Best regards

**Marianne Djupesland**
*Senior Public Prosecutor*

ATTACHMENTS

4

EXT- WALLACE-00010

KOPI  Annex 1

## STATEMENT

I, Marianne Djupesland, submit this statement in support of the extradition request for Kendrick Taylor Wallace ("Wallace").   Wallace is wanted by Norway so that he can serve a seven-year sentence of imprisonment following his conviction for two counts of active, aggravated corruption in violation of 1902 Norwegian General Civil Penal Code ("1902 Penal Code") Sections 276a and 276b.  He has not served any part of that sentence.

### Factual Background

In March 2004, Norsk Hydro ASA's fertilizer division was spun off as a separate company under the name Yara International ASA ("Yara").  Yara subsequently became one of the world's largest producers of mineral fertilizers with more than 8,000 employees worldwide. The company remains listed on the Oslo Stock Exchange and the Kingdom of Norway owns 36.2 % of its shares.

From 2004 until the summer of 2008 when he retired, Wallace served as Yara's Chief Legal Officer.  He also was a member of its management team. An investigation by Norwegian law enforcement authorities revealed that while serving as Yara's Chief Legal Officer, Wallace assisted Yara enter into agreements to pay bribes – parts of which in fact were paid - to Libyan and Indian foreign officials in relation to negotiations  to establish joint venture agreements with state-controlled companies.  The illegal payments were made under the guise of consultancy agreements with sons of the two foreign public officials.

### The Initiation of Criminal Proceedings and Conviction

On 15 January 2014, Wallace and three members of Yara's management team were indicted. Mr. Wallace was charged with two counts of active, aggravated corruption in violation of 1902 Penal Code Sections 276a and 276b.  The first count concerned a bribe of $4.5 million

1

dollars (US) to a Libyan public official; the second count concerned a bribe of $3 million dollars (US) to an Indian official.

The trial of Wallace and his codefendants before the Oslo District Court lasted from 5 January 2015 to 26 March 2015. Wallace was present and testified in his own defense. On 7 July 2015, the Oslo District Court entered its judgment finding Wallace guilty of both counts and sentenced him to a term of imprisonment of two years and six months. A copy of the 98-page judgment (in English translation) is appended to this declaration at **Tab 1**.

Wallace and his codefendants appealed the judgment of the Oslo District Court to the Borgarting Court of Appeal. Under Norwegian law, by noting an appeal, Wallace and his codefendants received a new trial. The new trial lasted from 23 August 2016 to 2 December 2016 and Wallace was present and testified in his own defense. Wallace was found guilty of both counts of the indictment and sentenced to a total term of imprisonment of seven years. The judgment (in English translation) of the Borgarting Court of Appeal, issued on 17 January 2017, is appended to this declaration at **Tab 2**.

Wallace noted an appeal from the ruling by the Borgarting Court of Appeal to the Supreme Court of Norway alleging procedural errors at the trial and wrongful application of the law, and also challenging the length of his sentence. The Supreme Court agreed to consider only the challenge concerning the sentence and affirmed the ruling below. A copy of the Supreme Court's judgment (in English translation), issued on 15 September 2017, is appended to this declaration at **Tab 3**.[1]

<u>Code Provisions and Statute of Limitations</u>

---

[1]     On 2 October 2017, Wallace was served with a copy of the judgment from the Supreme Court of Norway. A copy of the receipt he signed acknowledging service of the judgment is appended to this declaration at **Tab 4**.

2

The provisions of the 1902 Penal Code related to Wallace's prosecution and subsequent conviction, Sections 276a and 276b, (in English translation) are appended to this declaration at **Tab 5**. The offense for which Wallace was convicted carries a maximum penalty of imprisonment of 10 years, subject to increase under Section 62. A copy of Section 62 (in English translation) also is found at **Tab 5**.

Under Sections 71 and 72 of the 1902 Penal Code, the limitations period governing the execution of a seven-year sentence is fifteen years from the date the sentence became final, in this case, 15 September 2017. A copy of Sections 71 and 72 (in English translation) also is found at **Tab 5**.

<u>Identification</u>

Kendrick Taylor Wallace is a citizen of the United States. He was born on 3 August 1945 in California. A copy of Wallace's photograph is appended to this declaration at **Tab 6**. I was the prosecutor who presented the case against Wallace and his co-defendants during the trials before the Oslo District Court and the Borgarting Court of Appeals. The photograph at **Tab 6** is that of Kendrick Taylor Wallace, who testified on his own defense at trial, and who was convicted of two counts of active, aggravated corruption in violation of Norwegian Penal Code Sections 276a and 276b.

Oslo 29 May 2018

Marianne Djupesland
Senior Public Prosecutor

3

KOPI TAB 1

# OSLO TINGRETT

## DOM

| | |
|---|---|
| **Avsagt:** | 7. juli 2015 |
| **Saksnr:** | 14-022670MED-OTIR/05 |
| **Rettens leder:** | |
| | Tingrettsdommer      Heidi Heggdal |
| **Meddommere:** | |
| Siviløkonom | Leif Helmich Pedersen |
| Statsautorisert revisor | Morten Drake |

---

| | |
|---|---|
| Den offentlige påtalemyndighet | Førstestatsadvokat Marianne Djupesland |
| | Førstestatsadvokat Bård Thoresen |
| | Politiadvokat Helene Bærug Hansen |

**mot**

| | |
|---|---|
| Kendrick Taylor Wallace | Advokat Arild Dyngeland |
| Daniel Roger Clauw | Advokat Fredrik Berg |
| | Advokatfullmektig Ruth Heile Tezfasion |
| Thorleif Enger | Advokat Ellen Holager Andenæs |
| | Advokat Jan Erik Teigum |
| Tor Holba | Advokat Astri Aas-Hansen |
| | Advokat Nadia Christina Hall |



TRUE COPY

Ingen begrensninger i adgangen til offentlig gjengivelse

## DOM

Kendrick Taylor Wallace er født 3. august 1945 og bor i 5002 South Elberon St, TAMPA, FL 33611, USA

Daniel Clauw er født 27.februar 1950 og bor i 3 Avenue Guillemotte, 78112 FOURQUEUX, Frankrike.

Thorleif Enger er født 31. oktober 1943 og bor i Volvat terrasse 6, leil. H0301, 0369 Oslo.

Tor Holba er født 17. mars 1956 og bor i Sierra Blanca, Calle 38, Casa 204, 29602 Marbella, Malaga, Spania.

Ved tiltalebeslutning utferdiget av Økokrim 15. januar 2014 er de tiltalte satt under tiltale ved Oslo tingrett for overtredelse av:

### Straffeloven § 276a, jf. § 276 b
For å ha gitt eller tilbudt noen en utilbørlig fordel i anledning stilling, verv eller oppdrag. Med stilling, verv eller oppdrag menes også stilling, verv eller oppdrag i utlandet. Forholdet anses som grovt blant annet fordi handlingen har gitt betydelig økonomisk fordel, fordi det er tale om bestikkelse av utenlandsk offentlig tjenestemann eller fordi det er benyttet uriktig regnskapsdokumentasjon.

### Grunnlag er følgende forhold:
Yara International ASA (Yara) er morselskap i et internasjonalt konsern med virksomhet innen hovedsakelig produksjon og salg av gjødsel og har mer enn 8000 ansatte over hele verden. Selskapet har hovedkontor i Oslo og er notert på Oslo Børs. Den norske stat eier 36,2 % av aksjene.

I perioden 2004 til oktober 2008 var Thorleif Enger konsernsjef i Yara. Kendrick Wallace var Yaras juridiske direktør og satt i konsernledelsen i perioden 2004 til sommeren 2008. Tor Holba satt i konsernledelsen fra 2004 til mai 2012 (fra oktober 2006 som leder for oppstrømsegmentet og prosjekteier for forhandlingene i Libya). Daniel Clauw satt i konsernledelsen i perioden 2004 til høsten 2006 som driftsdirektør og visekonsernsjef, deretter var han engasjert som konsulent direkte underlagt Enger med ansvar for "growth initiatives", en posisjon han hadde frem til september 2007.

Personer som handlet på vegne av Yara medvirket til følgende:

### Post a)
### Gjelder tiltalte nr. 1 Wallace, nr. 2 Clauw, nr. 3 Enger og nr. 4 Holba
I perioden 2004 til 2009 forhandlet Yara med det libyske statlige oljeselskapet National Oil Corporation (NOC) om et samarbeid (joint venture) om gjødselsproduksjon i Libya. En gang, trolig på nyåret 2007, inngikk Wallace på

EXT- WALLACE-00015

14-022670MED-OTIR/05

vegne av Yara avtale om å betale USD 5 millioner eller mer til Mohamed Ghanem, sønn av Shukri Ghanem. Shukri Ghanem var på det tidspunktet oljeminister i Libya og styreleder i NOC. Avtalen hadde sammenheng med Yaras forhandlinger med NOC og Shukri Ghanems rolle der.

Deler av det avtalte beløp, USD 1,5 millioner, ble overført til en konto i Sveits som ble disponert av Mohamed Ghanem. Dette skjedde på følgende måte: Det sveitsiske selskapet Nitrochem Distribution AG (Nitrochem) ble bedt om å forskuttere beløpet for Yara, noe Nitrochem gjorde ved å overføre USD 1,5 millioner til den avtalte kontoen 29. mars 2007. Yara refunderte deretter Nitrochem via Yaras deleide selskap i Sveits, Balderton Fertilizer SA (Balderton). Tilbakebetalingen ble skjult gjennom overfakturering av flere ordinære ammoniakkleveranser fra Nitrochem til Balderton, i perioden oktober 2007 til mai 2008. De aktuelle ammoniakkleveransene ble videresolgt fra Balderton til Yara Switzerland SA (Yara Switzerland), til en pris som også dekket inn den overpris Balderton hadde betalt for råvarene. I realiteten var det således Yara Switzerland som dekket betalingen til Ghanem.

Betalingen ble foretatt samtidig som Yara og NOC var i sluttforhandlinger om "Heads of Agreement" (HoA), som ble undertegnet i april 2007.

Både avtalen og delbetalingen utgjorde en utilbørlig fordel.

Clauw, Enger og Holba ga sin tilslutning, trolig på nyåret 2007, til at det skulle inngås avtale om å betale penger til Shukri Ghanems sønn.

Clauw medvirket videre ved å foreslå at Nitrochem på vegne av Yara kunne forskuttere betalingen på USD 1,5 millioner til Mohamed Ghanem, og ved å kontakte Nitrochem for å sørge for at dette ble gjort.

Enger og Holba deltok i forhandlingene med NOC og undertegnet blant annet "Partnership agreement" i juli 2008 mellom Yara og NOC med kunnskap om at det forelå en avtale om å betale bestikkelser der ikke alle avdragene var betalt. Den endelige avtalen mellom Yara og NOC ble undertegnet i februar 2009.

**Post b)**
**Gjelder tiltalte nr. 1 Wallace, nr. 2 Clauw, nr. 3 Enger**
I perioden fra desember 2006 til våren 2008 forhandlet Yara International ASA (Yara) med Krishak Bharati Cooperative Limited (KRIBHCO) om et samarbeid (joint venture) innen gjødelssektoren i India. Den indiske stat eide 67% av KRIBHCO som administrativt var underlagt Ministry of Chemicals & Fertilizers.

I april 2007 tilbød Wallace og Clauw på vegne av Yara å inngå en avtale med Gurpreetesh Singh Maini, sønn av Dr. Jivtesh Singh Maini. Dr. Jivtesh Singh Maini var på det tidspunkt Additional Secretary and Financial Adviser i Ministry of Chemicals & Fertilizers og styremedlem i KRIBHCO på vegne av departementet Avtaletilbudet med Gurpreetesh Singh Maini hadde sammenheng med Dr. Jivtesh Singh Mainis stilling.

Avtaletilbudet ("Representative Engagement Letter") som ble fremsatt overfor Gurpreetesh Singh Maini, innebar blant annet utbetaling av et engangsbeløp på USD

TRUE COPY

- 3 -

14-0226(MED) SI

250 000 samt et tilbud om at han på nærmere bestemte betingelser skulle få USD 0,50 per metrisk tonn av alle gjødselprodukter som Yara ville komme til å selge i India. Et vilkår for avtalens varighet var at avtalen mellom Yara og Kribcho kom i stand.  I et senere avtaleforslag fra Yara ble engangsbeløpet erstattet med et beløp på USD 3 millioner, som skulle utbetales med USD 1 million pr år i perioden 1. januar 2007 til 31. desember 2009.

Den 16. oktober 2007 betalte Yara USD 1 million på grunnlag av en faktura oversendt fra Gurpreetesh Singh Maini fra det libanesiske selskapet CYC s.a.r.l. Beløpet ble i stedet, og etter forespørsel fra Gurpreetesh Singh Maini, overført fra Yara til en konto i Hong Kong tilhørende selskapet Krystal Holdings & Investments Limited (British Virgin Islands), et selskap i navnet til ektefellene til Jivtesh Singh Maini og Gurpreetesh Singh Maini.

Både avtaletilbudet og betalingen utgjorde en utilbørlig fordel.

Enger medvirket ved å gi sin tilslutning til avtaleforhandlingene med Gurpreetesh Singh Maini og ved å godkjenne utbetalingen på USD 1 million.

Før hovedforhandlingen ble det avholdt to saksforberedende møter.

Berammingstidspunktet ble avklart med alle parter, det samme gjelder tidsavsettingen. Forsvarerne og aktoratet fikk uttale seg om valg av fagkyndige meddommere og ingen hadde innvendinger mot meddommernes habilitet.

Forut for hovedforhandlingen fikk også aktor og forsvarer uttale seg om fagdommers habilitet og hadde ingen innvendinger.

Det ble oppnevnt tolker, hvis navn ble gjort kjent for alle parter forut for hovedforhandlingen.

Hovedforhandling ble holdt i perioden 5. januar. – 26. mars 2015.

Økokrim tok forhandlingene opp på lydbånd som ble delt med forsvarerne etter avtale.

Tiltalte nr. 1 møtte og erkjente seg ikke skyldig etter tiltalebeslutningen.
Tiltalte nr. 2 møtte og erkjente seg ikke skyldig etter tiltalebeslutningen.
Tiltalte nr. 3 møtte og erkjente seg ikke skyldig etter tiltalebeslutningen.
Tiltalte nr. 4 møtte og erkjente seg ikke skyldig etter tiltalebeslutningen.

På dag 2 i forhandlingene gjorde aktor retten oppmerksom på at enkelte av tilhørerne i saken (pressen) tok bilder av skjermene der digitale dokumenter ble vist. Etter å ha hørt aktor, alle forsvarerne og to representanter fra pressen fattet retten følgende:

14-022670MED-OTIR/05

*B e s l u t n i n g:*

*Utgangspunktet i domstolloven § 131a er at det er forbudt å fotografere under hovedforhandlingen. Det er hensynet til privatlivets fred og at rettens forhandlinger ikke skal forstyrres som må veies opp mot informasjonsfriheten. Retten har kommet til å ikke tillate fotografering av dokumenter som vises på skjermene når aktørene viser og leser opp fra dokumentene i saken. Retten begrunner sin avgjørelse med følgende:*

- *både aktoratet og forsvarerne motsetter seg slik fotografering*
- *personvernhensyn, i det det dokumenteres f.eks. fra dagbøker som kan inneholde private notater uten relevans for saken*
- *at ikke hele dokumentet dokumenteres og det kan da være uheldig at dokumentet i sin helhet fotograferes*
- *informasjonsfriheten er i varetatt ved at det ikke er gitt forbud mot private lydbåndopptak*

*Retten finner ikke grunnlag for å forby private lydbåndopptak. Retten viser til at i utgangspunktet er private lydbåndopptak av hovedforhandlingen tillatt. Det er lydbåndopptak til kringkasting (radio eller fjernsyn) som er forbudt. Retten kan forby private lydbåndopptak, men det må være en grunn til det, jfr. domstolloven § 133. En grunn kan være frykt for at lydbåndopptakene kan bli misbrukt. Retten kan ikke se at det i denne saken er grunn til å frykte at pressen eller andre vil misbruke opptakene, f.eks. til å påvirke vitner. En slik generell mulighet foreligger jo, men det er ikke opplyst konkrete forhold i denne saken som gir tilstrekkelig grunn til å forby private lydbåndopptak.*

*Etter dette har retten kommet til at det ikke gis tillatelse til å fotografere skjermene med dokumentbevis under forhandlingene og private lydbåndopptak forbys ikke.*

Beslutningen var enstemmig.

Retten mottok forklaring fra 33 vitner, hvorav flere via videolink, og ett sakkyndig vitne. Det ble for øvrig foretatt slik dokumentasjon som framgår av rettsboken.

Aktor la ned påstand om at tiltalte dømmes i samsvar med tiltalebeslutningen som følger:
1. Kendrick Taylor Wallace dømmes til fengsel i 7 år med fradrag av 3 dager for utholdt varetekt.
2. Daniel Clauw dømmes til fengsel i 6 år med fradrag av 3 dager for utholdt varetekt.
3. Thorleif Enger dømmes til fengsel i 6 år med fradrag av 3 dager for utholdt varetekt.
4. Tor Holba dømmes til fengsel i 3 år med fradrag av 3 dager for utholdt varetekt.

Alle forsvarerne nedla påstand om frifinnelse.



TRUE COPY

- 5 -

14-022670MED-OTIR/05

## I. Innledning

Det er i denne saken tatt ut tiltale for to tilfeller av korrupsjon i henholdsvis Libya og India. De fire tiltalte har alle vært en del av konsernledelsen i Yara International ASA (Yara). Den ene av de tiltalte, (Tor Holba) er fortsatt ansatt i selskapet, men har for tiden permisjon. De tre øvrige tiltalte har sluttet i Yara.

Begge forholdene i tiltalebeslutningen gjelder tilbud/avtale om betaling til sønner av høytstående offentlige tjenestemenn. Forhandlingene i Libya foregikk i perioden 2004-2009, mens forhandlingene i India foregikk i perioden 2006- 2008.

Faktum i saken er omfattende. Det er lagt frem nesten 7000 dokumenter for retten. Selv om ikke alle dokumentene er lest opp i retten og dokumentert, har det vært en stor oppgave for retten å gjennomgå og beskrive sakens faktum. Den delen av faktumbeskrivelsen som fremgår av dommen avsnitt IV, pkt. 1-5 og V 1-6, er i det store og hele hentet fra sakens dokumenter. Etter rettens oppfatning er faktum slik det er beskrevet i avsnitt IV pkt. 1-5 og V, pkt. 1-6 i det vesentlige ubestridt, bortsett fra på et par områder der det fremgår uttrykkelig at retten har foretatt en vurdering av bevisene slik de er fremlagt for retten.

Avsnitt IV, pkt. 6 og V pkt. 7 inneholder rettens vurdering av det beskrevne faktum. I avsnitt VI og VII inneholder rettens vurdering av faktum opp mot korrupsjonsbestemmelsene i straffeloven§ 276a, jfr. 276b (grov korrupsjon) og grensedragningen mot straffeloven § 276c (påvirkningshandel).

Under vurderingen av den enkelte tiltaltes skyld i avsnitt VIII, har retten foretatt en bevisvurdering som på mange punkter avviker fra de forklaringer de tiltalte har gitt i retten. Problemstillingen for retten har vært hvem av de tiltalte som hadde kunnskap om de ulike deler av faktum og når denne kunnskapen ble ervervet.

Korrupsjon er, som retten kommer tilbake til nedenfor, en straffbar handling hvor både den som bestikker og den som blir bestukket har en fordel av handlingen. Det er derfor typisk at alle de involverte parter er interessert i å skjule spor. Det er lite skriftlighet, betalingsstrømmen skjules og kanaliseres ofte til skatteparadiser med begrenset innsyn for utenlandske myndigheter. Det er således en vanskelig bevissituasjon.  Det må likevel settes samme krav til bevis for korrupsjon som for andre forbrytelser.

Ved bevisbedømmelsen under skyldspørsmålet har retten lagt til grunn at det for domfellelse kreves at det er ført fullt bevis for de faktiske forhold, både i objektiv og subjektiv henseende, og at enhver rimelig tvil skal løses til fordel for tiltalte, jf. Rt-1978-882. Bevisbedømmelsen skal foretas på grunnlag av en samlet vurdering av flere momenter som hver for seg kan ha ulik bevisstyrke. Det kreves således ikke at hvert enkelt moment skal være bevist ut over enhver rimelig tvil, så lenge det etter en samlet vurdering av momentene ikke er rimelig tvil om konklusjonen, jf. Rt-2005-1353.

## II. Granskning, etterforskning og tiltale

Advokat Jan Fougner, som ledet den interne granskningen som Yara igangsatte, tok kontakt med Økokrim den 8. april 2011 og Økokrim startet etterforskningen med innledende avhør kort tid etter. Økokrim etterforsket saken i nesten tre år før det ble utferdiget et forelegg mot Yara den 14. januar 2014 og tatt ut tiltale mot de fire tiltalte den 15. januar 2014.

Etterforskningen har vært omfattende. Økokrim har foretatt ransaking i Yara ASAs lokaler i Oslo, i selskapene Balderton og Yara Swiss i Geneve og i Nitrochems lokaler i Basel. Det har også vært foretatt ransaking av Daniel Clauws (Clauw) boliger i Frankrike og hans kontor i Paris, Kendrik Taylor Wallaces (Wallace) leilighet i Paris, hos Nejdet Baysan (Baysan) i Geneve og Friedrich Heister i Zürich (i forbindelse med Helangavtalen, se nedenfor). Baysan har vært avhørt i Bern, Mohammed Ghanem (Ghanem jr.) i Stockholm og Gurpreetesh Singh Maini (Maini jr.) i New Dehli. I alt har det vært avhørt 85 vitner i saken og det har vært foretatt etterforskning i 12 jurisdiksjoner.

Våren 2012 foretok Økokrim en samordnet aksjon i Paris i samarbeid med FBI i USA og fransk politi. Wallace og Clauw ble pågrepet, satt i arrest og avhørt 10. og 11. mai 2012. Den 18. til 19. mai 2012 ble Torleif Enger (Enger), Tor Holba (Holba) og Hallgeir Storvik (Storvik) arrestert og avhørt. Wallace ble igjen avhørt i Brüssel den 18. juni, samt 11. og 12. november 2012. En fransk forhørsdommer foretok avhør av Clauw i Versailles den 2. august og den 29. november 2012.

Det oppstod under hovedforhandlingen spørsmål om de tiltalte hadde blitt foreholdt sine rettigheter etter straffeprosessloven i forbindelse med avhør. Dette gjaldt Clauw og Wallace. Dette ble avklart og retten fikk opplyst at de tiltalte var avhørt som siktede og var foreholdt sine rettigheter i forbindelse med avhør før disse ble foretatt.

Avhørene av Wallace og Clauw i Paris er det dermed ingen prosessuelle problemstillinger rundt. Wallace forklarte seg uten advokat til stede, men han var foreholdt sin rett til å ha advokat til stede under avhøret. Det ble opplyst at Wallace og Clauw ikke fikk se dokumenter under avhørene i Paris. Retten ser ingen betenkeligheter i dette. Det er ikke uvanlig at politiet i utgangspunktet ønsker en fri forklaring uten at de siktede blir presentert bevis.

Forsvarerne har vært spesielt opptatt av avhørene av Wallace i november 2012 i Brüssel. Wallace hadde ikke advokat til stede under disse avhørene. Økokrim hadde invitert en representant fra FBI og en representant fra Justisdepartementet i USA til Brüssel. Wallace var ikke informert om dette på forhånd. Slik retten har oppfattet det, overhørte amerikanerne avhørene av Wallace fra et annet rom. Etter at Wallace var ferdig med avhøret første dag, fikk Wallace vite at representanter fra FBI og det amerikanske Justisdepartementet var til stede. De ønsket å snakke med ham, hvis han selv tillot det.

EXT- WALLACE-00020

Wallace var villig til å snakke med dem. Retten fikk høre opptak av hva representanten fra Justisdepartementet sa til Wallace og det fremkom av dette opptaket at Wallace ble anmodet om å snakke sant. Representanteten fra Justisdepartementet fortalte at han hadde aktorert en mengde store korrupsjonssaker. Han sa videre at han hadde med seg en såkalt "waiver of prosecution" som ville innebære at Wallace ikke ville bli straffeforfulgt for forholdet i USA. USA har ikke regler for dobbelt straffeforfølging ved internasjonal korrupsjon. Representanten fra Justisdepartementet sa deretter at etter å ha hørt Wallace sin vitneforklaring, var det ikke lenger aktuelt å tilby Wallace denne "waiver of prosecution", fordi den var betinget av at Wallace snakket sant. De amerikanske representantene hadde hørt at han hadde endret sin forklaring fra Paris- avhøret og mente at han ikke snakket sant i Brüssel-avhøret.

Retten finner denne fremgangsmåten høyst betenkelig. Det kan synes som om Økokrim har forsøkt å presse Wallace til å forklare noe annet enn han forklarte i Brüssel-avhøret, ved å bringe amerikansk påtalemyndighet inn i bildet under avhør. Slike metoder er ikke akseptable ved avhør av siktede i vårt rettssystem. Det er en viktig rettighet siktede har at han ikke behøver å forklare seg. Retten kan imidlertid ikke finne spor av at dette eventuelle presset på Wallace har hatt betydning for hans senere forklaringer. Wallace har forklart at det han endret fra Paris-avhøret gjorde han i avhøret av juni 2012. Da forklarte han at han ikke kunne ha rapportert til Clauw i Libyaprosjektet, fordi Clauw var ute av konsernledelsen på det aktuelle tidspunkt. Ellers har Wallace sine forklaringer etter Parisavhøret vært preget av at han husker lite. Retten kan derfor ikke se at Wallace sin forklaring har blitt påvirket av FBI og det amerikanske Justisdepartements inntreden i saken, verken i Brüssel, eller av det faktum at en representant fra FBI var til stede under deler av Wallace sin forklaring i retten.

Den 14. januar 2014 utferdiget Økokrim et forelegg mot Yara på kr. 270 millioner og inndragning av vinning med kr. 25 millioner. Forelegget gjaldt, i tillegg til de to poster som denne saken gjelder, også to tilfeller av korrupsjon i Russland der det ble betalt ut henholdsvis USD 2, 8 millioner og ca USD 1,14 millioner.

Yara vedtok forelegget og erkjente i tillegg straffeskyld. Det siste er ikke nødvendig ved vedtakelse av forelegg. Verken Jørgen Ole Haslestad (Haslestad) som var konsernsjef da forelegget ble vedtatt, eller Øyvind Lund (Lund), som var styreleder, kunne forklare hvorfor Yara erkjente straffeskyld. Retten har ved sin bevisvurdering i saken ikke lagt vekt på at Yara har erkjent straffeskyld for selskapets del. Bevisene er vurdert for de enkelte tiltalte uavhengig av selskapets erkjennelse av straffeskyld.



14-022670MED-OTIR/05

### III. Bakgrunnsinnformasjon

<u>1. Yarakonsernet</u>

Frem til mars 2004 var gjødselvirksomheten i det som i dag er Yara en divisjon i det
børsnoterte Norsk Hydro ASA (Hydro). På dette tidspunkt ble divisjon Agri skilt ut fra
Hydro som et eget selskap gjennom en fisjon.

I årene forut for etableringen av Yara hadde virksomheten gjennomgått en betydelig
restrukturering som innebar at selskapet våren 2004 fremstod som meget
konkurransedyktig og var verdens største produsent av mineralgjødsel. Dette var en
posisjon selskapet hadde bygget opp over de 100 år Hydro hadde eksistert.

Beslutningen om å skille ut divisjon Agri i et eget selskap var basert på en vurdering om at
selskapet lettere ville kunne realisere en vekststrategi som et frittstående selskap.
Selskapet ble børsnotert i forbindelse med utskillelsen.

Enger, som tidligere hadde ledet utbyggingen av Osebergfeltet i Nordsjøen og senere Olje
& Gassdivisjonen i Norsk Hydro ASA, ble den 1. januar 1999 tilsatt for å lede
snuoperasjonen innen gjødselområdet.  Ved etableringen av Yara ble han konsernsjef og
det ble samtidig valgt et styre med Lund som styreleder.

Foruten konsernsjefen bestod ledergruppen av de samme personer som utgjorde
ledergruppen før utskillelsen. Clauw var driftsdirektør, Holba var ansvarlig for
nedstrømsvirksomheten, mens Wallace var juridisk direktør.  Alle disse rapporterte direkte
til konsernsjefen. I løpet av den tidsperioden som er viktig for denne saken, skjedde det
noen organisatoriske endringer som berørte nevnte personer. Clauw gikk sommeren 2006
av som driftsdirektør og gikk inn i en stilling som rådgiver med et spesielt ansvar for
vekststrategien (special growth initiatives) i selskapet.  Han rapporterte også i denne
stillingen til Enger og hadde denne posisjonen frem til han sluttet i Yara sommeren 2007.
Holba ble sjef for oppstrømsvirksomheten høsten 2006, mens Wallace var juridisk direktør
inntil han gikk av med pensjon sommeren 2008.

I tillegg til de nevnte personer, var de viktige posisjonene i konsernledelsen på
utskillelsestidspunktet besatt av personer med erfaring fra ulike posisjoner i Hydro/divisjon
Agri.  Dette gjaldt finansdirektør, sjefen for oppstrøms-, industrivirksomheten (tilsatt etter
fisjonen) og personaldirektøren.  For blant annet å ivareta kontakten med investormarkedet
ble det tilsatt en kommunikasjonsdirektør med ekstern bakgrunn.  Vedkommende ble også
en del av konsernledelsen.

Under rettsforhandlingene har både de tiltalte og flere vitner uttalt at Enger hadde en
uformell og delegerende lederstil. Han utøvet sitt lederskap blant annet gjennom periodiske
ledermøter hvor konsernledelsen deltok.  Det ble laget referat fra ledermøtene.

EXT- WALLACE-00022

ledermøtene ble aktuelle prosjekter diskutert og behandlet før eventuell etterfølgende fremleggelse for styret i Yara.

Retten har også fått opplyst at et grunnleggende prinsipp i selskapet var at hvert prosjekt var ansvarsmessig forankret hos en prosjekteier i konsernledelsen.

Systemer og rutiner for drift og oppfølging av virksomheten som var bygget opp mens gjødselvirksomheten gjennom divisjon Agri fortsatt var en del av Hydro, ble videreført og videreutviklet i Yara. Her nevnes spesielt at medarbeidere i internrevisjonen i Hydro fulgte med ved utskillelsen og ble ansatt i tilsvarende stillinger i det nye selskapet. De etiske regler som var etablert i Hydro ble benyttet som utgangspunkt ved utarbeidelsen av tilsvarende regler og rutiner i Yara.

Yara hadde en vekststrategi og selskapet tok aktivt del i den pågående omstruktureringen av gjødselindustrien i de årene denne saken omfatter. Selskapet gikk i 2005 inn på eiersiden i så vel en russisk som en australsk gjødselfabrikk. I 2006 overtok Yara en brasiliansk produsent og inngikk et strategisk samarbeid med en kinesisk gjødselprodusent. I denne perioden ble det også vedtatt et femte byggetrinn ved verdens største ureafabrikk, Quafco i Quatar, hvor Yara eier 25%.

Ekspansjonen fortsatte i 2007 med kjøpet av finske Kemira Grow How og bygging av ny ammoniakk- og ureakapasitet i Quatar. 2007 var også året hvor "Heads of Agreement" (HoA) med det The National Oil Comany of Libya (NOC) ble undertegnet.

I 2006 inngikk Yara en Joint Venture (JV) avtale med det sveitsiske selskapet Balderton. Avtalen innebar at Yara kjøpte 50% av aksjene i selskapet fra Nejdet Baysan (Baysan), som var gründeren og lederen for selskapet. Han fortsatte som 50% eier og leder av selskapet også etter avtaleinngåelsen. Målsettingen med denne satsingen var å styrke tilgangen på konkurransedyktig priset ammoniakk og gjødsel fra andre produsenter. I tillegg ville det være en alternativ salgskanal for Yaras egne produkter. Avtalen om å gå inn på eiersiden i Balderton var også motivert av at man ikke ønsket å integrere Yaras lange norske industrielle tradisjoner med den meglerorienterte kulturen som rådet i Balderton. Yara overtok senere Balderton 100%.

Blant annet disse oppkjøp og avtaler bidro til at Yara i perioden 2004-2008 mer enn doblet omsetningen og i den samme perioden økte nettoresultatet fra NOK 3,8 mrd. i 2004 til NOK 8,2 mrd. i 2008. Aksjeverdien av selskapet steg betydelig i den samme perioden. Yara lyktes således med å realisere den uttalte målsettingen om vekst både i omsetning og resultat. En vekst som medførte at Yara ble et av de største aksjeselskaper i Norge målt i børsverdi.

14-022670MED-OTIR/05

Enger sluttet i Yara den 1. oktober 2008 og ble etterfulgt av Haslestad som hadde sittet i styret i selskapet fra generalforsamlingen i 2006.

2. Yaras interne rutiner og kontroll rettet mot forhindring av korrupsjon
Det er under rettsforhandlingene dokumentert en rekke tiltak iverksatt fra selskapets side for å kontrollere risikoen knyttet til korrupte transaksjoner.  Det er også ført flere vitner som har forklart seg om dette.

Det fremstår således for retten at det ble nedlagt et betydelig arbeid fra selskapets side for å kontrollere risikoen for uønskede transaksjoner.  Dette hadde sitt naturlige utgangspunkt i at lovgivningen i store deler av verden, herunder Norge, ble skjerpet i tråd med de anbefalinger som ble utarbeidet av OECD, EU og FN.  Man hadde dessuten erfart hvilke konsekvenser manglende kontroll innenfor området hadde forårsaket for internasjonale selskaper, herunder vårt eget Statoil.

Det var juridisk direktør som hadde ansvaret for etiske regler og regler for god forretningsskikk (Code of Conduct og Compliance). Wallace utabeidet i november 2005 nye retningslinjer som ble presentert for organisasjonen. I presentasjonen "Corporate Social Responsibility and Code of Conduct" fremgår det følgende:

> *Getting Guidance*
> - *Most questions are simple. The language of the Code of Conduct has been kept simple on purpose – so that the rules are clear and plain. Common sense and good judgement will normally provide the right answer to questions that may arise about most matters.*
>
> - *If you do have a questions about an action or proposal, ask yourself these questions:*
>   - *Is it fair?*
>   - *Is it legal?*
>   - *Is it clear that Yara would not be embarrassed if this were public knowledge?*
>   - *Would I approve of this if I were a customer, supplier, partner or other person directly affected by it?*
>
> *The answer to all of these questions must be Yes.*

Om ledelsens ansvar heter det i presentasjonen:

> *What do we need to do as leaders*
> - *Lead according to the ambitions and commitments in Yara's Code of Conduct in terms of both words and actions*

TRUE COPY

14-022670MED-OTIR/05

EXT- WALLACE-00024

- *Promote Yara's ambitions and commitments and be available to anyone with concerns, questions or complaints*
- *Encourage all employees to raise issues and concerns about the Code of Conduct and Sustainability policy*
- *Take seriously all concerns, complaints and questions*

Retten har ikke funnet grunn til å gå detaljert inn på det arbeid som Yara gjennomførte med de etiske retningslinjer for å vurdere deres hensiktsmessighet. De handlinger retten i dette tilfelle skal vurdere retter seg mot personer i selskapets konsernledelse og dets konsernsjef. Retten ser det slik at disse personer som gruppe, og også langt på vei enkeltvis, var i en posisjon hvor de kunne sette selskapets kontroll og rutiner til side. Det er ethvert kontrollsystems begrensning at så kan skje.

Det eneste retten vil bemerke er at det arbeid som ble utført synes å ha hatt de ønskede virkninger overfor organisasjonen under konsernledelsen. Det vises her til at de transaksjoner som denne saken dreier seg om vedrørende Libya, ble brakt til overflaten mest trolig fra interne kilder. Betalingstransaksjonen for honoreringen av Maini jr. ble nektet gjennomført fra selskapets kontor i Singapore. Begge disse forhold indikerer at forståelsen i organisasjonen av selskapets nedfelte prosedyrer var til stede.

## IV. Tiltalebeslutningens post a): Libyaforholdet

### 1. Innledning

Frem til omkring 2001 var Libya, på grunn av sin påståtte tilknytning til internasjonal terrorisme, underlagt internasjonale sanksjoner. Disse innebar at landet blant annet var underlagt eksportrestriksjoner for olje og gass, som var en viktig inntektskilde for landet.

Disse sanksjonene ble etter hvert opphevet, noe som medførte fornyet interesse blant internasjonale selskaper for å engasjere seg i Libya. Landet hadde behov for internasjonal kapital, teknologi og kompetanse for å ruste opp anlegg og virksomheter innen ulike sektorer.

Kontakten mellom Yara og NOC startet allerede i 2002 før Yara ble fisjonert fra Hydro. Interessen synes fra Yaras side i første omgang å være tilgang til libysk gass til anleggene i Italia. Libyerne ønsket på sin side investorer bl.a til ureafabrikken i Marsa El Brega som var en del av et større integrert petrokjemianlegg eiet av NOC. Planen var at gjødseldelen av dette anlegget skulle skilles ut og legges inn i et nytt selskap. Dette selskapet skulle være eiet av NOC og en utenlandsk investor. Det er fremkommet opplysninger under saken om at Yara, i kraft av å være verdens største produsent av gjødsel, var libyernes foretrukne samarbeidspartner. Tanken var at Yara kunne tilføre prosjektet den nødvendige tekniske kompetanse, markedstilgang gjennom Yaras internasjonale distribusjonssystem og derigjennom bidra til utviklingen av virksomheten.

14-022670MED-OTIR/05

EXT- WALLACE-00025

For Yara representerte dette en interessant mulighet fordi det passet med selskapets vekststrategi og ville styrke selskapets posisjon i betjeningen av det europeiske markedet for urea, og spesielt markedet rundt Middelhavet. Forutsetningen var at man kunne oppnå en gunstig langsiktig gassavtale og forhandle frem en pris for en inntreden i selskapet som sannsynliggjorde en fornuftig forrentning av investeringen.

Det var godt kjent for Yara at det var store utfordringer med korrupsjon i Libya. Retten viser til en e-post fra Holba av 3. juli 2002 til bl.a. Clauw og Willem Sloot (Sloot), hvor Holba redegjør for problemene forbundet med å gjøre forretninger i Libya, herunder at det var vanskelig å komme i kontakt med de riktige beslutningstakerne i NOC og ministeriene. Sloot var prosjektleder da Holba overtok og jobbet ved Brüssel-kontoret. Retten har også merket seg at Hydro i 2001 besluttet å trekke seg ut av Libya på grunn av korrupsjonsfaren i landet.

## 2. Prosjektstart og prosessen frem til engasjementet av Ghanem jr.
Yara og NOC hadde flere møter i perioden frem til det ble inngått en Memorandun of Understanding (MoU) i april 2004 med tanke på et JV som omfattet ureafabrikken. Et teknisk team fra Yara gjennomførte en besiktigelse av anleggene i Marsa El Brega i juni 2004. Kort tid etter utferdiget Yara en "business proposal" til NOC.

Den 5. oktober samme år var det et møte i Brüssel hvor representanter fra NOC og Yara vurderte grunnlaget for etablering av et JV. For å få grunnlag for diskusjonene ble det besluttet å engasjere en uavhengig rådgiver, Booz Allen Hamilton, som skulle foreta en vurdering av verdien av anleggene som skulle inngå i transaksjonen. Yara engasjerte også velrennomerte lokale og internasjonale advokater til å bistå seg i prosessen. Delegasjonen ble fra libysk side ledet av Omar Gazal, styreleder i Oil & Gas Downstream Investment Committee (ODIC).

Yara hadde et møte med NOC den 17. januar 2005, hvor NOC aksepterte at Yara skulle ha en eierandel i JV på 50 % og øke eierandelen på et senere tidspunkt. NOC skulle også forberede informasjon som Booz Allen Hamiltons verdivurdering skulle basere seg på.

Den videre gangen var at prosjektet den 31. januar 2005 ble formalisert i et ledermøte i Yara med Sven Ombudstvedt (Ombudstvedt) og Sloot, som henholdsvis prosjekteier og prosjektleder. Denne beslutningen ble etterfulgt av tekniske inspeksjoner av anleggene fra Yara sin side, samt ferdigstillelse av verdivurderingen fra Booz Allen Hamilton. Denne viste et verdianslag på anleggene på USD 129 millioner, forutsatt en gasspris på USD 1/mmbtu. Den 14. juni 2005 ble ledergruppen informert om at NOC var innstilt på å fortsette forhandlingene med Yara med sikte på en JV-avtale. Fra presentasjonen for ledergruppen fremgår at de videre forhandlingene ville fokusere på følgende områder:

*Gas supplies/ entrance price in JV*

14-022670MED-OTIR/05

*Ownership and company structure*

*Yara technical and operational management*

*Sales and marketing agreement*

*Principles for carve out and assets to be included*

*Relations to "neighbouring" bodies regarding people, services and supplies (NOC will be contract partner)*

*Principles for dealing with plant extension/new plants*

*Final Due Diligence*

På ledermøte den 30. august 2005 ble det foreslått at Yara skulle fremsette et forslag til "Heads of Agreement" ("HoA") som skulle inneholde alle vesentlige betingelser i en JV-avtale, herunder de ovenstående forhold og en prisformel for gassprisen, uttrykt som en funksjon av prisen på urea.

Basert på Booz Allen Hamiltons verdivurdering og egne beregninger av prosjektet, tilbød Yara en pris på USD 65 millioner for 50% av det nyetablerte selskapet, basert på en forutsetning om en 25 årig gassavtale og en variabel gasspris på USD 1/ mmbtu knyttet til prisutviklingen på urea.  Tilbudet var basert på flere forutsetninger, blant annet at Yara skulle ha ansvaret for all distribusjon av produksjonen fra anlegget.

Dette ble starten på en lang forhandlingsprosess med flere tilbud fra Yara sin side.

Yara møtte Omar Gazal den 23. september 2005 for å diskutere utkastet til HoA og presentasjonen overfor NOCs ledelse. I en presentasjon for ledergruppen i Yara den 6. oktober 2005 fremgår det følgende:

*Key feedback from Mr. Gazal (NB! This was not a negotiation, but a strong advice from Gazal for our proposal to NOC) :*

*– not accept right of first refusal to JV for new projects in Libya,*

*new proposal: right of first refusal on projects in Marsa el Brega*

*– not accept option to Yara to buy more than 50% (proposed up to 80%),*

*new proposal: Parties express strong intentions to move Yara up to 80%*

*– Gas price formula should be linked to urea, but without floors and ceilings,*

*new proposal: Linear link with 1 USD/MMBTU at urea price = USD 150 – 1% increase in urea price = 1% increase in gas price.*

*– Indicated that key issues will be gas price and marketing agreement (questions our proposal on 3% commission)*

TRUE COPY

Den 12. oktober 2005 sendte Gazal et brev til Sloot, der han bl.a tok opp at NOC ønsket at inngangsverdien i JV skulle baseres på substans- og ikke avkastningsverdi. Basert på dette utspillet svarte Yara i brev av 24. oktober bl.a at verdivurderingen av anlegget kunne økes til USD 150 millioner, dvs. USD 75 millioner for 50% av selskapet.

Den 1. desember 2005 ble det i ledermøte foreslått å forbedre tilbudet ytterligere ved at prisen ble øket fra USD 75 millioner til USD 100 millioner for 50% av selskapet. Det er ikke fremlagt dokumentasjon for retten som viser bakgrunnen for denne siste økningen av tilbudet. Tilbudet ble meddelt Gazal i et brev datert 9. desember 2005. I utkastet til HoA, som var vedlagt brevet, fremgikk det at Yara foreslo at partene inngikk en 25 års gassforsyningsavtale og en gasspris på USD 1/mmbtu. Yara bekreftet også sitt samtykke til en revidert, mer ambisiøs tidsplan. Dette forutsatte at begge parter oppnådde styregodkjennelse innen 31. januar 2006 og at transaksjonen skulle gjennomføres innen 30. juni 2006.

Gazal sørget for at NOCs styre fikk oversendt en full rapport over prosjektet med de siste endringer i slutten av desember 2005. NOC hadde da to avtaleforslag de skulle vurdere. Ett fra Yara og ett fra DOW Chemicals. Dow Chemicals var ikke gjødselsprodusent og dermed ikke direkte konkurrent av Yara. Det var forventet at NOCs styre ville ta stilling til avtaleforslagene i januar 2006.

Sloot var i telefonisk kontakt med NOC den 16. januar 2006 og fikk da vite at utkastet til JV-avtale var sendt til regjeringen. NOCs styre hadde ingen kommentarer. Prosjektet ble presentert for ledergruppen igjen den 7. februar 2006. Det fremgår av presentasjonen at det på dette tidspunktet ikke forelå noen formell tilbakemelding fra NOC.

Deretter fulgte en periode med stillstand i dialogen mellom partene og i slutten av mars mottok Yara informasjon fra Gazal at det ville ta tid før de kunne komme tilbake. Dette ble forklart med at en ny styreleder ville ta over i NOC og at det var endringer i rapporteringsreglene, ved at styreleder i NOC for fremtiden skulle rapportere direkte til statsministeren. Det fremgår av presentasjonen for ledergruppen i møte den 4. april at tilbakemelding ikke var forventet før etter 2-3 uker.

Den nye styrelederen var dr. Shukri Mohammed Ghanem (dr. Ghanem), som den 2. mars 2006 gikk av som statsminister og ble erstattet av sin egen visestatsminister. NOC fungerte, slik retten forstår det, som Libyas olje og energidepartement. Dette er lagt til grunn i et kort nyhetsnotat på Regjeringen.no den 8. desember 2006 i forbindelse med daværende oljeminister Enoksens reise til Libya:

*Etter omrokkeringen i den libyske regjeringen tidligere i år fungerer det nasjonale oljeselskapet også som et olje- og energidepartement.*

TRUE COPY

14-022670MED-OTIR/05

EXT- WALLACE-00028

Forsvarerne har hatt innvendinger mot Økokrims benevnelse av Dr. Ghanem som oljeminister (i tiltalen) og som "de facto" oljeminister (i retten). Det ble bl.a. vist til en rapport fra CERA, hvor det fremgår at dr. Ghanems utnevnelse til styreformann i NOC med direkterapportering til statsministeren, bekrefter libyske myndigheters ønske om å fortsette reformene i oljesektoren. Det fremgår av rapporten at beslutningsmyndigheten ville forbli kompleks og prosjektbasert. At beslutningsmyndigheten fortsatte å være kompleks, tilsier ikke at NOCs posisjon som fungerende olje- og energidepartement var svekket. Slik retten vurderer faktum på dette punkt, underbygger dr. Ghanems rolle som styreleder i NOC med direkterapportering til statsministeren hans fremtredende rolle i oljepolitikken. Dette faktum, kombinert med NOCs posisjon, tilsier at dr. Ghanem i realiteten fungerte som Libyas oljeminister fra han ble utnevnt som styreleder i NOC og retten legger til grunn at benevnelsen av dr. Ghanem som "de facto" oljeminister er dekkende.

Dr. Ghanem var far til Ghanem jr. som senere ble engasjert av Yara. Engasjementet av Ghanem jr. er presentert i et eget avsnitt nedenfor.

Den neste utviklingen i forhandlingene skjedde som en følge av et møte mellom Enger og dr. Ghanem den 18. juni 2006 i Tripoli.  Møtet kom til på initiativ fra Yara ved Enger.  Dr. Ghanem og Enger ble enige om de overordnede prinsippene for samarbeidet og om at forhandlingsteamene skulle ferdigforhandle hovedprinsippene i løpet av en tre-ukers periode. Dette fremgår av referat fra ledelsesmøtet den 27. juni 2006.

Den 3.- 4. juli 2006 ble det avholdt et nytt møte mellom NOC og Yara i Tripoli. Det fremgår av et kort referat fra møtet at HoA skulle reflektere hovedpunktene i avtalen mellom partene. Partene ble enige om at forhandlingene skulle være ferdigstilte og styregodkjennelse foreligge i begge selskaper innen 31. juli 2006.

Denne fremdriftsplanen ble heller ikke overholdt. I en presentasjon for ledergruppen fremgår det også at partene hadde blitt enige om en forandring i gassprisformelen og at verdien på anlegget ble hevet fra USD 200 millioner til USD 225 millioner.

Forslaget til avtale mellom partene skulle sendes til regjeringen for godkjennelse i august 2006. Dette forslaget av 27. juli 2006 ble mottatt og vurdert av dr. Ghanem, som styreleder i NOC.

Basert på forhandlingene ga styret i Yara i september 2006 administrasjonen v/ Enger fullmakt til å inngå avtale innenfor en ramme på USD 130 millioner for en 50 % andel i JV under etablering.

Til tross for enigheten om vilkårene fikk Yara den 11. oktober 2006 tilbakemelding fra Gazal om at NOCs toppledelse hadde reservasjoner når det gjaldt det økonomiske utbyttet av prosjektet og foreslo et nytt møte. Sloot møtte så NOC i Tripoli den 30. oktober. Tilbakemeldingen fra dette møtet var at de libyske myndigheter hadde godtatt alle deler av prosjektet bortsett fra gassprisen. NOCs analyser viste at gassprisformelen som var foreslått, ville gjøre det mer lønnsomt for NOC å videreføre virksomheten uten å ta inn en ny eier.

Denne tilbakemeldingen dannet grunnlaget for nye beregninger som resulterte i at man fra Yara sin side fant det økonomisk forsvarlig å øke gassprisen fra USD 1 til USD 1,30/ mmbtu.   Det forbedrede tilbudet, det fjerde i rekken, ble fremlagt i et møte med Gazal i Hamburg den 24. november 2006. På dette møtet deltok også Holba. Han hadde i løpet av sensommeren og høsten 2006 overtatt ansvaret for oppstrømsvirksomheten i Yara. Libya-prosjektet sorterte under denne divisjonen. Prosjektet ble på dette tidspunktet flyttet fra Brüssel- til Oslokontoret.

Den neste utviklingen i saken var at Gazal den 17. januar 2007 informerte Yara ved Sloot om at han hadde levert sin rapport om prosjektet til styret i NOC og til myndighetene, som skulle diskutere saken på sitt neste møte den 22. januar 2007. Slik behandling fant ikke sted, men det ble senere mottatt informasjon om at saken skulle diskuteres på det påfølgende møtet som var berammet til den 10. februar 2007.

Den 27. februar 2007 mottok Yara en tilbakemelding fra NOC ved styreleder dr. Ghanem. Dette var ikke en aksept av Yaras fjerde og siste tilbud, men et nytt forslag med noen vesentlige endringer. De viktigste endringene var at Yara skulle tilføre JV USD 225 millioner i kontanter i stedet for å betale til NOC for 50% andelen og at gassprisen skulle være på minimum USD 1,30/mmbtu.  NOC skulle skyte inn anleggene som et tingsinnskudd.   NOC fremsatte også krav om at det ikke skulle foretas oppsigelser ved anlegget med mindre det ble skaffet alternativ sysselsetning.  Enger bekreftet rett etter, i et brev datert 1. mars 2007 til dr. Ghanem, at Yara var tilfreds med beslutningen i NOC og aksepterte de nye kravene.  Han foreslo at forhandlingsteamene ble enige om utestående punkter i HoA og at de to deretter skulle treffes for å undertegne avtalen.

Den kronologiske gjennomgangen ovenfor er basert på fremlagte dokumenter i saken.  I mars 2007 hadde diskusjonene med NOC pågått siden 2004. Som påpekt av forsvarerne gikk utviklingene i forhandlingene utelukkende i NOCs favør. Fra utgangspunktet på et tilbud på USD 65 millioner for 50 % av JV og en gasspris på USD 1/mmbtu i august 2005, var tilbudet i januar 2007 økt til at Yara skulle tilføre USD 225 millioner i kontanter til JV og en gasspris på USD minimum 1,30/mmbtu. Retten legger til grunn at Yara ikke konkurrerte med andre om å etablere et JV for produksjon av urea. Yaras forhandlingsvilje viser derfor at det var svært viktig for Yara å lykkes med å få etablert et JV med NOC.

**TRUE COPY**

14-022670

3 Engasjement av Ghanem jr.

Før Libya-prosjektets videre fremdrift blir beskrevet vil retten redegjøre for engasjementet av Ghanem jr. Denne prosessen startet i desember 2006 og pågikk i en separat prosess parallelt med forhandlingene om de kommersielle vilkår for Yaras inntreden på eiersiden i anleggene i Marsha El Brega.

Yara ble introdusert til Ghanem jr. av Zafer Nahawi (Nahawi) som var Yaras representant i Midt-Østen. Han ble av de tiltalte og flere vitner beskrevet som en person som hadde et stort kontaktnett i området og som snakket arabisk. Nahawi ble invitert til å være med på prosessen i Libya allerede i mai 2004. Det presiseres i en e-post fra Sloot at dette skulle være konfidensielt "within Yara", som må bety at bare forhandlingsteamet skulle ha informasjon om Nahawis deltakelse.

Det er noe uklart for retten når Ghanem jr. ble introdusert. Det er dokumenter i saken som tyder på at han kan ha vært kontaktet allerede i mai 2005. Sloot nevnte bl.a i en e-post av 23. mai 2005 til Nahawi at det kan være av interesse å møte hans kontakt. Videre er Nahawis kontakt nevnt i en e-post fra Sloot til Ombudstvedt den 23. januar 2006:

> FYI; spoke with Zafer and according his contact in Libya, the Yara and Dow Chemical proposals were being discussed inside NOC and Government.

Denne kontakten må ha vært Ghanem jr. Retten viser her til Wallaces forklaring under hovedforhandlingen. Wallace hadde ikke informasjon om at Nahawi hadde andre aktuelle kontakter.

Ghanem jr. ble født i 1977. Han er utdannet fra Webster College i Wien og har en MBA fra Glamorgan University i Wales. I tillegg har han lederkurs fra MIT i USA. Ghanem jr. arbeidet for Nahawis bror i Arab Banking Corp. i Bahrain. Wallace har for retten forklart at han fikk informasjon om Ghanem jr. under et møte med Nahawi i Paris den 2. desember 2006.

Basert på denne informasjonen ble det avtalt et møte mellom Wallace og Ghanem jr. i Bahrain den 18. januar 2007 hvor et engasjement med ham ble diskutert. Wallace forklarte i retten at Nahawi også deltok på dette møtet. Det var Wallace som førte diskusjonene med Ghanem jr. fra første stund. Etter møtet sendte Ghanem jr. en e-post til Wallace hvor han takket for møtet i Bahrain og bl.a opplyste at han ville dra til Libya og komme tilbake med gode nyheter, jfr e-post av 28. januar 2007:

> As per our earlier conversation, I will be going to Libya for a week and will be back with good news

TRUE COPY

Møtet i Bahrain ble fulgt opp med et utkast fra Yaras side til konsulentavtale mellom Yara og selskapet Saudi Logistics and Support (SALT). Dette var selskapet Ghanem jr. nominerte som oppdragstaker vis a vis Yara for engasjementet.

Dette første utkastet, som er datert 6. februar 2007, regulerte hvilke tjenester Ghanem jr. skulle levere, samt kompensasjonen for tjenestene. Rådgiverrollen ble definert til å gi bistand til Yara for å gjennomgå og vurdere verdien av anleggsmidlene, samt rådgivning når det gjaldt transaksjonsstruktur, vilkår, regulatoriske forhold, logistikk, forsyningsmuligheter mm i forbindelse med overtakelse og utvikling av anleggene.

Den 12. mars 2007 ble det avholdt et nytt møte mellom Wallace og Ghanem jr. i London for å bli enige om det endelige avtaleutkastet. Nahawi deltok også i dette møtet. Her ble et utkast nummer to til konsulentavtale diskutert. I likhet med det første utkastet skulle avtalepartene være SALT og Yara Nederland BV. Fra det siste utkastet til konsulentavtale siteres følgende:

> (...)to act as the Company's advisor during the negotiations with the Libyan National Oil Company ("NOC") and other Libyan governmental bodies regarding the establishment of a fertilizer production and marketing joint-venture company utilising the existing fertilizer production facilities located at Marsa el Brega in Libya ("the Transaction"). The Company's proposal for the Transaction to the NOC has been approved by the NOC and the Libyan Council of Ministers. Based upon such approvals, it is now necessary that negotiations of detailed documents relating to the project must be commenced and concluded over a period of several months. Conclusion of such negotiations and execution of definitive documents (the "Closing") is anticipated prior to 30 June 2007. A significant component of the Transaction will be the improvement and upgrading of the production facilities and infrastructure as necessary to bring the production facilities into competitive, world-class condition. In this connection, Yara will require the advice of consultants with experience in major construction and logistics projects in the Middle East in addition to its own experience in Qatar.

Forskjellen mellom de to utkastene er meget små, idet rådgivers arbeidsoppgaver er nesten uendret fra utkast nummer en til utkast nummer to. Det siste utkastet, som er gjengitt overfor, er noe mer detaljert i å beskrive at det vedrører det konkrete anlegget i Marsa El Brega. Den siste setningen i utkastet over om at Yara ville trenge råd fra konsulenter med ekspertise fra store kontruksjons- og logistikkprosjekt i Midt-Østen var ikke med i det opprinnelige utkastet. Rådgivers øvrige arbeidsoppgaver er i det siste utkastet definert som følger:

### 1. Role of the Advisor and Basis of Appointment

*Based upon the receipt of the approvals required to commence the Transaction that have been received, the Company and NOC are preparing to commence*

14-022670MED-OTIR/05

TRUE COPY

*preparations for the Closing and implementation phase. In this respect, Advisor will perform the following services as the Company may require:*

i)   *Advise and assist the Company's accounting and legal advisors during the set up of a data room for the detailed assessment of the Marsa el Brega facilities in accordance with agreed deadlines;*

ii)  *Advise and assist the Company's accounting and legal advisors during the evaluation of the Marsa el Brega assets which are to be contributed by NOC to the future joint-venture company in accordance with agreed deadlines;*

iii) *Advise and assist the Company in conjunction with its other professional advisers in considering alternative structures for the Transaction;*

iv)  *Advise and assist the Company in conjunction with its other professional advisers in the negotiation of the terms and conditions of the definitive and binding agreements of the Transaction which are envisaged to be signed at Closing, i.e. (without limitation) Share Purchase Agreement, Service Agreements, Gas Supply Agreement etc.;*

v)   *Provide, on request, strategic advice regarding regulatory issues, logistics, supply, procurement and infrastructure development or other specialist or technical advice or services relating to the development of the Marsa el Brega site; and*

vi)  *Carry out such additional duties in relation to this Engagement (if any) as may be agreed in writing by Advisor and the Company from time to time.*

Den vesentligste forskjellen mellom utkastene er at det faste honoraret var øket fra USD 1 million til USD 1,5 million USD. Videre ble det gjort visse tilpasninger i datoene som definerer suksessprovisjonens størrelse. Det ble også lagt inn noe lengre tid før suksessprovisjonen skulle reduseres fra det definerte beløpet på 3 millioner USD. I avtalen er honoraret til rådgiveren beskrevet som følger:

### 2. Fees, Expenses and Payment Terms

*In consideration of Advisor agreeing to provide such of the services specified in clause 1 as the Company may require, the Company agrees to pay to Advisor the following:*

(a)   *a retainer of US$ 1.5 million within 14 days following the execution hereof in consideration of the services to be provided during the negotiation of the definitive documents resulting in the Closing; and*

(b)   *an all-inclusive lump sum of US$ 3 Million ("Closing Fee") within 14 days of the Closing of the Transaction and the execution of all necessary definitive agreements, PROVIDED that the Closing of the Transaction occurs on or before 30 September 2007. If, for any reason whatsoever, Closing were not to take place on or before 30 September 2007 but between 30 September 2007 and 31 December 2007, then Advisor shall be entitled to a Closing Fee of 50% of the initial fee. If Closing takes*

14-022670MED-OTIR/05

> *place between 1 January 2008 and 31 March 2008 then Advisor shall be entitled to a Closing Fee of 25%. If Closing occurs after 31 March 2008 then no Closing Fee shall be due. The parties acknowledge that this payment mechanism and the timely Closing of the Transaction are of the essence of this Agreement.*
>
> *Irrespective of whether the Transaction proceeds to Closing, the Company will not reimburse Advisor for any of its out-of-pocket and other expenses incurred in connection with this Engagement.*

Under rettsforhandlingene ble det opplyst at avtaleutkastet ikke ble undertegnet. Wallace forklarte for retten at han valgte å basere seg på et muntlig avtaleforhold med Ghanem jr. I sin politiforklaring i Brüssel den 18. juni 2012 forklarte Wallace at en skriftlig avtale kunne skade Yara. Dette viser at Wallace var opptatt av å holde konsulentavtalen skjult. Wallace forklarte også i retten at avtaleforholdet med Ghanem jr. skulle være konfidensielt blant annet for å unngå uønsket publisitet og på grunn av farens stilling. I henhold til Wallace hadde den muntlige avtalen med Ghanem jr. i det vesentlige samme innhold som det siste skriftlige utkastet.

Den 29. mars besørget Yara overførsel av USD 1,5 millioner til selskapet Golden Petal Ltd.'s konto i UBS. Dette var få dager etter at forhandlingsteamene hadde blitt enige om avtalen og initiert denne. Retten ser det slik at det faste honoraret dermed var forfalt. Overførselen ble foretatt av en kunde av Balderton, Nitrochem SA.

Kontakten med Nitrochem ble arrangert ved at Clauw introduserte Wallace for Andreas Zivy (Zivy), som var styreformann i selskapet Ameropa som igjen eide Nitrochem. Beløpet med renter skulle tilbakebetales av Yara Sveits gjennom overfakturering av ammoniakkleveranser. Clauw hadde på forhånd tatt opp dette spørsmålet med Zivy under et møte som også hadde andre temaer. Ifølge Wallace var så vel Yara som Ghanem jr. opptatt av å holde transaksjonen skjult.

Clauw forklarte selv i retten at han ikke visste konkret hva Zivy skulle være behjelpelig med annet enn at det var en betalingsformidling som skulle være diskret. Han sier han ikke visste hvem det skulle betales til eller for hva, men han forklarte i retten at han visste at det var snakk om en betaling til en konsulent og at det gjaldt Libya. Han forklarte også at han forstod at betalingsmetoden var uetisk, men ikke at den var ulovlig.

Golden Petal Limited er registrert på de britiske jomfruøyene og er eiet av Golden Petal Limited Trust. Trustens eneste "beneficial owner" er Ghanem jr. Han er også eneste signaturberettigede. Selskapet ble opprettet i 2002.

I bankens journaler er betalingen beskrevet som en kommisjon på ammoniakkontrakter fremforhandlet av Golden Petal Ltd. Beløpet synes deretter å ha vært brukt til verdipapirinvesteringer gjennom bankens forvaltningsapparater.

EXT- WALLACE-00034

Dr. Ghanem hadde konto i samme bank, og på grunn av hans stilling som statsminister ble både dr. Ghanems og sønnens konto underlagt særlige overvåkningsrutiner. Det er ikke dokumentert bankutskrifter for noen av kontiene som disse personene hadde, bare opplysninger om særlige transaksjoner på Golden Petals konto.  Det kan derfor ikke sluttes at noen del av betalingen fra Nitrochem er overført til dr. Ghanem. Frederic Ceres, som hadde ansvaret for kontoen til Golden Petal, har dessuten i retten opplyst at faren og sønnens konti ble forvaltet helt separat og at de ikke hadde tilgang til hverandres konti. Kontoen til Golden Petal Ltd ble avsluttet i mars 2011 og saldo ble overført til Ghanem jr.´s andre konto i banken.  I mars 2012 ble alle hans konti sperret etter pålegg fra sveitsiske myndigheter.

Allerede før avtalen med Ghanem jr. var ferdigforhandlet og den første provisjonen var betalt, mottok Yara informasjon fra Ghanem jr. om prosessen på libysk side.  Den 28. januar 2007 informerte han Wallace om at han skulle reise til Libya og returnere med "good news" jfr ovenfor siterte e-post.  Wallace har forklart for retten at det var Ghanem jr. som i en e-post av 22. februar 2007 informerte Wallace om beslutningen om at avtalen med Yara var godkjent av myndighetene.  I samme e-post ble det informert om at Dow Chemical hadde oppnådd enighet om en gasspris på USD 1,25/ mmbtu. Vedleggene til e-posten var på arabisk og Wallace sendte vedleggene videre til Nahawi for oversettelse samme dag.

Informasjonen fra Ghanem jr. ble mottatt fem dager før Yara fikk den samme bekreftelsen fra offisielt hold. Den offisielle bekreftelsen kom i form av et brev fra dr. Ghanem til Enger av 27. februar 2007. I dette brevet nevnes ikke avtaleforhandlingene med Dow Chemicals.

### 4 Utviklingen i saken fra undertegning av HoA den 25. april 2007

Etter at det var inngått muntlig avtale om rådgivningstjenester med Ghanem jr. og den første delbetalingen var overført i slutten av mars 2007, ble HoA mellom NOC og Yara undertegnet den 25. april 2007. Det var Enger og dr. Ghanem som undertegnet avtalen på vegne av partene.

Til tross for at HoA ble undertegnet oppstod det nye utfordringer i forhandlingene idet NOC under et forhandlingsmøte i Tripoli 28.-30. august brakte opp en rekke nye momenter.

Dette ledet til at prosjektteamet utarbeidet en oversikt over temaer hvor det var fremkommet uoverensstemmelser mellom partene.  Denne oversikten er i det etterfølgende referert til som "issue list". Denne ble distribuert fra Holba til Enger, Wallace, Ombudstvedt med flere, i en e-post av 7. september 2007.

Den 12. september 2007 reiste Wallace til Dubai sammen med Holba som i likhet med Wallace skulle delta på et styremøte i Burrup (et australsk samarbeidende selskap hvor Yara var deleier). Wallace hadde på forhånd avtalt et møte med Ghanem jr. i Dubai.

Wallace har i retten forklart at han ikke husker hvem som ba ham om å møte Ghanem jr. og heller ikke om han fortalte noen hvem han skulle møte. Det er imidlertid på det rene at hensikten med møtet med Ghanem jr. var å gjennomgå isssue listen og å få råd om hvordan Yara burde forholde seg til de enkelte punkter. Wallace etterlot issue listen hos Ghanem jr. Wallace rapporterte tilbake til Holba og Charles Grey (som var juristen i prosjektet) i en e-post av 14. september og vedla issue listen med de konklusjoner han hadde trukket etter de råd han mottok fra Ghanem jr. Hovedkonklusjonen var at Yara kunne forholde seg til vilkårene i den undertegnede HoA, selv om man på noen punkter ble oppfordret til å vise en viss fleksibilitet.

Det fremgår også i e-posten at: *"the plan is for Tor to go to Tripoli prior to the scheduled meeting in October to meet with dr Ghanem to go over the attached"* (the attached er issue listen). Videre sies det at: *"it is agreed that this cannot be the start of another round of negotiations from scratch"*. Og til slutt sies det: *"finally, it is accepted that unless Omar or his direct assistant is in the meetings, nothing will happen"*.

Disse utsagnene og de forhandlingsposisjoner som angis etter møtet med Ghanem jr., kan ikke fortolkes annerledes enn at Ghanem jr. har vært i kontakt med sin far i forbindelse med møtet med Wallace. Det er denne kontakt som har gitt det resultat som er beskrevet over.

Holba har i retten forklart at han, på det tidspunkt han reiste til Dubai sammen med Wallace, verken kjente til engasjementet med Ghanem jr. eller at han var den kontakten Wallace møtte under sitt opphold. Holba sa at han antok at den kontakten Wallace skulle møte var en person Wallace kjente fra tidligere og som han hadde tillit til. Innholdet i e-posten fra Wallace, det faktum at han etterlot seg issue listen, samt Holbas posisjon som prosjekteier, gjør at retten ikke fester lit til Holbas utsagn på dette punkt.

Etter ytterligere bearbeidelse i prosjektteamet ble issue listen oversendt NOC i brev av 17. september 2007 og ble lagt til grunn for samtaler i møte i Tripoli 16. -18. oktober 2007. Resultatet fra dette møtet ble referert i ledermøte i Yara med at prosjektet nå var *"firmly back on track"*.

De endringer i HoA som denne prosessen resulterte i, ble nedfelt i en ny avtale, "Joint Venture Framework Agreement" som ble undertegnet den 17. februar 2008.

14-022670MED-OTIR/05

EXT- WALLACE-00036

5. Krav om betaling nummer to fra Ghanem jr.

I juni 2008 meddelte Wallace at han ville gå av med pensjon fra og med 1. juli 2008. En tid deretter mottok han en henvendelse fra Ghanem jr. med forespørsel om betaling nummer to i henhold til den muntlige avtalen. Wallace tok dette opp med Holba og de ble enige om å avvise kravet. I retten sa Holba at han heller ikke på dette tidspunkt var klar over at det eksisterte en avtale eller at det allerede var foretatt en betaling i mars 2007.

Holba forklarte i retten at han snakket med personalsjefen, Dalane, om kravet og at hun rådet ham til å snakke med Enger. Holba kontaktet deretter Enger og informerte ham om kravet. Holba har forklart at han informerte Enger om den første betalingen og at det var kommet krav om en betaling nummer to. Enger på sin side forklarte i retten at Holba fortalte han om kravet, men at han ikke kunne huske at det ble informert om at det allerede var foretatt en første betaling.

Retten legger til grunn at Holba fortalte til Enger det han hadde fått vite av Wallace. Det er ingen logisk forklaring på hvorfor han ikke skulle fortelle at det allerede var utbetalt et beløp.

Sammen ble Enger og Holba enige om å avvise kravet.

Haslestad hadde tiltrådt som konsernsjef i Yara i månedsskiftet september/oktober 2008. Etter et møte med konsernledelsen den 11. oktober, hvor Haslestad uttalte at han "ville trekke en linje i sanden", tok Holba også saken opp med ham. Retten legger til grunn at Holba fortalte Haslestad at det allerede hadde blitt betalt et beløp og at kravet fra sommeren 2008 var et nytt krav. Dette forklarte Haslestad også i sin politiforklaring. Haslestad snakket med Faksvåg (ny juridisk direktør i Yara) og Yaras styreformann, Lund, om kravet. Det ble bestemt at kravet ikke skulle betales. Ingen andre, heller ikke Yaras styre, ble informert om betalingen som hadde blitt foretatt i 2007 og om det nye kravet. Det var heller ingen som tok til orde for å foreta en nærmere undersøkelse av saken.

Den 17. juli 2008 ble «Partnership Agreement» undertegnet, mens det endelige avtaleverket først ble undertegnet den 9. februar 2009 og prosjektet gikk deretter over i en operativ fase. Etter flere års forhandlinger ble dermed avtalen formalisert og satt ut i livet.

6. Rettens vurdering av engasjementet av og betalingen til Ghanem jr.

6.1 Innledning

Det fremgår av tiltalen at påtalemyndigheten anser engasjementet av og betalingen til Ghanem jr. som en utilbørlig fordel som rammes av straffeloven § 276a, jfr. grunnlaget for tiltalens post a:

*Både avtalen og betalingen utgjorde en utilbørlig fordel*

Forsvarerne på sin side hevder at avtalen med Ghanem jr. var en ordinær konsulentavtale, som var knyttet til tjenester han skulle utføre og ikke hadde tilknytning til farens posisjon som fungerende oljeminister.

### 6.2 Valget av Ghanem jr. som Yaras konsulent i Libya

Det er på det rene at Ghanem jr. var sønn av en fremstående offentlig tjenestemann som hadde stor myndighet i forhandlingene mellom Yara og NOC, både i egenskap av styreleder i NOC, tidligere statsminister og som Libyas fungerende oljeminister. Dette må Wallace ha visst da Ghanem jr. ble engasjert.

Retten har ikke funnet, verken i dokumentene eller i de øvrige bevis som er ført under hovedforhandlingen, at Ghanem jr. hadde en kompetanse, erfaring eller selvstendige posisjon som kunne være av interesse for Yara utover det faktum at han var dr. Ghanems sønn.

Ghanem jr. var ansatt i en bank i Bahrain og hadde ingen lang arbeidserfaring. I avtaleutkastet som er gjengitt ovenfor fremgår det at Yara trengte råd fra konsulenter med erfaring fra større konstruksjons- og logistikkprosjekter i Midt-Østen. Videre er "Role of the Advisor" oppgitt å være bistand overfor Yara med å gjennomgå og vurdere verdien av anleggsmidlene, transaksjonsstruktur, forhandlinger vedrørende vilkår, samt rådgivning når det gjaldt regulatoriske forhold, logistikk, forsyningsmuligheter mm i forbindelse med overtakelse og utvikling av anleggene.

Retten legger til grunn, som forklart av Wallace i retten, at den muntlige avtalen med Ghanem jr. hadde samme generelle innhold som det siste avtaleutkastet. Hvis det faktisk var denne type behov Ghanem jr. skulle dekke, er det utenkelig at ikke prosjektteamet ledet forhandlingen om avtalen med ham. Dertil kommer at de faktisk ikke hadde slike behov. Retten ser det derfor slik at avtalens definisjon av arbeidsoppgaver ikke hadde noen realitet.

Wallace har forklart at han dro til Bahrain for å møte Ghanem jr. personlig og for å finne ut hva han kunne gjøre for Yara. Wallace har også forklart at det var Ghanem jr.'s kontakter i Libya som var interessante for Yara. Wallace har imidlertid ikke kunnet redegjøre for hva slags kontakter dette var og hva kontaktene kunne bidra med. Wallace forklarte for retten at han ikke spurte Ghanem jr. om dette, noe som også er påfallende. Han forklarte at han forutsatte at Ghanem jr. ikke skulle ha kontakt med sin far i oppdragets anledning. Retten fester ingen lit til Wallaces forklaring på dette punkt.

### 6.3 Konsulentavtalens innhold

Dernest er det forhold ved selve avtalen som gir retten grunn til å mene at avtalens utforming skulle tjene til å begrunne det høye nivået på godtgjørelsen, snarere enn å være en reell oppdragsbeskrivelse.

Avtalen ble inngått muntlig. Retten vil bemerke at det ikke er ulovlig å inngå en muntlig avtale. Det er likevel høyst irregulært i internasjonale forretningsforhold at det inngås en muntlig avtale som regulerer så vidt omfattende tjenester og som innebærer et honorar på flere millioner dollar.

Avtalen skulle dessuten være konfidensiell, både overfor NOC og internt i Yara. Det kan være gode grunner for at en avtale skal være konfidensiell. Retten ser imidlertid ingen slike grunner her. Tvert imot, dersom Ghanem jr. skulle bistå i forhandlingene med NOC hvor hans far var styreleder og sentral i forhandlingene, burde det være åpenhet rundt hans oppdrag.

I retten har Wallace gitt utrykk for at det Yara reelt ønsket, var at Ghanem jr. skulle informere om hva som skjedde i Libya og for øvrig være disponibel ved behov for å kunne gi råd om hvordan Yara burde forholde seg i gitte situasjoner.

Holba sa i retten at utkastet til konsulentavtale gikk mye lenger enn det var relevant for Yara å søke bistand til. Yara hadde ifølge Holba de ressurser som var nødvendige i egen organisasjon. Disse opplysningene står i skarp kontrast til definisjonen av tjenestene i avtaleutkastet og tyder på at man har prøvd å gi et inntrykk av et annet innhold i rådgivers rolle enn det som faktisk var behovet. Intensjonen var innsyn i og påvirkning av forhandlingsprosessen gjennom dr. Ghanem.

Allerede før Yara startet prosessen med å engasjere Ghanem jr., inngikk Yara en avtale om rådgivning med det sveitsiske selskapet Helang SA. Denne avtalen utløp den 31. desember 2006 og ble ikke fornyet. Konsekvensen var at Yara kunne inngå en avtale med Ghanem jr. uten å komme i konflikt med Helang. Etter rettens oppfatning var heller ikke Helangavtalen en ordinær konsulentavtale. Avtaleutkastet ovenfor er, med ett unntak, helt likt den avtale som ble inngått med selskapet Helang i mars 2006 når det gjelder definisjon av arbeidsoppgavene og er etter rettens oppfatning nok et moment for at innholdet i avtalen med Ghanem jr. skulle fordekke realiteten. Retten antar at årsaken til at Helangavtalen ble terminert, er at Helang ikke leverte de tjenestene Yara ettersurte. Yara hadde dessuten i mellomtiden fått tilgang til Ghanem jr., som var mer interessant på grunn av farens posisjon.

### 6.4 Honorarets størrelse og betalingen

Ghanem jr. sin rolle var å innhente informasjon og videreformidle denne til Yara. Utover dette hadde han ingen selvstendig rådgiverrolle. Etter rettens vurdering var det et klart misforhold mellom verdien av den enkle formidlingsrollen og honoraret på inntil USD 4,5 millioner som var avtalt. Dette misforholdet kan bare forklares med den potensielle verdien det hadde for Yara å kjøpe seg kunnskap og eventuelt innflytelse gjennom faren.

14-022670MED-OTIR/05

Sist, men ikke minst kommer måten Ghanem jr. ble betalt på. Betalingsmetoden må karakteriseres som en dekkoperasjon. Behovet for konfidensialitet hadde ingen legitime grunner. Behovet for å skjule betalingen, sammenholdt med de øvrige momenter retten har lagt vekt på, viser at det her var tale om en konsulentavtale som ikke tålte dagens lys.

### 6.5 Ghanem jr.'s tjenester

Forsvarerne har anført at det ikke er bevist at dr. Ghanem ble påvirket eller forsøkt påvirket gjennom avtalen og betalingen til Ghanem jr. Det er blant annet pekt på at forhandlingene var godt i gang mellom Yara og NOC før dr. Ghanem ble utnevnt som styreleder og at Yara hadde fått tilbakemelding om både fremdrift og positiv vurdering av tilbudet fra Yara. Videre viste forsvarerne til at fremdriften i forhandlingene også trakk ut etter dr. Ghanems inntreden i NOC og at vansker oppsto i august 2007 på tross av avtalen med Ghanem jr. Det var også et faktum at vilkårene i avtalen gikk i NOCs favør gjennom hele forhandlingsprosessen, også etter at konsulentavtalen var inngått med Ghanem jr.

Retten har vurdert disse forhold, men finner det bevist at det reelle innholdet i konsulentavtalen mellom Yara og Ghanem jr. var at han skulle innhente informasjon og råd fra sin far om hvordan Yara skulle forholde seg i forhandlingsprosessen med NOC og at Yara dermed i realiteten inngikk avtalen for å få en separat kontakt til dr. Ghanem gjennom hans sønn for på denne måten å skaffe viktig informasjon for å kunne påvirke forhandlingsutfallet.

De bevis som er fremkommet under hovedforhandlingen beskriver hva Ghanem jr. faktisk bistod med i prosessen. Det er godt dokumentert at Ghanem jr. ikke utførte de oppgavene som fremgår av utkastet til konsulentavtale, hvilket er et ytterligere tegn på at avtalen alene hadde til hensikt å underbygge det meget betydelige honorar som avtalen innebar og ikke arbeidets reelle innhold. Betalingen var i all hovedsak for informasjon og råd fra dr. Ghanem.

I september 2007 reiste Wallace til Dubai for å møte Ghanem jr. Formålet var å få råd om hvordan Yara burde forholde seg til nye krav som var kommet opp under forhandlingene fra libysk side. Ghanem jr. gav konkrete råd til hvert enkelt punkt på den issue listen som Yara hadde utarbeidet over utestående punkter. Yara benyttet rådene fra Ghanem jr. i de etterfølgende forhandlingsmøtene og det ble oppnådd enighet mellom partene.

Retten finner det bevist at Ghanem jr. mottok "good news" fra sin far etter reisen til Libya i januar 2007 og at disse nyhetene var at det nå gikk mot en avtale. Det brevet Yara mottok den 22. februar 2007 med bekreftelse på at myndighetene hadde godkjent avtalen, kommer også fra dr. Ghanem og inneholdt mulig viktig informasjon om hvilken pris DOW skulle betale. Det er ingen annen logisk forklaring enn at det er faren som er kilden når Ghanem jr. gir informasjon og råd til Wallace.

14-022670MED-OTIR/05

EXT- WALLACE-00040

Wallace forklarte i politiavhør i Paris i mai 2012 at Yaras forhandlingsteam kom tilbake fra et møte i Tripoli med beskjed fra dr. Ghanem om å "sort it out with my son". Wallace forklarte i retten at det må ha vært feil, fordi han ikke ser noen dokumenter som støtter denne politiforklaringen.

Retten mener at Wallace sin politiforklaring i Paris i mai 2012 må tillegges stor vekt som bevis. Paris-forklaringen er avgitt for tre år siden og Wallace sin hukommelse må ha vært bedre da enn i 2015. Retten ser ikke bort ifra at Wallace kan ha tatt feil av tidspunkter for ulike begivenheter, møter og samtaler i sin forklaring i Paris, men det endrer ikke at *innholdet* i hans forklaring stemmer godt med de øvrige bevis i saken, herunder dokumentbevisene. Forklaringen etter at Wallace bestemte seg for å "set things straight" er dessuten detaljert og nyansert i motsetning til hans forklaring i retten. Forklaringen i retten bærer preg av at Wallace ikke husker. Retten er derfor overbevist om at noen i Yaras forhandlingsteam kom tilbake fra et møte i Tripoli med beskjed fra dr. Ghanem om å "sort it out with my son" og det var det Wallace gjorde. Nøyaktig når og hva dr. Ghanem gav forhandlingsteamet beskjed om å snakke med sønnen om, er ikke klarlagt. Men det endrer ikke rettens vurdering av at dette faktisk ble sagt og at det var noe som var tilstrekkelig viktig til at Wallace sa det i sin politiforklaring i Paris. Wallace kom først inn i prosjektet ultimo 2006. Dette var på et tidspunkt hvor Holba hadde overtatt som prosjekteier. Det er utfra dette utenkelig at ikke Holba også skulle ha mottatt den samme informasjon som Wallace om dr. Ghanems utsagn. Retten viser også til at Wallace i Parisforklaringen sa at han fikk informasjonen om hva dr. Ghanem hadde sagt fra Holba.

Utsagnet viser etter rettens syn at far og sønn opptrer sammen.

Retten ser ikke bort ifra at det hadde vært mulig for Yara å få til en avtale med NOC uten å bruke Ghanem jr. Det er også mulig at avtalen hadde fått samme innhold. Forsvarerne har anført at dette innebærer at det ikke foreligger noe påvirkningselement fordi engasjementet med Ghanem ikke skulle påvirke forhandlingene og heller ikke gjorde det. Det skal derfor svært mye til for å anse engasjementet av Ghanem jr. som korrupsjon. Høyesterett uttalte i Rt-2009-130, at det bare er i svært spesielle tilfelle at det er grunn til å dømme etter korrupsjonsbestemmelsen dersom en må se helt bort fra at det foreligger et påvirkningsmoment.

Spørsmålet kom ikke på spissen i nevnte dom og det gjør det heller ikke i denne saken. Faktum er at Yara engasjerte Ghanem jr. og retten kan ikke se at det var noen annen grunn for dette engasjementet enn å sikre seg tilgang til informasjon og råd fra dr. Ghanem for å stille sterkere i forhandlingene med NOC. Det foreligger dermed et klart påvirkningsmotiv fra Yaras side og Yara forventet å få noe tilbake fra dr. Ghanem. For den aktive bestikker foreligger det fullbyrdet forbrytelse allerede ved at tilbudet har kommet til motpartens kunnskap, jfr. bokstav 276a bokstav b.

14-022670MED-OTIR/05

EXT- WALLACE-00041

Retten finner dessuten bevist at engasjementet av Ghanem jr. hadde den ønskede virkning og at Yara fikk det de ville ha. Få dager etter at HoA var godkjent av begge parter ble betalingen til Ghanem jr. foretatt og HoA ble formelt undertegnet i april 2007. Etter at Wallace i september 2007 fikk råd i forhold til utestående punkter i issue listen, kom forhandlingene "firmly back on track" (ledermøte 29.oktober 2007) og ny JV Framework Agreement ble undertegnet den 17. februar 2008.

Etter en samlet vurdering av de bevis som retten har fått presentert og de momenter som retten har gjennomgått ovenfor, finner retten det bevist utover enhver rimelig tvil at avtalen med Ghanem jr. var inngått for å sikre Yara informasjon og råd direkte fra styreleder og fungerende oljeminister i Libya i forhandlingene Yara førte med NOC.

Ghanem jr.'s oppgave var å være budbringer og tilsløre det faktum at det ble opprettet en separat kanal til dr. Ghanem.

## V.Tiltalebeslutningens post b): Indiaforholdet

### 1. Innledning
På det tidspunktet Yara besluttet å se nærmere på mulighetene i det indiske markedet hadde selskapet en begrenset virksomhet representert ved import av spesialprodukter. Dette salget ble håndtert av en stedlig agent som var underlagt divisjon nedstrøm ved Asia-kontoret.

Som verdens største produsent av gjødsel var det naturlig for Yara å søke en sterkere tilstedeværelse i India som var verdens tredje største marked for gjødsel. Yaras industrielle mål for India ble utformet i et strateginotat i 2006. Strategien var å søke samarbeid om produksjon med lokale produsenter. I tillegg ville Yara arbeide for at myndighetene skulle endre subsidiesystemet slik at det ble mulig å importere egne- og tredjepartsprodukter for videresalg i det indiske markedet.

Som fremstillingen vil vise valgte Yara å inngå en samarbeidsavtale med et indisk gjødselkooperativ med ca. 7000 medlemmer. Dette var bønder som hadde organisert seg i et kooperativ for å ivareta sine interesser vedrørende produksjon og innkjøp av gjødsel. Kooperativets navn var Krishak Bharati Cooperativ Limited (Kribcho) og det var eiet med 67% av den indiske stat.

Den indiske stat, Kribhco og Yara synes å ha hatt felles mål på mange punkter. Yara ønsket å komme inn i markedet med sitt spesialprodukt NPK. Dette sammenfalt med Indias ønske om bruk av et mer sammensatt gjødselprodukt som kunne redusere den akselererende bruk av urea, som utgjorde en belastning for jordsmonnet.

Et stadig økende forbruk av urea i landbruket ble også, på grunn av subsidiesystemet, en betydelig økonomisk belastning for staten. Forhandlingene med Kribhco resulterte derfor

EXT- WALLACE-00042

raskt i en avtale om videre samtaler for å komme frem til en bindende avtale om et langsiktig samarbeid.

Av spesiell betydning for denne saken er den rådgivningsavtalen som ble inngått med Maini jr. Hans far dr. Maini, var Additional Secretary and Financial Advisor i det indiske Ministry of Chemicals & Fertilizer (DOF) og var i denne egenskap en sentral embetsmann i et for Yara svært viktig departement.

I henhold til Clauws forklaring for retten kjente dr. Maini en forretningsmann som heter Eli Calil (Calil). Calil opererte som mellommann i større transaksjoner særlig innenfor energisektoren. Calil visste at Dr. Maini hadde promotert sin sønn bl.a. på en IFA (International Fertilizer Industry Association) konferanse og at han ønsket sin sønn introdusert for et selskap som kunne realisere hans ambisjoner for forandring i det indiske gjødselregimet. Calil kjente Clauw allerede før Clauw ble ansatt i Yara og han introduserte Maini jr. som deretter ble engasjert for å bistå Yara som rådgiver i prosessen med Kribhco.

Avtalen, og den rolle som sønnen og faren siden spilte i Yaras India-satsing, er gjennomgått nedenfor.

2. Prosjektstart og prosessen frem til engasjementet av Maini jr.
Det innledende møtet mellom Yara og Kribcho fant sted i midten av desember 2006. Det var Clauw og Wallace som representerte Yara i møtene med Kribcho og med DOF. Førstnevnte var representert ved administrerende direktør B. D. Sinha (Sinha) og DOF ved dr. Maini.

Møtet ble fulgt opp med et brev fra Clauw på vegne av Yara hvor han oppsummerte mulige samarbeidsområder. Den videre gangen var at Kribhco responderte positivt på Yara´s forslag og det ble avtalt et oppfølgingsmøte i slutten av februar 2007 hvor de samme personer deltok. I tillegg var Kribhco representert med sin finansdirektør, R. Karma.

På møtet ble det besluttet at Wallace skulle utarbeide et forslag til HoA. Avtaleutkastet som Wallace utarbeidet beskrev områder for det fremtidige samarbeidet, herunder en målsetting om å restarte nedlagte gjødselfabrikker. Tanken var at disse, som alle var anlegg for produksjon av urea, skulle oppgraderes og benyttes til produksjon av NPK. Avtalen innebar også en intensjon om et samarbeid om nyetablering i land hvor man kunne skaffe tilgang til gassavtaler på gunstige vilkår. Planen var at gjødsel produsert ved slike anlegg eventuelt kunne eksporteres til India, noe som forutsatte et endret subsidieregime.

Etter en kort dokumentutveksling ble HoA undertegnet den 13. april 2007.



14-022670MED-OTIR/05

På tross av entusiasme fra begge parter skjedde det i praksis lite når det gjaldt å identifisere og bearbeide industrielle muligheter i tråd med intensjonen. Den listen som Kribhco skulle utarbeide over aktuelle anlegg for oppgradering ble stadig forsinket. Inspeksjon av mulige anlegg ble først utsatt og senere avblåst. Dette fordi de aktuelle anlegg var nærmest verdiløse og oppgradering i realiteten var å sidestille med etablering av helt nye fabrikker.

I juni 2007 informerte Wallace Kribhco at man var nødt til å sette prosjektet på hold. Bakgrunnen for dette ble forklart i en e-post med at det på grunn av ferieavvikling ikke var mulig å sende tekniske eksperter til India før over sommeren og videre var det behov for endringer i forhandlingsteamet. Avtaleforhandlingene fortsatte imidlertid og 15. oktober 2007 ble avtalen med Kribhco forlenget for ett år med det samme innhold som tidligere, bortsett fra at eksklusivitetsklausulen ble tatt ut. Engasjementet fra Yaras side i samarbeidet synes imidlertid etter dette å dempes og det ender med at prosessen med Kribhco avsluttes sommeren 2008 uten at det har skjedd noe siden avtaleforlengelsen.

3. Engasjementet av Maini jr.
Maini jr. hadde ingen faglig eller erfaringsmessig bakgrunn innenfor gjødselsektoren. På tross av dette fattet Yara interesse for Calil's forslag om å benytte Maini jr. som rådgiver.

Oppdraget Yara så for seg at Maini jr. skulle bistå med, var begrenset til å tilrettelegge for Yara`s kontakt og forhandlinger med DOF og Kribhco og å ta seg av praktiske detaljer knyttet til besøk i India.

Det Maini jr. og Calil så for seg at de skulle være med på, var etableringen av et omfattende prosjekt knyttet til Kribhco for videreutvikling av gjødselindustrien i India. Dette fremgår av de første avtaleforslag fra Maini jr.'s advokat. Avtaleforslaget viser at Maini jr. og Calil la opp til en rådgivning som innebar alt fra arbeid med å initiere muligheter i India til bistand med å forhandle frem konkrete avtaler om samarbeid og prosjektutvikling. Videre forutsatte de at de skulle delta på eiersiden i fremtidige prosjekter med Yara samt å være Yara's salgsagent. Avtalen skulle dessuten gi dem en såkalt put opsjon tilbake til Yara, dvs. de skulle kunne selge sin eierandel i et eventuelt fremtidig felles eiet selskap tilbake til Yara.

Yara og Maini jr. hadde således en ulik oppfatning om innholdet i den rådgivning som Maini jr. skulle yte. Dette resulterte i at det tok en viss tid og flere avtaleutkast før man ble enige om innholdet i oppdraget.

Det første avtaleutkastet som ble presentert fra Maini jr. og Calil er datert 21. mars 2007. Wallace besvarte forslaget med å si at oppdragets omfang gikk utover det Yara så for seg.

> *"My understanding is that we will engage ABC to work on the existing joint venture arrangement with Kribhco and, should those fail to develop as contemplated, to assist us in finding and working with another joint venture partner or partners".*

ABC skal her oppfattes som Calil og Maini jr.

Videre sa Wallace at kompensasjonen måtte diskuteres med Clauw direkte.

Basert på denne tilbakemeldingen sendte Maini jr. og Calil et revidert utkast datert den 10. april 2007 som ble diskutert under et møte i London den 12. april 2007. Utkastet var omarbeidet noe, sammenlignet med det første utkastet, men det favnet fortsatt videre enn Yara hadde sett for seg.

I en e-post to dager etter møtet i London fremgår det at Maini jr. feilaktig har oppfattet det slik at partene ble enige om en avtale under London-møtet.

Noen dager senere sendte Wallace sitt første avtaleforslag til Maini jr. Dette begrenset oppdraget i forhold til Maini jr./Calils forslag og det omfattet bare Maini jr. Godtgjørelsen ble foreslått til USD 250.000 pluss dekning av direkte utgifter for hele avtaleperioden som ble angitt fra 1. november 2006 til 30. april 2008. I tillegg ble det foreslått en kommisjon på alle produkter Yara ville selge i India i perioden april 2007 og frem til avtalen ble terminert. Det skal her nevnes at Yara allerede hadde en avtale med en agent som hadde eksklusiv rett til salg i India av visse produkter, herunder NPK.

Yaras forslag ble negativt oppfattet av Maini jr. I en e-post datert 2. mai 2007 ba han Yara revurdere sitt forslag og fremsatte et motforslag med en godtgjørelse på USD 1 million pr. år, samt normal investeringsbank-provisjon hvis deres tjenester ble benyttet ved etablering i utlandet. Videre krevde de suksesshonorar ved et vellykket forhandlingsresultat, og deltakelse på eiersiden i fremtidige fosfatanlegg. Sist, men ikke minst, skulle Maini jr. sitt selskap Nuovo fungere som Yaras langsiktige representant.

I en tilbakemelding til Maini jr. av 15. mai slo Clauw uttrykkelig fast at Yaras behov for rådgivning var knyttet til avtalen med Kribhco. Utover dette ville fremtiden måtte vise hvilket behov for rådgivning Yara ville få. Clauw ba videre Maini jr. om ikke å foreta ansettelser i anledning av samarbeidet med Yara. Det Yara trengte var Maini jr.´s egen kompetanse og "lobbying capabilities". Clauw presiserte også at Yara selv hadde all nødvendig ekspertise innenfor gjødsel.

Det neste som skjedde var at Calil meddelte at subsidieordningen var nær ved å bli endret. Dette ble uttrykt i hans e-post av 15. mai 2007 til Clauw, Wallace og Maini jr. som følger:

> *"As you may be aware, partly thanks to our efforts the Indian Government is moving ever closer to a sane subsidy policy on fertilizers. This was Yara's original proposal*

> *and wish and 6 months later we are close to it (record time for Indian policy changes!!)".*

På denne bakgrunn ba Calil om at "avtaler kommer på bordet". Retten bemerker for øvrig at noen slik endring av subsidiesystemet ikke fant sted.

Tre uker etter Calils utspill sendte Wallace sitt avtaleutkast nummer to hvor han kom Maini jr. i møte ved å øke kompensasjonen. Den ble nå foreslått til USD 1 mill. pr. år i 3 år fra 1. januar 2007 til 31. desember 2009. Avtalen ble forutsatt å være uoppsigelig. Maini jr.´s tidligere krav om egenkapitalandel og representasjon ble delvis ivaretatt gjennom uforpliktende formuleringer om å forhandle om både representasjon og egenkapitalandel i fremtidige prosjekter under forutsetning av at samarbeidet med Kribhco ble realisert.

Det er tydelig at det forut for dette avtaleutkastet også har vært en diskusjon om betalingsmottaker idet Wallace i sin e-post sa følgende:

> *"Payment to nominees and/or nominee bank accounts without limitation is an issue for a public company in an OECD country such as Yara. Lets discuss what you have in mind and we can probably find a suitable resolution".*

Etter noen endringer i et utkast nummer tre fra Yara, som ikke synes å være av materiell karakter, blir et endelig utkast oversendt Maini jr. Samlet sett var det således 4 utkast til avtale før Maini jr.`s aksept i e-post av 23. juni 2007. I tillegg kom de avtaleforslag som Maini jr. selv, og gjennom sin advokat, fremsatte innledningsvis. Avtaleforhandlingene gikk over lang tid og det kan synes som om Yara bevisst trenerte endelig avtaleinngåelse. Det skal også tillegges at avtalen aldri ble underskrevet. Yara anså den imidlertid som bindende inngått idet det var fremsatt et tilbud som Maini jr. hadde akseptert.

Senest den 13. juni 2007 ble Enger informert om og godkjente engasjementet av Maini jr. Dette fremgår av en e-post fra Wallace til Clauw, Ombudstvedt og Cavazuti som lyder:

> *"I have spoken to Thorleif and explained the retention of G. Maini`s company to represent Yara in India. He understands that it has been approved by Daniel, Sven, Ed and me and he is OK with the arrangement".*

Wallace sa i sin forklaring i retten knyttet til ovennevnte at familierelasjonen mellom dr. Maini og Maini jr. ble diskutert innenfor den ovennevnte gruppe. Av Wallaces forklaring for retten fremgår det også at Enger var informert om både familierelasjonen og dr. Mainis stilling i DOF. Clauw hevder at han ikke informerte Enger om familierelasjonen fordi han ikke så den som viktig. Enger på sin side sier at han ikke husker om dette ble nevnt. Retten viser til at Clauw i annen sammenheng har uttalt at "når Wallace visste det så visste de andre i ledelsen det også".



Retten vurderer det slik at alle de ovennevnte visste om forholdet senest på
betalingstidspunktet og antakelig allerede den 13. juni 2007.

<u>4. Avtaleteksten for det aksepterte tilbudet</u>
Nedenfor er inntatt den avtaleteksten som ble avtalt for rådgivningsavtalen mellom Yara
og Maini jr.:

> *"On behalf of Yara Asia Trade Pte. Ltd. and its parent company, Yara International
> ASA (collectively, "Yara"), I would like to extend our thanks for the efforts that
> XXXX and its assigns (the "Company") have put in on our behalf in connection with
> the discussions and plans of our entry into the Indian fertilizer market. In recognition
> of these efforts and to regulate our relationship for the period specified and till such
> time as we assess and structure the basis for such a market entry, we propose the
> following engagement:*
>
> ***Representation:*** *The Company and its assigns (the Company 1. shall however ensure
> the sustained engagement on Yara's behalf for the Indian market by Gurpreetesh S.
> Maini) are appointed as Yara's representative and strategic advisor in connection
> with all discussions of the proposed joint venture with Krishak Bharati Cooperative
> Limited ("Kribhco") and any other fertilizer market initiatives and/or joint venture
> discussions initiated during the term of this engagement or any successive terms as
> decided between both parties for the Indian market.*
>
> *2. **Duties:** The Company will act as the Representative of and as the Strategic
> Advisor to Yara in India in connection with the development of fertilizer sales and
> marketing initiatives in India and the development of both domestic and dedicated
> import production facilities overseas for the Indian market. In this connection, the
> Company will:*
>
> *a.    Assist Yara in identifying, exploring and pursuing potential fertilizer sector
> opportunities in India;*
>
> *b.    Advise Yara regarding its business relationships with existing and/or
> prospective joint venture partners in the fertilizer sector;*
>
> *c.    Coordinate the representation of Yara before governmental authorities;*
>
> *d.    Assist in identifying, evaluating and recommending the most appropriate
> geographical locations for investment in the fertilizer sector in India;*
>
> *e.    Coordinate the import and sale of fertilizer products into India with Yara
> personnel responsible for such imports and sales; and*
>
> *f.    Provide such reasonable assistance, as may be required by Yara in stabilizing
> its Indian engagement including:*
>
> *The provision of requested reports, digests i. and other materials to enable Yara to
> assess the business opportunities be explored during the term of this engagement;
> and ii. The coordination of and provision of support to visits of Yara personnel to*

*India in connection with the activities of the proposed joint venture with Kribhco or any other initiative of Yara and the provision of office facilities and support to such personnel.*

**3. Compensation.** *Yara will pay to the order of the Company for services rendered to date and for the balance of the term of this engagement, the following:*

a.   *The aggregate sum of US$ 1.000.000,00 (USD 1 Million) per calendar year payable quarterly in advance on the first day of each calendar quarter (with a cumulative payment of US$ 750.000,00 due on 1 July 2007 in respect of services rendered to date); and*

b.   *Reimbursement of all out of pocket expenses incurred by the Company in the performance of its duties under this engagement including travelling, boarding and lodging on the business of Yara.*

**4. Term.** *The initial term of this engagement will be from 1 January 2007 through 31 December 2009. This contract shall be automatically extended for successive two-year periods unless either party gives to the other party written notice of intent not to extend not less than six months prior to the end of the initial term or any extension thereof.*

**5. Permanent Engagement.** *In the event that the joint venture discussions with Kribhco or any other party for the Indian fertilizer market are finalized and the joint venture is created during the term of this agreement, Yara agrees that it will negotiate in good faith toward the establishment of a representation arrangement with the Company that includes the possibility of an equity participation in the Yara joint venture participant as well as engagement in activities beyond those contemplated for the initial period as set forth herein.*

**6. Termination.** *This engagement may not be terminated during the initial term or any extension thereof, except:*

a.   *y the mutual consent of the parties;*

b.   *in the event of the failure or refusal of a party hereto to perform its obligations hereunder following notice and a reasonable period to cure such failure or refusal; or*

c.   *at the end of the initial term or any extension thereof pursuant to written notice as provided in Paragraph 4.*

*As you well understand, we are at the very preliminary stage of assessing the nature and scope of our engagement in India. The foregoing engagement is intended to be an interim measure until the structure of Yara's business development is more clearly defined. At that time, we will be in a position to consider a number of options, including those that you have suggested in the materials that we have reviewed. Until then, we believe that the remuneration arrangement will provide a fair compensation for the Company's efforts. In addition, we will evaluate the proposals for participation in a joint initiative with respect to the single super phosphate fertilizer*

14-022670MED-CTIR/05

EXT- WALLACE-00048

*business in India. If our evaluation of this business indicates that Yara should*
*participate, the Company will be Yara's preferred partner for such activities, subject*
*to the negotiation and execution of a mutually satisfactory agreement regulating*
*such activities.*

*Finally, the parties (or their affiliates) intend to enter into a separate agreement for*
*the payment of normal brokerage commissions per ton of product sold in India by*
*Yara or its affiliates (including any joint venture for the production and/or sale of*
*fertilizer products). Such commission will be based on and comparable to the*
*commission arrangements paid by Yara in other countries for similar services in*
*similar circumstances.*

5. Utviklingen i saken etter at konsulentavtalen var ferdigforhandlet

Som det fremgår av avtalen skulle USD 750,000 betales pr. 1. juli 2007 for tjenester levert
til dato. På grunn av Clauw´s fratreden ble prosjektet satt på hold til et nytt prosjektteam
var etablert. Det ble derfor avtalt at betaling skulle utstå til 1. september 2007 og at det da
skulle betales USD 1 million. Tiden gikk og betaling fant ikke sted på det avtalte
forfallstidspunktet. På tross av at Clauw hadde sluttet i Yara, var det Clauw som ble purret
på betalingen. På bakgrunn av Maini jr.´s purring sendte Clauw den 5. september 2007 en
e-post til Wallace med kopi til Enger, hvor han skrev at hvis Yara ønsket å videreføre
samarbeidet med Kribhco så måtte Yara signere avtalen med Maini jr. Hvis ikke ville
Kribhco ikke videreføre avtalen. Han skrev også at dersom Yara ikke ønsket å videreføre
samtalene med Kribhco, trodde han det ville være mulig å avvikle forholdet til Maini jr.
med en ett års "lump sum" betaling. Han sa videre:

> *"As you know, Maini has been with his father the driving force of the government*
> *starting changing for more balance nutrients consumption and pushing KRIBHCO to*
> *negotiate with YARA".*

Etter rettens vurdering viser Clauws e-post av 5. september 2007 at dr. Maini ikke bare
hadde makt i forhold til beslutninger i DOF. Han kunne også, i kraft av sin styreposisjon i
Kribcho, påvirke samarbeidet mellom Yara og Kribcho. I følge Clauw ville det ikke bli en
avtalefornyelse med Kribcho med mindre Yara honorerte avtalen med sønnen. Sitatet
overfor viser også at dr. Maini var sentral i forhold til det for Yara viktige spørsmålet om
endringer i subsidiesystemet.

Retten betviler ikke at dr. Maini faktisk mente at subsidiesystemet burde endres. Som det
vil fremgå nedenfor mener imidlertid retten at Yara bevisst inngikk avtalen med sønnen for
å oppnå fordeler via faren i forbindelse med satsingen i India.

I midten av august 2007 sendte Wallace en e-post til Kribhco hvor han tok opp tråden fra
før sommerferien. Wallace informerte om Clauw´s fratreden og Enger´s planlagte tur til
India samme høst, hvor Enger ønsket å møte både Kribcho og dr. Maini. Wallace bad også
om informasjon om aktuelle anlegg for oppgradering. Maini jr. ble kopiert av Wallace på

nevnte mail i form av en såkalt blindkopi. Den 17. august svarte Maini jr. og informerte om at faren var blitt overflyttet til et annet departement fra 1. september 2007.

Den 20. august ba Wallace i en e-post til Enger om instruks med hensyn til forholdet til Maini jr. Han vedla det avtaleutkast som ble akseptert. Den 18. september ga Enger beskjed til Wallace om å avslutte forholdet til Maini jr. Dette skjedde etter at Terje Knutsen, (Knutsen) som var leder for Yaras Asia-avdeling, hadde vært i India og hatt møte med Kribhco som gjorde ham enda mer skeptisk til samarbeidet. Videre hadde Knutsen samme dag fått en e-post fra Yara's lokale agent som svar på sitt spørsmål om hvem Maini jr var. Her svarte agenten at han er sønn av dr. Maini og at han hadde fratrådt stillingen i DOF. Han sier at med farens avgang fra DOF har Maini jr.:

   *"lost out the support system to call themselves "`fertiliser consultants`"".*

### 6. Betalingen til Maini jr.

Etter Wallaces kontakt bekreftet Maini jr. den 19. september at han aksepterte en godtgjørelse på USD 1 million som et endelig oppgjør for sin bistand. Den 16. oktober 2007 ble beløpet overført fra Yara til selskapet Krystal Holding Limiteds konto i Standard Chartered Bank i Hong Kong.

Selskapet CYC sarl med adresse i Beirut, Libanon, utstedte fakturaen på USD 1 million. Det er for retten ikke dokumentert hvem som eide dette selskapet. Fakturaen ble oversendt i e-post fra Maini jr. den 25. september 2007 med betalingsanvisning til en bank samme sted. Fakturaen ble anvist til betaling to dager senere av Wallace. Etter det opplyste ble fakturaen så henvist til betaling fra Yara's Asiakontor. Her ble imidlertid fakturaen liggende uten å bli honorert. Årsaken var dels at fakturaen var for tjenester som kontoret ikke hadde bestilt og således var ukjent for Knutsen som kontorets sjef. Knutsen fant også fakturaen tvilsom. Når fakturaen endelig ble betalt var det således fra Oslo-kontoret først den 16.oktober 2007.

I en e-post av 8. oktober 2007 ba Maini jr. om at beløpet skulle betales til en konto i Standard Bank (Hong Kong) Ltd i navn av selskapet Krystal Holdings & Investments Limited istedenfor CYC's konto. Denne kontoen ble åpnet 4. oktober 2007. Overførselen ble registrert inn på kontoen den 17. oktober 2007. Det er for øvrig ikke dokumentert noen faktura utstedt fra sistnevnte selskap. Ei heller er det dokumentert noen kreditnota fra CYC sarl.

Midlene ble så overført med USD 500.000 til selskapet Rhines & Raavi Holdings Limited den 22. oktober 2007 og med USD 499.000 til en terminkonto (tidsinnskudd) med en måneds varighet i samme bank den 24. oktober 2007. Det sistnevnte beløp ble så tilbakeført til kontoen en måned senere og USD 456.000 ble overført til Rhines & Raavi

14-022670MED-OTIR/05

Holdings Ltd samme dag. Ytterligere USD 30.000 ble overført samme selskap den 23.januar 2008.

Det er for retten ikke dokumentert hvem som er eier av selskapet CYC sarl og årsakene til at dette selskapet sendte fakturaen for Maini jr.´s tjenester til Yara. Selskapet Krystal Holding & Investment Ltd er et selskap registrert på British Virgin Islands (B.V.I.) og er eiet av The Meher Trust. Trustens benefisienter er Maini jr.´s mor og kone.

Selskapet Rhines & Raavi Holdings Ltd. ble registrert i 2003 i Dehli, India og er eiet 86 % av Maini jr., 9% av Krystal Holdings & Investments Ltd. og 5% av andre. Styret består av dr. Maini, Maini jr, deres koner og formodentlig Maini jr. sin yngre bror (f. 1980) og bestefar (f.1924). Selskapet fremstår således som et rent familieselskap.

Bakgrunnen for at midlene fra Yara ble forlangt overført til et B.V.I.-registrert selskap, var ønsket fra Maini jr. sin side om at honoraret ikke skulle komme til beskatning i India.

I og med at beløpet ble overført som det gjorde, må det legges til grunn at det ikke på noen måte er nærliggende å slutte, som forsvaret hevder, at beløpet i realiteten har kommet Maini jr. alene til gode og for ingen del hans far. Det er ikke sannsynlig at beløpet ble overført fra Krystal Holdings & Investments Ltd. til Rhine & Raavi Holdings Ltd. som en avståelse av inntekt. Det er mer sannsynlig at det var et lån. Det ville ellers ikke ha hatt noen mening å overføre midlene via B.V.I., da indisk skatt naturlig ville ha påløpt ved innteksføring i Rhines & Raavi Holdings Ltd.. Retten finner derfor at beløpet også har kommet Maini jr.'s familie til gode.

<u>7. Rettens vurdering av engasjementet av og betalingen til Maini jr.</u>
*7.1 Innledning*
Det fremgår av tiltalen at påtalemyndigheten anser avtalen mellom Maini jr. og Yara som en utilbørlig fordel som rammes av straffelovens § 276a, jfr. grunnlaget for tiltalens post b:

> *Både avtalen og betalingen utgjorde en utilbørlig fordel.*

Forsvarerne på sin side hevder at avtalen med Maini jr. var knyttet til tjenester han hadde ytt eller skulle yte og ikke til påvirkning eller forsøk på påvirkning av faren.

*7.2 Valget av Maini jr. som Yaras konsulent i India*
Retten har ved sin vurdering lagt vekt på at Maini jr. er sønn av en offentlig ansatt tjenestemann som hadde betydelig innflytelse innenfor gjødselsektoren. Som sentral tjenestemann i DOF og styremedlem i Kribhco hadde han stor innflytelse både på utformingen av gjødselpolitikken og på beslutningene i Kribhco.

Retten legger til grunn at Maini jr. fikk ideen til et samarbeid mellom Kribhco og Yara fra sin far. Videre er det rettens vurdering at Maini jr. ikke var kvalifisert for de alt vesentlige av de oppgaver mandatet angir. Han hadde ingen erfaring med gjødselbransjen. Han var relativt nyutdannet og hadde derfor liten arbeidslivserfaring. Rettsforhandlingene viste også at det aldri var meningen at Maini jr. skulle utføre det vesentlige av de oppgavene som fremgikk av avtalen.

Retten ser det slik at det eneste Maini jr. bistod med var praktisk tilrettelegglese samt å viderebringe informasjon til og fra dr. Maini. Det er ikke fremlagt dokumenter eller andre opplysninger som indikerer at Maini jr. har utført noen av de andre oppgavene som er definert i mandatet. Hans praktiske bistand besto i hotellreservasjoner, transport, bistand med å fremskaffe visa og lignende i forbindelse med Yaras besøk i India. Maini jr.`s kontakt med Kribhco synes å ha vært begrenset. Han oversendte dog noen rapporter om gjødselindustrien, men de var produsert av andre enn ham selv. Omfanget av dette arbeidet, i form av timer benyttet, er ikke dokumentert for retten.

Retten viser også til e-post fra Wallace til Enger og fire andre i august 2007 hvor han ber om instrukser for hvordan man skal forholde seg videre til Maini jr. Han sier her følgende:

> *"I would ordinarily rely on him to see that Kribhco actually responds in a timely manner to our inquiry about meeting (not a given), that there is actually a meeting at the Ministry for the same period (definitely not a given) and that the necessary invitations, etc. for visas are sent out promptly, hotels are booked, dinners arranged, etc. If we are not going to use him, I would like to know who will undertake these matters, particularly for the upcoming trip".*

I tillegg viser retten til Clauw sin oppsummering i e-posten datert 5. september 2007 til Wallace og Enger hvor han sier:

> *"As you know, Maini has been with his father the driving force of the government starting changing for more balance nutrient consumption and pushing KRIBHCO to negotiate with YARA".*

Disse to e-postene dokumenter at sønnens rolle primært var å tildekke realiteten, som var at Yara kjøpte seg bistand i forhandlingene med Kribhco og informasjon, råd og påvirkning inn i gjødseldepartementet fra dr. Maini.

Rettsforhandlingene har vist at det var faren som bidro med å fremme mulighetene for Yara i India. Han deltok på møter med Kribcho og Yara og bidro med innspill til endringer av subsidieordningen i India. Han oversendte Yara, via sønnen, agendaen for styremøte i Kribcho. Faren undertegnet nødvendige invitasjoner som grunnlag for visa og han deltok på møter med Yara i departementet.

EXT- WALLACE-00052

### 7.3 Konsulentavtalens innhold

Det krevdes mange avtaleutkast fra Yaras side før det ble oppnådd enighet. Uenigheten skyldes primært en diskusjon om kompensasjon for rådgivningsrollens første fase, samt rådgivers rettigheter mht deltakelse og kompensasjon for medvirkning i de etterfølgende prosjekter og kompensasjon for en rolle for Maini jr. som salgsagent. Avtalens definisjon av Maini jr. sine oppgaver endres ikke fra det ene utkastet til det andre. Årsaken til dette er etter rettens vurdering at det aldri var aktuelt at Maini jr. skulle levere reelle rådgivnings tjenester. Formålet med definisjonen av Maini jr.´s oppgaver i avtaleteksten, var å tildekke den realitet at det var farens innflytelse man betalte for. Det Maini jr. faktisk leverte utover råd og informasjon fra sin far, er dokumentert i de e-poster som er referert over.

Retten konstaterer at Yara endte opp med å gi etter for kravet om kompensasjon ved at beløpet ble endret fra USD 250.000 til USD 3 millioner over en treårsperiode. Retten viser også til at det ikke er fremlagt noen dokumentasjon på at avtalen ble fremlagt for eller diskutert med styret i Kribhco eller DOF. Sett hen til familierelasjonen mellom far og sønn hadde dette vært høyst naturlig hvis det hadde vært en bona fide avtale.

### 7.4 Honorarets størrelse

Ut fra det som er presentert for retten, finner retten bevist at verdien av det faktisk utførte arbeid var uvesentlig sammenholdt med både med den avtalte og den betalte godtgjørelsen.

Rettens konklusjon er at den kompensasjonen Yara aksepterte, herunder muligheten for deltakelse i fremtidige prosjekter og avtale som salgsagent, på ingen måte står i forhold til de tjenester Maini jr. på selvstendig grunnlag faktisk leverte eller var forventet å levere. Det er ingen annen rimelig forklaring på avtalen enn at kompensasjonen skulle være for de tjenester dr. Maini, i kraft av sin posisjon, kunne bistå med i forbindelse med Yaras etablering og fremtidige virksomhet i India.

Forsvaret har påberopt seg at godtgjørelsen i utgangspunktet var ment som en godtgjørelse for å komme med prosjektet/forretningsideen med Kribhco og følge dette frem til en suksess. Når det da viste seg at Yara ikke ville forfølge denne lenger, måtte man finne en minnelig løsning for å unngå en rettslig konflikt i India. Retten har forståelse for at avløsningssummen på USD 1 million kunne ha en rimelig forankring i et ønske om å unngå en rettslig konflikt. Dette forandrer imidlertid ikke det faktum at avtalen hadde et annet reelt innhold enn det som fremgår av den.

### 7.5 Maini jr.'s tjenester

Retten finner det bevist at det var farens, og ikke sønnens, idé med et samarbeid mellom Yara og Kribhco. Grunnlaget for denne konklusjonen er administrerende direktør i Kribhco, Sinhas forklaring i retten om at Yara kom i kontakt med Kribhco via DOF og at den første kontakten var mot dr. Maini.

14-022670MED-OTIR/05

Under rettsforhandlingene ble det fremlagt dokumenter som skulle illustrere på hvilken måte Maini jr. bistod i prosessen.  Samtlige var enten produsert av andre enn ham selv eller av faren.  De oppgaver Maini jr. utførte var kun relatert til praktiske gjøremål i forbindelse med reiser og det å arrangere møter samt å introdusere Yaras representanter.  Sinha bekreftet også i sin forklaring i retten at Maini jr. ikke hadde noen reell rolle i diskusjonene mellom Kribcho og Yara.   Retten vektlegger også at avtalen ble terminert selv om Yaras interesse for Kribhco og India fortsatt var tilstede.

Etter en samlet vurdering av alle de bevis som retten har fått presentert og de momenter retten har gjennomgått ovenfor, finner retten det bevist utover enhver rimelig tvil at engasjementet av Maini jr. var inngått for å få tilgang til dr. Mainis innflytelse, både i forhold til forhandlingene med Kribhco og i forhold til Yaras mer langsiktige plan for etablering i India. Maini jr.´s oppgave var, i likhet med den rolle Ghanem jr. hadde, å være budbringer og tilsløre det faktum at det i realiteten var inngått en avtale med dr. Maini.

## VI.   Straffeloven § 276a jfr. straffeloven § 276b og grensen mot påvirkningshandel, jfr. straffeloven § 276c.

### 1. Generelt.

Tiltalen mot alle de fire tiltalte gjelder overtredelse av straffeloven § 276a bokstav b) s, om lyder som følger:

> *For korrupsjon straffes den som*
>
> *b) gir eller tilbyr noen en utilbørlig fordel i anledning av stilling, verv eller oppdrag.*
>
> *Med stilling, verv eller oppdrag i første ledd menes også stilling, verv eller oppdrag i utlandet.*

Den som gir eller tilbyr noen en bestikkelse, er i lovforarbeidene kalt "den aktive bestikker" (Ot.prp. nr. 79 (2002-2003). Den aktive bestikker gjør seg skyldig i aktiv bestikkelse eller aktiv korrupsjon. Med passiv bestikkelse eller passiv korrupsjon siktes det til situasjoner hvor noen (den passive bestikker) krever, mottar eller aksepterer et tilbud om en bestikkelse. Sistnevnte handling er regulert i straffelovens § 276 a bokstav a). Tiltalen i denne saken gjelder den <u>aktive</u> korrupsjonshandling, eller medvirkning til denne.

### 2. "Utilbørlig fordel"

Det som gis eller tilbys må være en " utilbørlig fordel".  Begrepet "utilbørlig" er en rettslig standard som angir grensen mellom det straffbare og det straffrie. Forsvarerne var i sine prosedyrer inne på at begrepet "utilbørlig" skaper uklarhet om rekkevidden av straffebudet. Etter rettens vurdering er denne problemstillingen vurdert av lovgiver. I NOU 2002:22, s. 39 uttalte Straffelovrådet følgende om vurderingen av hva som skal anses som utilbørlig:

EXT- WALLACE-00054

*Ved vurderingen av hva som er "utilbørlig", må man i det enkelte tilfelle foreta en totalvurdering av situasjonen, hvor en rekke momenter vil spille inn. Momenter i den sammenheng vil være formålet med ytelsen, ytelsens art og verdi, hvilken grad av åpenhet som foreligger, hvilket regelsett som eksisterer i bedriften eller bransjen, om forholdet gjelder offentlige tjenestemenn eller privat næringsliv, og også ellers hvilken posisjon henholdsvis giver og mottaker til ytelsen har, m.m.*

Straffelovrådet uttalte videre at det skal en del til for at en fordel skal anses "utilbørlig": Det er ikke tilstrekkelig at forholdet er kritikkverdig. Ved at loven bruker uttrykket "utilbørlig" er det gitt en margin slik at tjenestemannen eller den næringsdrivende ikke skal kunne straffes med mindre det foreligger et klart klanderverdig forhold. Det er en ganske sterk fordømmelse som ligger i uttrykket "utilbørlig" (NOU 2002:22, s.39).

I Ot.prp. nr. 78 (2002-2003) pkt. 5.3.4 fremgår det at departementet også mener at grensen mot straffrie handlinger bør trekkes ved hjelp av et utilbørlighetskriterium, hvis nærmere innhold må fastlegges av domstolene. Departementet uttaler videre at det er ikke den enkelte dommers personlige oppfatning som skal være avgjørende for hvilke handlinger som er å anse som utilbørlige og dermed straffbare. Vurderingen skal bero på oppfatningen i samfunnet i lys av de reelle hensyn og grunnleggende verdier som ligger bak bestemmelsen. Utilbørlighetsstandarden vil derfor ikke ligge fast, men utvikles på bakgrunn av det rådende moralsynet i samfunnet til enhver tid. Retten bemerker her at det siste gjør seg spesielt gjeldende når det gjelder korrupsjon, hvor samfunnets oppfatning av klanderverdigheten i slike handlinger har endret seg de siste par tiår.

Det fremgår også av proposisjonen at departementet har vurdert det problematiske i at utilbørlighetsstandarden ikke er presis:

*Departementet ser at det kan reises innvendinger mot at det ikke angis mer presist når en handling er straffbar, og at den foreslåtte bestemmelsen vil kunne reise vanskelige avgrensningsspørsmål i grenseområdet mellom utilbørlige og andre fordeler. Departementet har likevel kommet til at den foreslåtte utformingen er den mest hensiktsmessige. Det er grunn til å understreke at under norske forhold har verken den som foretar en "bestikkelse" eller den som mottar den, noen rimelig grunn til å balansere på kanten av en straffebestemmelse om korrupsjon.*

*Etter departementets syn tilfredsstiller forslaget til ny § 276 a de krav som med rimelighet må stilles til klarhet og forutberegnelighet. Det er ikke gitt at en mer detaljert gjerningsbeskrivelse ville ha skapt noen større grad av klarhet og forutberegnelighet. Enkle og oversiktlige straffebud som henviser til den alminnelige dom over en handling, for eksempel gjennom et krav om utilbørlighet, vil ofte kunne fremstå som mer instruktive for ikke-jurister enn en gjerningsbeskrivelse som er juridisk mer stringent, men som kanskje er vanskeligere å forstå for en lekmann. Se i denne retning også Andenæs, Alminnelig strafferett (4. utgave, Oslo 1998) side 115.*

14-022670MED-OTIR/05

EXT- WALLACE-00055

*I tillegg kommer at faren er stor for at en mer detaljert formulering ikke vil fange opp alle de tilfeller man ønsker å ramme gjennom forslaget.*

Fra lovgivers side er valget av den rettslige standarden "utilbørlig" i straffeloven § 276a foretatt etter en grundig vurdering. En tilsvarende rettslig standard er også brukt i Europarådets strafferettslige konvensjon mot korrupsjon (Europarådskonvensjonen) hvor den straffbare fordelen er kalt "undue advantage". I OECDs konvensjon om motarbeidelse av bestikkelse av utenlandske tjenestemenn i internasjonale forretningsforhold brukes begrepet "undue pecuniary or other advantage". Norge har ratifisert begge konvensjonene. I tillegg til at lovgiver har foretatt en vurdering av hensiktsmessigheten av den rettslige standarden "utilbørlig" i straffebudet, er standarden således også i harmoni med tilsvarende rettslige standard i de konvensjonene Norge har tiltrådt på området.

Retten må etter dette foreta en konkret vurdering av om de tilbud som ble gitt, de avtaler som ble inngått og de betalinger som ble foretatt i denne saken rammes av standarden "utilbørlig fordel" i straffebudet. Denne vurderingen vil retten foreta under behandlingen av skyldspørsmålet i forhold til de enkelte grunnlag i tiltalen.

### 3. "I anledning av stilling verv eller oppdrag"
Den utilbørlige fordel må være gitt eller tilbudt noen "i anledning av stilling, verv eller oppdrag".

Det har vært et tema under hovedforhandlingen hvorvidt forholdet rammes av straffeloven § 276a eller straffeloven § 276c.

Forsvarerne har anført at dersom det er snakk om korrupsjon i denne saken må det i så fall være i form av "påvirkningshandel" etter straffeloven § 276c. Straffeloven § 276c lyder som følger:

> *For påvirkningshandel straffes den som*
>
> *a) for seg eller andre krever, mottar eller aksepterer et tilbud om en utilbørlig fordel for å påvirke utføringen av stilling, verv eller oppdrag, eller*
> *b) gir eller tilbyr noen en utilbørlig fordel for å påvirke utføringen av stilling, verv eller oppdrag.*
> *Med stilling, verv eller oppdrag i første ledd menes også stilling, verv eller oppdrag i utlandet.*
>
> *Straffen for påvirkningshandel er bøter eller fengsel inntil 3 år. Medvirkning straffes på samme måte.*

Det er alternativ b) "aktiv påvirkningshandel" som eventuelt kan være relevant i denne saken.

14-022670MED-OTIR/05

EXT- WALLACE-00056

Påvirkningshandel er i forarbeidene definert som følger (Ot.prp.nr. 78 (2002-2003), pkt. 6.3):

> *Utilbørlig påvirkningshandel i konvensjonens forstand foreligger når en person som tilhører en beslutningstakers politiske parti, familie eller omgangskrets, eller som av andre årsaker er eller hevder å være i stand til å øve påvirkning på beslutningstakeren, utnytter sin stilling ved å kreve, motta eller akseptere et tilbud om en utilbørlig fordel ("any undue advantage"). Personen som krever, mottar eller aksepterer fordelen (påvirkningsagenten), gjør seg skyldig i passiv påvirkningshandel. En person som gir eller tilbyr påvirkningsagenten en utilbørlig fordel, gjør seg skyldig i aktiv påvirkningshandel. For enkelhets skyld vil den som søkes påvirket, i det følgende bli kalt "beslutningstakeren", selv om utkastet til ny straffeloven § 276 c også fanger opp en del situasjoner hvor det kan fremstå som lite naturlig å si at den som søkes påvirket, er en beslutningstaker.*

Straffelovrådet anbefalte ikke innføring av en straffebestemmelse mot påvirkningshandel, hovedsakelig fordi det var vanskelig å trekke grensen mot lovlig lobbyvirksomhet. Departementet fant, som det fremgår ovenfor, at det var behov for et straffebud som rammet utilbørlig påvirkningshandel.

Avtalene som tiltalen i denne saken gjelder, er formelt inngått med sønner av de som påstås å være beslutningstakere. Forsvarerne anfører at en da er utenfor anvendelsesområdet for straffeloven § 276a, fordi det ikke er tilbudt en utilbørlig fordel til en person i anledning hans stilling, men til en person som er nærstående og som ikke selv har beslutningsmyndighet.

Umiddelbart kan det synes som om forsvarerne har et poeng her.  Ordlyden i straffeloven § 276a synes ikke å dekke det tilfelle at avtaler inngås med en agent/mellommann og ikke selve beslutningstakeren, mens ordlyden i straffeloven § 276c nettopp synes å regulere denne situasjonen.

Det må være helt på det rene at dersom bestikkeren gir en utilbørlig fordel til en agent/mellommann/slektning for å påvirke beslutningstakeren, så er dette påvirkningshandel og det er straffeloven § 276 c som er det aktuelle straffebud. Dersom retten finner bevist at sønnene i denne saken ble betalt for å påvirke sine fedre og dette var utilbørlig, skulle det vært tatt ut tiltalte etter straffeloven § 276 c.

Det er likevel ikke alltid slik at forholdet dekkes av ordlyden i straffeloven § 276 c der bestikkelsen ikke betales direkte til beslutningstakeren. Hvis den som mottar betalingen ikke "selger" sin påvirkningsposisjon, men kun er en mellommann, for å kanalisere betalingen til beslutningstakeren eller andre som beslutningstakeren har bestemt skal ha

14-022670MED-OTIR/05

fordelen, er det ikke naturlig å kalle forholdet for påvirkningshandel.  Det samme gjelder den som mottar betalingen i realiteten bare skal kamuflere at avtalen er inngått med beslutningstakeren.  I begge tilfeller dreier det seg om å tilby/avtale en indirekte fordel. Spørsmålet blir om disse typetilfellene er straffbare etter straffeloven § 276a.

Ordlyden i straffeloven § 276 a nevner ikke direkte den omstendighet at den utilbørlige fordelen tilbys/avtales indirekte gjennom en mellommann.

Straffebestemmelsene om korrupsjon ble inntatt i straffeloven ved en lovendring av 4. juli 2003 og tok sikte på å gjennomføre Norges folkerettslige forpliktelser etter OECD konvensjonen om motarbeidelse av bestikkelse av utenlandske tjenestemenn i internasjonale forretningsforhold av 1997 (OECD-konvensjonen) og Europarådets strafferettslige konvensjon mot korrupsjon av 1999 (Europarådskonvensjonen).  Både OECDs konvensjon og Europarådskonvensjonen likestiller direkte og indirekte betaling til beslutningstaker. OECD-konvensjonens Artikkel 1 fastslår at

> *Hver av partene skal treffe de tiltak som er nødvendige for å kunne konstatere at det etter sitt lovverk er straffbart for enhver forsettlig å tilby, love, eller gi en urettmessig økonomisk eller ikke-økonomisk fordel, for å få en utenlandsk offentlig tjenestemann til å foreta eller unnlate å foreta handlinger i tjenesten slik at en kan få eller ta vare på oppdrag eller annen utilbørlig fordel i tilknytning til internasjonale forretningsforhold. <u>Dette skal gjelde både direkte ytelser, og ytelser som blir gitt via en mellommann og omfatter både ytelser til tjenestemannen selv og til en tredjepart.</u> (rettens understrekning).*

Europarådskonvensjonens artikkel 2 lyder slik:

> *Partene forplikter seg til å vedta lovgivning som er nødvendig for å fastsette at det etter nasjonal lovgivning er straffbart <u>direkte, eller indirekte (rettens understrekning)</u> å love, tilby eller gi enhver utilbørlig fordel til en offentlig tjenestemann, eller noen annen, for at tjenestemannen skal handle, eller unnlate å handle under utøvelse av sine funksjoner.*

Norge har ratifisert begge konvensjonene. I NOU 2002:22 fremgår det under pkt. 1 at straffelovrådet ved sitt lovutkast har lagt vesentlig vekt på korrupsjonsdefinisjonen slik den fremkommer i Europarådets korrupsjonskonvensjon i artiklene 2-11. Dette tyder på at selv om det ikke fremgår uttrykkelig av lovteksten, har det vært meningen at bestemmelsen skal dekke også indirekte betaling og indirekte tilbud eller avtaler gjennom mellommenn.

Det er for øvrig ikke spor i forarbeidene av begrunnelse for hvorfor "direkte eller indirekte" ikke er tatt inn i lovteksten. I Ot.prp. nr. 78 (2002-2003) under kommentarer til straffeloven § 276 a uttales følgende:

EXT- WALLACE-00058

14-022670MED-OTIR/05

*Straff kan idømmes selv om fordelen er ment å komme andre enn den passive bestikker til gode, jf. "for seg eller andre" i første ledd bokstav a og ordet "noen" i første ledd bokstav b. Det kan for eksempel være at bestikkelsen settes inn på en konto som disponeres av et aksjeselskap eller en slektning av den passive bestikkeren.*

Denne uttalelsen tyder på at lovgiver har ment at ordlyden "for seg eller andre" er det samme som "direkte eller indirekte".

At det har vært noe forvirring rundt rekkevidden av straffeloven § 276 a viser OECDs oppfølgingsrapport 2 og 3 av Norges implementering av konvensjonen. I Phase 2 Report on implementing the OECD Anti- Bribery Convention in Norway s. 25 avsnitt 76 og 77 fremgår det at under besøket fra arbeidsgruppen anførte norske myndigheter at det har ingen betydning for skyldspørsmålet etter straffeloven § 276 a) om den aktive bestikker bruker en annen person for å utføre selve korrupsjonshandlingen. Arbeidsgruppen påpekte at det ikke var relevante rettsavgjørelser på området og at enkelte advokater mente at bruk av mellommenn ville rammes av straffeloven § 276c og ikke § 276a). Arbeidsgruppen mente imidlertid at utfallet av en sak, der et norsk konsulentfirma var gitt et forelegg og en person var tiltalt for bestikkelse av en iransk tjenestemann, ville bidra til å avskaffe usikkerheten i de nye korrupsjonsbestemmelsene på dette punkt. Den omtalte saken er SINTEF- saken, jfr. nedenfor.

I oppfølgingsrapport for fase 3. s. 11 avsnitt 24 var OECDs arbeidsgruppe igjen opptatt av at bestikkelse via mellommenn ikke er direkte regulert i lovteksten. Arbeidsgruppen ville bl.a følge opp følgende (rapporten s. 41):

*The application of the foreign bribery offence as litigation further develops to ensure that it covers bribes paid to third parties and bribery through the use of intermediaries, as well as the interpretation of the "impropriety of the advantage" and the application of the trading in influence offence in cases of foreign bribery.;*

Det er svært lite praksis som kan kaste lys over tolkningen av straffeloven § 276a på dette punkt, men Økokrim gav i 2007 forelegg i en annen sak. SINTEF Petroleum AS (SINTEF) ble ilagt et forelegg på 2 millioner kroner for overtredelse av straffeloven § 276a, jfr. § 276b. Forelegget ble vedtatt av selskapet. Bakgrunnen for saken var at SINTEF i 2002 inngikk en avtale med et iransk oljeselskap om levering av konsulenttjenester for prosjektet 7 West Zagros Fields i Iran. SINTEF skulle inngå avtalen bl.a. sammen med sin joint venture partner RIPI (National Iranian Oil Company Research Institute of Petroleum Industry). SINTEF inngikk også en avtale med Hinson Engineering Ltd., et selskap registrert på de B.V.I. I henhold til avtalen skulle Hinson utføre konsulenttjenester for SINTEF i forbindelse med West Zagros-prosjektet. Hinson-avtalen bestemte at Hinson

skulle motta 6 % av den internasjonale delen av kontraktsverdien for West Zagros prosjektet som vederlag for tjenestene, til sammen USD 254 426. Det ble foretatt betalinger fra SINTEF til Hinsons bankkonto i Sveits den 29. januar og 4. august 2003 på til sammen ca USD 100 000.

Etter ØKOKRIMs oppfatning innebar Hinson-avtalen i realiteten tilbud om betaling av utilbørlige fordeler til president og visepresident i RIPI. Fordelene ble tilbudt/gitt i anledning de iranske tjenestemennenes stilling og for at de hadde påvirket og/eller skulle påvirke beslutningsprosesser av betydning for SINTEF's kommersielle virksomhet i Iran. Fordelene som ble tilbudt/gitt i henhold til Hinson-avtalen var utilbørlige bl.a. på grunn av mottakernes stilling/verv, på grunn av vederlagets størrelse og fordi fordelene ble fordekt som vederlag for konsulenttjenester.

En direktør i selskapet ble også tiltalt etter de samme bestemmelser, men frifunnet i tingretten fordi retten ikke fant bevist at direktøren hadde begått de straffbare forhold han var tiltalt for. I og med at tingretten frifant direktøren, ble det ikke foretatt en direkte rettslig avklaring av grensegangen mellom straffeloven § 276a og § 276c. Andre lignende saker er etter det retten kan se, ikke behandlet i domstolen. Faktum i SINTEF-saken ligner på faktum i denne saken. I tingrettens dom er det ikke spor av at spørsmålet om det var straffeloven § 276a eller § 276c som var relevant ble tatt opp, hverken av aktor, forsvarer eller retten. Retten antar derfor at problemstillingen ikke var oppe i SINTEF-saken. Dette er et moment som taler for at den lovforståelsen norske myndigheter har gitt uttrykk for til arbeidsgruppen i OECD er korrekt.

Retten er enig med forsvarerne i at legalitetsprinsippet setter begrensninger for utvidende tolkning av straffebud. Etter en helhetsvurdering av de momenter som er nevnt ovenfor har retten kommet til at det er det reelle faktiske forhold som retten finner bevist, som er avgjørende for om det er straffeloven § 276a eller § 276c som for anvendelse. Det betyr at dersom retten kommer til at avtalene i realiteten var et tilbud/avtale om utilbørlige fordeler til fedrene i anledning fedrenes stillinger eller verv, så er dette etter en tolkning av straffebudet omfattet av straffeloven § 276a. Etter rettens oppfatning behøver ikke den utilbørlige fordel- i dette tilfelle betalingene- ha endt hos fedrene, så lenge det var fedrene som kunne kontrollere hvor pengene skulle ende, jfr. her ordlyden i bestemmelsen "for seg eller andre".

Rettens konklusjon styrkes i tillegg av det faktum at 3/4 av all internasjonal korrupsjon skjer ved hjelp av agenter/mellommenn. Jfr. OECDs Foreign Bribery Report hvor det er analysert mer enn 400 korrupsjonssaker over hele verden i perioden 1999 til 2014. I rapporten som ble publisert i november 2014 fremgår det følgende på s. 8:

> *Intermediaries were involved in 3 out of 4 foreign bribery cases. These*
> *intermediaries were agents, such as local sales and marketing agents, distributors*

EXT- WALLACE-00060

> *and brokers, in 41% of cases. Another 35% of intermediaries were corporate*
> *vehicles, such as subsidiary companies, companies located in offshore financial*
> *centres or tax havens, or companies established under the beneficial ownership of*
> *the public official who received the bribes.*

På side 29 i rapporten fremgår det at der det ble brukt mellommenn/agenter i korrupsjonssakene var 3% av disse familiemedlemmer til offentlige tjenestemenn. Retten kan vanskelig se for seg at lovgiver har ment at en stor andel av den internasjonale korrupsjon skal rammes av en mildere straffebestemmelse i Norge.

Etter dette blir bevistema i denne saken om avtalene med sønnene i realiteten var tilbud/avtale om betaling av utilbørlige fordeler til fedrene i anledning deres stillinger som offentlige tjenestemenn.

## VII.  Rettens vurdering av om avtalene og betalingene rammes av det objektive gjerningsinnholdet i straffeloven § 276a, jfr. § 276b.

### 1.Innledning

Det fremgår av tiltalen at påtalemyndigheten anser at både avtalene og betalingene i Libya og India utgjorde en utilbørlig fordel som rammes av straffeloven § 276 a, jfr. grunnlaget til tiltalens post a.

Forsvarerne på sin side hevder at begge avtalene var regulære avtaler som var knyttet til tjenester som sønnene hadde ytt eller skulle yte og ikke hadde noe å gjøre med fedrenes stillinger.

I tiltalebeslutningens post a) er gjerningsbeskrivelsen som følger:

> *I perioden 2004 til 2009 forhandlet Yara med det libyske statlige oljeselskapet*
> *National Oil Corporation (NOC) om et samarbeid (joint venture) om*
> *gjødselproduksjon i Libya. En gang, trolig på nyåret 2007, inngikk Wallace på vegne*
> *av Yara avtale om å betale USD 5 millioner eller mer til Mohamed Ghanem, sønn av*
> *Shukri Ghanem. Shukri Ghanem var på det tidspunktet oljeminister i Libya og*
> *styreleder i NOC. Avtalen hadde sammenheng med Yaras forhandlinger med NOC*
> *og Shukri Ghanems rolle der.*

Om betalingen fremgår det følgende av gjerningsbeskrivelsen i post a)

> *Deler av det avtalte beløp, USD 1,5 millioner, ble overført til en konto i Sveits som*
> *ble disponert av Mohamed Ghanem. Dette skjedde på følgende måte: Det sveitsiske*
> *selskapet Nitrochem Distribution AG (Nitrochem) ble bedt om å forskuttere beløpet*
> *for Yara, noe Nitrochem gjorde ved å overføre USD 1,5 millioner til den avtalte*

14-022670MED-OTIR/05

*kontoen 29. mars 2007. Yara refunderte deretter Nitrochem via Yaras deleide selskap i Sveits, Balderton Fertilizer SA (Balderton). Tilbakebetalingen ble skjult gjennom overfakturering av flere ordinære ammoniakkleveranser fra Nitrochem til Balderton, i perioden oktober 2007 til mai 2008. De aktuelle ammoniakkleveransene ble videresolgt fra Balderton til Yara Switzerland SA (Yara Switzerland), til en pris som også dekket inn den overpris Balderton hadde betalt for råvarene. I realiteten var det således Yara Switzerland som dekket betalingen til Ghanem*

*Betalingen ble foretatt samtidig som Yara og NOC var i sluttforhandlinger om "Heads of Agreement" (HoA), som ble undertegnet i april 2007.*

*Både avtalen og delbetalingen utgjorde en utilbørlig fordel.*

Retten har ovenfor under faktumbeskrivelsen når det gjelder Libyaforholdet kommet til at det ble inngått en muntlig avtale med Ghanem jr., der tilbudet om honorar var på til sammen USD 4,5 millioner (ikke 5 millioner som det fremgår av gjerningsbeskrivelsen i tiltalebeslutningen).

Retten har også ovenfor funnet det bevist at betalingen på USD 1, 5 millioner ble gjennomført slik det fremgår av gjerningsbeskrivelsen og at betalingen ble foretatt etter at forhandlingsteamene var blitt enige om HoA i mars 2007 men før den formelle undertegnelse i april.

I tiltalebeslutningens post b) er gjerningsbeskrivelsen som følger:

*I april 2007 tilbød Wallace og Clauw på vegne av Yara å inngå en avtale med Gurpreetesh Singh Maini, sønn av Dr. Jivtesh Singh Maini. Dr. Jivtesh Singh Maini var på det tidspunkt Additional Secretary and Financial Adviser i Ministry of Chemicals & Fertilizers og styremedlem i KRIBHCO på vegne av departementet. Avtaletilbudet med Gurpreetesh Singh Maini hadde sammenheng med Dr. Jivtesh Singh Mainis stilling.*

*(...)I et senere avtaleforslag fra Yara ble engangsbeløpet erstattet med et beløp på USD 3 millioner, som skulle utbetales med USD 1 million pr år i perioden 1. januar 2007 til 31. desember 2009*

Om betalingen fremgår det:

*Den 16. oktober 2007 betalte Yara USD 1 million på grunnlag av en faktura oversendt fra Gurpreetesh Singh Maini fra det libanesiske selskapet CYC s.a.r.l. Beløpet ble i stedet, og etter forespørsel fra Gurpreetesh Singh Maini, overført fra Yara til en konto i Hong Kong tilhørende selskapet Krystal Holdings & Investments*

EXT- WALLACE-00062

*Limited (British Virgin Islands), et selskap i navnet til ektefellene til Jivtesh Singh
Maini og Gurpreetesh Singh Maini.*

Retten har ovenfor i faktumbeskrivelsen for Indiaforholdet funnet bevist at det siste
avtaleutkastet som ble akseptert at Maini jr., innebar et honorar på USD 1 million pr år
over tre år og at det ble utbetalt USD 1 million.

2. Var avtalene og betalingene "utilbørlige fordeler"?
Som det fremgår under gjennomgangen av vilkårene for å straffes for korrupsjon ovenfor,
må det foretas en totalvurdering av situasjonen for å bedømme om det her er gitt en
"utilbørlig fordel". Det er flere momenter som kan trekkes inn her.

Det er uttrykkelig uttalt i forarbeidene at det skal en del til for at en fordel skal anses
utilbørlig. Det ligger en ganske sterk fordømmelse i uttrykket utilbørlig. Det må foreligge
et klart klanderverdig forhold.

Det har vært en utvikling i synet på klanderverdigheten av norske selskapers delaktighet i
korrupsjon i land hvor korrupsjon er en del av forretningskulturen. Før 1995 kunne norske
bedrifter få skattefradrag for dokumenterte utgifter til tvilsomme utbetalinger (bestikkelser)
i utlandet, mens det etter 2003 ble vedtatt strenge straffer for korrupsjon. Retten mener
imidlertid at dette ikke kan tillegges særlig vekt i utilbørlighetsvurderingen i denne saken.
Den type fordel som ble betalt og tilbudt av Yara i Libya og India var ansett som klart
klanderverdig på det tidspunkt handlingen ble foretatt, både nasjonalt og internasjonalt.
Det viser presseoppslagene om Statoilsaken og andre korrupsjonssaker i den aktuelle
perioden. Dette var de tiltalte også klar over.

Formålet med ytelsen er nevnt i forarbeidene som et moment i denne totalvurderingen.
Retten har funnet bevist at formålet med konsulentavtalen og betalingen til Ghanem jr. var
å få informasjon og råd fra dr. Ghanem til bruk i forhandlingene med NOC. Formålet med
konsulentavtalen og betalingen til Maini jr. var å sikre seg farens innflytelse i forbindelse
med forhandlingene med Kribhco og samtalene med DOF om gjødselsregimet i India.

Dette er momenter som trekker sterkt i retning av at det foreligger en "utilbørlig fordel" for
begge avtalenes del.

Honorarets størrelse er også et moment for at fordelen er utilbørlig. Det ble betalt USD 1,5
millioner til Ghanem jr. og inngått avtale om ytterligere USD 3 millioner under visse
forutsetninger. For Maini jr. var tilsvarende beløp USD 1 million pr år i tre år. Retten har
kommet til at honorarene ikke på noen måte stod i forhold til de tjenester som Ghanem jr.
og Maini jr. personlig leverte.

14-022670MED-OTIR/05

Graden av åpenhet er i forarbeidene nevnt som et moment i totalvurderingen. Til det vil retten peke på at avtalene i begge tilfeller var skjult for forhandlingsmotpartene. Det ble også utvist stor kreativitet når det gjaldt å skjule betalingen til Ghanem jr. Det er typiske trekk ved korrupsjon at det er vanskelig å spore betalingsstrømmen. I India var ikke betalingen skjult på samme finurlige måte, men også for India-forholdets del var det problematisk å få betalt fakturaen fra Maini jr.

Retten vil også trekke frem det faktum at avtalen og betalingen både til Ghanem jr. og Maini jr. var i strid med Yaras egne etiske retningslinjer. Betalingen til Ghanem jr. var ikke lovlig. Avtalen og betalingen var ikke "fair" for noen av avtalene. Det var åpenbart at det ble problematisk for Yara at avtalene og betalingene ble kjent.

Det er på det rene at korrupsjon var, og er, svært utbredt i Libya. Retten legger også til grunn at bruk av konsulenter som Ghanem jr., var vanlig for å få tilgang til personer med innflytelse og makt til å inngå avtaler på vegne av libyske statlige organer. Det samme gjelder India. Som nevnt fremgår det av OECDs undersøkelse som er referert ovenfor at mellommenn/konsulenter er brukt i 3 av 4 internasjonale korrupsjonssaker og 3% av disse konsulentene var familiemedlemmer.

Det er nevnt i forarbeidene, bl.a i Ot.prp. nr. 78 (2002-2003) under merknadene til straffeloven § 276 a, at det på noen virksomhetsområder kan ha dannet seg en "ukultur" i form av aksept av utilbørlige fordeler. Departementet uttaler at sedvane på det aktuelle området utgjør et sentralt moment i utilbørlighetsvurderingen, men at det ikke uten videre er avgjørende for hvor grensen for det utilbørlige skal trekkes.

Det er åpenbart at det var "korrupsjonskultur" både i Libya og i India. Retten mener at selv om det kan tillegges vekt i utilbørlighetsvurderingen at forretningsmoralen i Libya og India var slik at korrupsjon var akseptert, så kan ikke dette momentet ha særlig vekt for utilbørlighetsvurderingen i denne saken. Det er nettopp korrupsjon satt i system som i disse tilfeller, som OECD-konvensjonen, FN-konvensjonen og vårt eget regelverk tar sikte på å ramme.

Retten har etter dette kommet til at det er åpenbart at Yara har tilbudt og gitt en "utilbørlig fordel" både i Libya og India, jfr. straffeloven § 276a.

Som retten vil komme nærmere tilbake til nedenfor kan imidlertid det faktum at det var en "korrupsjonskultur" i de aktuelle land få betydning for straffeutmålingen.

3 Var den utilbørlige fordel gitt "i anledning stilling, verv eller oppdrag"?
Retten har ovenfor funnet bevist at Ghanem jr. sin rolle var å innhente informasjon og råd fra sin far og videreformidle dette til Yara. Ghanem jr. drev ikke påvirkningshandel, som rammes av straffeloven § 276c. Han skulle ikke påvirke faren. Han skulle innhente råd og

EXT- WALLACE-00064
14-022070MED-OTIR/05

informasjon om NOCs posisjon fra faren. Det var dr. Ghanem som gav informasjon og råd til Yara, ikke Ghanem jr.  Sønnen var bare budbringeren.

Når det gjelder India har retten funnet det bevist at Yara betalte Maini jr. for tjenester dr. Maini, i kraft av sin posisjon, kunne bistå med i forbindelse med Yaras etablering og fremtidige virksomhet i India.

Forsvarerne har anført at det ikke er rom for gjennomskjæring i strafferetten på samme måte som i skatteretten. Retten er i utgangspunktet enig med forsvarerne i dette. Men retten mener at en ikke står overfor gjennomskjæringsproblematikk i denne saken. Den muntlige avtalen med Ghanem jr. og de øvrige omstendighetene rundt dette avtaleforholdet som retten har funnet bevist ovenfor, kan bare logisk forklares med at det ikke var Ghanem jr. som var avtalemotpart i korrupsjonshandelen, men styreformann og fungerende oljeminister, dr. Ghanem.

Det har ikke blitt dokumentert for retten at betalingen har tilfalt dr. Ghanem. Tvert i imot tyder gjennomgangen av faktum at betalingen stoppet hos Ghanem jr. Hvem som mottar den utilbørlige fordelen kunne være et moment for å anse forholdet som påvirkningshandel. Men dette argumentet slår ikke gjennom når det er dr. Ghanem som yter tjenesten. Hvem man velger som mottaker av honoraret er ikke avgjørende for om straffeloven § 276a eller § 276c får anvendelse, jfr. ordlyden i straffeloven § 276a "for seg *eller andre*" og rettens vurdering av korrupsjonsbestemmelsene ovenfor.

Det er derfor etter rettens oppfatning ikke tvil om at avtalen og betalingen av USD 1,5 million til Ghanem jr. var en utilbørlig fordel som dr. Ghanem kontrollerte. Dr. Ghanem var som nevnt styreleder i NOC og fungerende oljeminister i Libya og det var i kraft av disse posisjonene hans informasjon og råd var av verdi for Yara. Det er derfor heller ikke tvil om at den utilbørlige fordelen var tilbudt og gitt i anledning av dr. Ghanems stilling som høytstående offentlig tjenestemann.

Når det gjelder India finner også retten bevist at avtalene med Maini jr. bare kan forklares med at det var dr. Maini som var den reelle avtalemotpart. Det er ikke tale om påvirkningshandel, fordi det ikke var Maini jr. som påvirket sin far.  I Indiaforholdet er det også bevist at betalingen endte hos familien Maini og ikke bare hos Maini jr. Forøvrig vises til det som ovenfor er sagt om betydningen av den passive bestikkers valg av mottaker av fordelen.

Etter dette har retten etter en helhetsvurdering av de forhold som er behandlet ovenfor funnet det bevist at konsulentavtalene og betalingene til Ghanem jr. og Maini jr. var utilbørlige fordeler i anledning stilling og dermed omfattes av det objektive gjerningsinnholdet i straffeloven § 276a.

14-022670MED-OTIR/05

4. Grov korrupsjon

Tiltalen gjelder grov korrupsjon, jfr. straffeloven § 276 b. Det fremgår av straffeloven §
276 b annet ledd at ved avgjørelsen av om korrupsjonen er grov skal det blant annet legges
vekt på om handlingen er forøvd av eller overfor en offentlig tjenestemann eller noen
annen ved brudd på den særlige tillit som følger med hans stilling, verv eller oppdrag, om
den har gitt betydelig økonomisk fordel, om det forelå risiko for betydelig skade av
økonomisk eller annen art, eller om det er registrert uriktige regnskapsopplysninger,
utarbeidet uriktig regnskapsdokumentasjon eller uriktig årsregnskap.

Retten finner det åpenbart at det i denne saken foreligger grov korrupsjon. Retten viser til
at korrupsjonen i både Libya og India er foretatt overfor en høytstående offentlig
tjenestemann.

I Libya var det avtalte totalhonorar på inntil USD 4,5 millioner mens betalingen var på
USD 1,5 million. Avtalen og betalingen var derfor en betydelig økonomisk fordel for
familien Ghanem. Retten finner også å legge vekt på den måten betalingen ble utført på,
ved å involvere et selskap Yara gjorde forretninger med og bidra til at betalingen ble holdt
skjult.
I India var betalingen på USD 1 million, mens avtalen definerte et honorar på USD 3
millioner.  Dette representerte en betydelig økonomisk fordel for Maini-familien.

**VIII  Rettens vurdering av skyldspørsmålet for den enkelte av de tiltalte**

1. Wallace:

*2.1. Tiltalebeslutningen post a): Libyaforholdet.*
Etter tiltalebeslutningen er Wallaces straffbare handling beskrevet å være at han på vegne
av Yara inngikk en avtale med Ghanem jr. og at avtalen og den senere betalingen hadde
sammenheng med Yaras forhandlinger med NOC og dr. Ghanems rolle.

Wallace har erkjent at det var han som inngikk den muntlige avtalen med Ghanem jr. på
vegne av Yara i 2007.

Retten er ikke i tvil om at Wallace inngikk avtalen med Ghanem jr., vel vitende om at
Ghanem jr.'s primære rolle var å være budbringer av informasjon og råd fra faren samt å
tilsløre de reelle forhold.

Som det fremgår ovenfor er retten videre heller ikke i tvil om at honoraret som ble avtalt
og delvis betalt til Ghanem jr. var ment å skulle kanalisere råd og informasjon fra dr.
Ghanem til Yara i forhandlingene med NOC. Informasjon og råd som Yara ikke ville fått
uten avtalen om betaling.

14-022670MED-OTIR/05

EXT- WALLACE-00066

Retten er videre overbevist om at Wallace, som erfaren forretningsadvokat, var fullstendig klar over alle omstendigheter i arrangementet. Wallace var juridisk direktør i Yara og hadde ansvaret for utarbeidelse av de etiske regler og retningslinjer i selskapet. Han hadde tidligere vært direktør og sjefsjurist for Norsk Hydro Americas Inc. Det er åpenbart at han forsto at engasjementet med Ghanem jr. var korrupsjon. Wallace handlet med viten og vilje.

Wallace har erkjent at han tok kontakt med Zivy for å skjule betalingen. Retten finner også at Wallace har medvirket til å få gjennomført betalingen til Ghanem jr.

Wallace må etter dette dømmes i henhold til tiltalebeslutningens post a).

*2.2 Tiltalebeslutningens post b): Indiaforholdet.*
Etter tiltalebeslutningen er Wallaces straffbare handling beskrevet som at han i april 2007 tilbød, sammen med Clauw, på vegne av Yara, å inngå en avtale med Maini jr. og at avtaletilbudet hadde sammenheng med dr. Jivtesh Singh Mainis stilling.

Retten har ovenfor kommet til at Wallace på vegne av Yara inngikk en avtale med Maini jr. som i realiteten var en avtale med dr. Maini. Wallace har også erkjent at det var han som inngikk avtalen.

Retten er ikke i tvil om at Wallace inngikk avtalen med Maini jr., vel vitende om at Maini jr. viktigste rolle var å tilsløre realitetene som var å gi Yara en direkte kanal til faren.

Retten er heller ikke i tvil om at honoraret som ble avtalt var ment å skulle påvirke dr. Maini til å bruke sin innflytelse til Yaras fordel.

Retten er også for Indiaforholdets del overbevist om at Wallace visste og forstod alle elementer i arrangementet og at han handlet med viten og vilje.

Etter dette dømmes Wallace i henhold til tiltalebeslutningens post a).

2. Clauw:
*2.1 Innledning:*
Det fremgår av tiltalebeslutningens post a) at påtalemyndigheten mener Clauw er skyldig i medvirkning til grov korrupsjon i Libya ved å ha gitt sin tilslutning til at det ble inngått en avtale om å betale penger til Shukri Ghanems sønn og videre ved å foreslå at Nitrochem på vegne av Yara kunne forskuttere betalingen på USD 1,5 millioner til Mohamed Ghanem, og ved å kontakte Nitrochem for å sørge for at dette ble gjort.

Videre fremgår av post b) at grunnlaget for tiltalen mot Clauw for Indiaforholdet er at han og Wallace på vegne av Yara tilbød å inngå en avtale med Maini jr.

14-022670MED-OTIR/05

## 2.2 Nærmere om Libyaforholdet

### 2.2.1. Clauws rolle i organisasjonen og forholdet til de medtiltalte

Det er på det rene at Clauw gikk av som driftsdirektør i Yara sommeren 2006 og gikk inn i en stilling som rådgiver med spesielt ansvar for vekststrategien i selskapet. Han rapporterte direkte til Enger og det var ingen av de øvrige i konsernledelsen som rapporterte til Clauw, slik det hadde vært da han var driftsdirektør. Både Clauw og Enger har forklart i retten at Clauw følte at han ikke ble holdt like jevnlig og grundig informert om prosjekter som han hadde blitt mens han var driftsdirektør. Clauw hadde ikke noe eget kontor i Yaras lokaler i Norge. En gjennomgang av konsernledermøtene viser at han ikke var fysisk til stede etter september 2006, men han fikk kopi av møtereferatene. Clauw jobbet fortsatt tett med Enger, men Clauw og Holba hadde ikke et nært forhold i perioden etter at Clauw ble rådgiver.

Clauws rolle i organisasjonen fra sommeren 2006 var dermed noe annerledes enn den var for de andre tiltalte. Dette mener retten får betydning for vurderingen av hans involvering i Libyaforholdet.

### 2.2.2 Clauws befatning med Libyaforhandlingene i henhold til dokumentene og andre bevis

En gjennomgang av e-poster i perioden 2004 til november 2006 viser at Clauw bare er innkopiert på noen få e-poster som gjaldt NOC. Det er ikke spor av at han var involvert i Helang-avtalen.

Det er et faktum at korrupsjon sjelden direkte viser seg i skriftlig materiale. Videre har retten hørt flere vitneforklaringer om at Clauw var involvert i det meste og at hans arbeidsform, kontaktnett og interesseområde kan tilsi at han var mye sterkere involvert i Libya enn det retten har funnet spor av i dokumentene.

Wallace forklarte i Paris-forklaringen at han rapporterte til Clauw mht sitt engasjement i Libya prosjektet. Allerede i Brüsselavhøret i juni endret han sin forklaring på dette punkt. I motsetning til Holba, som ble prosjekteier for Libyaprosjektet i oktober 2006 og også ble værende i konsernledelsen, ble Clauw fjernere fra formelle beslutningsfora. Retten kan derfor ikke se bort ifra at Wallace tok feil i Paris-forklaringen når det gjaldt Clauws rolle i Libyaprosjektet.

Etter dette finner ikke retten det tilstrekkelig bevist at Clauw, frem til betalingen til Ghanem jr. i mars 2007, har hatt en slik deltakelse i Libyaprosjektet at han kan anses for å ha gitt sin tilslutning til at det ble inngått en avtale med Ghanem jr. i januar 2007.

EXT- WALLACE-00068

### 2.2.3 Clauws rolle når det gjaldt betalingen

Clauw har selv forklart i retten at det var han som spurte Zivy i selskapet Ameropa om de kunne være behjelpelig med å gjennomføre en betaling for Yara som skulle være konfidensiell. Zivy sa seg villig til dette og Clauw sa han ville bli kontaktet av Wallace. Clauw forklarte også at han visste at betalingen skulle gå til en konsulent og at det gjaldt Libya. Han tenkte at det kunne være et etisk problem å foreta en slik betaling, men trodde ikke det var snakk om noe ulovlig idet Wallace fortalte ham at det var en lovlig betaling etter sveitsisk lovgivning.

Etter rettens vurdering burde både det faktum at betalingen skulle være konfidensiell og at det var snakk om betaling til en konsulent og at det gjaldt Libya, være tilstrekkelig til å konstatere at Clauw forstod at dette var snakk om korrupsjon. Men det er beviser i saken som trekker i en annen retning.

For det første kan ikke retten se bort ifra at Wallace har sagt til Clauw at dette var en lovlig betaling i Sveits. Retten viser her både til Clauws forklaring til retten og til den avlyttede telefonsamtalen mellom Clauw og Wallace av 14. mai 2012 hvor Wallace sier til Clauw:

> *And so, you know, I mean, there were no point in saying that wasn't the case. Yes, we made it in Switzerland, because it was legal in Switzerland. We didn't make it in Norway, because we didn't want it in Norway. But Nejdet had told them, you know, about Zivy making the payment, and him reimbursing Zivy, so there was no point in my saying that wasn't true. You know. So that was it.*

I telefonsamtale med Clauw den 18. mai sier Wallace:

> *But Libya, a little different. On the other hand, like I said, I am still not sure that we've vio ... , that Norwegian law was violated. But it's the old thing of what I've always said, about nobody ever goes to jail for what they did, they go to jail for trying to cover it up.*

Hvis det forholder seg slik at juridisk direktør i et stort internasjonalt selskap som Yara sier at betalingen er lovlig etter sveitsisk lovgivning, kan ikke retten se bort ifra at Clauw i kraft av han ikke hadde noe ansvar i libyaforhandlingene, slo seg til ro med det.

Clauw sa flere ganger i telefonsamtaler med Wallace, som er avlyttet, at han ikke visste noen ting om Libya. Retten må anta at Clauw snakket sant når han ikke visste at han ble avlyttet, på samme måte som retten mener at Wallace snakket sant i disse telefonsamtalene.

Retten viser til Clauws telefonsamtale med Wallace den 14. mai 2012 hvor han sier:

> *Okay, anyway for me, I did not knew so it was quite...*

og senere i samtalen:

> *But, because I have not been involved, and for the Indian case, where I took*
> *responsibility of the Indian discussion*

Her skiller han mellom sin rolle i Libya og sin rolle i India, noe som tilsier at det var en
forskjell i Clauws involvering i disse to prosjektene.

I telefonsamtalen den 20. Mai 2012 sier han om Libya:

> *Yeah, I did not have even any clue, what has been done*

og videre:

> *Yeah, but definitely they wanted to implicate Thorleif, in my opinion. Because they*
> *say, you know, it's a CEO responsibility and all of that. And I said, what I did*
> *mention, what was clear, I said, I didn't believe that something has happened, but if*
> *something has happened, Ken has no interest to do it on his own, he has been doing*
> *it because he has been asked to do it.*

Disse utsagnene fra Clauw trekker også i retning av at Clauw var lite involvert i Libya.

Selv om retten antar at Clauw hadde mer kunnskap, både om betalingsarrangementet og
forhandlingene i Libya. enn han selv gir uttrykk for i retten, er ikke retten overbevist om at
Clauw oppfyller de objektive og subjektive vilkår for straff for denne tiltale-posten. Clauw
frifinnes etter dette for tiltalebeslutningens post a).

### 2.2 Nærmere om Indiaforholdet

I India var omstendighetene annerledes. Clauw var her i førersetet. Det var Clauw som
kjente Calil og via han fant frem til Maini jr. Clauw visste at Maini jr. ikke hadde noen
erfaring fra gjødselsektoren og at han var dr. Mainis sønn. Det var Clauw som ba Wallace
om å utarbeide avtaleutkastene med Maini jr. Retten tviler ikke på at Clauw har hatt en
langsiktig forretningsmessig fornuftig plan for Yaras engasjement i India, men retten fester
ikke lit til at Clauw mente Maini jr. hadde noe å bidra med i den sammenheng, utover det
hans far kunne tilby, nemlig å styrke Yaras posisjon i forhandlingene med Kribhco og
innflytelse inn i gjødselsdepartementet.

Retten finner også bevist at når det gjelder India var Clauw kjent med alle forhold som
gjorde handlingen til grov korrupsjon. Han visste om relasjonen mellom Maini jr og dr.
Maini, som var årsaken til at Maini jr. ble engasjert av Yara, jfr. også ovennevnte e-post

14-022670MED-OTIR/05

EXT- WALLACE-00070

*As you know, Maini has been with his father the driving force of the government starting changing for more balance nutrients consumption and pushing KRIBHCO to negotiate with YARA*

Han fastsatte også honoraret det var snakk om, jfr her Wallace sin e-post av 21. mars 2007, hvor Wallace sa at kompensasjonen måtte diskuteres med Clauw direkte.

Retten viser også til avtalen ble holdt skjult for Kribhco og DOF. Det var dermed ikke slik transparens rundt avtaleforholdet med Maini jr. som situasjonen skulle tilsi.

Som nevnt ovenfor mener retten arrangementet må karakteriseres som klassisk korrupsjon. Det visste Clauw. Han er en erfaren forretningsmann som var godt kjent med korrupsjonsfaren. Han visste at arrangementet med Maini jr. i realiteten var bestikkelse av en fremstående offentlig tjenestemann. Retten er videre overbevist om at Clauw handlet med viten og vilje.

Etter dette dømmes Clauw i samsvar med tiltalebeslutningens post b).

### 3. Enger:
*3. 1. Innledning*
Grunnlaget for tiltalebeslutningens post a) mot Enger er medvirkning til grov korrupsjon i Libya ved å ha gitt sin tilslutning til at det ble inngått en avtale om å betale penger til dr. Ghanems sønn og at Enger (sammen med Holba) deltok i forhandlingene med NOC og undertegnet bl.a "Partnership Agreement" i juli 2008 mellom Yara og NOC med kunnskap om at det forelå en avtale om å betale bestikkelser der deler av avtalen var oppfylt fra Yaras side.

I tiltalebeslutningens post b) er grunnlaget for Engers del medvirkning til grov korrupsjon ved å ha gitt sin tilslutning til avtalen med Maini jr. med en økonomisk ramme på USD 3 millioner og ved å godkjenne utbetalingen på USD 1 million.

Enger har i sin forklaring for retten benektet begge forhold.

Når det gjelder Libyaforholdet forklarte Enger at han ikke hadde kunnskap om avtalen med Ghanem jr. Han visste heller ikke at det hadde blitt betalt et beløpt til Ghanem jr. før det tidspunkt "Partnership Agreement" ble undertegnet.

I India var han mer involvert. Han godkjente at det ble engasjert en konsulent, men han forklarte at han ikke var klar over at konsulentens far var en høyt tilsatt tjenestemann i det indiske gjødselsdepartementet. Betalingen til Maini jr. godkjente han fordi han mente de var forpliktet til å betale noe når de brøt konsulentavtalen.

*3.2 Engers rolle i organisasjonen og forholdet mellom de tiltalte. Felles for tiltalebeslutningens post a) og b).*

Enger var konsernsjef i Yara helt fra Yara ble skilt ut fra Hydro til han pensjonerte seg høsten 2008.  Før han ble konsernsjef i Yara var han fra 1. januar 1999 leder i Hydro Agri. Enger satte selv sammen sitt lederteam.  De fire tiltalte var alle en del av konsernledelsen, dog slik at Clauw gikk over i en rådgiverrolle den 30.juni 2006 med direkte rapportering til Enger.  Clauw sluttet 30. juni 2007.  Det nevnes spesielt at Wallace, som juridisk direktør, hadde en stabsrolle uten operativt ansvar.  Hans rolle var å ivareta organisasjonens behov for juridiske tjenester, herunder avtaleforhandlinger.  Wallace bekreftet i retten at han ikke var bemyndiget til å inngå avtaler annet enn på oppdrag fra de operative enheter eller fra Enger.  Unntaket var engasjement av ekstern juridisk bistand hvor Wallace selv kunne engasjere og betale for slik bistand.

En del av styringssystemet var konsernledermøtene hver 14. dag.  De fire tiltalte hadde kontorer ved siden av hverandre, dog slik at Clauw ikke hadde kontor i Oslo på permanent basis.  Alle de tiltalte har forklart at det var en åpen og uformell dialog og tette bånd dem imellom når det gjaldt det forretningsmessige.

Enger hadde en åpen og uformell lederstil. Retten oppfatter Enger slik at han var en tilstedeværende og tilgjengelig sjef.  Enger har i retten forklart at han var opptatt av delegering og at hans lederteam hadde ansvaret for sine områder uten at han var engasjert i detaljene. Flere av vitnene som har arbeidet for Enger har forklart det samme. Kombinasjonen av at alle de tiltalte satt i konsernledelsen, at det var tette bånd dem imellom og at de i tillegg hadde kontor ved siden av hverandre, tilsier etter rettens oppfatning at de tiltalte holdt hverandre informert om viktige prosjekter.

Dette er momenter som taler for at Enger hadde kunnskap om at det var inngått avtaler med sønner av fremstående offentlige tjenestemenn i Libya og India og de øvrige forhold som gjorde disse avtalene korrupte.

Enger har i retten forklart at han og ledelsen i Yara var opptatt av etiske retningslinjer og hadde nulltoleranse for korrupsjon. Enger var godt kjent med korrupsjonsrisikoen i Libya. Libya var et nytt land for Yara, men Hydro hadde vært inne i Libya tidligere, noe retten legger til grunn at Enger var kjent med gjennom å være en del av konsernledelsen i Hydro i flere år. At India er et korrupsjonsutsatt land, var også godt kjent for alle i konsernledelsen. Enger har forklart for retten at Yara var "ekstremt opptatt av sitt renommé", men at de likevel måtte gå inn i land med korrupsjonsrisiko. I den sammenheng var det viktig med best mulige rutiner, holdninger og regelverk for å unngå å bli eksponert for korrupsjon. Dersom Yara skulle inngå avtaler med nære slektninger av fremtredende offentlige tjenestemenn i korrupsjonsutsatte land, var dette åpenbart en omstendighet som konsernsjefen skulle ha informasjon om.

14-022670MED-OTIR/05

Dersom Enger ikke visste om arrangementet med Ghanem jr. og hans far, og at Maini jr. var sønn av dr. Maini, kan det etter rettens oppfatning bare være to grunner til det. Enten har en eller flere av de tre øvrige tiltalte eller andre i konsernledelsen gått bak Engers rygg. Det finner retten ikke var tilfelle. Alternativt har Enger bevisst gått inn for å vite minst mulig om disse konsulentavtalene. Retten viser her til det som er behandlet nedenfor.

### 3.3. Nærmere om Libyaforholdet.
#### 3.3.1 Fullmakts- og ansvarsforhold
Fullmakts- og ansvarsforholdene i Yara taler for at Enger og/eller Holba var kjent med konsulentavtalen og med utbetalingen til Ghanem jr. Wallace kunne ikke godkjenne en slik avtale eller foreta utbetalingen uten prosjekteier eller Engers godkjennelse. Betalingen skulle før eller siden belastes prosjektet og det er derfor usannsynlig at Wallace inngikk avtalen og arrangerte betalingen på egen hånd.

Wallace har sagt det selv flere ganger, også i retten: Han var en god soldat, men han var ikke kommandanten. Det er ingen grunn til at Wallace skulle handle på egen hånd og gå bak ryggen på sin sjef, den ansvarlige for prosjektet eller de andre i konsernledelsen. Retten kan ikke se noen rasjonell forklaring på at Wallace, som juridisk direktør, skulle eksponere seg for den risiko det ville innebære å inngå en korrupt avtale innenfor ansvarsområdet til en kollega i konsernledelsen. Dette ville både være en illojal handling og dessuten eksponere Wallace for en risiko han ikke hadde noe incitament til å påta seg. Rettens vurdering er også overensstemmende med Wallaces eget utsagn: " I wasn't out on a frolic on my own".

Det er en mulighet for at andre i konsernledelsen godkjente avtalen, men det kan ikke ha vært uten Engers viten. Det er ikke nødvendigvis slik at Enger kjente detaljene i avtalen med Ghanem jr. Men både politi- og vitneforklaringer (se nedenfor), samt den informasjon Enger mottok om Helangavtalen, tilsier at Enger hadde kunnskap om at det var inngått en avtale med en konsulent for Libyaprosjektet, hvilke type tjenester det var snakk om og at det var betalt et større beløp.

#### 3.3.2. Helangavtalen
Enger ble informert om Helangavtalen. Det fremgår av e-post fra Wallace av 13.februar 2006 til Mathieu Krane, hvor tema er Helangavtalen, at Enger ble informert om avtalen Wallace skriver i e-posten som Enger mottok kopi av:

*The other person who is aware of this and VERY interested is Thorleif Enger*

Enger har selv forklart i retten at han var interessert i konsulentavtaler generelt, men at e-posten ikke dokumenterer at han visste om Helangavtalen. Dette er etter rettens oppfatning ikke troverdig. E-posten viser at Wallace og Enger hadde snakket om Helangavtalen. Det

er ingen annen mulig forklaring på teksten i e-posten. Dersom Enger var interessert i konsulentavtaler generelt og dette var kommunisert til de øvrige i konsernledelsen, er det et moment som taler for at han også visste om tilsvarende konsulentavtaler, herunder avtalen med Ghanem jr.

Oppdragsbeskrivelsen i avtalene var etter rettens oppfatning ikke reelle og avtalenes innhold skulle skjule deres realitet. Når det gjelder rettens vurdering av Helangavtalen, vises for det første til Wallaces forklaring om at det var han som møtte personene bak selskapet Helang personlig. Det var Wallace som forhandlet, på tross av at han ikke hadde noen rolle i prosjektet. Videre ble det ikke foretatt annen undersøkelse av selskapet og personene bak enn et personlig møte. Det finner retten påfallende. Det fremgår også av to e-poster at Helangavtalen ikke var det den gav seg ut for å være. Retten viser til e-post av 13. februar 2006 fra Mattieu Krane, som på dette tidspunkt var juristen i prosjektteamet:

> *I refer to our little talk of this morning. Please find enclosed a first draft Engagement Letter of the Swiss/Dubai company which Yara thinks of retaining for the NOC project. Considering the little time available I have based this draft on a (much longer and complicated) standard engagement letter used by ABN-Amro*

Senere samme dag svarer Wallace til Krane:

> *My goal here is for this to look like any other consulting/investment banking arrangement*

Manglende undersøkelser og ønsket om å få avtalen til å se ut som en consulting/banking arrangement beviser at avtalens innhold skulle skjule dens realitet.

### 3.3.3 Politiforklaringer og utskrift fra telefonavlytting

Alle de tiltalte har vært unnvikende i sine forklaringer for retten når det gjelder hvem som visste hva om de forhold tiltalen gjelder. Retten har derfor ved sin bevisvurdering, i tillegg til dokumentbevisene, lagt stor vekt på bevis som er fremkommet før rettsforhandlingene og i mindre grad de forklaringer de tiltalte har kommet med i retten. Retten viser spesielt til de første politiforklaringene og telefonsamtalene som ble underlagt kommunikasjons-kontroll (telefonavlytting).

I sin forklaring for fransk politi i mai 2012, ville Wallace etter en stund *"set the story straight"*. Deretter forklarte han seg detaljert om både egen og andres involvering i Libya. Retten er enig med påtalemyndigheten i at Wallace sin forklaring for fransk politi er mer troverdig enn hans forklaring for retten. Retten fester ikke lit til Wallace sin forklaring i retten om at hans politiforklaring av mai 2012 var *"flat out wrong"*.

14-022670MED-OTIR/05

EXT- WALLACE-00074

I Parisforklaringen sa Wallace at *"Engers mentality was not to know"* og *"Enger did not ask the question and I did not answer".* I en telefonsamtale med en venn av 18. mai 2012, noen dager etter at han slapp ut av varetekt i Paris, sa Wallace bl. a:

> *(...) what did Thorleif know, and what did Thorleif not know. And I was very upfront saying, you know, Thorleif did not know very much, because he did not want to know very much. You know, that was my job.*

Og videre:

> *What did I tell Thorleif? I told him we made no direct payments. We made no written agreements. And they said, what did you say about indirect payments? I said: He didn't ask, and I didn't say anything. And that was the deal. The bottom line was, the deal was: Let's not talk about this. And everybody wants to go around saying: I knew nothing.*

Wallace forklarte med andre ord til politiet at han fortalte til Enger at Yara ikke hadde noen skriftlig avtale og heller ikke hadde foretatt noen direkte betalinger. For øvrig ville ikke Enger vite noe. Wallace beskriver her etter rettens oppfatning en stilltiende avtale mellom Wallace og Enger om at Enger ikke skulle vite detaljer om denne type avtaler og betalinger.

I en etterfølgende avlyttet telefonsamtale mellom Wallace og Clauw den 20. mai 2012 sa Clauw:

> *But OK, that was what I said. I said, so I don't believe that this has happened, but if it has happened, Ken has been, everybody has been informed, I know how this management works, and it's no secret, everyone has the same information.*
>
> *(...)*
>
> *and decide on the same things*

Wallaces politiforklaring i Paris og de utdrag av telefonsamtaler som er gjengitt ovenfor, beviser etter rettens vurdering at Enger visste mye mer enn han selv gav uttrykk for i retten. I den grad han ikke hadde detaljkunnskaper om konsulentavtalen i Libya, var det fordi han hadde gitt uttrykk for at han ikke ønsket å ha det.

### 3.3.4 Øvrige vitneforklaringer

Retten har også lagt vekt på Ed Cavazutis (Cavazuti) forklaring i retten. Cavazuti var leder for Yaras´s nedstrømsavdeling fra 2006 til 2009 og en del av konsernledelsen. Cavazuti forklarte i retten at han i januar 2008, mens han var på flyplassen i München på vei til

14-022670MED-OTIR/05

Quatar, fikk en telefon fra Baysan. Baysan fortalte til Cavazuti at selskapet Amerika skulle foreta en betaling på Baysans vegne til en konsulent i Libya. Han sa det var lovlig etter sveitsisk lov. Cavazuti forklarte at han ikke forsto hvorfor Baysan ringte ham om dette, men han ble bekymret og tok dette opp med Enger da han var tilbake i Oslo. Han tidfestet samtalen med Enger til februar 2008. Cavazuti forklarte videre at Enger sa at Baysan snakket veldig mye og det ikke var grunn til å ta alvorlig det han sa. Enger sa til ham at det dreide seg om noen som hjalp dem som "investment bankers" og at han ikke skulle bekymre seg. Cavazuti sa til Enger at de burde sjekke ut hvem konsulenten var uten at Enger hadde noen kommentar til dette.

Retten bemerker at avtalene med Helang og Ghanem jr. fremstår som typiske "investment bankers"- avtaler.

Noe senere kom Wallace til Cavazuti for å snakke med ham om saken. Han forsto det slik at Enger hadde snakket med Wallace. Innholdet av samtalen var uklart for ham under forklaringen for retten, men han husker at han anbefalte at man burde få Nahawi til å sjekke hvem konsulenten var.

Enger´s reaksjon på Cavazuti´s henvendelse viser at Enger kjente til avtalen med Ghanem jr.

Cavazuti forklarte også i retten at han en gang i juni/juli 2008 ble kalt inn på Engers kontor hvor Enger satt sammen med Holba, og han ble spurt om "hvordan de kunne betale disse menneskene". Han følte seg ukomfortabel med spørsmålet idet han antok at det dreide seg om Libya og han svarte "at de vel kunne betale med varer eller med penger eller gjøre det som sist".

Baysan nevnte også for Storvik (tidligere finansdirektør og leder for "Supply and Trade") under en middag de hadde sammen sommeren 2007, at Baysan hadde en dialog med Wallace rundt en utbetaling som Storvik oppfattet var tilknyttet Libya og at Enger visste om dette. Storvik tvilte på at Enger visste dette, men han gikk ikke selv til Enger med informasjonen.

Haslestad forklarte også til politiet at Baysan fortalte at han hadde snakket med Enger om Libyaforholdet under en flytur en gang i 2006/2007. Haslestad kunne ikke huske sin forklaring på dette punkt i retten, men også her er retten av den oppfatning at det er politiforklaringen som må tillegges vekt, ikke det Haslestad forklarte i retten.

Det at Baysan har fortalt til flere at han har snakket med Enger om Libya, tilsier at Cavazuti snakker sant.

14-022670MED-OTIR/05

EXT- WALLACE-00076

Enger har benektet at han hadde snakket med Cavazuti om betaling til en konsulent i Libya i februar 2008 og at det var et møte på Engers kontor i juni/juli 2008 med Cavazuti og Holba.

Det er fra forsvarers side anført at Cavazutis forklaring kan ha vært påvirket av at FBI ble koblet inn i saken. Det vises bl.a til at dialogen med FBI ikke er transparent og at Cavazuti møter til avhør med FBI med to advokater og også møtte i retten med advokat.

Forsvarer reiste spørsmålet om motivet for Cavazutis forklaring var å selv unngå straffeforfølgelse. Dersom han kunne få etablert et faktum der han hadde sagt fra til sine overordnede om klanderverdige forhold, kunne han håpe selv å slippe ansvar.

Retten har vurdert disse innvendingene mot Cavazutis forklaring, men retten fester lit til Cavazutis forklaring. Cavazutis forklaring understøttes av andre bevis i saken, herunder Wallace og Clauws forklaringer som er gjengitt ovenfor. Cavazutis forklaring for retten støttes også av øvrige vitners forklaringer om hva Baysan har sagt om betalingen.  Dette er nok et moment som taler for at Enger visste at det var inngått en avtale med Ghanem jr. og at det hadde blitt foretatt en betaling til Libya lenge før sommeren 2008.

### 3.3.5 Andre momenter

Enger gjorde ingenting med informasjonen han fikk fra Cavazuti, noe som også tyder på at han allerede var kjent med forholdene rundt Ghanem jr. og betalingen.

Retten finner det også påfallende at Enger ikke var mer interessert i bakgrunnen for det kravet som Holba fortalte han om sommeren 2008. Retten har ovenfor funnet det bevist at Holba fortalte at det hadde gått en betaling tidligere.  Selv om de var enige om å avvise betalingen, ville det være naturlig for Enger å undersøke betalingen nærmere ved å snakke med Wallace. Enger var på vei ut av organisasjonen, men det kan ikke forklare den manglende interesse for å undersøke nærmere forholdene rundt betaling og krav fra Libya.

Enger var fortsatt konsernsjef. Det var hans ansvar å foreta nærmere undersøkelser. Han visste hvilke utfordringer som selskapet møtte i korrupsjonsutsatte land.

Den eneste sannsynlige forklaringen som retten kan finne på at Enger ikke undersøkte, var at han allerede visste hva dette var. Alternativt at han bevisst ikke ønsket å vite detaljer om et forhold han forstod ikke var forenlig med selskapets etiske retningslinjer og norsk og internasjonal lovgivning.

Enger har i retten gitt uttrykk for at den muntlige avtalen med Ghanem jr. og den skjulte betalingen gjennom Nitrochem ikke var i samsvar med de etiske retningslinjene i Yara og skulle vært gjort annerledes. Retten utelukker at Wallace har gått bak Engers rygg. Forhandlingene i Libya foregikk over lang tid, selv etter at dr. Ghanem kom inn i bildet.

14-022670MED-OTIR/05

EXT- WALLACE-00077

Enger var en involverende og tilstedeværende leder og, som nevnt ovenfor, var det en åpen og uformell tone mellom de tiltalte. Det er utenkelig at Wallace over en lang periode holdt engasjementet av Ghanem jr. skjult for Enger.

På tross av at Enger visste at det hadde gått en irregulær betaling til Libya og det hadde kommet krav om en til, dro Enger og Holba til Tripoli og undertegnet Partnership Agreement den 17. juli 2008.

### 3.3.6 Engers motiv

Under forhandlingene ble det fra forsvarers side stilt spørsmål ved hvilket motiv Enger skulle ha for å medvirke til korrupsjon helt på tampen av sin karriere.

Retten har ikke funnet noen grunn til å anta at personlig økonomisk vinning har vært av betydning for de handlingene som er omfattet av tiltalen.

Retten finner likevel grunn til å påpeke at korrupsjon begått på den måten retten har funnet bevist ovenfor, ikke nødvendigvis er begrunnet i personlig økonomisk vinning.

Ønske om å lede en virksomhet med stor suksess og å tilfredsstille eiere, ansatte og andre kan være like motiverende for en slik adferd. Det kan også være en grunn at en slik adferd i en virksomhet ikke lett lar seg endre på kort sikt. Retten antar at slike momenter kan ha ligget bak Engers handlinger.

### 3.3.7. Betydningen av at ikke vitner som Baysan, Ghanem jr. og Nahawi er ført for retten, eller avhørt ved bevisopptak.

Forsvarerne har vært opptatt av at påtalemyndigheten ikke har sørget for sin plikt til å opplyse saken i tilstrekkelig grad ved å sørge for at viktige vitner ble avhørt ved bevisopptak. Retten er enig med forsvarerne i at det for så vidt er uheldig at retten ikke har fått høre disse vitnenes forklaringer. Retten er, som det fremgår av det som er vurdert ovenfor, likevel av den oppfatning at saken er tilstrekkelig belyst.

### 3.3.8 Oppsummering og konklusjon:

Enger har i retten forklart at han ikke kjente til avtalen med Ghanem jr. før etter avtaleundertegnelsen i Tripoli 17. Juli 2008.

Gjennomgangen av bevisene ovenfor beviser etter rettens oppfatning, utover enhver rimelig tvil, at dette ikke kan medføre riktighet. Som det fremgår av fremstillingen underbygges dette av at Enger før 17. juli 2007 var informert om Helang avtalen, han hadde fått informasjon fra Cavazuti om betalingen i Sveits, han hadde hatt samtale med Wallace like etter dette og han hadde hatt samtale med Holba om et ytterligere krav. I den grad Enger ikke hadde detaljkunnskaper om avtalen og betalingen, f.eks. beløpets størrelse og betalingsmetode, så skyldes det at han bevisst gikk inn for å få vite minst mulig.

EXT- WALLACE-00078

Det er således ikke ett enkelt dokumentbevis eller én enkelt forklaring som har gjort retten overbevist om at Enger visste om avtalen og betalingen før juli 2008. Konklusjonen er basert på de dokumentbevis, forklaringer og omstendigheter som retten har vurdert, samt på Engers posisjon som konsernsjef og forholdet mellom de tiltalte.

## 3.4  Nærmere om Indiaforholdet
### 3.4.1 Innledning
Enger har forklart at Clauw foreslo at de skulle bruke en agent i India og at han godkjente dette. Enger forklarte i retten at han ikke kunne huske om Clauw sa at konsulenten hadde en far som var embetsmann, men han forklarte at han uansett ikke oppfattet navnet på konsulenten.

### 3.4.2. Avtalen med Maini jr.
Retten har ovenfor funnet bevist at senest den 13. juni 2007 ble Enger informert om og godkjente engasjementet med Maini jr., jfr. E-posten tatt inn ovenfor.

Av denne e-posten fra Wallace til Clauw fremgår det at Wallace har snakket med Enger om Maini jr. Det fremgår også at Enger har fått vite at fire andre i konsernledelsen hadde godkjent arrangementet. Hvis Enger ikke hadde oppfattet at Yara engasjerte sønnen til dr. Maini, må det ha vært fordi de øvrige i konsernledelsen som var kjent med dette, ikke forteller til Enger hvem Maini jr. var. Wallace forklarte imidlertid for retten at alle de som var mottakere av e-posten var informert om familieforholdet og at man av denne grunn måtte utvise forsiktighet. I dette lå at de måtte tenke på hva de ba Maini jr. om og at de måtte dokumentere det de gjorde.

Engasjement av sønner til fremstående offentlige tjenestemenn i korrupsjonsutsatte land ville reise, i henhold til Engers egen forklaring, røde flagg. Det arrangementet som Wallace i henhold til e-posten hadde klarert med Enger, var etter rettens oppfatning utkastet til avtale med Maini jr. Retten viser i den forbindelse til at Wallace sendte avtaleutkastet til Maini jr. samme dag som han orienterte Clauw om at Enger hadde godkjent arrangementet. Enger hadde også fått informasjon om at Kribhco var under kontroll av DOF. Retten viser her til brev fra Resources Int v/ Anupam Dev til Enger av 20.mai 2007:

> *On top of this the majority Govt stake holding in Kribhco exposes it to direct bureaucratic control of the Deptt of Fertilisers and even political interference by the Fertiliser Minister and his office.*

Anupam Dev var Yaras agent i India. Retten kan ikke se bort ifra at Anupam Dev hadde en egeninteresse av at Yara ikke inngikk noe samarbeid med Kribhco, men opplysningen om Kribhco i brevet burde uansett fått Enger til å være ekstra oppmerksom.

Enger visste at dr. Maini var en embetsmann i DOF. Retten viser her til e-post fra Wallace av 17. august 2007 hvor det fremgår at Enger ønsket å møte Sinha i Kribhco og dr. Maini i ministeriet. Enger fikk kopi av denne e-posten. Det er ikke sannsynlig at Yaras konsernsjef reiste til India uten å vite hvem han skulle møte og hvilke posisjoner disse hadde. Enger hadde også godkjent bruk av en konsulent som han visste het Maini. At Enger ikke koblet disse to sammen, er ikke troverdig. Også her legger retten vekt på at Enger er en erfaren forretningsmann og industrileder og at han var godt kjent med korrupsjonsrisikoen i de land Yara hadde virksomhet.

E-posten til Enger fra Wallace av 20. august 2007 viser også at Enger i alle fall på dette tidspunkt kjente alle relevante detaljer rundt engasjementet av Maini jr., herunder slektskapet mellom Maini jr. og dr. Maini og detaljene i avtalen som var inngått. Fra e-posten siteres følgende:

> Also attached is the form of representation agreement that had been negotiated and agreed by Daniel for the retention of Mr. Maini in India. We need to decide whether to go forward with this or settle on something for past services and go forward in another way. Please note that I would ordinarily rely on him to see that Kribhco actually responds in a timely manner to our inquiry about a meeting (not a given), that there is actually a meeting at the Ministry for the same time period (definitely not a given) and that the necessary invitations, etc. for visas are sent out promptly, hotels are booked, dinners arranged, etc. If we are not going to use him, I would like to know who will undertake these matters, particularly for the upcoming trip.

Enger var ved denne e-posten ikke bare informert igjen om innholdet i den avtalen som ble inngått med Maini jr., men også at avtalen ikke var reell. Retten viser her til at Wallace orienterte Enger om hva de egentlig brukte Maini jr. til, nemlig å sørge for at Kribhco svarte i tide og at det ble et møte i Ministeriet, samt at alle andre praktiske detaljer ble gjort.

Den 27. august 2007 fikk Enger i en e-post fra Wallace vite at dr. Maini skulle fratre sin stilling i DOF.

På tross av at Clauw hadde sluttet i Yara sendte han den 5. september 2007 en e-post til Wallace med kopi til Enger. Av e-posten fremgår det bl.a følgende:

> I am not anymore in charge but if YARA really wants to develop with KRIBHCO, you have to sign this agreement, otherwise KRIBHCO will not extend.

Og lenger ned i e-posten:



14-022670MED-OTIR/05

EXT- WALLACE-00080

*As you know, Maini has been with his father the driving force of the government*
*starting changing for more balance nutrients consumption and pushing KRIBHCO to*
*negotiate with YARA.*

Enger videresendte e-posten til Holba og Cavazuti. Enger må derfor ha lest e-posten, ellers
ville han ikke ha videresendt den til dem han gjorde. E-posten viste at det var Maini jr.,
sammen med faren, som var drivkraften både i form av å komme i posisjon til
forhandlinger med Kribhco og for å få startet en endring i gjødselpolitikken. Senest på
dette tidspunkt hadde Enger fått så mye informasjon at det er utenkelig at han ikke visste
hva slags arrangement dette var.

### 3.4.3. Utbetalingen på USD 1 million

Med den viten Enger hadde, godkjente han også at det ble betalt USD 1 million til Maini
jr. Det vises til e-posten av 27. september 2007 med fakturaen til CYC sarl i Libanon. Her
ber Wallace om at fakturaen belastes juridisk avdeling til han fikk snakket med
Ombudstvedt og Cavazuti som ble kopiert til Enger. Denne betalingen burde Enger ha
stoppet.

Enger har hevdet at han godkjente betalingen for å unngå at det skulle oppstå problemer.
Betalingen var en erstatning for en brutt avtale fra Yaras side. Denne forklaringen legger
retten ingen vekt på. Retten har funnet det bevist at Enger visste at det var inngått en avtale
med sønnen til en embetsmann i DOF og at avtalens innhold ikke gjenspeilte realitetene.

### 3.4.4. Oppsummering og konklusjon

Det er inngått en avtale med sønnen av en fremstående tjenestemann som også var
styremedlem i selskapet Yara skulle forhandle med. Sønnen hadde ikke de kvalifikasjoner
som var nødvendige for å oppfylle arbeidsoppgavene i avtalen og honoraret stod heller
ikke i forhold til de tjenester han faktisk utførte.

Dette var informasjon som Enger hadde. Retten finner det bevist utover enhver rimelig tvil
at Enger godkjente at det ble inngått avtale med Maini jr. og at han kjente innholdet i
avtalen. Retten finner også bevist at Enger visste at Maini jr. var sønn av dr. Maini, som på
dette tidspunktet var en sentral embetsmann i DOF. I tillegg finner retten det bevist at
Enger godkjente utbetalingen på USD 1 million. Han visste også at avtaleforholdet ikke
var transparent vis a vis Kribhco og DOF.

### 3.5 Subjektiv skyld

#### 3.5.1 Tiltalebeslutningens post a) - Libyaforholdet

Medvirkningshandlingen inndeles tradisjonelt i fysisk og psykisk medvirkning. For Engers
del er det spørsmål om han kan dømmes for psykisk medvirkning eller eventuelt passiv
medvirkning.

14-022670MED-OTIR/05

Fysisk medvirkning er en handling som på en eller annen måte bidrar til den faktiske utførelsen av handlingen, mens psykisk medvirkning innebærer at gjerningspersonens motivasjon til å utøve handlingen blir påvirket, jfr. Magnus Matningsdal: Medvirkning til straffbare handlinger – hovedpunkter i Jussens Venner s. 363.

*I utgangspunktet kan ingen straffes for psykisk medvirkning uten at medvirkeren positivt har tilskyndet gjerningspersonen til å utføre handlingen.*

Ren passivitet er normalt ikke nok for medvirkeransvar. Johs. Andenæs nevner i Alminnelig strafferett s. 329 at selv om en person har en spesiell plikt til å hindre den straffbare handlingen, vil en ren passivitet som regel ikke kunne straffes som medvirkning. Men for den person som har en slik særlig plikt til å gripe inn, kan det ikke kreves en positiv tilskyndelse som vilkår for medvirkningsansvar. Andenæs sier på s. 329 det må være nok til å gjøre ham ansvarlig at han ovenfor den skyldige gir uttrykk for at han ikke har noe imot handlingen og viser til eksempelet med gårdsgutten som spør husbonden om han ikke skal hugge litt inn på naboens eiendom, og husbonden svarer "gjerne for meg". Videre følger på s. 329:

*Allerede en unnlatelse fra den overordnedes side av å gripe inn kan av den underordnede oppfattes som et samtykke, og er den overordnede klar over dette, må det betraktes som en psykisk medvirkning.*

Retten har ovenfor kommet til at Enger hadde kunnskap om konsulentavtalen med Ghanem jr. og at han visste om den betalingen som var foretatt på et langt tidligere tidspunkt enn han selv hevder. Retten har også funnet det bevist at i den grad Enger ikke visste om detaljene i avtalen, så var det fordi han ikke ville vite dette. På tross av at han visste hva som foregikk forhindret ikke Enger verken at avtalen med Ghanem jr. ble inngått eller at betalingen ble foretatt. Han dro til Tripoli den 18. juli 2008 og undertegnet en "Partnership Agreement" med NOC etter at han visste at det var utbetalt penger til fungerende oljeministers sønn. Inngåelsen av avtalen med NOC på dette tidspunkt var aktiv medvirkning fra Engers side.

Retten finner bevist at Enger i forbindelse med avtaleinngåelsen med Ghanem jr. har gitt uttrykk for overfor Wallace at han ikke hadde noe imot at avtalen ble inngått. Om dette ble gjort uttrykkelig eller stilltiende er ikke avgjørende. Det er uansett snakk om psykisk medvirkning som er tilstrekkelig til at Enger kan straffes for medvirkning til korrupsjon. Enger var Wallaces overordnede og Enger hadde en plikt til å hindre at det ble begått korrupsjon på Yaras vegne. Enger kan ikke komme fri for straffansvar for medvirkning ved bevisst å unngå å få kunnskap om detaljene i arrangementet. Wallace var klar over at Enger visste hva som foregikk i Libyaforhandlingene.

EXT- WALLACE-00082

Enger grep ikke inn, men forholdt seg passiv og ga i tillegg uttrykk for at han ikke ville vite noe, jfr. Wallaces utsagn om at "Enger did not ask the question and I did not answer". Dette kan bare forstås på en måte. Enger godkjente at Wallace gjorde det som måtte gjøres for å få til en avtale med NOC, han ville bare ikke vite om det. Dette er mer enn "gjerne for meg", som i eksemplet med husbonden ovenfor. Dette er en stilltiende avtale mellom Enger og Wallace om at Wallace hadde alle fullmakter. Wallace har flere ganger uttalt at han var en god soldat, men ikke kommandanten. Enger var den øverste kommandanten. Wallace handlet ikke på egen hånd. Enger har ved sin viten og manglende inngripen gitt Wallace den forutsetning som var nødvendig for å utføre den aktive korrupte handling.

Retten viser også her til Andenæs (jfr. ovenfor) på s. 329, hvor Andenæs uttaler at et stilltiende eller uttrykkelig samtykke fra den som har en særlig plikt til å hindre den straffbare handling, betyr at én av de normale hindringer for forbrytelsen er ryddet bort og ikke kan betraktes på samme måte som et tilsvarende samtykke fra en utenforstående.

Skyldkravet er forsett, jfr. straffeloven § 40. Medvirkeransvaret er et selvstendig ansvar. For å kunne domfelle for medvirkning til et straffbart forhold må den tiltalte - i tillegg til at han rent faktisk må ha medvirket til det lovbrudd tiltalen gjelder - som hovedregel ha utvist skyld i forhold til ethvert faktisk moment som er et vilkår for straff.

Selv om Enger ikke nødvendigvis har kjent til detaljene i avtalen, mener retten at han har hatt kunnskap om de forhold ved avtalen og betalingen som medfører at det er gitt en utilbørlig fordel til en person i anledning denne personens stilling. Enger har også hatt kunnskap om de omstendigheter ved handlingen som medførte at det dreide seg om grov korrupsjon. Enger visste at det mest sannsynlig var snakk om en ikke ubetydelig økonomisk fordel, jfr. her også hans erfaring fra Indiaforholdet, og at det var betaling for råd fra en fremstående offentlig tjenestemann. På tross av dette ga han sin tilslutning til avtaleinngåelsen og undertegnet en avtale med NOC.

Enger har etter dette medvirket til korrupsjonshandlingen med viten og vilje og han har visst om og utvist skyld i forhold til de omstendigheter ved handlingen som er vilkår for straff for grov korrupsjon.

Etter dette finner retten at Enger må dømmes i henhold til tiltalebeslutningens post a).

### 3.5.2 Tiltalebeslutningens post b): Indiaforholdet

Retten har ovenfor kommet til at Enger godkjente at det ble inngått avtale med Maini jr. og at han kjente innholdet i avtalen. Retten har også funnet det bevist at Enger visste at Maini jr. var sønn av dr. Maini, som på dette tidspunktet var en sentral embetsmann i DOF. På tross av dette godkjente Enger utbetalingen på USD 1 million. Han visste også at avtaleforholdet ikke var transparent vis a vis Kribhco og DOF.

Retten fester ikke lit til at Enger ikke visste at tilbudet og betalingen til Maini jr var korrupsjon. Enger kjente alle relevante forhold rundt engasjementet med Maini jr. og dr. Maini. Når han på tross av dette godkjenner avtalen og betalingen, har han med viten og vilje medvirket til grov korrupsjon.

Enger dømmes derfor i samsvar med tiltalebeslutningens post b).

### 4. Holba
#### 4.1 Innledning
Holba er tiltalt for medvirkning til korrupsjon ved å ha gitt sin tilslutning til at det ble inngått en avtale om at det skulle betales penger til dr. Ghanems sønn og at Holba (sammen med Enger) deltok i forhandlingene med NOC og undertegnet blant annet "Partnership agreement" med kunnskap om at det forelå en avtale om å betale bestikkelser der ikke alle avdragene var betalt.

#### 4.2 Holbas rolle i organisasjonen og forholdet til Enger og Wallace
Holba var leder av nedstrømsdivisjonen fra Yara ble etablert til oktober 2006, da han tok over etter Ombudstvedt som leder av oppstrømsdivisjonen. Holba var dermed i konsernledelsen mens Libya-forhandlingene pågikk. Da han ble leder av oppstrømsdivisjonen ble han også prosjekteier for Libya-prosjektet. Han var prosjekteier frem til den endelige avtalen ble undertegnet av Yara og NOC i februar 2009.

Holba kjente Libyaprosjektet før han tok over oppstrømsdivisjonen i 2006. Retten viser her til en e-post fra Holba til bl.a. Solheim, Clauw og Sloot av 3. juli 2002 hvor han kommer med sine kommentarer til Yaras inntreden i Libya. Det er også en e-post fra Solheim til Holba, hvor Holba får oversendt informasjon. Holba kjente både til NOC og Omar Gazal allerede på dette tidspunkt. Det viser bl.a et memo fra 20. februar 2004 fra et møte Yara hadde med Gazal.

Holba er av flere av vitnene beskrevet som en "hands on" prosjekteier. Vitnet, Tom Østlyngen, som ble prosjektleder etter at prosjektet ble flyttet til Oslo, forklarte at Holba brukte en god del tid på Libya-prosjektet og fulgte det opp på en positiv måte. Holba var aktivt med i forhandlingsmøtene med NOC. Etter at prosjektet ble flyttet til Oslo satt hele prosjektteamet i samme etasje. I tillegg til e-poster og annen formell kontakt, var det også en uformell kontakt i prosjektet.

Retten finner det derfor usannsynlig at Wallace engasjerte en konsulent og betalte bestikkelser uten at Holba visste om dette. Det er på det rene at det var prosjekteier som hadde myndighet til å engasjere eksterne rådgivere og pådra kostnader i et prosjekt. Dette har både Holba og flere av vitnene forklart. Det er prosjekteier i samarbeid med sitt prosjektteam som vil være nærmest til å vurdere behovet for å leie inn ekstern ekspertise.

EXT- WALLACE-00084

Dersom Holbas forklaring om at han ikke visste om avtalen og betalingen før sensommeren 2008 er korrekt, ville det i realiteten bety at en eller flere i konsernledelsen i Yara inngikk korrupte avtaler i et prosjekt, uten prosjekteiers viten. Det finner ikke retten troverdig og viser bl.a. til Clauws forklaring om at når Wallace visste noe som var viktig, så visste alle i konsernledelsen det.

Holba kjente også Nahawi godt. Han hadde kjent ham i 10 år og forklarte i retten at han brukte tid på å snakke med Nahawi om Libya. Ghanem jr. var Nahawis kontakt. At Nahawi skulle holde det skjult for Holba at Ghanem jr. hadde fått en avtale med Yara i Libyaprosjektet, er ikke sannsynlig.

*4.3 Tidspunkt for avtale med og betaling til Ghanem jr.*
Wallace har forklart at han fikk vite om Ghanem jr. under et møte med Nahawi i Paris den 2. desember 2006. Dette var etter at Holba hadde tatt over som prosjekteier. Wallace møtte Ghanem jr. i januar 2007 og førte forhandlingene med Ghanem jr. frem til den muntlige avtalen ble inngått i perioden februar til mars 2007. Betalingen ble foretatt 29. mars 2007. På dette tidspunkt hadde Holba vært prosjekteier i flere måneder. I perioden oktober 2006 til utbetalingen til Ghanem jr. hadde prosjektet vært behandlet i styret tre ganger og i konsernledermøte syv ganger. En "hands on" prosjekteier som Holba må ha vært nøye informert om alle deler av prosjektet i denne perioden.

HoA ble undertegnet den 25. april 2007. Dette var en viktig milepæl i forhandlingene. Libyaprosjektet var et stort og prestisjetungt prosjekt for Yara. Den aktivitet i prosjektet som foregikk forut for undertegnelse av HoA har dermed vært viktig også for Holba. Det er for retten utenkelig at han ikke var fullt informert om alle viktige elementer i forhandlingene, herunder at det var inngått en avtale med Ghanem jr. som innebar at de fikk informasjon og råd fra dr. Ghanem og at han fikk betaling for dette.

*4.4 Wallace sine politiforklaringer og avlyttede telefonsamtaler*
Retten legger til grunn, som det fremgår ovenfor, at Wallace snakket sant da han forklarte seg for fransk politi i mai 2012. I dette avhøret uttalte han at Holba ba han dra til Dubai for å møte Ghanem jr. Han forklarte også at det må ha vært Holba som godkjente beløpet som ble betalt. Retten viser også til Wallaces forklaring om prosjektteamets meddelelse fra dr. Ghanem om at de måtte "sort it out with my son". Holba var prosjekteier og var derfor den sentrale mottaker av denne beskjeden.

I den avlyttede telefonsamtalen med Clauw den 14. mai 2012 sa Wallace:

> *I just said, you know, Mr. Holba knew about it all the time. You know. It was his prooject, it wasn't mine. I wasn't out on a frolic on my own.*

TRUE CO[PY]

14-022670MED-OTIR/05

Wallace fortalte noe av det samme til en venn i en avlyttet telefonsamtale den 18. mai 2012:

> And so I finally just said. You know what, folks. I am a good soldier, but I was not the commandant. This wasn't my project. Here's the deal. I'm still not sure it was a violation of Norwegian law, by the way. But in any event, I basically said, you know, if Mr. Holba is telling you that he knew nothing, until I came in and told him - this is bullshit.

I en annen avlyttet samtale med Clauw av 20. mai 2012 sier Wallace:

> Yeah, you know, and I said, you know, if, you know, the one thing that they did read to me, and I said, "that is bullshit", was when Tor basically said that the first time he knew anything about Libya was in September 2008, when I was, when I, you know - that's bullshit. It was his project.

I samme samtale sa han også:

> Well, well, let me put it differently. Nothing I said should have made Hallgeir's life any more difficult. Tor, on the other hand, has got a lot of explaining to do.

Retten legger stor bevismessig vekt på politiforklaringen i Paris etter at Wallace bestemte seg for å "set the story straight" og de avlyttede telefonsamtalene. Når det gjelder de avlyttede telefonsamtalene viser retten til at her snakker Wallace til en god kollega og til en venn. Det er ingen grunn til å anta at han ikke snakker sant til disse to.

Wallace har sagt at hans forklaring i Paris var preget av at han ikke hadde tilgang til dokumenter og at han ikke nå kan finne støtte for det han har sagt om Holba i dokumentene. I retten husket han ingenting. Etter rettens oppfatning er det støtte i dokumentene og i øvrige omstendigheter for at Wallace snakket sant i politiforklaringen i mai 2012. Holba tok over som prosjekteier i oktober 2006. Wallace dro til Paris for å møte Nahawi i desember 2006 og møtte Ghanem jr. første gang i januar 2007. Wallace hadde ikke eget budsjett til å pådra Yara generelt eller prosjektet spesielt slike utgifter det her var snakk om. Holba, som prosjekteier, var den eneste som hadde myndighet til dette.

Som det fremgår ovenfor, under faktumbeskrivelsen, var det et forhandlingsmøte mellom Yara og NOC i august 2007. På dette tidspunkt hadde Ghanem jr. fått utbetalt USD 1,5 millioner og HoA var undertegnet. Forhandlingsmøtet var ikke vellykket. I e-post av 7. september 2007 til bla. Enger, Wallace og Nahawi, beskriver Holba situasjonen som

> (...) basically led them to re-opening all aspects of the signed HoA – to our detriment.

TRUE COPY

EXT- WALLACE-00086

Det er på det rene at Wallace skulle reise til Dubai og at han da skulle møte Ghanem jr. for å få informasjon som kunne løse problemene samt at han tok med seg den ovenfor nevnte issue listen. Wallace og Holba tok fly sammen til Dubai. Holba forklarte i retten at han visste at Wallace skulle møte en kontakt og at han visste at Wallace hadde med seg issue listen. Holba forklarte videre at han ikke visste hvem denne kontakten var og at han heller ikke spurte. På spørsmål i retten om hvorfor han ikke spurte hvem denne kontakten var og hva han kunne bidra med, svarte Holba at det ikke var naturlig for ham å spørre Wallace om dette og at det kunne være legitime grunner til at noen ville holde sitt nettverk for seg selv.

Holba var klar over temaet for møtet med "kontakten", nemlig issue listen. Det kunne derfor ikke være hvilken som helst kontakt Wallace skulle møte. Det kunne bare være behov for en som kunne bidra med noe utenfor de offisielle forhandlingene. I tillegg forklarte Holba at det skulle være klare linjer i prosjektet. Det skulle bare være "en stemme" fra prosjektet. Wallace var ikke en del av prosjektteamet. Libyaprosjektet var Holbas ansvars. Etter rettens vurdering er det ikke troverdig at Holba ikke visste hvem som var Wallaces kontakt og hva denne kontakten skulle bidra med.

Oppfølgingen etter møtet med Ghanem jr. i Dubai i september 2007 viser at Holba visste mer enn han gav uttrykk for i retten. Wallace kom tilbake med råd om hvordan Yara burde forholde seg og det er på det rene at dette var råd som Wallace hadde fått av sin kontakt.

### 4.5 Våren 2008 og varsling sommeren/høst 2008

Wallace forklarte under politiavhøret i Paris i mai 2012 at han brukte tiden fra april til juni 2008 til å overføre sine oppgaver til sin etterfølger. Wallace forklarte videre i avhøret at han i løpet av denne perioden hadde et møte med Holba, der muligheten for et ytterligere betalingskrav fra Ghanem jr. ble diskutert. Wallace forklarte at han ikke visste hvordan det skulle la seg gjøre å foreta en ytterligere utbetaling.

Retten legger også her politiforklaringen til grunn av de samme grunner som er nevnt ovenfor. Videre viser retten til Cavazutis forklaring om hans samtale på Engers kontor om hvordan de skulle betale "disse menneskene" som han tidfestet til juni 2008. Etter rettens vurdering viser dette at problemstillingen rundt et nytt krav fra Ghanem jr. dukket opp allerede på forsommeren 2008, før undertegningen av "Partnership Agreement" den 18. juli 2008.

Kravet fra Ghanem jr. kom den 24. juli 2008, altså bare få dager etter at Partnership agreement var undertegnet. Det var Wallace som informerte Holba om at kravet hadde kommet. Retten viser her til både Holba og Wallaces forklaringer. Etter Wallaces forklaring for retten, kan han ikke huske om Holba spurte nærmere hva denne betalingen dreide seg om. Holba forklarte at han ikke spurte Wallace eller foretok nærmere undersøkelser.

TRUE C

14-022670MED-OTIR/05

Den eneste forklaringen på at Holba ikke undersøkte dette nærmere, er etter rettens oppfatning at han allerede visste både om avtalen og betalingen som allerede var foretatt.

Holba har forklart at han etter å ha snakket med Dalane gikk til Enger og fortalte om kravet, og senere fortalte han dette både til Enger og Haslestad. Holba hevder at samtalen med Enger og Haslestad må anses som varsling og at varslingen viser at han ikke var involvert. Retten finner ikke at det Holba har foretatt seg i forhold til avtroppende og påtroppende konsernsjef kan anses som varsling.

For det første finner retten det bevist at Enger visste om konsulentavtalen og betalingen før sommeren 2008. Samtalen mellom Enger og Holba må derfor ha vært en diskusjon om hvordan de skulle løse et problem. For det andre ventet Holba med å snakke med Haslestad til det hadde gått flere uker etter Haslestads tiltredelse. Begge disse forhold tilsier at man ikke står overfor en varsler. Det viktigste momentet for retten i forhold til om Holba er en varsler eller ikke, er at han på tross av at dette var hans prosjekt, ikke foretok seg noe som helst for å undersøke kravet.

Til slutt har retten også lagt vekt på at Wallace reiste til Dubai for å møte Ghanem jr. igjen i september 2008. På dette tidspunkt hadde Wallace sluttet. Retten ser liten grunn til at Wallace skulle gjøre dette på egen hånd. Noen må ha bedt Wallace om å dra for å møte Ghanem jr. og det må ha vært Holba. Enger var også på vei ut av Yara, det samme gjaldt Ombudstvedt, slik at Holba var den eneste i prosjektet som kan tenkes å be Wallace møte med Ghanem jr. for å avvise kravet. Holba var også den som risikerte å sitte igjen med ansvaret alene for de straffbare forhold.

Retten er etter dette overbevist om at Holba gav sin tilslutning til at Wallace inngikk en muntlig konsulentavtale med Ghanem jr., som i realiteten var en avtale med dr. Ghanem om å få informasjon og råd i forhandlingene med NOC. Retten er også overbevist om at Holba hadde godkjent at det hadde blitt utbetalt et betydelig beløp til Ghanem jr. og at det skulle betales flere avdrag.

*4.6 Subjektiv skyld.*
Som det fremgår ovenfor, har retten kommet til at Holba hadde kunnskap om avtalen om å betale bestikkelser til Ghanem jr. og at Holba deltok i forhandlingene med NOC etter at avtalen med Ghanem jr. var inngått. Retten har også funnet det bevist at Holba har godkjent beløpene i avtalen. Holba reiste sammen med Enger da "Partnership Agreement" skulle undertegnes.

Holba har etter rettens oppfatning hatt mer detaljkunnskap om Wallaces handlinger enn Enger. Han var prosjekteier og hadde kontroll på budsjettet og hvem som skulle engasjeres i prosjektet utover Yaras eget forhandlingsteam.

TRUE C

14-022670MED-OTIR/05

EXT- WALLACE-00088

For Holba var det snakk om mer enn psykisk medvirkning. Han hadde godkjent beløpene som ble avtalt med Ghanem jr. Ved å sende Wallace til Ghanem jr. med issue listen vel vitende om avtalen som var inngått og betalingen som var foretatt, medvirket han aktivt til korrupsjon. Det samme gjelder det faktum at han dro sammen med Enger da en ny avtale med NOC den 18. juli 2008 skulle undertegnes på tross av at han visste at det var betalt bestikkelser.

Retten er ikke i tvil om at Holba har medvirket med viten og vilje. Han var klar over de omstendigheter som medfører straffeskyld i straffeloven § 276a og 276b. Han visste at det var tilbudt og betalt bestikkelser til sønnen av en offentlig tjenestemann og han visste om beløpets størrelse og de øvrige momenter som medfører at handlingen er grov korrupsjon.

Holba dømmes etter dette i samsvar med tiltalebeslutningens post a).

## IX Straffeutmåling
### 1. Generelt om strafferammen for grov korrupsjon
De fire tiltalte er funnet skyldig i grov korrupsjon eller medvirkning til grov aktiv korrupsjon. For to av de tiltalte (Holba og Clauw) er det snakk om ett tilfelle av betaling av bestikkelse på henholdsvis 1,5 millioner USD (ca. 8,5 millioner norske kroner etter datiden dollarkurs) og 1 million USD (ca. 5,5 millioner kroner etter datidens dollarkurs) For de to andre tiltalte er det snakk om to tilfeller av bestikkelser på til sammen USD 2,5 millioner. Det var både for Libya og India tilbud om ytterligere betaling på henholdsvis USD 3 og 2 millioner.

Det fremgår av straffeloven § 276b at strafferammen for grov korrupsjon er 10 år. Saken gjelder korrupsjon begått i utlandet i form av tilbud om og betaling av bestikkelser til utenlandske offentlige tjenestemenn. Slik korrupsjon var og er svært utbredt i de land denne saken gjelder. Korrupsjon fører med seg store problemer og utgjør en trussel mot rettsstaten, demokratiet, menneskerettighetene og sosial rettferdighet. Det fører også til konkurransevridning bedrifter i mellom, jfr. uttalelsene i Ot.prp nr. 78 (2002-2003) pkt. 2.1.1. Sterke allmennpreventive hensyn gjør seg derfor gjeldende ved utmåling av straff for korrupsjon.

Norge har ratifisert OECD-konvensjonen om motarbeidelse av bestikkelse av utenlandske tjenestemenn i internasjonale forretningsforhold, Europarådets strafferettslige konvensjon mot korrupsjon og FNs konvensjon om grenseoverskridende organisert kriminalitet. For å følge opp Norges forpliktelser etter disse konvensjonene ble det vedtatt nye korrupsjonsbestemmelser i straffeloven i juli 2003 (straffeloven § 276a, § 276b og § 276c). Samtidig ble strafferammen for grov korrupsjon kraftig skjerpet.

TRUE

Bestikkelse av utenlandske tjenestemenn var tidligere regulert i straffeloven § 128 og hadde en strafferamme på ett år. Etter lovendringen ble strafferammen for simpel korrupsjon hevet til tre år og strafferammen for grov korrupsjon hevet til 10 år. Med dette ble strafferammen for grov korrupsjon høyere enn ved andre formuesforbrytelser. Straffelovrådet begrunnet straffeskjerpelsen med at korrupsjon etter omstendighetene ville være mer straffverdig og kunne utgjøre et lagt større samfunnsproblem enn underslag og tyveri, jfr. NOU 2002: 22, pkt.5.3.4.

Men departementet uttaler også i punkt 7.3.2:

> *Departementet vil understreke at det bare ved meget alvorlige og samfunnsskadelige former for korrupsjon kan være aktuelt å reagere med fengselsstraffer på mer enn seks år.*

Justiskomiteen uttalte om straffenivået i Innst.O. nr. 105 (2002-2003):

> *Etter komiteens syn kan dette i utgangspunktet virke strengt, blant annet fordi andre grove formuesforbrytelser straffes med inntil 6 år. Når komiteen likevel støtter forslaget om 10 år, er det fordi korrupsjon i større grad rammer vitale samfunnsinteresser. Grov korrupsjon vil etter komiteens mening dessuten være mer straffverdig og mer samfunnsskadelig enn grovt underslag og tyveri.*

Grov korrupsjon vil kunne være mer straffverdig enn annen økonomisk kriminalitet og straffen vil dermed være strengere.  Men det fremgår også av forarbeidene at det skal mye til for å reagere med en straff på over 6 år (*"meget alvorlige og samfunnsskadelige former for korrupsjon*).

I Rt. 2010-1624 uttalte Høyesterett om straffenivået etter skjerpelsen:

> *Noe klart signal om at heving av det generelle straffenivået for grov korrupsjon var et formål ved lovendringen utover de mest alvorlige tilfellene, er det imidlertid ikke mulig å lese ut av forarbeidene. Selv om en heving av strafferammen i seg selv ikke tilsier en generell heving av straffenivået, vil imidlertid utvidelsen av spennet kunne medvirke til et større spillerom i straffutmålingen og dermed til en strengere straffutmåling også utenfor de mest alvorlige tilfellene. Forarbeidenes understreking av straffverdigheten ved korrupsjon gir dessuten etter mitt syn, sammenholdt med de synspunkter som lå til grunn for de to nevnte høyesterettsdommene, grunnlag for en viss skjerpelse av straffenivået.*

Retten må etter dette ved straffeutmålingen ta hensyn til at det har skjedd en viss generell straffeskjerpelse for grov korrupsjon etter lovendringen i 2003.

**TRUE COPY**

14-022670MED-OTIR/05

I forarbeidene er ikke korrupsjon begått i utlandet viet mye oppmerksomhet, bortsett fra uttalelsene om at straffeloven § 128 burde endres, særlig på grunn av lav strafferamme og dermed kort foreldelsesfrist. Som nevnt ovenfor under utilbørlighetsvurderingen, fremgår det av Ot.prp. nr. 78 (2002-2003) at:

> Det kan være store forskjeller fra land til land i forretningsmoral, forvaltningsskikk og sedvane. Etter departementets oppfatning kan utilbørlighetsvurderingen ikke stå upåvirket av forholdene i et annet land hvor bestikkelsen mottas eller ytes, eller hvor den passive bestikker har sitt virke.

Selv om dette momentet ikke ble gitt nevneverdig vekt ved den konkrete utilbørlighetsvurderingen i denne saken, mener retten at det bør få betydelig vekt ved straffeutmålingen.

Samfunnets alminnelige fordømmelse av korrupsjon har, som tidligere nevnt, vært gjenstand for en utvikling fra skattefradrag til strenge fengselsstraffer for samme handling. Denne utviklingen fanges opp av vurderingen om en handling er utilbørlig eller ikke, jfr. ovennevnte proposisjon:

> Vurderingen skal bero på oppfatningen i samfunnet i lys av de reelle hensyn og grunnleggende verdier som ligger bak bestemmelsen. Utilbørlighetsstandarden vil derfor ikke ligge fast, men utvikles på bakgrunn av det rådende moralsynet i samfunnet til enhver tid.

Etter rettens oppfatning må straffeutmålingen til en viss grad følge samme utvikling.

I Libya og India er det fortsatt en "korrupsjonskultur" som er forskjellig fra forretningskulturen i de fleste vestlige land. Ingen av disse landene har ratifisert OECD-konvensjonen. Det er ikke tvil om at korrupsjon i disse landene er samfunnsskadelig. Retten er likevel av den oppfatning at når et lands forretningsmoral og sedvane kan tillegges vekt ved utilbørlighetsvurderingen, må disse forholdene også tillegges vekt ved straffeutmålingen.

2. Gjennomgang av rettspraksis
Det er lite rettspraksis på området. Når det gjelder korrupsjon begått i utlandet, er det etter det retten kan se bare en underrettsdom som behandler denne type korrupsjon. Retten kommer nærmere tilbake til denne dommen nedenfor.

Det er noe mer rettspraksis på straffeutmåling ved grov korrupsjon begått i Norge.

I Rt-2008-1473 uttalte Høyesterett at straffen for grov korrupsjon og grov utroskap ved korrupsjon på til sammen ca. NOK 6,5 millioner burde ligge på rundt fem år og seks



14-022670MED-OTIR/05

måneder. Retten fastsatte også straffen for to medtiltalte til ett år og syv måneder. De hadde betalt bestikkelser på rundt NOK 900 000,-. En siste tiltalt ble dømt for grov korrupsjon ved å ha gitt hovedtiltalte ca. NOK 3 millioner. Hans straff ble fastsatt til to år og to måneder etter fradrag for tilståelse. I straffe skjerpende retning for den strengeste straffen ble det lagt vekt på at vedkommende hadde vært initiativtaker og den som ledet den kriminelle aktiviteten. Hans virksomhet var målrettet med tanke på egen vinning.

I saken nevnt ovenfor (Rt- 2010- 1624) mottok en saksbehandler i plan- og bygningsetaten i en kommune i alt kr. 150 000 fra et eiendomsselskap eid av to brødre. A ble dømt til fengsel i ett år, mens brødrene ble dømt til fengsel i syv måneder. Det ble ikke tillagt nevneverdig vekt at det var syv år siden de straffbare handlinger ble begått. I straffeskjerpende retning ble det lagt vekt allmennpreventive hensyn og at den straffbare virksomheten hadde pågått i lang tid.

Rt- 2012-243 gjaldt fire tilfeller av passiv grov korrupsjon og utroskap sentrale oppgaver i forbindelse med tildeling og oppfølging av oppdrag i et kommunalt eiendomsforetak. A hadde ved fire anledninger mottatt til sammen ca. NOK 1,5 millioner Høyesterett uttalte at straffen for korrupsjonsforholdet isolert tilsa en fengselsstraff på 3 år. Høyesterett fastsatte (og skjerpet) straffen for to av de medtiltalte som begge ble funnet i skyldig i aktiv grov korrupsjon med ca. NOK 200 000. Høyesterett uttalte at straffen for den aktive korrupsjonen burde være på rundt ett og seks måneder. De ble også domfelt for utroskap og fikk en samlet straff på 2 år.

I Oslo tingretts dom av 3. desember 2014 ble fire tidligere Unibuss-ledere, en tidligere salgssjef det tyske busselskapet Man i Norge og lederen for et byggefirma dømt for bl.a grov korrupsjon. Hovedtiltalte hadde mottatt bestikkelser på til sammen ca. NOK 6 millioner, hvorav NOK 2, 5 millioner var bevist personlig vinning for ham. Det ble uttalt at normalstraffen ville vært 6 år. Ved den konkrete straffutmålingen la tingretten særlig vekt på den personlige vinning som den enkelte hadde hatt, totalomfanget av den korrupsjonen som vedkommende har vært involvert i, tidsperioden vedkommende hadde operert og antallet enkelthandlinger.

Straffeskjerpelsen for grov korrupsjon og begrunnelsen for denne sammenholdt med nyere rettspraksis viser etter rettens oppfatning at straffeutmålingen i stor grad er knyttet til størrelsen på det beløpet som er gitt eller mottatt. Hvis en ser beløpene som er betalt og tilbudt isolert, ville straffeutmålingen i denne saken ligge på et sted mellom 5 og 7 år, avhengig av om det er snakk om domfellelse for det ene eller begge forholdene.

Retten finner at det i tillegg som det som er nevnt ovenfor om de spesielle omstendigheter ved korrupsjon begått i utlandet også er andre ulikheter mellom den korrupsjon som er pådømt i de ovennevnte dommene og den type korrupsjon som denne saken gjelder.

TRUE CO

14-022670MED-OTIR/05

EXT- WALLACE-00092

Det er ikke dokumentert at de tiltalte har hatt personlig økonomisk vinning. Korrupsjonen har skjedd på vegne av et stort børsnotert aksjeselskap, slik at det ville være selskapet, og ikke de tiltalte, som innkasserte en eventuell fordel av bestikkelsene. I dommene ovenfor har den aktive bestikker fått betydelige personlige økonomiske fordeler.

Retten har gått gjennom de saker hvor Økokrim har gitt forelegg for overtredelse av straffeloven § 276a, jfr § 276b, hvor det er utenlandske offentlige tjenestemenn som er bestukket. Informasjonen er hentet fra Økokrims nettside.

I februar 2007 tok Økokrim ut tiltale for grov korrupsjon mot en tidligere administrerende direktør i SINTEF Petroleumsforsikring AS (saken er nevnt ovenfor under drøftelsen av grensen mellom straffeloven § 276a og 276c), samt utferdiget et forelegg mot selskapet PF på NOK 2 millioner. Korrupsjonen foregikk i 2002 og frem til slutten av oktober 2003, altså delvis før og delvis etter straffeskjerpelsen. Tilbudet om betaling var på USD 254 426, mens det ble utbetalt ca. USD 100 000 før avtalen ble terminert. SINTEF PF vedtok forelegget, mens direktøren ble frifunnet i Trondheim tingrett den 30. mai 2007. Aktor la i tingretten ned påstand om 90 dagers fengsel.

I mai 2014 ble det utferdiget et forelegg mot rederiselskapet Cabu Chartering AS hvor selskapet ble ilagt en bot på NOK 20 millioner. Forelegget ble vedtatt av selskapet. Saken gjaldt bestikkelse av høytstående beslutningstaker i Bahrain (på ministernivå) i perioden juli 2003- mars 2004. Bestikkelsene var fordekt som kommisjoner som ble betalt til en bankkonto i Sveits tilhørende et selskap registrert på B.V.I. Utbetalingene var på ca. 9 millioner kroner. Økokrim la i formildende retning vekt på at rederiet selv varslet Økokrim om forholdet i august 2010, og at rederiet etter dette reelt bidro til å opplyse saken ved blant annet å gjennomføre egen granskning. Økokrim la videre betydelig vekt på at avtalen med mellommannen om kommisjon var en løpende avtale inngått før norsk korrupsjonslovgivning ble strammet inn med virkning fra 4. juli 2003. Det straffbare forholdet som rederiet ble bøtelagt for besto i at rederiet unnlot og terminere avtalen med mellommannen da nye korrupsjonsbestemmelser trådte i kraft. For de siktede personene ble forholdet avgjort ved påtaleunnlatelse, særlig på grunn av at forholdet ble avsluttet våren 2004 og at de preventive hensynene ble tilstrekkelig ivaretatt ved reaksjonene mot selskapet.

Oslo tingrett avsa den 15. juli 2011 en dom mot tre personer for grov korrupsjon. Ved inngåelsen av en kontrakt om et prosjekt i Tanzania ble det forutsatt at 5% av kontraktssummen skulle betales til ansatte som deltok i prosjektet. De ansatte jobbet i DAWASA, som var en offentlig etat. De tiltalte hadde ikke noe å gjøre med korrupsjonsavtalen, men fikk på et senere tidspunkt kjennskap til dette og medvirket deretter til at utbetalingene ble foretatt i perioden 2004 til august 2007. Utbetalingene var på til sammen USD 172 700. En av de tiltalte ble dømt for medvirkning ved i alt 8 overføringer på tilsammen USD 109 000. Han fikk en straff på 6 måneder hvoray 2

14-022670MED-OTIR/05

måneder betinget. En annen av de tiltalte fikk 60 dagers betinget fengsel for medvirkning til utbetaling av USD 49 000.

Aktor gav uttrykk for at straffeutmålingen i denne saken var utfordrende på grunn av manglende rettspraksis når det gjelder utenlandskorrupsjon.

Retten har også funnet straffeutmålingen vanskelig. Den begrensede praksis som foreligger når det gjelder korrupsjon begått i utlandet viser etter rettens oppfatning at straffene ligger på et helt annet og mye lavere nivå enn for korrupsjon begått overfor offentlig tjenestemann i Norge. Beløpet i SINTEF-saken ville etter rettspraksis for korrupsjon overfor norsk offentlig tjenestemann ha medført en straff på ubetinget fengsel i 2-3 år, det samme gjelder for Norconsultsaken. Dette må retten ta hensyn til ved straffeutmålingen.

I Norconsultsaken er fraværet av økonomisk fordel for de tiltalte nevnt som et moment som får betydning for straffeutmålingen. Retten mener at dette momentet også må få betydning i denne saken.

Retten mener også at det må tas hensyn til i formildende retning at handlingene er begått i land der korrupsjon er en del av forretningskulturen. Behandlingen av denne type korrupsjon har på kort tid gått fra å ikke være straffbar, til en strafferamme på 10 år. Fordømmelsen og klanderverdigheten i handlingene har hatt samme utvikling. Selv om lovgiver har ønsket å skjerpe straffene også for denne type korrupsjon, mener retten at det bør være en glidende opptrapping i straffeutmålingen. Likebehandling og forutberegnelighet er et viktig hensyn ved straffeutmåling. Retten er derfor av den oppfatning at straffen må reduseres betydelig i forhold til aktors påstand.

## 2.    Straffeutmålingen i denne saken, felles for alle tiltalte
Det er karakteristisk ved korrupsjon at den foregår svært fordekt, noe faktum i denne saken også viser. Både den aktive og passive bestikker legger ressurser i å skjule sine handlinger. Oppdagelsesrisikoen er derfor liten. Høyesterett uttalte i Rt-2001-2007, hvor en avdelingsleder i Statoil ble dømt for korrupsjon, at hvor oppdagelsesrisikoen er liten, tilsier allmennpreventive hensyn at de tilfellene som avdekkes, straffes strengt.

Retten finner at det må legges vekt på i straffeskjerpende retning for alle de tiltalte at de var en del av selskapets konsernledelse.

Sammen har de tiltalte, etter rettens oppfatning, bidratt til at verdien av selskapets antikorrupsjonsarbeid ble sterkt forringet. Det har liten betydning å iverksette antikorrupsjonsarbeide for Yaras 8000 ansatte, hvis konsernledelsen ikke selv forholder seg til eget regelverk. Det skal også tillegges at alle de tiltalte hadde mulighet for å stoppe den korrupsjon som de nå dømmes for.

TRUE COPY

Retten antar at en del av antikorrupsjonsarbeidet ble håndtert ved at konsernets sjefsjurist skulle ha full kontroll med alle transaksjoner som kunne representere mulig brudd på regelverket.

Wallaces oppgave fremstår ha vært å begrense oppdagelsesrisikoen for de korrupte avtaler Yara valgte å gå inn i, heller enn å unngå at selskapet påtok seg slik risiko overhodet. Det var Wallace som langt på vei alene førte kontraktsforhandlingene med Gahnem jr. i Libya, med Maini jr. i India og også med Helang. Det var også han som definerte den type kontrakter som ble benyttet, kontrakter som gå skinn av å omfatte noe annet enn det oppdragene faktisk gikk ut på. Dette viser at det nettopp var på konsernledernivå at de korrupte handlingene fant sted. Det kan derfor synes som Yara`s regler for Code of Conduct gjaldt for alle andre enn konsernledelsen selv.

Det følger av rettspraksis, særlig Rt-2010-1624 som er nevnt ovenfor, at de momenter som etter lovens skal vektlegges ved bedømmelsen av om korrupsjonen er grov også vil være sentrale momenter ved straffeutmålingen. Det fremgår av annet ledd i straffeloven § 276b at disse momentene bl.a er om handlingen er forøvd av eller overfor en offentlig tjenestemann eller noen annen ved brudd på den særlige tillit som følger med hans stilling, verv eller oppdrag, og den har gitt betydelig økonomisk fordel, om det forelå risiko for betydelig skade av økonomisk eller annen art, eller om det er registrert uriktige regnskapsopplysninger, utarbeidet uriktige regnskapsdokumenter eller uriktige årsregnskap.

Korrupsjonen ble begått overfor sentrale offentlige tjenestemenn. Dette er straffeskjerpende, jfr. momentene i straffeloven § 276b annet ledd. Videre er måten transaksjonene er organisert og gjennomført på, eksempler på klassisk korrupsjon.

Det faktum at det er inngått avtaler som ikke gjenspeiler det reelle innhold og måten betalingen til Ghanem jr. ble skjult på viser at korrupsjonen var godt planlagt.

Høyesterett uttalte i Rt-2010-1624 at på grunn av de tungtveiende offentlige hensyn vil størrelsen på den økonomiske fordelen ikke uten videre være avgjørende, men beløpet vil telle med i en totalvurdering. Det er i denne saken, i en norsk sammenheng, snakk om relativt store beløp som er tilbudt og betalt både i Libya og i India. De tiltalte har ikke, etter rettens oppfatning, begått korrupsjon for å oppnå egen økonomisk vinning. Retten finner dermed at det økonomiske omfanget av korrupsjonen ikke bør få den samme straffeskjerpende betydning som fremgår av rettspraksis gjennomgått ovenfor.

Det har gått syv år siden de straffbare handlinger ble begått og saken har vært under etterforskning fra 2011 frem til tiltale ble tatt ut i januar 2014. Etterforskningen har vært krevende, og foregått i flere jurisdiksjoner, slik det ofte er tilfelle ved korrupsjon begått i utlandet. Høyesterett uttalte i Rt-2012-243 følgende:

14-022670MED-OTIR/05

*De straffbare forhold ligger nå et stykke tilbake i tid. I saker som dette får likevel tidsmomentet begrenset betydning, jf. Rt-2010-1624 avsnitt 30: Korrupsjon og utroskapssaker er nærmest gjennomgående omfattende og komplekse; etterforskningen er krevende. Et omfattende bevismateriale og mange involverte gjør det vanskelig å få sakene iretteført så raskt som man skulle ønske.*

Denne saken har ikke hatt liggetid hos Økokrim, i motsetning til ovennevnte sak, som hadde hatt en liggetid på ett år hos påtalemyndigheten. Retten nevner i den forbindelse også at årsaken til noe av den tiden som har gått fra de straffbare forholdene ble begått, skyldes manglende reaksjon fra Yaras ledelse etter at de hadde fått signaler om at noe var galt i 2008. Retten viser her spesielt til at verken den nye konsernsjef eller styreleder undersøkte de opplysninger de fikk om betalingen i Libya i 2008. Først etter at Dagens Næringsliv stilte spørsmål om forholdet våren 2011 kom reaksjonen fra Yaras ledelse. Den tiden som er gått siden de straffbare handlinger ble begått får derfor ikke betydning for straffeutmålingen.

I Cabu Chartering-saken fant Økokrim av at de preventive hensyn var tilstrekkelig ivaretatt ved en reaksjon mot selskapet. Retten er av den oppfatning at sterke allmennpreventive hensyn taler for at de personer som har begått de korrupte handlingene også får en merkbar straff, selv om selskapet blir ilagt en stor bot. Særlig gjelder dette hvor det er personer i selskapets ledelse som har begått korrupsjonen. Retten viser her til at det er de tiltaltes handlinger som har påført selskapet boten og risikoen for tap av anseelse.

Retten er av den oppfatning at straffens individualpreventive virkning for alle de tiltalte langt på vei er ivaretatt ved at det ble tatt ut tiltale og selve gjennomføringen av rettsaken.

Retten mener også at det må ses hen til hvordan de ytterst få sakene i praksis er behandlet av Økokrim og domstolen når det gjelder internasjonal korrupsjon. Straffeutmålingen bør utvikles gradvis, ikke i store sprang. De generelle straffeutmålingsmomenter som retten har gjennomgått ovenfor, straffeutmålingen i Norconsultsaken, sammenholdt med behandlingen i Cabu Cateringsaken, tilsier etter rettens oppfatning at straffene i denne saken i utgangspunktet bør ligge mellom 5 til 6 års ubetinget fengsel, avhengig av om det er domfellelse for ett eller to forhold samt den tiltaltes posisjon i organisasjonen.

*Rettet i medhold av straffeprl. §44 8/7-2015* [handwritten marginal note]

### 3.   Straffeutmålingen for den enkelte
*3.1 Enger*
Retten har funnet Enger skyldig i medvirkning til to tilfeller av korrupsjon.

Straffeloven § 62 får dermed anvendelse.

TRUE C [stamp]

Av de fire tiltalte er retten av den oppfatning at Enger er den som bør dømmes strengest. Enger var konsernsjef. Tillitsbruddet overfor Yara var størst for Engers del. Han hadde muligheter til å stoppe korrupsjonen både i India og Libya. Det var Enger som skulle påse at selskapets etiske regler og retningslinjer ble fulgt. I stedet ga han sin godkjennelse til at personer i hans lederteam begikk korrupsjon og viste dermed at korrupsjon var akseptert i Yara.

Enger har vært opptatt av at han stolte på sine medarbeidere og hadde en delegerende lederstil. Men en toppsjef kan ikke delegere sitt ansvar. Han hadde ansvaret for at toppledelsen i selskapet viste de øvrige ansatte i selskapet at de etiske retningslinjene ble fulgt. Hans godkjennelse av den korrupsjonen han visste foregikk, var en nødvendig forutsetning for at korrupsjonen ble begått. Ansvaret for å forhindre korrupsjonen lå til syvende og sist hos Enger.

Retten finner ikke at straffen for Engers del vil ha noen individualpreventiv virkning. Den omstendighet at Enger ble tiltalt og selve rettssaken har etter rettens oppfatning tilstrekkelig avskrekkende virkning.

Aktor har nedlagt påstand om 6 års fengsel. Retten mener dette er en for streng straff og viser til gjennomgangen av generelle straffeutmålingsmomenter ovenfor. Retten fastsetter etter dette straffen til ubetinget fengsel i 3 år.

Til fradrag kommer 3 dager for utholdt varetekt.

### 3.2 Wallace
Wallace er funnet skyldig i to tilfeller av grov korrupsjon.

Straffeloven § 62 får anvendelse.

Han var den aktive utfører av handlingen. Han inngikk avtalene og sørget for betalingene.

Retten har også i skjerpende retning lagt vekt på at Wallace var en del av konsernledelsen og en erfaren jurist. Han var også den som hadde ansvaret for arbeidet med selskapets etiske retningslinjer. Han visste at det han gjorde var i strid med de retningslinjer han selv hadde laget.

Retten har i formildende retning lagt vekt på at Wallace ikke var den som gav ordren. Han var den gode soldaten, som fulgte ordre. Men Wallace hadde likevel som de andre tiltalte, mulighet til å stoppe korrupsjonen.

Aktor har nedlagt påstand om fengsel i 7 år for Wallace. Aktors straffepåstand er etter rettens oppfatning for streng, jfr. ovenfor. Retten mener også at Wallace sin straff bør

være lavere enn for Enger. Retten fastsetter etter dette straffen til ubetinget fengsel i 2 år og seks måneder.

Til fradrag kommer 3 dager for utholdt varetekt.

### 3.3 Holba

Holba er funnet skyldig i ett tilfelle av medvirkning til grov korrupsjon.

Holba er tiltalt og funnet skyldig i kun ett forhold som må medføre en del lavere straff enn for Wallace og Enger, som er funnet skyldig i to forhold. Som nevnt ovenfor har ikke retten kun lagt vekt på beløpets størrelse, men det må gis en viss vekt, jfr. gjennomgangen av rettspraksis ovenfor.

Holba hadde som konserndirektør og prosjekteier i Libyaprosjektet et særlig ansvar.

Retten finner ingen formildende omstendigheter utover de som fremgår ovenfor.

Aktor har nedlagt påstand om fengsel i 3 år for Holba. Som for de andre tiltalte finner retten at straffepåstanden er for streng. Retten fastsetter etter dette straffen til ubetinget fengsel i 2 år.

Til fradrag kommer 3 dager for utholdt varetekt.

### 3.4 Clauw

Clauw er frifunnet for Libyaforholdet og funnet skyldig i grov korrupsjon i India.

I skjerpende retning legger retten vekt på at Clauw var den som initierte korrupsjonen i India.

For øvrig finnes ingen formildende omstendigheter, utover de som retten har gjennomgått ovenfor.

Retten fastsetter straffen til ubetinget fengsel i 2 år.

Til fradrag i straffen kommer 3 dager for utholdt varetekt.

Dommen er enstemmig.



- 85 -          14-022670MED-OTIR/05

## DOMSSLUTNING:

1.  Thorleif Enger, født 31.10.1943, dømmes for overtredelse av straffeloven § 276a, jfr. § 276b til fengsel i 3 –tre– år, jfr. straffeloven § 62. Til fradrag i straffen kommer 3 – tre- dager for utholdt varetekt.

2.  Kendrick Taylor Wallace, født 03.08.1945, dømmes for overtredelse av straffeloven § 276a, jfr. § 276b til fengsel i 2 –to- år og 6 –seks- måneder, jfr. straffeloven § 62. Til fradrag i straffen kommer 3 –tre- dager for utholdt varetekt.

3.  Tor Holba, født 17.03.1956, dømmes for overtredelse av straffeloven § 276a, jfr. 276b til fengsel i 2 –to- år. Til fradrag i straffen kommer 3 –tre- dager for utholdt varetekt.

4.  Daniel Clauw, født 27.02.1950, frifinnes for tiltalebeslutningens post a).

5.  Daniel Clauw, født 27.02.1950, dømmes for overtredelse av straffeloven § 276a, jfr. § 276b til fengsel i 2 – to – år. Til fradrag i straffen kommer 3 – tre- dager for utholdt varetekt.

****

Etter avtale med forsvarerne postforkynnes dommen ved at den sendes til forsvarerne som har påtatt seg å forkynne dommen for de tiltalte. For Wallaces del skal dommen oversettes til engelsk. For Clauws del skal dommen oversettes til fransk. Det tar ca. to uker. Retten og forsvarerne har blitt enige om at de skal forkynne den oversatte dommen og forkynnelsesdato blir derfor når den oversatte dommen er forkynt, noe som også får betydning for utgangspunktet for ankefristen. Mottakskvittering vil bli sendt sammen med dommen til samtlige forsvarere og vil følge den oversatte dommen når det gjelder Clauw og Wallace. Vedlagt dommen følger "Rettledning til domfelte og opplysning om ankefrist".

Retten hevet

Heidi Heggdal

Leif Helmich Pedersen

Morten Drake

- 86 -

14-022670MED-OTIR/05

EXT- WALLACE-00099

*Translation from Norwegian*



# OSLO DISTRICT COURT
## [Oslo tingrett]

## JUDGMENT

**Delivered on:**          7 July 2015

**Case No:**               14-022670MED-OTIR/05

**Presiding judge:**
                           District Court Judge          Heidi Heggdal

**Lay judges:**
Siviløkonom [*Economist*]                                Leif Helmich Pedersen
Chartered Accountant                                     Morten Drake

---

The Public Prosecuting Authority        Senior Public Prosecutor   Marianne Djupesland
                                        Senior Public Prosecutor   Bård Thoresen
                                        Police Prosecutor   Helene Bærug Hansen

vs

Kendrick Taylor Wallace                 Advocate Arild Dyngeland
Daniel Roger Clauw                      Advocate Fredrik Berg
                                        Deputy advocate Ruth Heile Tezfasion
Thorleif Enger                          Advocate Ellen Holager Andenæs
                                        Advocate Jan Erik Teigum
Tor Holba                               Advocate Astri Aas-Hansen
                                        Advocate Nadia Christina Hall

---

**No restrictions on publishing**

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



EXT- WALLACE-00100

*Translation from Norwegian*

# JUDGMENT

Kendrick Taylor Wallace was born on 3 August 1945 and lives at 5002 South Elberon St, TAMPA, FL 33611, USA

Daniel Clauw was born on 27 February 1950 and lives at 3 Avenue Guillemotte, 78112 FOURQUEUX, France.

Thorleif Enger was born on 31 October 1943 and lives at Volvat terrasse 6, apt. H0301, 0369 Oslo.

Tor Holba was born on 17 March 1956 and lives at Sierra Blanca, Calle 38, Casa 204, 29602 Marbella, Malaga, Spain.

By an indictment issued by the *Norwegian National Authority for Investigation and Prosecution of Economic and Environmental Crime [Økokrim]* on 15 January 2014, the defendants were indicted before Oslo District Court for violation of:

> **The Penal Code, section 276a, cf. section 276b**
> For having given or offered an improper advantage in connection with a position, office or assignment. Position, office or assignment also means a position, office or assignment in a foreign country. The offence is considered gross because, among other things, the act resulted in a considerable financial advantage, because the act concerns the bribery of a foreign public official or because incorrect accounting documentation was used.
> **The indictment is based on the following:**
> Yara International ASA (Yara) is the parent company of an international corporate group with activities mainly within the production and sale of fertilizers, with more than 8,000 employees worldwide. The company's headquarters is located in Oslo and its shares are listed on the Oslo Stock Exchange.
> The Norwegian State holds 36.2 % of the shares.
>
> Thorleif Enger was President and Chief Executive Officer of Yara during the period 2004 - October 2008. Kendrick Wallace was Yara's Chief Legal Officer and a member of the corporate management team during the period from 2004 to the summer of 2008. Tor Holba was a member of the corporate management team from 2004 until May 2012 (from October 2006 as Head of the Upstream segment and project owner for the negotiations in Libya). Daniel Clauw was a member of the corporate management team as Chief Operating Officer and Deputy CEO of Yara during the period from 2004 to the autumn of 2006, when he was engaged as a consultant responsible for growth initiatives reporting directly to Mr Enger, a position he held until September 2007.
> Persons acting on behalf of Yara aided and abetted the following:

---

- 2 -                                                          14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà. Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



EXT- WALLACE-00101

*Translation from Norwegian*

**Count a)**
**Concerns defendants no. 1 Wallace, no. 2 Clauw, no. 3 Enger and no. 4 Holba**
In the period 2004 to 2009, Yara negotiated with the state-owned Libyan oil company
National Oil Corporation (NOC) regarding cooperation (a joint venture) on fertilizer
production in Libya. At some point, probably in early 2007, Wallace entered into an
agreement on behalf of Yara to pay USD 5 million or more to Mohamed Ghanem, the
son of Shukri Ghanem. At the time, Shukri Ghanem was Libya's oil minister and
chairman of the NOC. The agreement was made in connection with Yara's
negotiations with the NOC and Shukri Ghanem's role there.

Parts of the agreed amount, USD 1.5 million, were transferred to a Swiss bank account
controlled by Mohamed Ghanem. This happened as follows: The Swiss company
Nitrochem Distribution AG (Nitrochem) was asked to advance the amount on Yara's
behalf, which Nitrochem did by transferring USD 1.5 million to the agreed account on
29 March 2007. Yara subsequently reimbursed Nitrochem via its partially-owned
subsidiary in Switzerland, Balderton Fertilizer SA (Balderton). The reimbursement was
concealed by over-invoicing several ordinary deliveries of ammonia from Nitrochem to
Balderton, in the period from October 2007 to May 2008. The ammonia deliveries in
question were then sold from Balderton to Yara Switzerland SA (Yara Switzerland) at a
price which also covered the excess price that Balderton had paid for the commodities.
Thus, in reality it was Yara Switzerland that covered the payment to Ghanem.
The payment was made at the same time as Yara and the NOC were in the final stages
of negotiating a "Heads of Agreement" (HoA), which was signed in April 2007.
Both the agreement and the partial payment constituted an improper advantage.
Clauw, Enger and Holba consented, probably in early 2007, to entering into a deal to
pay money to Shukri Ghanem's son.

Clauw further aided and abetted by proposing that Nitrochem could, on behalf of Yara,
advance the USD 1.5 million payment to Mohamed Ghanem, and by contacting
Nitrochem to ensure that this was done.
Enger and Holba participated in the negotiations with the NOC and signed, *inter alia*, a
"Partnership Agreement" between Yara and the NOC in July 2008, knowing that an
agreement had been made to pay bribes of which not all the instalments had been paid.
The final agreement between Yara and the NOC was signed in February 2009.
**Count b) Concerns defendants no. 1 Wallace, no. 2 Clauw, no. 3 Enger**
In the period from December 2006 to the spring of 2008, Yara International ASA
(Yara) negotiated with Krishak Bharati Cooperative Limited (KRIBHCO) regarding
cooperation (a joint venture) within the fertilizer sector in India. The Government of
India held 67 % of the shares in KRIBHCO, with the administrative responsibility being
allocated to the Ministry of Chemicals & Fertilizers.

In April 2007, Wallace and Clauw, on behalf of Yara, offered to enter into an agreement
with Gurpreteesh Singh Maini, the son of Dr. Jivtesh Singh Maini. Dr. Jivtesh Singh
Maini was at the time Additional Secretary and Financial Adviser at the Ministry of
Chemicals & Fertilizers and a member of the board of KRIBHCO on behalf of the

- 3 -                                              14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

*Translation from Norwegian*

Ministry. The offer of an agreement with Gurpreetesh Singh Maini was made in connection with Dr. Jivtesh Singh Maini's position.

The offer of an agreement ("Representative Engagement Letter") which was presented to Gurpreetesh Singh Maini entailed, *inter alia*, an offer to pay USD 250 000 in a one-off payment, and an offer to pay him, on certain conditions, USD 0.50 per metric ton on all fertilizer products sold by Yara in India. One of the conditions for the duration of the agreement was that an agreement between Yara and KRIBHCO would be reached. In a later proposal from Yara for an agreement, the one-off payment offer was replaced by an amount of USD 3 million, to be paid in instalments of USD 1 million per year during the period 1 January 2007-31 December 2009.

On 16 October 2007, Yara paid an amount of USD 1 million on the basis of an invoice forwarded by Gurpreetesh Singh Maini from the Lebanese company CYC s.a.r.l. The amount was instead, at Gurpreetesh Singh Maini's request, transferred from Yara to an account in Hong Kong belonging to the company Krystal Holdings & Investments Limited (British Virgin Islands), a company registered in the names of the spouses of Jivtesh Singh Maini and Gurpreetesh Singh Maini.

Both the offer of an agreement and the payment constituted an improper advantage.

Enger aided and abetted by consenting to the negotiations with Gurpreetesh Singh Maini and by approving the payment of USD 1 million.

Before the main hearing, two pre-trial preparatory meetings were held.

The scheduled dates were agreed with all parties, the same applies to the time set aside for the trial. The defence counsels and the prosecution were allowed to present their opinions on the choice of expert lay judges and nobody had any objections as to the impartiality of the lay judges.

Prior to the main hearing, the prosecutor and the defence counsels were also allowed to speak on the impartiality of the professional judge and there were no objections.

Interpreters were appointed whose names were made known to all parties prior to the main hearing.

The main hearing took place from 5 January to 26 March 2015.

Økokrim tape recorded the proceedings and the recordings were shared with the defence counsels as per agreement.

- 4 -                                                    14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*



Defendant no. 1 appeared and pleaded not guilty as charged.
Defendant no. 2 appeared and pleaded not guilty as charged.
Defendant no. 3 appeared and pleaded not guilty as charged.
Defendant no. 4 appeared and pleaded not guilty as charged.

On the second day of the proceedings, the prosecutor made the Court aware that some members of the public watching the case (the press) were taking photos of the screens where digital documents were shown. After having heard the prosecutor, all the defence counsels and two representatives of the press, the Court issued the following:

### *R u l i n g :*

*The general rule under the Courts of Justice Act section 131a is that photographing during the main hearing is prohibited. It is the concern for privacy and that the court proceedings shall not be disturbed that must be weighed against the freedom of information. The Court has arrived at the conclusion that it will not allow photography of documents shown on the screens when the court actors show and read from documents in the case. The Court's grounds are as follows:*

- *Both the prosecution and defence counsels oppose such photography*
- *the concern for privacy, since evidence is recorded for instance from diaries that may contain private notes that are not relevant to the case*
- *that not to the entire document is entered into evidence, and then it may be unfortunate that the document in its entirety is photographed*
- *the freedom of information is catered to in that no ban on private sound recordings has been issued*

*The Court finds no grounds for banning private sound recordings. The Court makes reference to the fact that as a general rule, private sound recordings of main hearings are allowed. It is sound recordings for broadcasting (radio or TV) that are forbidden. The Court may ban private sound recordings, but there must be a reason to do so, cf. the Courts of Justice Act section 133. One reason may be fear that the sound recordings may be misused. The Court cannot see that in this case there is any reason to fear that the press or others may misuse the recordings, for instance to influence witnesses. Such a general possibility does exist, but no concrete circumstances have been presented in this case that would give sufficient reason to prohibit private sound recordings.*

*Following the above, the Court concludes that no permission shall be given to photograph the screens with documentary evidence during the proceedings, and private sound recordings are not prohibited.*

- 5 -                                                              14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

The ruling was unanimous.

The Court received testimony from 33 witnesses, several of them via video conferencing, and from one expert witness. Additionally, such entry into evidence of documents was made as can be seen from the court record.

The public prosecutor submitted the claim that the defendants should be sentenced in accordance with the indictment as follows:
1.   Kendrick Wallace is to be sentenced to 7 years of imprisonment, with a deduction of 3 days for time spent in custody.
2.   Daniel Clauw is to be sentenced to 6 years of imprisonment, with a deduction of 3 days for time spent in custody.
3.    Thorleif Enger is to be sentenced to 6 years of imprisonment, with a deduction of 3 days for time spent in custody.
4.   Tor Holba is to be sentenced to 3 years of imprisonment, with a deduction of 3 days for time spent in custody.

All defence counsels entered pleas for acquittal.

## I. Introduction
In the case at hand, an indictment has been issued for two instances of corruption in Libya and India, respectively. The four defendants have all been part of the corporate management of Yara International ASA (Yara). One of the defendants (Tor Holba) is still employed by the company but is currently on leave. The three other defendants have left Yara.

Both counts of the indictment concern an offer/agreement of payments to sons of high-ranking public officials. The negotiations in Libya took place during the period 2004-2009, while the negotiations in India took place during the period 2006-2008.

The facts of the case are extensive. Almost 7,000 documents have been presented to the Court. Although not all documents have been read out in court and entered into evidence, it has been a major task for the Court to review and describe the facts of the case. The part of the description of facts that is found in the judgment's parts IV items 1-5 and V items 1-6 is mainly taken from the case documents. In the opinion of the Court, the facts as described in parts IV items 1-5 and V items 1-6 are mainly undisputed, except from in a couple of areas where it is expressly stated that the Court has made an assessment of the evidence as it has been presented to the Court.

- 6 -                                                   14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*





EXT- WALLACE-00105

*Translation from Norwegian*

Parts IV item 6 and V item 7 contain the Court's assessment of the described facts. Parts VI and VII contain the Court's assessment of the facts in relation to the corruption provisions of the Penal Code section 276a, cf. section 276b (gross corruption) and the delimitation of their scope vis-à-vis the Penal Code section 276c (trading in influence).

Under the assessment of the guilt of each individual defendant in part VIII, the Court has made an assessment of the evidence which on many points deviates from the statements that the defendants have given in court. The task for the Court has been to establish which of the defendants had knowledge of the different parts of the facts and when was such knowledge acquired.

Corruption is, as the Court will revert to below, a punishable act where both the one that bribes and the one that is being bribed derive an advantage from the act. It is thus typical that all parties involved are interested in covering their tracks. Little is done in writing, the payment flow is concealed and often channelled to tax havens with limited access for foreign authorities. Thus, the evidentiary situation is difficult.  Nonetheless, the same evidentiary requirements must apply for corruption as for other crimes.

In its assessment of the evidence relating to the question of guilt, the Court has applied that for a conviction it is necessary that the factual circumstances must have been fully proved, both in objective and subjective terms, and that any reasonable doubt shall be to the benefit of the defendant, cf. Rt-1978-882 [*the judgment reported in Rettstidende - Norwegian Supreme Court Law Reports 1978 on p. 882 onwards*]. The assessment of evidence shall be done on the basis of an overall evaluation of several elements that each may carry varying evidentiary strength. It is thus not required that each individual element shall be proved beyond a reasonable doubt, as long as upon an overall assessment of the elements there is no reasonable doubt as to the conclusion, cf. Rt-2005- 1332.

## II. Inquiry, investigation and indictment

Advocate Jan Fougner, who headed the internal inquiry initiated by Yara, contacted Økokrim on 8 April 2011, and Økokrim initiated the investigation with preliminary interviews shortly afterwards. Økokrim investigated the case for almost 3 years before a writ prescribing an optional fine in lieu of prosecution was issued against Yara on 14 January 2014 and the four defendants were indicted on 15 January 2014.

The investigation has been extensive. Økokrim has searched the premises of Yara ASA in Oslo, the companies Balderton and Yara Swiss in Geneva and the premises of Nitrochem in Basel. Searches have also been made at Daniel Clauw's (Clauw) residences in France and his office in Paris, Kendrick Taylor Wallace's (Wallace) apartment in Paris, at the premises of Nejdet Baysan (Baysan) in Geneva and Friedrich Heister in Zürich (in connection with the

- 7 -

14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



EXT- WALLACE-00106

Helang agreement, see below). Baysan has been interviewed in Bern, Mohammed Ghanem (Ghanem Junior) in Stockholm and Gurpreetesh Singh Maini (Maini Junior) in New Delhi. In total, 85 witnesses have been interviewed in the case and investigations have taken place in 12 jurisdictions.

In the spring of 2012, Økokrim carried out a coordinated raid in Paris in cooperation with the FBI in the USA and French police. Wallace and Clauw were detained, put under arrest and interrogated on 10 and 11 May 2012. On 18 to 19 May 2012, Torleif Enger (Enger), Tor Holba (Holba) and Hallgeir Storvik (Storvik) were detained and interrogated. Wallace was again interrogated in Brussels on 18 June, as well as on 11 and 12 November 2012. A French examining magistrate interrogated Clauw in Versailles on 2 August and on 29 November 2012.

During the main hearing, the question arose whether the defendants had been presented with their rights under the Criminal Procedure Act in connection with interviews. This concerned Clauw and Wallace. The issue was clarified and the Court was informed that the defendants had been questioned as persons charged and they had been presented with their rights in connection with the police interviews before the interviews were carried out.

Consequently, there are no procedural issues relating to the interviews of Wallace and Clauw in Paris. Wallace gave his statement without a lawyer present, but he had been presented with his right to have a lawyer present during the interview. It was stated that Wallace and Clauw were not allowed to see documents during the interviews in Paris. The Court sees no problems in that. It is not uncommon that the police at the outset want a free recall statement without the persons charged being presented with any evidence.

The defence counsels have focused especially on the interviews of Wallace in November 2012 in Brussels. Wallace did not have a lawyer present during those interviews. Økokrim had invited a representative of the FBI and a representative of the US Department of Justice to Brussels. Wallace had not been informed of this in advance. As far as the Court has understood, the Americans were listening in on the interviews of Wallace from another room. After Wallace had finished the interview the first day, Wallace got to know that representatives of the FBI and the US Department of Justice were present. They wanted to talk to him if he himself permitted it. Wallace was willing to talk to them. The Court got to hear a recording of what a representative of the Department of Justice said to Wallace, and it is clear from this recording that Wallace was encouraged to speak truthfully. The representative of the Department of Justice explained that he had prosecuted a large number of major corruption cases. He furthermore said that he had with him a so-called "waiver of prosecution" that would entail that Wallace would not be prosecuted for the matter in the

---

- 8 -                                                                 14-022670MED-OTIR /05



*Translation from Norwegian*

USA. The USA has no rules for double jeopardy in the case of international corruption. The representative of the Department of Justice then said that after having heard Wallace's witness statement, offering the "waiver of prosecution" to Wallace was no longer an option, since it was conditional upon Wallace telling the truth. The US representatives had heard that he had changed his statement from the Paris interview and believed that he was not telling the truth in the Brussels interview.

The Court finds this procedure highly worrying. It may seem like Økokrim has tried to pressure Wallace into stating something else than what he stated during the Brussels interview by bringing the US prosecuting authority into the picture during the interview. Such methods are not acceptable when questioning persons charged in our judicial system. An important right of persons charged is that they have no obligation to give any statement. The Court can however not find any trace of this possible pressure on Wallace having been of any significance for his subsequent statements. Wallace has explained that what he changed from the Paris interview he changed in the June 2012 interview. Then he stated that he could not have reported to Clauw in the Libya project, because Clauw was no longer a member of the corporate management at the time in question. For the rest, Wallace's statements after the Paris interview have been characterized by him remembering little. Consequently, the Court cannot see that Wallace's statement has been influenced by the FBI's and the US Justice Department's entry into the case, neither in Brussels, nor by the fact that a representative of the FBI was present during parts of Wallace's statement in court.

On 14 January 2014, Økokrim issued a writ in lieu of prosecution prescribing an optional fine to Yara in the amount of NOK 270 million and the confiscation of profits in the amount of NOK 25 million. In addition to the two counts that the case at hand concerns, the writ also concerned two counts of corruption in Russia, were amounts of USD 2.8 million and approximately USD 1.14 million, respectively, were paid.

Yara accepted the writ and in addition pleaded guilty. The latter is not necessary when accepting a writ prescribing an optional fine and/or confiscation. Neither Jørgen Ole Haslestad (Haslestad), who was the CEO when the optional fine was accepted, nor Øyvind Lund (Lund), who was the chairman of the board, could explain why Yara pleaded guilty. In its assessment of the evidence, the Court has not attached importance to the fact that Yara pleaded guilty as far as the company was concerned. The evidence has been assessed for each of the defendants independently of the company's acknowledgment of criminal liability.

---

- 9 -                                                                      14-022670MED-OTIR /05



EXT- WALLACE-00108

*Translation from Norwegian*

## III. Background information

### 1. The Yara group

Until March 2004, the fertilizer business of what currently is Yara was a division of Norsk Hydro ASA (Hydro), a company listed on the stock exchange. At that point in time, the Agri division was spun off from Hydro as a separate company through a demerger.

In the years prior to the establishment of Yara, the business had gone through a substantial restructuring that led to the company in the spring of 2004 being highly competitive and one of the world's largest producers of mineral fertilizers. This was a position that the company had built up over the 100 years that Hydro had existed.

The decision to spin off the Agri division as a separate company was based on the assessment that the company more easily would be able to pursue a growth strategy as an independent company. In connection with the demerger, the company was listed on the stock exchange.

Enger, who previously had headed the development of the Oseberg field in the North Sea and later the Oil & Gas Division of Norsk Hydro ASA, was on 1 January 1999 hired to head the turnaround operation within the fertilizer field. When Yara was established, he became the CEO, and at the same time a board was elected with Lund as the chairman of the board.

In addition to the CEO, the management group consisted of the same persons that had made up the management group prior to the demerger. Clauw was the Chief Operating Officer, Holba was in charge of downstream activities, while Wallace was the Chief Legal Officer. All of them reported directly to the CEO. In the course of the time period that is important to the case at hand, some organizational changes took place that affected the above-mentioned persons. In the summer of 2006, Clauw left the position as Chief Operating Officer and took up a position as an advisor with a special responsibility for the company's growth strategy (special growth initiatives). In this position too he reported to Enger and he held this position until he left Yara in the summer of 2007. Holba became Head of Upstream in the autumn of 2006, while Wallace was Chief Legal Officer until he retired in the summer of 2008.

In addition to the above-mentioned persons, the important positions in the corporate management at the time of the demerger were held by persons with experience from different positions within Hydro / the Agri division. This included the chief financial officer, the head of upstream activities, industrial activities (hired after the demerger) and the HR manager. To handle investor relations, amongst other things, a communications manager with an external background was hired. That person also became part of the corporate management.

---

*Translated by John Richard Stokbak Sciaba. Government Authorized Translator English – Norwegian - Spanish. Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



EXT- WALLACE-00109

*Translation from Norwegian*

During the court proceedings, both the defendants and several witnesses have stated that Enger had an informal and delegating management style. He exercised his management through, *inter alia*, periodic management meetings where the corporate management participated. Minutes from the management meetings where prepared. At the management meetings, potential projects were discussed and deliberated on before a possible subsequent presentation to the board of Yara.

The Court has also been informed that a fundamental principle of the company was that the responsibility for each project was held by a project owner within the corporate management.

Systems and routines for the operation and follow-up of activities that had been built while the fertilizer business through division Agri was still a part of Hydro, were continued and further developed in Yara. It is noted in particular that staff members of the internal audit committee at Hydro were transferred with the merger and were given similar positions in the new company. The ethical guidelines that had been established in Hydro were used as a point of departure when similar rules and routines were drawn up in Yara.

Yara had a growth strategy and the company participated actively in the ongoing restructuring of the fertilizer industry during the years that this case concerns. In 2005, the company acquired ownership interests in both a Russian and an Australian fertilizer plant. In 2006, Yara acquired a Brazilian manufacturer and formed a joint strategic cooperation with a Chinese fertilizer producer. During this period, the decision was also made to carry out a fifth building stage at the world's largest urea plant, the Quafco in Qatar, where Yara owns 25 %.

The expansion continued in 2007 through the acquisition of the Finnish Kemira Grow How and the building of new ammonia and urea capacity in Qatar. 2007 was also the year when the "Heads of Agreement" (HoA) with the National Oil Company of Libya (NOC) was signed.

In 2006, Yara entered into a Joint Venture (JV) agreement with the Swiss company Balderton. The agreement entailed Yara buying 50 % of the shares of the company from Nejdet Baysan (Baysan), who was the company's founder and manager. He continued as a 50 % owner and manager of the company also after the signing of the agreement. The purpose of this initiative was to strengthen the access to competitively priced ammonia and fertilizers from other producers. Additionally, it would be an alternative sales channel for Yara's own products. The agreement to acquire an ownership interest in Balderton was also motivated by the fact that there was no wish to integrate Yara's long-standing Norwegian industrial traditions with the broker-oriented culture that prevailed at Balderton. Yara later acquired Balderton 100 %.

---

- 11 -                                                          14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



These acquisitions and agreements, amongst other things, contributed to Yara in the period 2004-2008 more than doubling its turnover, and during the same period the net result increased from NOK 3.8 billion in 2004 to NOK 8.2 billion in 2008. The market capitalization of the company increased substantially during the same period. Thus, Yara succeeded in realizing the expressed objective of growth both in terms of turnover and in terms of results. A growth that led to Yara becoming one of the largest limited companies in Norway measured by market capitalization.

Enger left Yara on 1 October 2008 and he was replaced by Haslestad who had been on the company's board since the 2006 general meeting.

### 2. Yara's internal routines and control aimed at preventing corruption

During the court proceedings, a number of measures that were implemented on the part of the company to control the risk linked to corrupt transactions have been documented. Several witnesses have also been presented that have given statements relating to this.

It is thus clear to the Court that substantial efforts were made on the part of the company to control the risk of unwanted transactions. The natural point of departure for this was that legislation in large parts of the world, including Norway, was tightened in line with the recommendations that were drawn up by the OECD, the EU and the UN. In addition, there were experiences showing the consequences of a lack of control within this field that had been suffered by international companies, including our own Statoil.

It was the chief legal officer who was responsible for ethical guidelines and rules of good business practices (Code of Conduct and Compliance). In November 2005, Wallace prepared new guidelines that were presented to the organization. In the presentation "Corporate Social Responsibility and Code of Conduct" the following is stated:

> *Getting Guidance*
>   *Most questions are simple. The language of the Code of Conduct has been kept simple on purpose – so that the rules are clear and plain. Common sense and good judgement will normally provide the right answer to questions that may arise about most matters.*
>
>   *If you do have a questions about an action or proposal, ask yourself these questions:*
> -   *Is it fair?*
> -   *Is it legal?*
> -   *Is it clear that Yara would not be embarrassed if this were public*

---

- 12 -                                                                 14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

> knowledge?
> -    Would I approve of this if I were a customer, supplier, partner or other
> person directly affected by it?

> The answer to all of these questions must be Yes.

In the presentation, the following is stated about the responsibility of leaders:

> What do we need to do as leaders
> -    Lead according to the ambitions and commitments in Yara's Code of Conduct in terms
>      of both words and actions
> -    Promote Yara's ambitions and commitments and be available to anyone with concerns,
>      questions or complaints
> -    Encourage all employees to raise issues and concerns about the Code of Conduct and
>      Sustainability policy
> -    Take seriously all concerns, complaints and questions

The Court has not found grounds to review in detail the work done by Yara on their ethical guidelines with a view to assessing their suitability. The acts that the Court is to assess in this case, are linked to persons in the company's corporate management and its CEO. The Court considers that these persons as a group and to a large extent also individually, where in a position where they could set aside the company's controls and routines. It is the limitation of any control system that this may happen.

The only comment that the Court wants to make, is that the work that was done seems to have had the desired effects towards the organization under the corporate management. Reference is made to the fact that the transactions that this case concerns in relation to Libya, were brought to the surface most probably by internal sources. The company's office in Singapore refused to carry out the payment transaction for the remuneration of Maini Junior. Both of these circumstances indicate that the understanding within the organization of the company's express procedures was present.

## IV. **Count a) of the indictment: the Libya matter**

### 1. Introduction

Until around 2001, Libya was subject to international sanctions because of its alleged links with international terrorism. These sanctions entailed, *inter alia*, that the country was subject to export restrictions on oil and gas, which were a major source of revenue for the country.

---

14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



With time, the sanctions were lifted, leading to a renewed interest among international companies for getting involved in Libya. The country was in need of international capital, technology and competence to improve plants and businesses within different sectors.

The contact between Yara and the NOC started as early as in 2002, prior to Yara being spun off from Hydro. Initially, Yara's interest seemed to be in gaining access to Libyan gas for the plants in Italy. On their part, the Libyans wanted investors for, *inter alia*, the urea plant in Marsa El Brega that formed part of a large integrated petrochemical plant owned by the NOC. The plan was that the fertilizer part of this plant was to be separated and placed under a new company. This company was to be owned by the NOC and a foreign investor. In the course of the proceedings, information has been presented that Yara, by virtue of being the world's largest fertilizer producer, was the Libyans' preferred cooperation partner. The thought was that Yara could contribute to the project the necessary technical competence and market access through Yara's international distribution system and thus contribute to the development of the business.

To Yara, this represented an interesting opportunity because it suited the company's growth strategy and would strengthen the company's position for serving the European market for urea and in particular the market around the Mediterranean. This was conditional upon obtaining a favourable long-term gas agreement and negotiating a price for entry into the company that would make probable a reasonable return on the investments.

It was well known to Yara that there were great challenges in terms of corruption in Libya. The Court makes reference to an email from Holba of 3 July 2002 to Clauw and Willem Sloot (Sloot), amongst others, were Holba presents the problems linked to doing business in Libya, including the difficulty of getting in contact with the right decision-makers at the NOC and the ministries. Sloot was the project manager when Holba took over and worked at the Brussels office. The Court has also taken note that Hydro in 2001 decided to pull out of Libya because of the risk of corruption in the country.

2. Project start-up and the process leading up to the engagement of Ghanem Junior
Yara and the NOC had several meetings during the period until a Memorandum of Understanding (MoU) was signed in April 2004 with a view to a JV that encompassed the urea plant. A technical team from Yara performed an inspection of the plants in Marsa El Brega in June 2004. Shortly afterwards, Yara issued a "business proposal" to the NOC.

On 5 October that year there was a meeting in Brussels where representatives of the NOC and Yara assessed the basis for establishing a JV. In order to obtain a foundation for the discussions, the decision was made to engage an independent advisor, Booz Allen Hamilton,

*Translated by John Richard Stokbak Sciabà. Government Authorized Translator English – Norwegian - Spanish. Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

which was to perform a valuation of the plants that were to form part of the transaction. Yara also retained renowned local and international lawyers to assist the company in the process. On the Libyan side, the delegation was headed by Omar Gazal, chairman of the board of the Oil & Gas Downstream Investment Committee (ODIC).

Yara had a meeting with the NOC on 17 January 2005, where the NOC accepted that Yara was to have a 50 % ownership share of the JV and increase this share at a later stage. The NOC was also to prepare the information on which Booz Allen Hamilton's value assessment was to be based.

The further development was that the project on 31 January 2005 was formalized at a management meeting in Yara with Sven Ombudstvedt (Ombudstvedt) and Sloot, as project owner and project manager, respectively. This decision was followed by technical inspections of the plants on the part of Yara, as well as the completion of the value assessment by Booz Allen Hamilton. It showed an estimated value of the plants of USD 129 million, based on a gas price of USD 1/mmbtu. On 14 June 2005, the management group was informed that the NOC was ready to continue negotiations with Yara with a view to a JV agreement. From the presentation given to the management group it is clear that the further negotiations would focus on the following fields:

> *Gas supplies/ entrance price in JV*
>
> *Ownership and company structure*
>
> *Yara technical and operational management*
>
> *Sales and marketing agreement*
>
> *Principles for carve out and assets to be included*
>
> *Relations to "neighbouring" bodies regarding people, services and supplies (NOC will be contract partner)*
>
> *Principles for dealing with plant extension/new plants*
>
> *Final Due Diligence*

At the management meeting on 30 August 2005, it was proposed that Yara should present a proposal for a "Heads of Agreements" ("HoA") that was to contain all material conditions of a JV agreement, including the above matters and a price formula for the gas price, expressed as a function of the price of urea.

Based on Booz Allen Hamilton's value assessment and own calculations of the project, Yara offered a prize of USD 65 million for 50 % of the newly established company, based on a

---

- 15 -                                                                    14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciaba, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

precondition of a 25-year gas agreement and a variable gas price of USD 1/mmbtu linked to the development in the price of urea. The offer was based on several preconditions, including that Yara was to be responsible for all distribution of the production from the plant.

This became the start of a long negotiating process with several offers made by Yara.

Yara met Omar Gazal on 23 September 2005 to discuss the draft HoA and the presentation towards the NOC management. In a presentation to the management group of Yara on 6 October 2005, the following is stated:

> *Key feedback from Mr. Gazal (NB! This was not a negotiation, but a strong advice from Gazal for our proposal to NOC) :*
>
> *– not accept right of first refusal to JV for new projects in Libya,*
>
> *new proposal: right of first refusal on projects in Marsa el Brega*
>
> *– not accept option to Yara to buy more than 50% (proposed up to 80%),*
>
> *new proposal: Parties express strong intentions to move Yara up to 80%*
>
> *– Gas price formula should be linked to urea, but without floors and ceilings,*
>
> *new proposal: Linear link with 1 USD/MMBTU at urea price = USD 150 – 1% increase in urea price = 1% increase in gas price.*
>
> *– Indicated that key issues will be gas price and marketing agreement (questions our proposal on 3% commission)*

On 12 October 2005, Gazal sent a letter to Sloot in which he discussed, amongst other things, that the NOC wanted the entry value of the JV to be based on net asset value and not investment value. On the basis of this initiative, in a letter of 24 October Yara replied, *inter alia*, that the value assessment of the plant could be increased to USD 150 million; that is, USD 75 million for 50 % of the company.

On 1 December 2005, it was suggested at a management meeting to further improve the offer by increasing the price from USD 75 million to USD 100 million for 50 % of the company. No documentation has been presented to the Court showing the background of this latter increase of the offer. The offer was communicated to Gazal in a letter dated 9 December 2005. In the draft HoA, which was enclosed with the letter, it was stated that Yara suggested the parties entering into a 25-year gas supply agreement and a gas price of USD 1/mmbtu. Yara also confirmed its consent to a revised, more ambitious time table. This was conditional

Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com



*Translation from Norwegian*

upon both parties obtaining approval by the boards within 31 January 2006 and that the transaction was to be carried out within 30 June 2006.

Gazal made sure that the NOC board received a complete report of the projects with the latest amendments in late December 2005. The NOC then had two proposed agreements to assess. One from Yara and one from Dow Chemical. Dow Chemical was not a fertilizer manufacturer and thus not a direct competitor to Yara. It was expected that the NOC board would decide on the proposed agreements in January 2006.

Sloot was in contact by telephone with the NOC on 16 January 2006 and he was then told that the draft JV agreement had been forwarded to the government. The NOC board had no comments.
The project was presented to the management group again on 7 February 2006. It is clear from the presentation that at this point in time, no formal response from the NOC existed.

Then followed a period of stagnation in the dialogue between the parties, and towards the end of March Yara received information from Gazal that it would take time before they could provide a response. This was explained by the fact that a new chairman of the board would take over at the NOC and that there were changes in reporting rules, in that the NOC chairman in the future was to report directly to the prime minister. It is clear from the presentation to the management group at the meeting on 4 April that no response was expected for another 2 to 3 weeks.

The new chairman was Dr. Shukri Mohammed Ghanem (Dr. Ghanem), who on 2 March 2006 resigned as prime minister and was replaced by his own deputy prime minister. The NOC functioned, as far as the Court understands, as Libya's oil and energy ministry. This was the understanding presented in a short news memo on the website www.regjeringen.no on 8 December 2006 in connection with a trip to Libya by the then oil minister Enoksen.

> *Following the reshuffle of the Libyan government earlier this year, the national oil*
> *company now functions also as an oil and energy ministry.*

The defence counsels have had objections to Økokrim's reference to Dr. Ghanem as oil minister (in the indictment) and as "de facto" oil minister (in court). Amongst other things, reference was made to a report by CERA, in which it is stated that Dr. Ghanem's appointment as chairman of the board of the NOC with direct reporting to the prime minister, confirms the Libyan authorities' wish to continue reforms in the oil sector. The report states that the decision-making authority would remain complex and project-based. The fact that the decision-making authority continued being complex, does not mean that the NOC's position as a de facto oil and energy ministry was weakened. According to the Court's assessment of

--- 17 ---

14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

the facts on this point, Dr. Ghanem's role as the chairman of NOC, reporting directly to the prime minister, underlines his prominent role in oil politics. This fact, combined with the NOC's position, indicates that Dr. Ghanem in reality functioned as Libya's oil minister from the moment of his appointment as the NOC chairman, and the Court is of the opinion that referring to Dr. Ghanem as the "de facto" oil minister is warranted.

Dr. Ghanem was the father of Ghanem Junior, who later was engaged by Yara. The engagement of Ghanem Junior is presented in a separate paragraph below.

The next development in the negotiations took place as a consequence of a meeting between Enger and Dr. Ghanem on 18 June 2006 in Tripoli. The meeting took place at the initiative of Yara through Enger. Dr. Ghanem and Enger agreed on the general principles for the cooperation and that the negotiating teams should complete the negotiation on the main principles in the course of a three-week period. This is stated in the minutes of the management meeting on 27 June 2006.

On 3-4 July 2006, a new meeting between the NOC and Yara took place in Tripoli. It is stated in the brief minutes of the meeting that the HoA was to reflect the main points of the agreement between the parties. The parties agreed that the negotiations were to be completed and board approval by both companies was to be obtained within 31 July 2006.

This schedule was not complied with either. From a presentation to the management group it is also clear that the parties had agreed on a change in the gas price formula and that the value of the plant was increased from USD 200 million to USD 225 million.

The proposed agreement between the parties was to be sent to the government for approval in August 2006. This proposal of 27 July 2006 was received and assessed by Dr. Ghanem, in his capacity as chairman of the NOC.

On the basis of the negotiations, the board of Yara in September 2006 authorised the administration, represented by Enger, to enter into an agreement within a limit of USD 130 million for a 50 % share in the JV in the process of being established.

Despite the agreement on the conditions, Yara on 11 October 2006 received feedback from Gazal that the NOC top management had some reservations as regards the financial return on the project and suggested a new meeting. Next, Sloot met with the NOC in Tripoli on 30 October. The feedback from the meeting was that the Libyan authorities had accepted all parts of the project except the gas price. The NOC's analyses showed that the proposed gas price

---

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*





*Translation from Norwegian*

formula would make it more profitable for the NOC to continue its operations without including a new owner.

This feedback formed the basis of new calculations that resulted in Yara finding it financially viable to increase the gas price from USD 1 to USD 1.30/ mmbtu. The improved offer, the fourth in a row, was presented during a meeting with Gazal in Hamburg on 24 November 2006. At this meeting Holba participated as well. In the course of the late summer and autumn of 2006 he had assumed responsibility of Yara's upstream business. The Libya project fell within the scope of that division. At that point in time, the project was transferred from the Brussels office to the Oslo office.

The next development in the case was that Gazal on 17 January 2007 informed Yara, represented by Sloot, that he had submitted his report on the project to the board of the NOC and to the authorities, who were to discuss the case at their next meeting on 22 January 2007. Such deliberations did not take place, but later information was received stating that the matter was to be discussed at the next meeting that was to take place on 10 February 2007.

On 27 February 2007, Yara received a response from the NOC, represented by its chairman Dr. Ghanem.
It was not an acceptance of Yara's fourth and latest offer, but a new proposal with some substantial changes. The most important changes were that Yara was to contribute USD 225 million in cash to the JV instead of paying to the NOC for the 50 % share, and that the gas price was to be at least USD 1.30/ mmbtu. The NOC was to contribute the plants as a contribution in kind. The NOC also presented a claim that no layoffs should be made at the plants unless alternative employment was provided. Shortly afterwards, in a letter to Dr. Ghanem dated 01 March 2007, Enger confirmed that Yara was content with the decision of the NOC and accepted the new conditions. He suggested that the negotiating teams should agree on pending points in the HoA and that the two of them then should meet to sign the agreement.

The chronological review above is based on documents presented in the case. In March 2007, the discussions with the NOC had been going on since 2004. As pointed out by the defence counsels, the developments in the negotiations moved solely in favour of the NOC. From the initial offer of USD 65 million for 50 % of the JV and a gas price of USD 1/mmbtu in August 2005, the offer in January 2007 had increased, such that Yara was to contribute USD 225 million in cash to the JV and with a gas price of minimum USD 1.30/mmbtu. The Court takes as a fact that Yara was not competing with others for the establishment of a JV for the production of urea. Yara's willingness to negotiate thus shows that it was very important for Yara to succeed in establishing a JV with the NOC.

- 19 -                                              14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

*Translation from Norwegian*

### 3 The engagement of Ghanem Junior

Before describing the further progress of the Libya project, the Court shall review the engagement of Ghanem Junior  The process commenced in December 2006 and took place as a separate process, in parallel with the negotiations regarding the commercial terms and conditions for Yara's entry on the ownership side of the plants at Marsha El Brega.

Yara was introduced to Ghanem Junior by Zafer Nahawi (Nahawi), who was Yara's representative in the Middle East. He was described by the defendants and several witnesses as being a person who had a large network of contacts in the area and who spoke Arabic. Nahawi was invited to participate in the process in Libya as early as in May 2004.  It is specified in an email from Sloot that this was to be confidential "within Yara", which must mean that only the negotiating team was to have information about Nahawi's participation.

It is somewhat unclear to the Court when Ghanem Junior was introduced. There are documents in the case that suggest he may have been contacted as early as in May 2005. Amongst other things, Sloot mentioned in an email of 23 May 2005 to Nahawi that it might be of interest to meet his contact. Furthermore, Nahawi's contact is mentioned in an email from Sloot to Ombudstvedt on 23 January 2006:

> *FYI; spoke with Zafer and according his contact in Libya, the Yara and Dow Chemical proposals were being discussed inside NOC and Government.*

That contact must have been Ghanem Junior. Regarding this, the Court makes reference to Wallace's statement during the main hearing. Wallace did not have information of Nahawi having any other relevant contacts.

Ghanem Junior was born in 1977. He was trained at Webster College in Vienna and holds an MBA from Glamorgan University in Wales.  In addition, he has a management course from MIT in the USA.  Ghanem Junior worked for Nahawi's brother at the Arab Banking Corp. in Bahrain. Wallace has in court explained that he received information about Ghanem Junior during a meeting with Nahawi in Paris on 02 December 2006.

On the basis of this information, a meeting was agreed between Wallace and Ghanem Junior in Bahrain on 18 January 2007, where an engagement for him was discussed.  Wallace explained in court that Nahawi also participated at this meeting. It was Wallace who directed the discussions with Ghanem Junior from the outset.  After the meeting, Ghanem Junior sent an email to Wallace in which he thanked him for the meeting in Bahrain and amongst other things informed him that he would go to Libya and return with good news, see the email of 28 January 2007:

---

- 20 -                                          14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish. Candidatus Juris Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

> *As per our earlier conversation, I will be going to Libya for a week and will be back with good news*

The meeting in Bahrain was followed up with a draft by Yara for a consultancy agreement between Yara and the company Saudi Logistics and Support (SALT). This was the company that Ghanem Junior nominated as the one taking on the assignment for Yara.

This first draft, which is dated 06 February 2007, regulated which services were to be delivered by Ghanem Junior, as well as the compensation for the services. The role as an adviser was defined as providing assistance to Yara to review and assess the value of the fixed assets, as well as providing advice regarding transaction structure, terms and conditions, regulatory matters, logistics, supply options etc in connection with the takeover and development of the plants.

On 12 March 2007, a new meeting was held between Wallace and Ghanem Junior in London to agree on the final draft agreement. Nahawi also participated at that meeting. Here, a second draft consultancy agreement was discussed. As in the first draft, the parties to the agreement were to be SALT and Yara Nederland BV. The following is quoted from that last draft consultancy agreement:

> *(...)to act as the Company's advisor during the negotiations with the Libyan National Oil Company ("NOC") and other Libyan governmental bodies regarding the establishment of a fertilizer production and marketing joint-venture company utilising the existing fertilizer production facilities located at Marsa el Brega in Libya ("the Transaction"). The Company's proposal for the Transaction to the NOC has been approved by the NOC and the Libyan Council of Ministers. Based upon such approvals, it is now necessary that negotiations of detailed documents relating to the project must be commenced and concluded over a period of several months. Conclusion of such negotiations and execution of definitive documents (the "Closing") is anticipated prior to 30 June 2007. A significant component of the Transaction will be the improvement and upgrading of the production facilities and infrastructure as necessary to bring the production facilities into competitive, world-class condition. In this connection, Yara will require the advice of consultants with experience in major construction and logistics projects in the Middle East in addition to its own experience in Qatar.*

The differences between the two drafts are very small, as the adviser's tasks are almost unaltered from the first draft to the second draft. The last draft, which is quoted above, is somewhat more detailed in describing that it concerns the specific facilities at Marsa El Brega. The last sentence of the above draft stating that Yara will need the advice of consultants with expertise from major construction and logistics projects in the Middle East,

<hr>

- 21 -                                                    14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

was not included in the original draft. The other tasks of the adviser are defined as follows in the last draft:

### 1. Role of the Advisor and Basis of Appointment

*Based upon the receipt of the approvals required to commence the Transaction that have been received, the Company and NOC are preparing to commence preparations for the Closing and implementation phase. In this respect, Advisor will perform the following services as the Company may require:*

i)   *Advise and assist the Company's accounting and legal advisors during the set up of a data room for the detailed assessment of the Marsa el Brega facilities in accordance with agreed deadlines;*

ii)  *Advise and assist the Company's accounting and legal advisors during the evaluation of the Marsa el Brega assets which are to be contributed by NOC to the future joint-venture company in accordance with agreed deadlines;*

iii) *Advise and assist the Company in conjunction with its other professional advisers in considering alternative structures for the Transaction;*

iv)  *Advise and assist the Company in conjunction with its other professional advisers in the negotiation of the terms and conditions of the definitive and binding agreements of the Transaction which are envisaged to be signed at Closing, i.e. (without limitation) Share Purchase Agreement, Service Agreements, Gas Supply Agreement etc.;*

v)   *Provide, on request, strategic advice regarding regulatory issues, logistics, supply, procurement and infrastructure development or other specialist or technical advice or services relating to the development of the Marsa el Brega site; and*

vi)  *Carry out such additional duties in relation to this Engagement (if any) as may be agreed in writing by Advisor and the Company from time to time.*

The most important difference between the drafts is that the fixed fee was increased from USD 1 million to USD 1.5 million. Furthermore, certain adjustments were made to the dates that define the size of the success fee. The time that could pass before the success fee was to be reduced from a defined amount of 3 million USD was also increased somewhat. In the agreement, the adviser's fee is described as follows:

### 2. Fees, Expenses and Payment Terms

*In consideration of Advisor agreeing to provide such of the services specified in clause 1 as the Company may require, the Company agrees to pay to Advisor the following:*

---

- 22 -                                          14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

(a)    *a retainer of US$ 1.5 million within 14 days following the execution hereof in consideration of the services to be provided during the negotiation of the definitive documents resulting in the Closing; and*

(b)    *an all-inclusive lump sum of US$ 3 Million ("Closing Fee") within 14 days of the Closing of the Transaction and the execution of all necessary definitive agreements, PROVIDED that the Closing of the Transaction occurs on or before 30 September 2007. If, for any reason whatsoever, Closing were not to take place on or before 30 September 2007 but between 30 September 2007 and 31 December 2007 then Advisor shall be entitled to a Closing Fee of 50% of the initial fee. If Closing takes place between 1 January 2008 and 31 March 2008 then Advisor shall be entitled to a Closing Fee of 25%. If Closing occurs after 31 March 2008 then no Closing Fee shall be due. The parties acknowledge that this payment mechanism and the timely Closing of the Transaction are of the essence of this Agreement.*

*Irrespective of whether the Transaction proceeds to Closing, the Company will not reimburse Advisor for any of its out of pocket and other expenses incurred in connection with this Engagement.*

During the court proceedings it was informed that the draft agreement was not signed. Wallace explained in court that he chose to rely on an oral agreement with Ghanem Junior. In his police statement in Brussels on 18 June 2012, Wallace explained that a written agreement could harm Yara. This shows that Wallace wanted to keep the consultancy agreement hidden. Wallace also explained in court that the contractual relationship with Ghanem Junior was to be confidential in order to, amongst other things, avoid unwanted publicity and because of his father's position. According to Wallace, the oral agreement with Ghanem Junior had essentially the same content as the last written draft.

On 29 March, Yara effected a transfer of USD 1.5 million to the company Golden Petal Ltd's account with the UBS. This was a few days after the negotiating teams had agreed on the agreement and had initiated it. In the opinion of the Court, the fixed fee thus had fallen due. The transfer was done by a customer of Balderton's, Nitrochem SA.

The contact with Nitrochem was arranged by Clauw introducing Wallace to Andreas Zivy (Zivy), who was the chairman of the company Ameropa, which in turn owned Nitrochem. The amount plus interest was to be paid back by Yara Switzerland by over-invoicing ammonia deliveries. Clauw had in advance raised the matter with Zivy during a meeting that also dealt with other topics. According to Wallace, both Yara and Ghanem Junior wanted to keep the transaction hidden.

Clauw himself explained in court that he did not know specifically what Zivy was to assist in, apart from it being a payment facilitation that was to be discreet. He says he did not know to

- 23 -                                         14-022670MED-OTIR /05

Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com



*Translation from Norwegian*

whom the payment was to be made or for what, but explained in court that he knew it concerned a payment to a consultant and that it concerned Libya. He also explained that he understood that the payment method was unethical, but not that it was unlawful.

Golden Petal Limited is registered on the British Virgin Islands and is owned by Golden Petal Limited Trust. The trust's only beneficial owner is Ghanem Junior. He is also the only one authorized to sign on its behalf. The company was established in 2002.

In the bank's records, the payment is described as a commission on ammonia contracts negotiated by Golden Petal Ltd. The amount then seems to have been used for investments in securities through the bank's management systems.

Dr. Ghanem had an account with the same bank, and because of his position as a prime minister, both Dr. Ghanem's account and his son's account were subject to special monitoring routines. No bank statements concerning any of the accounts that these persons had, have been entered into evidence, only information about specific transactions on Golden Petal's account. Consequently, it is not possible to conclude that any part of the payment from Nitrochem was transferred to Dr. Ghanem. Additionally, Frederic Ceres, who was responsible for the account of Golden Petal, has explained in court that the father's and the son's accounts were managed completely separately and that they did not have access to each other's accounts.
The account of Golden Petal Ltd was closed in March 2011 and the balance was transferred to Ghanem Junior's other account with the bank. In March 2011, all of his accounts were blocked by order of the Swiss authorities.

Even before the agreement with Ghanem Junior had been fully negotiated and the first commission had been paid, Yara received information from Ghanem Junior about the process on the Libyan side. On 28 January 2007, he informed Wallace that he was going to travel to Libya and return with "good news", see the above-quoted email. Wallace has explained in court that is was Ghanem Junior who in an email of 22 February 2007 informed Wallace of the decision that the agreement with Yara had been approved by the authorities. In the same email it was informed that Dow Chemical had obtained agreement on a gas price of USD 1.25/ mmbtu. The enclosures to the email where in Arabic, and Wallace forwarded the enclosures to Nahawi for translation the same day.

The information from Ghanem Junior was received five days before Yara received the same confirmation from official quarters. The official confirmation was given in a letter from Dr. Ghanem to Enger of 27 February 2007. In this letter, the negotiations on an agreement with Dow Chemical are not mentioned.

14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

<u>4 Developments in the case from the signing of the HoA on 25 April 2007</u>
After an oral agreement concerning advisory services had been entered into with Ghanem Junior and the first partial payment had been transferred in late March 2007, the HoA between NOC and Yara was signed on 25 April 2007. It was Enger and Dr. Ghanem who signed the agreement on behalf of the parties.

Despite the HoA having been signed, new challenges arose in the negotiations, as the NOC during a negotiation meeting in Tripoli on 28-30 August brought up a number of new issues.

This led to the project team drawing up an overview of topics where disagreements had arisen between the parties. This overview is hereinafter referred to as the "issue list". It was distributed from Holba to Enger, Wallace, Ombudstvedt and others in an email of 7 September 2007.
On 12 September 2007, Wallace travelled to Dubai together with Holba, who like Wallace was going to participate at the board meeting in Burrup (an Australian cooperating company in which Yara had an ownership share). Wallace had in advance agreed a meeting with Ghanem Junior in Dubai.

Wallace has in court explained that he does not remember who asked him to meet Ghanem Junior, nor whether he told anybody with whom he was going to meet. It is however clear that the purpose of the meeting with Ghanem Junior was to review the issue lists to receive advice as to how Yara should relate to the individual issues. Wallace left the issue list with Ghanem Junior. Wallace reported back to Holba and Charles Grey (who was the lawyer on the project) in an email of 14 September and enclosed the issue lists with the conclusions he had drawn following the advice he had received from Ghanem Junior. The main conclusion was that Yara could rely on the conditions in the signed HoA, although on some points they were recommended to exhibit certain flexibility.

It is also stated in the email that: *"the plan is for Tor to go to Tripoli prior to the scheduled meeting in October to meet with dr Ghanem to go over the attached"* ("the attached" is the issue list). It is furthermore stated that: *"it is agreed that this cannot be the start of another round of negotiations from scratch"*. And finally, this is stated: *"finally, it is accepted that unless Omar or his direct assistant is in the meetings, nothing will happen"*.

These statements and negotiating positions that are indicated after the meeting with Ghanem Junior, cannot be interpreted in any other way than Ghanem Junior having been in contact with his father in connection with the meeting with Wallace. It is this contact that has given the result described above.

- 25 -                                                          14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

Holba has in court explained that he, at the point in time where he travelled to Dubai together with Wallace, neither knew of the agreement with Ghanem Junior nor that he was the contact that Wallace met during his stay. Holba said that he presumed that the contact that Wallace was to meet, was a person that Wallace knew from before and that he trusted. The contents of the email from Wallace, the fact that he left the issue list, as well as Holba's position as the project owner, lead the Court not to trust Holba's statement on this point.

Following further elaboration in the project team, the issue list was forwarded to the NOC in a letter of 17 September 2007, and it was used as a basis for conversations at a meeting in Tripoli on 16-18 October 2007. The results from this meeting were referred to in a management meeting in Yara as the project now being *"firmly back on track"*.

The changes to the HoA that this process resulted in were expressed in a new agreement, a "Joint Venture Framework Agreement" that was signed on 17 February 2008.

### 5. Claim for payment number two from Ghanem Junior

In June 2008, Wallace informed that he would retire on 1 July 2008. Some time thereafter he received a request from Ghanem Junior for a payment number two under the oral agreement. Wallace raised the issue with Holba and they agreed to reject the claim. In court, Holba said that not even at this point in time was he aware of the existence of an agreement or of the fact that a payment had already been made in March 2007.

Holba explained in court that he talked to the HR manager, Dalane, about the claim and that she advised him to talk with Enger. Holba then contacted Enger and informed him of the claim. Holba has explained that he informed Enger of the first payment and that a claim for a second payment had been received. Enger on his part explained in court that Holba told him about the claim but that he could not remember having been informed of a first payment already having been made.

The Court considers it a fact that Holba told Enger what he had been told by Wallace. There is no logical explanation why he would not tell that an amount already had been paid.

Together, Enger and Holba agreed to reject the claim.

Haslestad had taken up the position as CEO of Yara at the end of September / beginning of October 2008. Following a meeting with the group management on 11 October, in which

- 26 -                                          14-022670MED-OTIR /05



*Translation from Norwegian*

Haslestad stated that he "would draw a line in the sand", Holba also raised the issue with him. The Court considers it a fact that Holba told Haslestad that an amount already had been paid and that the claim from the summer of 2008 was a new claim. Haslestad also stated this in his police statement. Haslestad talked with Faksvåg (new chief legal officer of Yara) and Yara's chairman, Lund, about the claim. It was decided that the claim was not to be paid. Nobody else, not even Yara's board, was informed of the payment that had been made in 2007 or of the new claim. Nor did anybody suggest a further examination of the matter.

On 17 July 2008, the "Partnership Agreement" was signed, while the final contractual framework was not signed until 9 February 2009, after which the project entered an operative phase. After several years of negotiations, the agreement was thus formalized and implemented.

## 6. The Court's assessment of the engagement of and payment to Ghanem Junior

### 6.1    Introduction

It is clear from the indictment that the prosecuting authority considers the engagement of and the payment to Ghanem Junior as an improper advantage that amounts to a violation of the Penal Code section 276a; see the basis of count a) of the indictment:

> *Both the agreement and the payment constituted an improper advantage*

The defence counsels, on their part, claim that the agreement with Ghanem Junior was an ordinary consultancy agreement, which was linked to services he was to perform and that were unrelated to his father's position as the acting oil minister.

### 6.2    The choice of Ghanem Junior as Yara's consultant in Libya

It is clear that Ghanem Junior was the son of a prominent public official who held great authority in the negotiations between Yara and the NOC, both by virtue of being the NOC chairman, former prime minister and Libya's acting oil minister. Wallace must have known this when Ghanem Junior was retained.

The Court has not found, neither in the documents nor in the other evidence presented during the main hearing, that Ghanem Junior had any competence, experience or independent position that could be of interest to Yara beyond the fact that he was Dr. Ghanem's son.

Ghanem Junior was employed at a bank in Bahrain and did not have extensive work experience. In the draft agreement quoted above, it is stated that Yara needed the advice of consultants with experience in major construction and logistics projects in the Middle East. Furthermore, the "Role of the Advisor" was defined as providing assistance to Yara to review and assess the value of the fixed assets, transaction structure, negotiation of terms and

---

- 27 -                                                    14-022670MED-OTIR /05

conditions, as well as advice regarding regulatory issues, logistics, supply options etc. in connection with the takeover and development of the plants.

The Court presumes, as explained by Wallace in court, that the oral agreement with Ghanem Junior had the same general contents as the last draft agreement. If this was actually the kind of needs that Ghanem Junior was to cover, it is unthinkable that the project team did not head the negotiations regarding the agreement with him. Additionally, they did not actually have any such needs. Consequently, the Court considers that the agreement's definition of the tasks lacked any reality.

Wallace has explained that he went to Bahrain to meet Ghanem Junior personally and to find out what he could do for Yara. Wallace has also explained that it was Ghanem Junior's contacts in Libya that where of interest to Yara. Wallace has however not been capable of presenting what kind of contacts these where and with what those contacts could contribute. Wallace explained in court that he did not ask Ghanem Junior about this, which is also conspicuous. He explained that he presupposed that Ghanem Junior was not to have any contact with his father in connection with the assignment. The Court does not believe Wallace's statement on this issue.

### 6.3    The contents of the consultancy agreement

Next, there are circumstances concerning the agreement as such that give the Court reason to believe that the wording of the agreement was meant to justify the high level of the fee rather than being a genuine description of the assignment.

The agreement was entered into orally. The Court notes that it is not unlawful to enter into an oral agreement. Nonetheless, it is highly irregular in international business to enter into an oral agreement that regulates such extensive services and that entails a fee of several million dollars.

Additionally, the agreement was to be confidential, both towards the NOC and internally within Yara. There may be goods reasons for such an agreement to remain confidential. However, the Court sees no such reasons here. Quite the contrary; if Ghanem Junior was to assist in the negotiations with the NOC where his father was the chairman of the board and central in the negotiations, there ought to be openness surrounding his assignment.

In court, Wallace has expressed that what Yara in reality wanted, was for Ghanem Junior to inform on what happened in Libya and otherwise be available when needed to provide advice on how Yara should act in certain situations.

*Translated by John Richard Stokbak Sciaba, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

Holba said in court that the draft consultancy agreement went much further than what was relevant for Yara to ask for assistance with. According to Holba, Yara had the necessary resources within its own organisation. This information contrasts strongly with the definition of the services in the draft agreement and suggests an attempt at giving an impression of the adviser's role that differed from the actual need. The intention was insight into and influence on the negotiation process through Dr. Ghanem.

Already before Yara initiated the process of retaining Ghanem Junior, Yara signed an agreement on consultancy with the Swiss company Helang SA. The agreement expired on 31 December 2006 and was not renewed. The consequence was that Yara could enter into an agreement with Ghanem Junior without experiencing a conflict with Helang. In the opinion of the Court, the Helang agreement was not an ordinary consultancy agreement either. The draft agreement above is, with one exception, completely identical to the agreement that was entered into with the company Helang in March 2006 as regards the definition of tasks; in the opinion of the Court, this is yet another element indicating that the agreement with Ghanem Junior was to cover up the reality. The Court presumes that the reason why the Helang agreement was terminated is that Helang did not deliver the services Yara sought. Moreover, in the meantime Yara had gained access to Ghanem Junior, who was more interesting because of his father's position.

### 6.4    Size of the fee and the payment

The role of Ghanem Junior was to collect information and forward it to Yara. Beyond that, he had no independent role as an adviser. In the Court's assessment, there was a clear disproportion between the value of the simple forwarding role and the fee of up to USD 4.5 million that had been agreed. This disproportion can only be explained by the potential value it had for Yara to buy knowledge and potential influence through the father.

Last but not least there is the way in which Ghanem Junior was paid. The payment method must be described as a cover operation. The need for confidentiality lacked legitimate reasons. The need to conceal the payment, seen in conjunction with the two other elements to which the Court has attached importance, shows that this was a consultancy agreement that would not stand the light of day.

### 6.5    The services of Ghanem Junior

The defence counsels have submitted that it has not been proved that Dr. Ghanem was influenced or sought influenced through the agreement and payment to Ghanem Junior. It has been pointed out, amongst other things, that the negotiations were well on their way between Yara and the NOC before Dr. Ghanem was appointed as chairman and that Yara had received feedback both of progress and a positive assessment of the offer from Yara. Additionally, the

*Translated by John Richard Stokbak Sciaba, Government Authorized Translator English—Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

defence counsels pointed out that progress in the negotiations was slow also after Dr. Ghanem joined the NOC and that difficulties arose in August 2007 despite the agreement with Ghanem Junior.

It was also a fact that the conditions of the agreement went in favour of the NOC throughout the entire negotiating process, also after the consultancy agreement with Ghanem Junior had been entered into.

The Court has assessed these circumstances, but finds it has been proved that the actual content of the consultancy agreement between Yara and Ghanem Junior was that he was going to collect information and advice from his father as to how Yara was to act in the negotiating process with the NOC and that Yara thus in reality entered into the agreement to obtain a separate contact with Dr. Ghanem through his son in order to obtain important information to be able to influence the outcome of the negotiations.

The evidence that has been presented during the main hearing describes what Ghanem Junior actually contributed with in the process. It is well documented that Ghanem Junior did not perform the tasks stated in the draft consultancy agreement, which is yet another sign that the agreement had the sole purpose of justifying the very considerable fee that the agreement entailed and not the actual contents of the work. The payment was essentially for information and advice from Dr. Ghanem.

In September 2007, Wallace travelled to Dubai to meet Ghanem Junior. The purpose was to receive advice on how Yara should relate to new claims that had come up from the Libyan side during the negotiations. Ghanem Junior provided concrete advice on each individual point on the issue list that Yara had drawn up of pending items. Yara made use of the advice from Ghanem Junior in the subsequent negotiation meetings, and agreement was reached between the parties.

The Court finds it has been proved that Ghanem Junior received "good news" from his father after the trip to Libya in January 2007 and that the news was that now an agreement was approaching. The letter that Yara received on 22 February 2007 with confirmation that the authorities had approved the agreement, also comes from Dr. Ghanem and contains potentially important information about the price that DOW was to pay. There is no other logical explanation than the father being the source when Ghanem Junior gives information and advice to Wallace.

Wallace explained in a police interview in Paris in May 2012 that Yara's negotiating team returned from a meeting in Tripoli with a message from Dr. Ghanem to "sort it out with my son". Wallace explained in court that this must have been wrong because he does not see any documents that support that police statement.

- 30 -                                                    14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



The Court believes that Wallace's police statement in Paris in May 2012 should carry a lot of weight as evidence. The Paris statement was given three years ago and Wallace's memory must have been better then than in 2015. The Court does not discard the possibility that Wallace may have been mistaken about the dates of different events, meetings and conversations in his statement in Paris; however, this does not change the fact that the *contents* of his statement coincide well with the other evidence in the case, including the documentary evidence. Moreover, the statement after Wallace decided to "set things straight" is detailed and nuanced, as opposed to his statement in court. Wallace's statement in court is marked by him not remembering. The Court is therefore convinced that someone in Yara's negotiating team returned from a meeting in Tripoli with a message from Dr. Ghanem to "sort it out with my son", and that is what Wallace did. It has not been clarified precisely when and what Dr. Ghanem gave the negotiating team instructions to talk with his son about. However, this does not change the Court's assessment that this was actually said and that it was something that was sufficiently important for Wallace to mention it in his police statement in Paris. Wallace did not enter the project until late 2006. This was at a point in time where Holba had taken over as project owner. Having this in mind, it is unthinkable that Holba would not also have received the same information as Wallace about Dr. Ghanem's statement. The Court also makes reference to the fact that Wallace in his Paris statement said that he received the information about what Dr. Ghanem had told from Holba.

In the opinion of the Court, this statement shows that father and son act in unison.

The Court does not exclude the possibility that it would have been possible for Yara to obtain an agreement with the NOC without using Ghanem Junior. It is also possible that the agreement would have had the same content. The defence counsels have submitted that this entails that there is no element of influence, because the engagement of Ghanem was not supposed to influence the negotiations, nor did it do so. Therefore, it would take a lot to consider the engagement of Ghanem Junior to be corruption. The Supreme Court stated in Rt-2009-130 that only in very special cases is there any reason to convict someone under the corruption provision if one must completely disregard the existence of any element of influence.

The question was not taken to an extreme in the said judgment; nor is it in the case at hand. The fact is that Yara engaged Ghanem Junior, and the Court cannot see there being any other reason for this engagement than securing access to information and advice from Dr. Ghanem in order to have a stronger position in the negotiations with the NOC. Thus, a clear motive of influencing existed on the part of Yara, and Yara expected to get something in return from Dr.

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

*Translation from Norwegian*

Ghanem.  For the active briber, a consummated crime exists already when the offer has come to the knowledge of the counterparty, see section 276a paragraph b.

Moreover, the Court finds it has been proved that the engagement of Ghanem Junior had the desired effect and that Yara got what they wanted. A few days after the HoA had been approved by both parties, the payment to Ghanem Junior was made and the HoA was formally signed in April 2007.  After Wallace in September 2007 received advice in relation to the pending points of the issue list, the negotiations came "firmly back on track" (management meeting 29 October 2007) and a new JV Framework Agreement was signed on 17 February 2008.

Upon an overall assessment of the evidence that has been presented to the Court and the elements that the Court has reviewed above, the Court finds it has been proved beyond a reasonable doubt that the agreement with Ghanem Junior was entered into to secure for Yara information and advice directly from the chairman and acting oil minister of Libya in the negotiations that Yara held with the NOC.

Ghanem Junior's task was to be a messenger and conceal the fact that a separate channel to Dr. Ghanem was established.

## V. Count b) of the indictment: the India matter

<u>1. Introduction</u>
At the point in time when Yara decided to have a closer look at the opportunities in the Indian market, the company had limited activities represented by the import of specialty products. Those sales were handled by a local agent who reported to the downstream division of the Asia office.

As the world's largest fertilizer producer it was logical for Yara to seek a stronger presence in India, which was the world's third largest fertilizer market.  Yara's industrial goals for India were drawn up in a strategy memo in 2006.  The strategy was to seek cooperation on production with local producers.  Additionally, Yara would work to have authorities change the subsidy system to make it possible to import own and third party products to be resold in the Indian market.

As the presentation will show, Yara chose to enter into a cooperation agreement with an Indian fertilizer cooperative with about 7,000 members.  These were farmers who had organized themselves as a cooperative to take care of their interests concerning the production and procurement of fertilizer.  The name of the cooperative was Krishak Bharati Cooperative Limited (Kribcho) and it was 67 % owned by the Indian state.

- 32 -

14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

The Indian State, Kribhco and Yara seem to have had common objectives on many points. Yara wanted to enter the market with its specialty product NPK. This coincided with India's wish to use a more composite fertilizer product that could reduce the accelerating use of urea, which was a strain on the soil.

An ever increasing consumption of urea in the agricultural sector also became, because of the subsidy system, a substantial economic burden to the Indian State. The negotiations with Kribhco thus quickly produced an agreement to continue negotiations in order to arrive at a binding agreement on long-term cooperation.

Of particular importance for this case is the consultancy agreement that was entered into with Maini Junior. His father, Dr. Maini, was Additional Secretary and Financial Adviser in the Indian Ministry of Chemicals & Fertilizers (DOF), and as such he was a central civil servant in a ministry that was very important to Yara.

According to Clauw's statement before the Court, Dr. Maini knew a businessman by the name of Eli Calil (Calil). Calil operated as a middleman in large transactions, especially within the energy sector. Calil knew that Dr. Maini had promoted his son at, *inter alia*, an IFA (International Fertilizer Industry Association) conference and that he wanted his son to be introduced to a company that could realize his ambitions to change the Indian fertilizer regime. Calil knew Clauw already before Clauw was hired by Yara, and he introduced Maini Junior who subsequently was retained to assist Yara as an adviser in the process with Kribhco.

The agreement and the role later played by that the son and the father in Yara's India initiative are discussed below.

2. Project start-up and the process leading up to the hiring of Maini Junior

The introductory meeting between Yara and Kribhco took place in mid-December 2006. It was Clauw and Wallace who represented Yara at the meetings with Kribhco and with the DOF. The former was represented by its CEO B. D. Sinha (Sinha) and the DOF by Dr. Maini.

The meeting was followed up with a letter from Clauw on behalf of Yara in which he summed up possible fields of cooperation. What happened next was that Kribhco responded positively to Yara's proposal and a follow-up meeting was agreed for late February 2007, with the same persons participating. Kribhco was in addition represented by its CFO, R. Karma.

- 33 -                                                   14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



At the meeting it was decided that Wallace was to draw up a draft HoA. The draft agreement drawn up by Wallace described areas for the future cooperation, including the objective of restarting fertilizer plants that had been closed down. The thought was that these plants, which all were plants for urea production, were to be upgraded and used for the production of NPK. The agreement also entailed an intention of cooperation on start-ups in countries where one could obtain access to gas contracts on favourable conditions. The plan was that fertilizer produced at such plants possibly could be exported to India, something that would presuppose an amended subsidy regime.

Following a short exchange of documents, the HoA was signed on 13 April 2007.

Despite the enthusiasm by both parties, in practice little happened in terms of identifying and working on industrial opportunities in line with the intentions. The list that Kribhco was to prepare of plants for potential upgrading was constantly delayed. The inspection of potential plants was first postponed and later cancelled. The reason was that the plants concerned were virtually worthless and an upgrade would in reality be on a par with establishing completely new plants.

In June 2007, Wallace informed Kribhco that they had to put the project on hold. The reason for this was explained in an email as being that because of holidays it was not possible to send technical experts to India until after the summer, and that in addition there was a need for changes in the negotiating team. However, the contract negotiations continued and on 15 October 2007 the agreement with Kribhco was extended for one year with the same contents as before, except that the exclusiveness clause was removed. However, after this Yara's dedication to the cooperation seemed to wane, ending with a termination of the process with Kribhco in the summer of 2008 without anything having happened since the agreement was extended.

3. The engagement of Maini Junior
Maini Junior had no professional background in or experience from the fertilizer sector. Despite this, Yara took an interest in Calil's proposal to use Maini Junior as an advisor.

The assignment that Yara envisaged that Maini Junior was to assist in, was limited to facilitating Yara's contact and negotiations with the DOF and Kribhco and to take care of practical details linked to visits to India.

What Maini Junior and Calil envisaged they were going to participate in, was the establishment of an extensive project linked to Kribhco for the further development of the

- 34 -                                                    14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

fertilizer industry in India. This can be seen from the first draft agreement from Maini Junior's lawyer. The draft agreement shows that Maini Junior and Calil planned for a consultancy that would entail everything from working on initiating opportunities in India to assistance in negotiating concrete agreements on cooperation and project development. They further presupposed that they were to participate on the ownership side in future projects with Yara as well as being Yara's sales agent. Moreover, the agreement was to give them a so-called put option back to Yara; that is, they were supposed to be able to sell their ownership part in a potential future commonly owned company back to Yara.

Thus, Yara and Maini Junior had different perceptions of the contents of the consultancy that Maini Junior was to provide. As a result, it took some time and several draft agreements before they agreed on the contents of the assignment.

The first draft agreement that was presented from Maini Junior and Calil is dated 21 March 2007. Wallace responded to the proposal by stating that the scope of the assignment went beyond what Yara envisaged:

> *"My understanding is that we will engage ABC to work on the existing joint venture arrangement with Kribhco and, should those fail to develop as contemplated, to assist us in finding and working with another joint venture partner or partners".*

ABC is here to be understood as Calil and Maini Junior.

Additionally, Wallace said that the compensation would have to be discussed directly with Clauw.

On the basis of this feedback, Maini Junior and Calil sent a revised draft dated 10 April 2007, which was discussed at a meeting in London on 12 April 2007. The draft had been somewhat amended in comparison to the first draft, but its scope still exceeded what Yara had envisaged.

In an email two days after the meeting in London it is clear that Maini Junior mistakenly was of the understanding that the parties had reached an agreement at the London meeting.

A few days later, Wallace sent his first draft agreement to Maini Junior. It limited the assignment in comparison to the proposal from Maini Junior/Calil and it only included Maini Junior. The proposed remuneration was USD 250,000 plus reimbursement of out of pocket expenses for the entire term of the agreement, which was stated to be from 1 November 2006 to 30 April 2008. In addition, a commission was proposed on all products Yara would sell in

- 35 -                                          14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

*Translation from Norwegian*

India during the period from April 2007 to the termination of the agreement. It should be mentioned here that Yara already had an agreement with an agent who had an exclusive right to sales in India of certain products, including NPK.

Yara's proposal was negatively perceived by Maini Junior. In an email dated 2 May 2007, he asked Yara to reconsider its proposal and he presented a counterproposal of a fee of USD 1 million per year, as well as normal investment bank commissions if their services were used in the case of establishments abroad. Furthermore, they demanded success fees in the case of a successful outcome of the negotiations, as well as ownership shares in future phosphate plants. Last but not least, Maini Junior's company Nuovo was to act as Yara's long-term representative.

In a response to Maini Junior of 15 May, Clauw emphatically stated that Yara's need for advice was linked to the Kribhco agreement. Beyond that, the future would have to show what need for advice Yara would get. Furthermore, Clauw asked Maini Junior not to hire anybody in connection with the cooperation with Yara. What Yara needed was Maini Junior's own competence and "lobbying capabilities". Clauw also specified that Yara itself had all the necessary expertise within fertilizers.

What happened next was that Calil informed that the subsidy system was close to being changed. This was expressed in his email of 15 May 2007 to Clauw, Wallace and Maini Junior as follows:

> *"As you may be aware, partly thanks to our efforts the Indian Government is moving ever closer to a sane subsidy policy on fertilizers. This was Yara's original proposal and wish and 6 months later we are close to it (record time for Indian policy changes!!)".*

Against this background, Calil asked that "agreements be put on the table". In passing, the Court notes that no such change of the subsidy system took place.

Three weeks after Calil's initiative, Wallace sent his second draft agreement, in which he accommodated Maini Junior by increasing the compensation. It was now proposed to be USD 1 million per year for three years from 01 January 2007 to 31 December 2009. The agreement was presupposed to be non-terminable. Maini Junior's earlier claims for an equity share and representation were partly catered to through non-committing statements that there would be negotiations regarding both representation and equity shares in future projects on the condition that the cooperation with Kribhco would materialize.

---

- 36 -                                                                 14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish. Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

It is evident that prior to this draft agreement, there was also a discussion about the recipient of the payments, as Wallace stated the following in his email:

> "Payment to nominees and/or nominee bank accounts without limitation is an issue for a public company in an OECD country such as Yara. Lets discuss what you have in mind and we can probably find a suitable resolution".

After a few changes in a third draft from Yara, which do not seem to be of a substantive nature, a final draft is forwarded to Maini Junior. Thus, there were four drafts for an agreement prior to Maini Junior's acceptance in an email of 23 June 2007. In addition are the draft agreements that in the beginning were presented by Maini Junior himself and through his lawyer. The contract negotiations took place over a long period of time and it may seem like Yara intentionally procrastinated the final entry into an agreement. It should also be added that the agreement was never signed. Yara did however consider that it had been entered into in a binding way, as an offer had been set forth which Maini Junior had accepted.

By 13 June 2007 the latest, Enger was informed of and approved the engagement of Maini Junior. This is evident from an email from Wallace to Clauw, Ombudstvedt and Cavazuti which reads as follows:

> "I have spoken to Thorleif and explained the retention of G. Maini's company to represent Yara in India. He understands that it has been approved by Daniel, Sven, Ed and me and he is OK with the arrangement".

Wallace said in his statement in court in connection with the above that the family relationship between Dr. Maini and Maini Junior was discussed within the above-mentioned group. From Wallace's statement in court it is also clear that Enger was informed of both the family relationship and Dr. Maini's position within the DOF. Clauw claims he did not inform Enger about the family relationship because he did not consider it important. Enger, on his part, says he does not remember whether it was mentioned. The Court notes the fact that Clauw in another context has stated that "when Wallace knew it then all the other members of the management knew it too".

It is the Court's assessment that all the above-mentioned persons knew about the circumstance at the time of the payment and probably as early as by 13 June 2007.

4. The text of the agreement for the accepted offer

Below is the text of the agreement that was agreed for the advisory agreement between Yara and Maini Junior:

14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

*"On behalf of Yara Asia Trade Pte. Ltd. and its parent company, Yara International ASA (collectively, "Yara"), I would like to extend our thanks for the efforts that XXXX and its assigns (the "Company") have put in on our behalf in connection with the discussions and plans of our entry into the Indian fertilizer market. In recognition of these efforts and to regulate our relationship for the period specified and till such time as we assess and structure the basis for such a market entry, we propose the following engagement:*

**Representation:** *The Company and its assigns (the Company 1. shall however ensure the sustained engagement on Yara's behalf for the Indian market by Gurpreetesh S. Maini) are appointed as Yara's representative and strategic advisor in connection with all discussions of the proposed joint venture with Krishak Bharati Cooperative Limited ("Kribhco") and any other fertilizer market initiatives and/or joint venture discussions initiated during the term of this engagement or any successive terms as decided between both parties for the Indian market.*

*2.* **Duties:** *The Company will act as the Representative of and as the Strategic Advisor to Yara in India in connection with the development of fertilizer sales and marketing initiatives in India and the development of both domestic and dedicated import production facilities overseas for the Indian market. In this connection, the Company will:*

a.    *Assist Yara in identifying, exploring and pursuing potential fertilizer sector opportunities in India;*

b.    *Advise Yara regarding its business relationships with existing and/or prospective joint venture partners in the fertilizer sector;*

c.    *Coordinate the representation of Yara before governmental authorities;*

d.    *Assist in identifying, evaluating and recommending the most appropriate geographical locations for investment in the fertilizer sector in India;*

e.    *Coordinate the import and sale of fertilizer products into India with Yara personnel responsible for such imports and sales; and*

f.    *Provide such reasonable assistance, as may be required by Yara in stabilizing its Indian engagement including:*

*The provision of requested reports, digests i. and other materials to enable Yara to assess the business opportunities be explored during the term of this engagement; and ii. The coordination of and provision of support to visits of Yara personnel to India in connection with the activities of the proposed joint venture with Kribhco or any other initiative of Yara and the provision of office facilities and support to such personnel.*

---

- 38 -                                        14-022670MED-OTIR /05


Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com



*Translation from Norwegian*

**3. Compensation.** *Yara will pay to the order of the Company for services rendered to date and for the balance of the term of this engagement, the following:*

a.   *The aggregate sum of US$ 1.000.000,00 (USD 1 Million) per calendar year, payable quarterly in advance on the first day of each calendar quarter (with a cumulative payment of US$ 750.000,00 due on 1 July 2007 in respect of services rendered to date); and*

b.   *Reimbursement of all out of pocket expenses incurred by the Company in the performance of its duties under this engagement including travelling, boarding and lodging on the business of Yara.*

**4. Term.** *The initial term of this engagement will be from 1 January 2007 through 31December 2009. This contract shall be automatically extended for successive two-year periods unless either party gives to the other party written notice of intent not to extend not less than six months prior to the end of the initial term or any extension thereof.*

**5. Permanent Engagement.** *In the event that the joint venture discussions with Kribhco or any other party for the Indian fertilizer market are finalized and the joint venture is created during the term of this agreement, Yara agrees that it will negotiate in good faith toward the establishment of a representation arrangement with the Company that includes the possibility of an equity participation in the Yara joint venture participant as well as engagement in activities beyond those contemplated for the initial period as set forth herein.*

**6. Termination.** *This engagement may not be terminated during the initial term or any extension thereof, except:*

a.   *by the mutual consent of the parties;*

b.   *in the event of the failure or refusal of a party hereto to perform its obligations hereunder following notice and a reasonable period to cure such failure or refusal; or*

c.   *at the end of the initial term or any extension thereof pursuant to written notice as provided in Paragraph 4.*

*As you well understand, we are at the very preliminary stage of assessing the nature and scope of our engagement in India. The foregoing engagement is intended to be an interim measure until the structure of Yara's business development is more clearly defined. At that time, we will be in a position to consider a number of options, including those that you have suggested in the materials that we have reviewed. Until then, we believe that the remuneration arrangement will provide a fair compensation for the Company's efforts. In addition, we will evaluate the proposals for participation in a*

---

- 39 -                                                    14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*





*Translation from Norwegian*

*joint initiative with respect to the single super phosphate fertilizer business in India. If our evaluation of this business indicates that Yara should participate, the Company will be Yara's preferred partner for such activities, subject to the negotiation and execution of a mutually satisfactory agreement regulating such activities.*

*Finally, the parties (or their affiliates) intend to enter into a separate agreement for the payment of normal brokerage commissions per ton of product sold in India by Yara or its affiliates (including any joint venture for the production and/or sale of fertilizer products). Such commission will be based on and comparable to the commission arrangements paid by Yara in other countries for similar services in similar circumstances.*

5. Developments in the case after the consultancy agreement had been fully negotiated
As is evident from the agreement, USD 750,000 was to be paid per 1 July 2007 for services rendered to date. Because of Clauw's leaving, the project was put on hold until a new project team had been established. As a consequence, it was agreed that the payment should be postponed until 1 September 2007 and that USD 1 million would then be paid. Time passed and payment did not take place on the agreed due date. Despite Clauw having left Yara, it was Clauw who received a reminder of the payment. On the background of Maini Junior's reminder, on 5 September 2007 Clauw sent an email to Wallace with Enger copied in, in which he wrote that if Yara wanted to continue the cooperation with Kribhco, Yara would have to sign the agreement with Maini Junior. If not, Kribhco would not continue the agreement. He also wrote that if Yara did not want to continue the conversations with Kribhco, he thought it would be possible to discontinue the relationship with Maini Junior with a one-year lump sum payment. He further stated:

> *"As you know, Maini has been with his father the driving force of the government starting changing for more balance nutrients consumption and pushing KRIBHCO to negotiate with YARA".*

In the Court's assessment, Clauw's email of 5 September 2007 shows that Dr. Maini not only had power in relation to decisions within the DOF. He could also, by virtue of his position on the board of Kribhco, influence the cooperation between Yara and Kribhco. According to Clauw, there would be no renewal of the agreement with Kribhco unless Yara honoured the agreement with the son. The above quote also shows that Dr. Maini was central in relation to the question of changes to the subsidy system, an issue that was important to Yara.

The Court does not doubt that Dr. Maini actually believed that the subsidy system should be changed. As will be seen below, the Court however believes that Yara intentionally entered into the agreement with the son to obtain advantages through the father in connection with the initiative in India.

- 40 -                                            14-022670MED-OTIR /05

Translated by John Richard Stokbak Sciabà. Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com



*Translation from Norwegian*

In the middle of August 2007, Wallace sent an email to Kribhco in which he continued where they had left off before the summer holidays. Wallace gave information about Clauw leaving and Enger's planned trip to India that same autumn, where Enger wanted to meet both Kribhco and Dr. Maini. Wallace also asked for information about plants that could potentially be upgraded. Maini Junior was copied in on the above-mentioned email by Wallace through so-called blind copy. On 17 August Maini Junior replied, informing that his father had been transferred to another ministry effective 1 September 2007.

On 20 August, in an email to Enger, Wallace asked for instructions with regard to the relationship with Maini Junior. He enclosed the draft agreement that was accepted. On 18 September, Enger told Wallace to terminate the relationship with Maini Junior. This happened after Terje Knutsen (Knutsen), who was the head of Yara's Asia department, had been to India and had met Kribhco, which made him even more sceptical of the cooperation. Additionally, on that same day Knutsen had received an email from Yara's local agent in reply to his question about who this Maini Junior was. Here, the agent replied that he is the son of Dr. Maini and that he had left his position with the DOF. He says that through his father's leaving the DOF, Maini Junior:

> "lost out the support system to call themselves "fertilizer consultants`".

## 6. The payment to Maini Junior

Following Wallace's contact, Maini Junior confirmed on 19 September that he accepted a compensation of USD 1 million as a final settlement for his assistance. On 16 October 2007, the amount was transferred from Yara to the company Krystal Holding Limited's account with the Standard Chartered Bank in Hong Kong.

The company CYC sarl with its address in Beirut, Lebanon, issued the invoice of USD 1 million. It has not been documented to the Court who owned this company. The invoice was forwarded in an email from Maini Junior on 25 September 2007 with payment instructions to a bank located in the same place. The invoice was ordered paid two days later by Wallace. According to the information that has been provided, the invoice was then ordered paid out of Yara's Asia office. There, however, the invoice remained unpaid. The reason was partly that the invoice concerned services that the office had not ordered and it was therefore unknown to Knutsen, the head of that office. Knutsen also found the invoice to be dubious. So when the invoice was finally paid it was done by the Oslo office as late as on 16 October 2007.

In an email of 8 October 2007, Maini Junior asked that the amount be paid into an account with Standard Bank (Hong Kong) Ltd in the name of the company Krystal Holdings &

---

- 41 -                                                                          14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

*Translation from Norwegian*

Investments Limited instead of CYC's account. This account was opened on 4 October 2007. The transfer was registered entering the account on 17 October 2007. Incidentally, no invoice issued by the latter company has been documented. Nor has any credit note from CYC sarl been documented.

The funds were then transferred in the amount of USD 500,000 to the company Rhines & Raavi Holdings Limited on 22 October 2007 and in the amount of USD 499,000 to a term account (term deposit) of a one month term in the same bank on 24 October 2007. The latter amount was then transferred back to the account one month later and USD 456,000 was transferred to Rhines & Raavi Holdings Ltd on the same day. An additional USD 30,000 was transferred to the same company on 23 January 2008.

It has not been documented to the Court who owns the company CYC sarl and the reason why this company sent the invoice for Maini Junior's services to Yara. The company Krystal Holding and Investment Ltd is a company registered on the British Virgin Islands (B. V. I.) and is owned by the Meher Trust. The beneficiaries of the trust are Maini Junior's mother and wife.

The company Rhines & Raavi Holdings Ltd. was registered in 2003 in Delhi, India and is owned 86 % by Maini Junior, 9 % by Krystal Holdings & Investments Ltd. and 5 % by others. The board consists of Dr. Maini, Maini Junior, their wives and presumably Maini Junior's younger brother (born 1980) and grandfather (born 1924). Thus, the company appears to be a purely family-owned company.
The reason why it was demanded that the funds from Yara should be transferred to a company registered on the B. V. I. was the wish on the part of Maini Junior that the fee should not be taxed in India.

Since the amount was transferred in this way, it is to be presumed that it is in no way obvious to conclude, as claimed by the defence, that the amount in reality has been to the benefit of Maini Junior alone and that no part has benefited his father. It is not probable that the amount was transferred from Krystal Holding and Investments Ltd. to Rhine & Raavi Holdings Ltd. as a waiver of income. It is more probable that it was a loan. Otherwise it would not make sense to transfer the funds via the B. V. I., as Indian tax logically would have accrued upon booking as income by Rhines & Raavi Holdings Ltd. Consequently, the Court finds that the amount has also benefited Maini Junior's family.

<u>7. The Court's assessment of the engagement of and payment to Maini Junior</u>
*7.1     Introduction*

---

- 42 -                                   14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



EXT- WALLACE-00141

*Translation from Norwegian*

It is clear from the indictment that the prosecuting authority considers the agreement between Maini Junior and Yara to be an improper advantage that amounts to a violation of the Penal Code section 276a, see the basis of count b) of the indictment:

> *Both the agreement and the payment constituted an improper advantage.*

On their part, the defence counsels claim that the agreement with Maini Junior was linked to the services he had provided or was to provide and not to any influencing or attempt at influencing his father.

### 7.2    The choice of Maini Junior as Yara's consultant in India

In its assessment, the Court has attached significance to the fact that Maini Junior is the son of a public official who had substantial influence within the fertilizer sector. As a central public official at the DOF and a member of the board of Kribhco, he had a strong influence on both the design of the fertilizer policy and the decisions of Kribhco.

The Court considers it a fact that Maini Junior got the idea of cooperation between Kribhco and Yara from his father. Furthermore, it is the Court's assessment that Maini Junior was not qualified for the vast majority of the tasks indicated in the mandate. He had no experience from the fertilizer industry. He had graduated quite recently and therefore had little work experience. The court proceedings also demonstrated that it was never the intention that Maini Junior was to perform the vast majority of the tasks described in the agreement.

It is the Court's view that the only thing that Maini Junior assisted with was practical facilitation and forwarding of information to and from Dr. Maini. No documents or other information have been presented to suggest that Maini Junior performed any of the other tasks defined in the mandate. His practical assistance consisted in hotel bookings, transport, assistance in obtaining visas and the like in connection with Yara's visits to India. Maini Junior's contact with Kribhco seems to have been limited. He did however forward some reports on the fertilizer industry, but they had been produced by others. The scope of this work, in terms of hours spent, has not been documented before the Court.

The Court also makes reference to an email from Wallace to Enger and four others in August 2007 where he asks for instructions on how to relate to Maini Junior from that point onwards. In it he says the following:

> *"I would ordinarily rely on him to see that Kribhco actually responds in a timely manner to our inquiry about meeting (not a given), that there is actually a meeting at the Ministry for the same period (definitely not a given) and that the necessary*

---

- 43 -                                          14-022670MED-OTIR /05

Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com



*Translation from Norwegian*

> invitations, etc. for visas are sent out promptly, hotels are booked, dinners arranged, etc. If we are not going to use him, I would like to know who will undertake these matters, particularly for the upcoming trip".

Additionally, the Court makes reference to Clauw's summing up in the email dated 5 September 2007 to Wallace and Enger were he says:

> "As you know, Maini has been with his father the driving force of the government starting changing for more balance nutrient consumption and pushing KRIBHCO to negotiate with YARA".

These two emails document that the son's role primarily was to cover up the reality, which was that Yara bought assistance in the negotiations with Kribhco and information, advice and influence into the Department of Fertilizers from Dr. Maini.

The court proceedings have shown that it was the father who contributed with furthering Yara's opportunities in India. He participated at meetings with Kribhco and Yara and contributed with initiatives to changes to the subsidy scheme in India. He forwarded to Yara, via his son, the agenda of the Kribhco board meeting. The father signed the required invitations as basis for visas and he participated at meetings with Yara at the ministry.

### 7.3    The contents of the consultancy agreement

It took many draft agreements on Yara's part before an agreement was reached. The disagreement was primarily due to a discussion on compensation for the first phase of the consultancy, as well as the advisor's rights as to participation and compensation for contributions in the subsequent projects and compensation for a role for Maini Junior as a sales agent. The agreement's definition of Maini Junior's tasks is not changed from one draft to the other. The reason for this, in the Court's opinion, is that it was never an option that Maini Junior would deliver real advisory services. The purpose of the definition of Maini Junior's tasks in the text of the agreement was to cover up the reality that it was the father's influence that was being paid for. What Maini Junior actually delivered beyond advice and information from his father, is documented in the emails referred to above.

The Court observes that Yara wound up giving in to the claim for compensation, as the amount was changed from USD 250,000 to USD 3 million over a three-year period. The Court also makes reference to the fact that no documentation was presented showing that the agreement was presented to or discussed with Kribhco's board or the DOF. Considering the family relationship between father and son, that would have been highly natural if this had been a bona fide agreement.

---

Translated by John Richard Stokbak Sciabà, Government Authorized Translator English - Norwegian - Spanish, Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com



EXT- WALLACE-00143

*Translation from Norwegian*

## 7.4    The size of the fee

Based on what has been presented to the Court, the Court finds it has been proved that the value of the work actually performed was insignificant compared to both the agreed fee and the fee that was paid.

The Court's conclusion is that the compensation Yara accepted, including the possibility of participation in future projects and an agreement as a sales agent, in no way is proportionate to the services that Maini Junior on an independent basis actually delivered or was expected to deliver. There is no other reasonable explanation for the agreement than the compensation being a compensation for the services that Dr. Maini, by virtue of his position, could contribute in connection with Yara's establishment and future activities in India.

The defence has submitted that the compensation at the outset was intended to be a compensation for contributing the project/business idea of Kribhco and following it until it became a success. When it turned out that Yara no longer wanted to pursue it, it became necessary to find an amicable solution in order to avoid a legal dispute in India. The Court can understand that the termination amount of USD 1 million could reasonably be based on a wish to avoid a legal dispute. This does however not change the fact that the agreement had a different actual content than what it states.

## 7.5    The services of Maini Junior

The Court finds it has been proved that the idea of cooperation between Yara and Kribhco was the father's idea, not the son's. The basis of this conclusion is the statement in court of the CEO of Kribhco, Sinha, that Yara established contact with Kribhco through the DOF and that the first contact was with Dr. Maini.

During the court proceedings, documents were presented that were to illustrate in what way Maini Junior assisted in the process. All of them were either produced by other persons than himself or by his father. The tasks performed by Maini Junior related only to practical tasks in connection with travels and the organization of meetings, as well as introducing Yara's representatives. Sinha also confirmed in his statement in court that Maini Junior did not have any real role in the discussions between Kribhco and Yara. The Court also attaches significance to the fact that the agreement was terminated even though Yara's interest in Kribhco and India still existed.

Upon an overall assessment of all the evidence that has been presented to the Court and the elements that the Court has reviewed above, the Court finds it has been proved beyond a reasonable doubt that the engagement of Maini Junior was done to gain access to Dr. Maini's

- 45 -                                                          14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

influence, both in relation to the negotiations with Kribhco and in relation to Yara's more long-term plans for establishing the company in India. Maini Junior's task was, similarly to the role occupied by Ghanem Junior, to be a messenger and to conceal the fact that in reality an agreement had been made with Dr. Maini.

## VI.  The Penal Code section 276a, cf. the Penal Code section 276b and the delimitation against trading in influence, cf. the Penal Code section 276c.

### 1. General remarks

The indictment against all four defendants concerns the violation of the Penal Code, section 276a paragraph b), which is of the following tenor:

> *Any person who*
> *b) gives or offers any person an improper advantage in connection with a position, office or assignment*
> *shall be liable to a penalty for corruption.*
>
> *Position, office or assignment in the first subsection also means a position, office or assignment in a foreign country.*

The one who gives or offers someone a bribe is in the preparatory works of the Penal Code called "the active briber" (Proposition to the Odelsting [*legislative bill*] No. 79 (2002-2003)). The active briber is guilty of active bribery or active corruption. By passive bribery or passive corruption is meant situations where someone (the passive briber) demands, receives or accepts an offer of a bribe. The latter act is regulated by the Penal Code section 276a paragraph a). The indictment in the case at hand concerns the active act of corruption or aiding and abetting thereto.

### 2. "Improper advantage"

That which is given must be an "improper advantage".  The concept "improper" is a legal standard that indicates the delimitation between what is punishable and what is not punishable. In their closing arguments, the defence counsels mentioned that the concept "improper" gives rise to a lack of clarity as to the scope of the penal provision.  In the opinion of the Court, this issue has been considered by the legislator. In [*the green paper*] NOU 2002:22, p. 39 the Penal Code Commission stated the following on what is to be considered improper:

> *In the assessment of what is to be considered "improper", one must in each individual case perform an overall assessment of the situation, where a number of different elements will come into play. Elements in this context will be the purpose of the benefit, the nature and value of the benefit, the degree of openness that exists, what set of rules*

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

14-022670MED-OTIR /05



*Translation from Norwegian*

exists in the company or industry, whether the matter concerns public officials or the private business sector, and also otherwise the positions held by the giver and the receiver of the benefit, etc.

The Penal Code Commission furthermore stated that it takes quite a bit for an advantage to be considered "improper":
It is not sufficient that the matter is worthy of criticism. Since the Code uses the expression "improper", a margin has been provided so that it will not be possible to punish the public official or the business person unless the matter is clearly blameworthy. The expression "improper" entails a quite strong condemnation ([*the green paper*] NOU 2002:22, p.39).

In the Proposition to the Odelsting No. 78 (2002-2003) item 5.3.4 it is clear that the ministry also believes that the line against acts that are not punishable should be drawn by means of an impropriety criterion, the more detailed content of which must be established by the courts. The ministry furthermore states that it is not the personal opinion of the individual judge that is to be decisive for which acts are to be considered improper and thus punishable. The assessment shall depend on society's perception in light of policy considerations and the fundamental values that underlie the legal provision. Consequently, the impropriety standard will not be constant, but will develop on the basis of the prevailing moral views of society at any given time. Here, the Court notes that the matter will apply in particular to corruption, were society's perception of the blameworthiness of such acts has changed in the past couple of decades.

It is also clear from the Proposition that the ministry has considered the difficulties linked to the fact that the impropriety standard is not precise:

> *The Ministry sees that objections may be raised to the lack of a more precise indication of when an act is punishable and that the proposed provision may raise difficult issues of delimitation in the borderline area between improper advantages and other advantages. Nonetheless, the Ministry has arrived at the conclusion that the proposed wording is the most adequate one. There is reason to emphasize that under Norwegian circumstances, neither the one committing a "bribe" nor the one receiving it has any reasonable grounds for balancing on the edge of a penal provision concerning corruption.*

> *In the opinion of the Ministry, the proposed new section 276a satisfies the requirements that reasonably may be established with regard to clarity and predictability. It is not a given that a more detailed description of the crime would have created any greater degree of clarity and predictability. Simple and readily understood penal provisions that make reference to the general judgment of an act, for instance through a*

- 47 -                                                                14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

> *requirement of impropriety, may often come across as more instructive for persons who*
> *are not lawyers than a description of a crime that is legally more stringent but perhaps*
> *more difficult to understand for a layman. See similarly also Andenæs, Alminnelig*
> *strafferett [General Criminal Law] (4th edition, Oslo 1998) page 115. In addition, there*
> *is a great risk that a more detailed wording would not cover all the cases that the*
> *proposed provision seeks to ban.*

On the part of the legislator, the choice of the legal standard "improper" in the Penal Code
section 276a has been made following a thorough assessment. A corresponding legal
standard is also used in the Council of Europe's Criminal Law Convention on Corruption (the
Council of Europe Convention) where the punishable advantage is termed "undue advantage".
In the OECD Convention on Combating Bribery of Foreign Public Officials in International
Business Transactions, the concept "undue pecuniary or other advantage" is used. Norway has
ratified both conventions. In addition to the legislator having made an assessment of the
adequacy of the legal standard "improper" in the penal provision, the standard is thus also in
harmony with the corresponding legal standard of the conventions that Norway has ratified in
this field.

Following the above, the Court must perform a concrete assessment of whether the offers that
were given, the agreements that were entered into and the payments that were made in this
case are in violation of the standard "improper advantage" of the penal provision. This
assessment will be done by the Court during its discussion of the question of guilt in relation
to the various bases in the indictment.

3. "In connection with a position, office or assignment"
The improper advantage must have been given or offered someone "in connection with a
position, office or assignment".

During the main hearing the issue was raised whether the acts fall within the scope of the
Penal Code section 276a or the Penal Code section 276c.

The defence counsels have submitted that if there is any corruption in the case at hand, it must
be in the shape of "trading in influence" pursuant to the Penal Code section 276c. The Penal
Code section 276c is of the following tenor:

> *Any person who*
>
> *a) for himself or other persons requests or receives an improper advantage or accepts an*
> *offer thereof in return for influencing the conduct of any position, office or assignment, or*
> *b) gives or offers any person an improper advantage in return for influencing the conduct*

- 48 -                                                                        14-022670MED-OTIR /05

*Translation from Norwegian*

*of a position, office or assignment*
*shall be liable to a penalty for trading in influence.*
> *Position, office or assignment in the first subsection also means a position, office or assignment in a foreign country.*

> *Trading in influence shall be punishable by fines or imprisonment for a term not exceeding three years. Any person who aids and abets such an offence shall be liable to the same penalty.*

It is alternative b), "active trading in influence", that potentially might be relevant in this case.

Trading in influence is defined as follows in the preparatory works (Proposition to the Odelsting No. 78 (2002-2003), item 6.3):

> *Improper trading in influence in the sense of the Convention exists when a person belonging to the decision-maker's political party, family or social circle, or someone who for other reasons proclaims to be capable of exercising influence on the decision-maker, exploits his position by demanding, receiving or accepting an offer of an improper advantage ("any undue advantage"). The person who demands, receives or accepts the advantage (the influencing agent) is guilty of passive trading in influence. A person who gives or offers the influencing agent an undue advantage is guilty of active trading in influence. For the sake of simplicity, the one who is sought influenced shall hereinafter be called "the decision-maker", although the draft new section 276c of the Penal Code also covers some situations where it may seem not very logical to state that the one who is sought influenced is a decision-maker.*

The Penal Code Commission did not recommend the introduction of a penal provision against trading in influence, mainly because it was difficult to draw the line against legal lobbying. The ministry found, as can be seen above, that there was a need for a penal provision banning improper trading in influence.

The agreements that the indictment in the case at hand concerns, have formally been entered into with the sons of those who are claimed to be decision-makers. The defence counsels submit that we are then outside of the scope of application of section 276a of the Penal Code, since no improper advantage has been offered to a person in connection with his position, but to a person who is related and does not himself have any decision-making authority.

At first glance it may seem like the defence counsels do have a point here.

Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com



*Translation from Norwegian*

The wording of the Penal Code section 276a does not seem to cover the case that agreements are entered into with an agent/intermediary and not the decision-maker himself, while the wording of the Penal Code section 276c precisely seems to regulate precisely that situation.

It must be completely clear that if the briber gives an improper advantage to an agent/intermediary/relative in order to influence the decision-maker, then that is trading in influence and it is the Penal Code section 276c that is the applicable penal provision. If the Court finds it proved that the sons in this case were paid to influence their fathers and this was improper, then an indictment pursuant to the Penal Code section 276c should have been issued.

Still, it is not always the case that the matter is covered by the wording of the Penal Code section 276c when the bribe is not paid directly to the decision-maker. If the one who receives the payment does not "sell" his influencing position but is a mere intermediary to channel the payment to the decision-maker or others that the decision-maker has decided shall receive the advantage, it is not natural to call the matter "trading in influence". The same applies [when] the one receiving the payment in reality only is to disguise that the agreement was entered into with the decision-maker. Both cases concern offering/agreeing on an indirect advantage. The question is whether these categories of cases are punishable under the Penal Code section 276a.

The wording of the Penal Code Section 276a does not mention directly the circumstance that the improper advantage is offered/agreed indirectly through an intermediary.

The penal provisions concerning corruption were introduced into the Penal Code following an amendment of 4 July 2003 and were aimed at implementing Norway's obligations under international law pursuant to the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions of 1997 (the OECD Convention) and the Council of Europe's Criminal Law Convention on Corruption of 1999 (the Council of Europe Convention). Both the OECD Convention and the Council of Europe Convention treat direct and indirect payments to decision-makers as being equal. The OECD Convention Article 1 establishes that

> *Each Party shall take such measures as may be necessary to establish that it is a criminal offence under its law for any person intentionally to offer, promise or give any undue pecuniary or other advantage, <u>whether directly or through intermediaries, to a foreign public official, for that official or for a third party</u>, in order that the official act or refrain from acting in relation to the performance of official duties, in order to*

- 50 -                                              14-022670MED-OTIR /05

Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish. Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com



> *obtain or retain business or other improper advantage in the conduct of international business. (The Court's emphasis).*

The Council of Europe's Convention article 2 is of the following tenor:

> *Each Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences under its domestic law, when committed intentionally, the promising, offering or giving by any person, <u>directly or indirectly</u>, of any undue advantage to any of its public officials, for himself or herself or for anyone else, for him or her to act or refrain from acting in the exercise of his or her functions.*

Norway has ratified both conventions. In [*the green paper*] NOU 2002:22 it is stated under item 1 that the Penal Code Commission in its bill attached substantial importance to the definition of corruption as presented in the Council of Europe's Corruption Convention in articles 2-11. This suggests that even if it is not expressly stated in the text of the Code, the intention has been that the provision shall also cover indirect payments and indirect offers or agreements through intermediaries.

For the rest, there is no trace in the preparatory works of the reasons why "directly or indirectly" was not included in the text of the provision. In Proposition to the Odelsting No. 78 (2002-2003) under "Comments to the Penal Code section 276a" the following is stated:

> *A punishment can be imposed even if the advantage was intended to benefit others than the passive briber, cf. "for himself or other persons" in the first subsection paragraph a) and the word "anyone" in the first subsection paragraph b). It may for instance be that the bribe is deposited into an account at the disposal of a limited company or a relative of the passive briber.*

This statement suggests that the legislator intended the wording "for himself or other persons" to be the same as "directly or indirectly".

The fact that there has been some confusion about the scope of the Penal Code section 276a is evidenced by OECD's follow-up reports 2 and 3 on Norway's implementation of the Convention. In the Phase 2 Report on implementing the OECD Anti-Bribery Convention in Norway p. 25 sections 76 and 77 it is stated that during the visits by the Working Group, Norwegian authorities submitted that it is of no significance for the question of guilt under section 276a of the Penal Code whether the active briber used another person to perform the very act of corruption. The Working Group pointed out that no relevant judicial decisions existed in this field and that some lawyers believe that the use of intermediaries would amount

14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

to a violation of section 267c of the Penal Code and not section 276a. However, the Working Group believed that the outcome of a case where a Norwegian consultancy company had been issued with a writ prescribing an optional fine in lieu of prosecution and the person had been charged with bribing an Iranian public official, would contribute to removing the uncertainty of the new corruption provisions on this point. The case in question is the SINTEF case, see below.

In the follow-up report for Phase 3 paragraph 24, the OECD Working Group again focused on the fact that bribery through intermediaries is not directly regulated by the text of the Code. Amongst other things, the Working Group wanted to follow up on the following (the report page 41):

> *The application of the foreign bribery offence as litigation further develops to ensure that it covers bribes paid to third parties and bribery through the use of intermediaries, as well as the interpretation of the "impropriety of the advantage" and the application of the trading in influence offence in cases of foreign bribery.;*

There is very little case-law/practice that may shed light on the interpretation of the Penal Code section 276a on this point, but Økokrim in 2007 issued a writ prescribing an optional fine in lieu of prosecution in another case. SINTEF Petroleum AS (SINTEF) was issued with a writ prescribing an optional fine in lieu of prosecution in the amount of 2 million NOK for violation of the Penal Code section 276a, cf. section 276b.
The writ prescribing the optional fine in lieu of prosecution was accepted by the company. The background of the case was that SINTEF in 2002 signed an agreement with an Iranian oil Company for the delivery of consultancy services for the project 7 West Zagros Fields in Iran. SINTEF was to enter into the agreement together with, *inter alia*, its joint venture partner RIPI (National Iranian Oil Company Research Institute of Petroleum Industry). SINTEF also signed an agreement with Hinson Engineering Ltd., a company registered on the B. V. I. According to the agreement, Hinson was to perform consultancy services for SINTEF in connection with the West Zagros project. The Hinson agreement provided that Hinson was to receive 6 % of the international part of the contractual value for the West Zagros project as compensation for its services, a total of USD 254 426. Payments were made from SINTEF to Hinson's bank account in Switzerland on 29 January and 4 August 2003, totalling approximately USD 100,000.

In the opinion of ØKOKRIM, the Hinson agreement in reality entailed an offer for payment of improper advantages to the president and vice president of RIPI. The advantages were offered/given in connection with the Iranian public officials' positions and for them having influenced and/or going to influence the decision-making processes of significance for

- 52 -                                                    14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciaba, Government Authorized Translator English – Norwegian - Spanish. Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

SINTEF's commercial activities in Iran. The advantages that were offered/given pursuant to the Hinson agreement were improper, amongst other things because of the receivers' positions/offices, because of the size of the payment and because the advantages were concealed as payments for consultancy services.

A manager of the company was also indicted pursuant to the same provisions, but was acquitted by the district court because the court did not find it had been proved that the manager had committed the punishable acts that he was charged with. Since the district court acquitted the manager, no direct legal clarification of the delimitation between the Penal Code's section 276a and section 276c was made. As far as the Court can see, no other similar cases have been heard by the courts. The facts in the SINTEF case are similar to the facts in the case at hand. In the district court's judgment there is no trace of the question being raised whether it was the Penal Code section 276a or section 276c that was relevant, neither by the prosecutor, defence or the court. Consequently, the Court presumes that the issue was not raised in the SINTEF case. This is an element that suggests that the understanding of the law that Norwegian authorities have expressed to the OECD Working Group is correct.

The Court agrees with the defence counsels in that the principle of legality imposes limitations on any expansive interpretation of penal provisions. Following an overall assessment of the elements mentioned above, the Court has arrived at the conclusion that it is the actual circumstances of fact that the Court finds proved that are decisive for whether it is the Penal Code's section 276a or section 276c that is applicable. This means that if the Court concludes that the agreements in reality were an offer/agreement of improper advantages to the fathers in connection with the fathers' positions or offices, then it follows from an interpretation of the penal provision that this falls within the scope of the Penal Code's section 276a. In the Court's opinion, the improper advantage - in this case, the payments - needs not have ended up with the fathers, as long as it was the fathers who could control where the money was to end up, cf. the wording of the provision, "for himself or other persons".

The Court's conclusion is additionally strengthened by the fact that 3/4 of all international corruption takes place by means of agents/intermediaries. See the OECD Foreign Bribery Report, where more than 400 corruption cases all over the world during the period 1999 to 2014 were analyzed. In the report, which was published in November 2014, the following is stated on page 8:

> *Intermediaries were involved in 3 out of 4 foreign bribery cases. These intermediaries were agents, such as local sales and marketing agents, distributors and brokers, in 41% of cases. Another 35% of intermediaries were corporate vehicles, such as subsidiary companies, companies located in offshore financial centres or tax havens, or companies*

---

- 53 -                                        14-022670MED-OTIR /05

Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com



*Translation from Norwegian*

> established under the beneficial ownership of the public official who received the
> bribes.

On page 29 of the report it is stated that where intermediaries/agents were used in corruption
cases, 3% of these were family members of public officials.
It is difficult for the Court to envision that the legislator intended a large part of the
international corruption to be subject to a milder penal provision in Norway.

Following the above, the evidentiary topic in this case will be whether the agreements with
the sons in reality were offers/agreements for payments of improper advantages to the fathers
in connection with their positions as public officials.

## VII. The Court's assessment of whether the agreements and payments are encompassed by the objective description of the acts concerned in the Penal Code section 276a, cf. section 276b.

### 1. Introduction

It is clear from the indictment that the prosecuting authority considers that both the
agreements and the payments in Libya and in India amounted to an improper advantage in the
sense of the Penal Code section 276a, cf. the basis under count a) of the indictment.

On their part, the defence counsels claim that both agreements were regular agreements linked
to services that the sons had provided or were to provide and had nothing to do with the
positions of their fathers.

In count a) of the indictment, the description of the acts is as follows:

> In the period 2004 to 2009, Yara negotiated with the state-owned Libyan oil company
> National Oil Corporation (NOC) regarding cooperation (a joint venture) on fertilizer
> production in Libya. At some point, probably in early 2007, Wallace entered into an
> agreement on behalf of Yara to pay USD 5 million or more to Mohamed Ghanem, the
> son of Shukri Ghanem. At the time, Shukri Ghanem was Libya's oil minister and
> chairman of the NOC. The agreement was linked to Yara's negotiations with the
> NOC and Shukri Ghanem's role there.

As regards the payment, the following is stated in the description of the acts in count a):

> A portion of the agreed amount, USD 1.5 million, was transferred to a Swiss bank
> account controlled by Mohamed Ghanem. This happened as follows: The Swiss

- 54 -                                     14-022670MED-OTIR /05

Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish. Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com



*company Nitrochem Distribution AG (Nitrochem) was asked to advance the amount on Yara's behalf, which Nitrochem did by transferring USD 1.5 million to the agreed account on 29 March 2007. Yara subsequently reimbursed Nitrochem via its partially owned subsidiary in Switzerland, Balderton Fertilizer SA (Balderton). The reimbursement was concealed by over-invoicing several ordinary deliveries of ammonia from Nitrochem to Balderton, in the period from October 2007 to May 2008. The ammonia deliveries in question were then sold from Balderton to Yara Switzerland SA (Yara Switzerland) at a price which also covered the excess price for the commodities paid by Balderton. Thus, in reality it was Yara Switzerland that covered the payment to Ghanem.*

*The payment was made at the same time as Yara and the NOC were in the final stages of negotiating a "Heads of Agreement" (HoA), which was signed in April 2007.*

*Both the agreement and the partial payment constituted an improper advantage.*

Under the description of the facts regarding the Libya matter, the Court has above concluded that an oral agreement was entered into with Ghanem Junior, in which the fee offered totalled USD 4.5 million (not 5 million as stated in the indictment's description of the acts).

The Court has also above found it has been proved that the payment of USD 1.5 million was performed as stated in the description of the acts and that the payment was done after the negotiating teams had agreed on the HoA in March 2007, but before the formal signing in April.

In count b) of the indictment the description of the acts is as follows:

*In April 2007, Wallace and Clauw, on behalf of Yara, offered to enter into an agreement with Gurpreteesh Singh Maini, the son of Dr Jivtesh Singh Maini. Dr Jivtesh Singh Maini was at the time Additional Secretary and Financial Adviser at the Ministry of Chemicals & Fertilizers and a member of the board of KRIBHCO on behalf of the Ministry. The offer of an agreement with Gurpreetesh Singh Maini was made in connection with Dr Jivtesh Singh Maini's position.*

*(...)    In a later draft agreement from Yara, the one-off payment offer was replaced by an amount of USD 3 million, to be paid in instalments of USD 1 million per year during the period 1 January 2007-31 December 2009.*

---

- 55 -                                              14-022670MED-OTIR /05



*Translation from Norwegian*

The following is stated about the payment:

*On 16 October 2007, Yara paid an amount of USD 1 million on the basis of an invoice forwarded by Gurpreetesh Singh Maini from the Lebanese company CYC s.a.r.l. The amount was instead, at Gurpreetesh Singh Maini's request, transferred from Yara to an account in Hong Kong belonging to the company Krystal Holdings & Investments Limited (British Virgin Islands), a company registered in the names of the spouses of Jivtesh Singh Maini and Gurpreetesh Singh Maini.*

The Court has above in its description of the facts regarding the India matter found it has been proved that the last draft agreement that was accepted by Maini Junior, entailed a fee of USD 1 million per year over three years and that USD 1 million was paid.

<u>2. Were the agreements and payments "improper advantages"?</u>
As is clear from the review above of the requirements for convicting someone of corruption, an overall assessment of the situation must be made in order to establish whether an "improper advantage" was given in this case. For this purpose, several elements may be considered.

It is expressly stated in the preparatory works that it takes quite a lot for an advantage to be deemed improper. The expression "improper" entails a quite strong condemnation. A clearly blameworthy circumstance must exist.

There has been a development in the view of the blameworthiness of Norwegian companies' participation in corruption in countries where corruption is part of the business culture. Prior to 1995, Norwegian businesses could be granted a tax deduction for documented expenses for dubious payments (bribes) abroad, while after 2003, strict punishments for corruption were adopted. However, the Court does not believe that much importance can be attached to this when assessing the impropriety in the case at hand. The kind of advantage that was paid and offered by Yara in Libya and India was considered clearly blameworthy at the point in time when the act was committed, both domestically and internationally. This is demonstrated by the media reports on the Statoil case and other corruption cases during the period in question. The defendants were also aware of this.

The purpose of the benefit is mentioned in the preparatory works as an element to be included in this overall assessment. The Court considers it has been proved that the purpose of the consultancy agreement with and payment to Ghanem Junior was to receive information and advice from Dr. Ghanem for use in the negotiations with the NOC. The purpose of the consultancy agreement with and payment to Maini Junior was to secure his father's influence

14-022670MED-OTIR /05
*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



in connection with the negotiations with Kribhco and the conversations with the DOM on the fertilizer regime in India.

These are elements that strongly suggest the existence of an "improper advantage" as far as both agreements are concerned.

The size of the fee is also an element suggesting that the advantage is improper. The amount of USD 1.5 million was paid to Ghanem Junior and an additional USD 3 million was agreed subject to certain conditions. For Maini Junior the corresponding amount was USD 1 million per year for three years. The Court has concluded that the fees in no way were proportionate to the services that Ghanem Junior and Maini Junior supplied personally.

The degree of openness is mentioned in the preparatory works as an element in the overall assessment. Regarding this, the Court points out that the agreements in both cases were hidden from the other party that Yara negotiated with. Also, substantial creativity was displayed for the purpose of concealing the payment to Ghanem Junior. It is a typical feature of corruption that it is difficult to trace the payment flow. In India, the payment was not hidden in the same ingenious way, but also as regards the India matter it became a problem to have the invoice from Maini Junior paid.

The Court also wants to emphasize the fact that the agreement and payment to both Ghanem Junior and Maini Junior were contrary to Yara's own ethical guidelines. The payment to Ghanem Junior was not lawful. The agreement and the payment were not "fair" as far as any of the agreements were concerned. It was evident that it became a problem to Yara that the agreements and payments became known.

It is clear that corruption was, and is, very widespread in Libya. The Court also presumes that the use of consultants like Ghanem Junior was common to gain access to persons with influence and the power to enter into agreements on behalf of Libyan government bodies. The same is true for India. As mentioned, the OECD report referred to above states that intermediaries/consultants were used in 3 out of 4 international corruption cases and that 3 % of these consultants were family members.

It is mentioned in the preparatory works, including in the Proposition to the Odelsting No. 78 (2002-2003) under the comments to the Penal Code section 276a, that in some fields of business a "negative culture" of accepting improper advantages may have developed. The ministry states that custom in the field concerned will be a central element in the assessment of impropriety, but that it is not necessarily decisive for where the line for what is improper is to be drawn.

- 57 -                                                    14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciaba, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

It is evident that there was a "corruption culture" in both Libya and India. The Court is of the opinion that even if in the assessment of impropriety weight can be attached to the fact that the business ethics in Libya and India were such that corruption was accepted, this element cannot carry much weight in the assessment of impropriety in the case at hand. It is precisely systematic corruption like in these cases that the OECD Convention, the UN Convention and our own legal framework aim to counter.

Following the above the Court has found it evident that Yara has offered and given an "improper advantage" both in Libya and in India, cf. the Penal Code section 276a.

However, as the Court will revert to in further detail below, the fact that there was a "corruption culture" in the countries concerned may influence the sentencing.

3 Was the improper advantage given "in connection with a position, office or assignment"?
Above, the Court has found it has been proved that Ghanem Junior's role was to gather information and advice from his father and pass them on to Yara. Ghanem Junior did not deal in trading in influence, which is banned by the Penal Code section 276c. He was not supposed to influence his father. He was to collect advice and information about the NOC's position from his father. It was Dr. Ghanem who gave information and advice to Yara, not to Ghanem Junior. The son was only the messenger.

As regards India, the Court has found it has been proved that Yara paid Maini Junior for services that Dr. Maini, by virtue of his position, could assist with in connection with Yara's establishment and future activities in India.

The defence counsels have submitted that it is not possible to apply substance over form within criminal law in the same way as within tax law. As a point of departure, the Court agrees with this. However, the Court is of the opinion that in the case at hand we are not faced with an issue of applying substance over form. The oral agreement with Ghanem Junior and the other circumstances surrounding this contractual relationship that the Court above has found to be proved, can only logically be explained by the counterparty in the corruption trade not being Ghanem Junior, but the chairman and acting oil minister, Dr. Ghanem.

It has not been documented before the Court that the payment was received by Dr. Ghanem. Quite the contrary; the review of the facts indicates that the payments ended up with Ghanem Junior. Who is the receiver of the improper advantage could be an element in order to consider the matter as trading in influence. However, this argument does not prevail when it is Dr. Ghanem who provides the service. Who you choose to be the receiver of the fee is not decisive for whether the Penal Code section 276a or section 276c is applicable; see the

- 58 -                                    14-022670MED-OTIR /05
*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

wording of the Penal Code section 276a, "for himself *or other persons*" and the Court's assessments of the corruption provisions above.

In the opinion of the Court, there is thus no doubt that the agreement and the payment of USD 1.5 million to Ghanem Junior was an improper advantage that Dr. Ghanem controlled. Dr. Ghanem was, as mentioned, the chairman of the NOC and Libya's acting oil minister and it was by virtue of these positions that his information and advice were of value to Yara. Consequently, there is no doubt that the improper advantage was offered and given in connection with Dr. Ghanem's position as a high-ranking public official.

As regards India, the Court also finds it has been proved that the agreements with Maini Junior can only be explained by Dr. Maini being the actual contractual counterparty. It is not a case of trading in influence, since it was not Maini Junior who influenced his father. In the India matter it has also been proved that the payment ended up with the Maini family and not only with Maini Junior. For the rest, reference is made to what is stated above about the significance of the passive briber's choice of the receiver of the advantage.

Considering the foregoing, the Court has upon an overall assessment of the circumstances discussed above found it has been proved that the consultancy agreements and payments to Ghanem Junior and Maini Junior were improper advantages in connection with a position, thus falling within the objective description of acts prohibited under the Penal Code section 276a.

### 4. Gross corruption

The indictment concerns gross corruption, cf. the Penal Code section 276b. It is clear from the Penal Code section 276b second subsection that in deciding whether the corruption is gross, importance shall be attached to, *inter alia*, whether the act has been committed by or in relation to a public official or any other person in breach of the special confidence placed in him by virtue of his position, office or assignment, whether it has resulted in a considerable economic advantage, whether there was any risk of considerable damage of an economic or other nature, or whether false accounting information has been recorded, or false accounting documents or false annual accounts have been prepared.

The Court finds it evident that there is gross corruption in the case at hand. The Court makes reference to the fact that the corruption both in Libya and in India was done in relation to a high-ranking public official.

In Libya, the agreed total fee was of up to USD 4.5 million, while the payment made was in the amount of USD 1.5 million. Consequently, the agreement and the payment were a

- 59 -                                    14-022670MED-OTIR /05



considerable economic advantage to the Ghanem family. The Court also finds reason to attach importance to the way in which the payment was made, by involving a company with which Yara did business and contributing to the payment being kept secret.

In India, the payment was in the amount of USD 1 million, while the agreement defined a fee of USD 3 million. This represented a considerable economic advantage to the Maini family.

## VIII   The Court's assessment of the question of guilt for each of the defendants

### 1. Wallace:

*2.1. Count a) of the indictment: the Libya matter.*

According to the indictment, Wallace's punishable act is described as him on behalf of Yara having entered into an agreement with Ghanem Junior and that the agreement and subsequent payment were linked to Yara's negotiations with the NOC and Dr. Ghanem's role.

Wallace has acknowledged that he was the one who entered into the oral agreement with Ghanem Junior on behalf of Yara in 2007.

The Court is in no doubt that Wallace entered into the agreement with Ghanem Junior knowing that Ghanem Junior's primary role was to be a messenger of information and advice from his father and to cover up the actual circumstances.

As can be seen above, nor is the Court in doubt that the fee that was agreed and in part paid to Ghanem Junior was intended to channel advice and information from Dr. Ghanem to Yara in the negotiations with the NOC. Information and advice that Yara would not have obtained without the payment agreement.

Furthermore, the Court is convinced that Wallace, being an experienced business lawyer, was completely aware of all the circumstances of the arrangement. Wallace was the chief legal officer of Yara and was responsible for preparing the ethical rules and guidelines of the company. He had previously been a manager and chief legal officer of Norsk Hydro Americas Inc. It is evident that he understood that the engagement of Ghanem Junior was corruption. Wallace acted knowingly and intentionally.

Wallace has acknowledged that he contacted Zivy in order to conceal the payment. The Court also finds that Wallace has aided and abetted the realization of the payment to Ghanem Junior.

Following the above, Wallace must be convicted in accordance with count a) of the indictment.

- 60 -                                      14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

*2.2    Count b) of the indictment: the India matter.*

According to the indictment, Wallace's punishable act is described as him in April 2007 having offered, together with Clauw, on behalf of Yara, to enter into an agreement with Maini Junior and that the offer of an agreement was linked to Dr. Jivtesh Singh Maini's position.

The Court has above concluded that Wallace on behalf of Yara entered into an agreement with Maini Junior that in reality was an agreement with Dr. Maini. Wallace has also acknowledged that he was the one who entered into the agreement.

The Court does not doubt that Wallace entered into the agreement with Maini Junior well aware that Maini Junior's most important role was to conceal the reality; giving Yara a direct channel to his father.

Nor does the Court doubt that the fee that was agreed was intended to influence Dr. Maini to use his influence to Yara's advantage.

Also as regards the India matter, the Court is convinced that Wallace knew and understood all elements of the arrangement and that he acted knowingly and intentionally.

Following the above, Wallace is convicted in accordance with count a) of the indictment.

**2. Clauw:**

*2.1    Introduction:*

It is clear from count a) of the indictment that the prosecuting authority believes that Clauw is guilty of aiding and abetting gross corruption in Libya by having given his consent to the entry into an agreement to pay money to Shukri Ghanem's son and furthermore by proposing that Nitrochem on behalf of Yara could advance the payment of USD 1.5 million to Mohamed Ghanem and by contacting Nitrochem to make sure this was done.

It is furthermore clear from count b) that the basis of the indictment against Clauw for the India matter is that he and Wallace on behalf of Yara offered to enter into an agreement with Maini Junior.

*2.2    Further about the Libya matter*

2.2.1. Clauw's role in the organization and his relationship to his co-defendants

It is clear that Clauw left the position as chief operating officer at Yara in the summer of 2006 and entered a position as an advisor with a particular responsibility for the company's growth

---

- 61 -                                                14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



strategy. He reported directly to Enger and no other members of the corporate management
reported to Clauw, the way it had been when he was the chief operating officer. Both Clauw
and Enger have explained in court that Clauw felt that he was not being as regularly and
thoroughly informed about projects as he had been when he was the chief operating officer.
Clauw did not have an office of his own at Yara's premises in Norway. A review of the
corporate management meetings shows that he was not physically present after September
2006, but that he did receive copies of the meeting minutes. Clauw continued to work closely
with Enger, but Clauw and Holba did not have a close relationship during the period after
Clauw became an advisor.

Clauw's role in the organization from the summer of 2006 was thus somewhat different from
that of the other defendants. The Court is of the opinion that this is of significance for the
assessment of his involvement in the Libya matter.

>    2.2.2    Clauw's involvement with the Libya negotiations according to the documents
>             and other evidence

A review of emails for the period 2004 to November 2006 shows that Clauw is copied in on
only a few emails that concerned the NOC. There is no trace of him having been involved in
the Helang agreement.

It is a fact that corruption seldom is directly reflected in written material. Furthermore, the
Court has heard several witness statements to the effect that Clauw was involved in most
things and that his working mode, network of contacts and field of interest may indicate that
he was much stronger involved in Libya than what the Court has found traces of in the
documents.

Wallace explained in his Paris statement that he reported to Clauw with regard to his
involvement in the Libya project. Already in the Brussels interview in June he changed his
statement on that point. As opposed to Holba, who became the project owner of the Libya
project in October 2006 and who also remained part of the corporate management, Clauw
became more distanced from the formal decision-making forums. As a consequence, the
Court cannot disregard the possibility of Wallace being mistaken in the Paris statement with
regard to Clauw's role in the Libya project.

Following the above, the Court does not find it sufficiently proved that Clauw, up until the
payment to Ghanem Junior in March 2007, had such a participation in the Libya project that
he may be considered to have given his consent to an agreement being entered into with
Ghanem Junior in January 2007.

14-022670MED-OTIR /05

Translated by John Richard Stokbak Sciaba, Government Authorized Translator English – Norwegian - Spanish. Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com

*Translation from Norwegian*

### 2.2.3    Clauw's role as regards the payment

Clauw has himself explained in court that he was the one who asked Zivy in the company Ameropa if they could assist in making a payment for Yara that was to be confidential. Zivy said he was willing to do so and Clauw said he would be contacted by Wallace. Clauw also explained that he knew that the payment was to be for a consultant and that it concerned Libya. He thought it could be an ethical problem to make such a payment but did not think it entailed anything illegal, as Wallace told him that this was a legal payment under Swiss law.

In the Court's assessment, both the fact that the payment was to remain confidential and that it concerned payment to a consultant and it concerned Libya, should be sufficient to ascertain that Clauw understood that it was corruption. However, there is evidence in the case pointing in a different direction.

Firstly, the Court cannot disregard the possibility of Wallace having told Clauw that this was a lawful payment in Switzerland. In this regard, the Court makes reference both to Clauw's statement in court and to the intercepted telephone conversation between Clauw and Wallace on 14 May 2012, in which Wallace says to Clauw:

> *And so, you know, I mean, there were no point in saying that wasn't the case. Yes, we made it in Switzerland, because it was legal in Switzerland. We didn't make it in Norway, because we didn't want it in Norway. But Nejdet had told them, you know, about Zivy making the payment, and him reimbursing Zivy, so there was no point in my saying that wasn't true. You know. So that was it.*

In a telephone conversation with Clauw on 18 May, Wallace says:

> *But Libya, a little different. On the other hand, like I said, I am still not sure that we've vio ... , that Norwegian law was violated. But it's the old thing of what I've always said, about nobody ever goes to jail for what they did, they go to jail for trying to cover it up.*

If the situation is that the chief legal officer of a large international company like Yara says that the payment is legal under Swiss legislation, the Court cannot disregard the possibility that Clauw by virtue of him not having any responsibility in the Libya negotiations, accepted that as a fact.

Clauw said several times in telephone conversations with Wallace - that have been wiretapped - that he knew nothing about Libya. The Court must presume that Clauw told the truth when

---

- 63 -                                                14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



EXT- WALLACE-00162

he did not know that he was being wiretapped, in the same way as the Court believes that Wallace told the truth in these telephone conversations.

The Court makes reference to Clauw's telephone conversation with Wallace on 14 May 2012, in which he says:

> *Okay, anyway for me, I did not knew so it was quite…*

and later in the conversation:

> *But, because I have not been involved, and for the Indian case, where I took responsibility of the Indian discussion*

Here he makes a distinction between his role in Libya and his role in India, which suggests there was a difference in Clauw's involvement in these two projects.

In the telephone conversation on 20 May 2012, he says about Libya:

> *Yeah, I did not have even any clue, what has been done*

and further:

> *Yeah, but definitely they wanted to implicate Thorleif, in my opinion. Because they say, you know, it's a CEO responsibility and all of that. And I said, what I did mention, what was clear, I said, I didn't believe that something has happened, but if something has happened, Ken has no interest to do it on his own, he has been doing it because he has been asked to do it.*

These statements by Clauw also suggest that Clauw was little involved in Libya.

Although the Court presumes that Clauw had more knowledge about both the payment arrangement and the negotiations in Libya than what he expresses himself in court, the Court is not convinced that Clauw fulfils the objective and subjective conditions for punishment under this count of the indictment. Following the above, Clauw is acquitted of count a) of the indictment.

### 2.2    Further about the India matter

In India, the circumstances were different. Here, Clauw was in the driving seat. It was Clauw who knew Calil and through him found Maini Junior. Clauw knew that Maini Junior had no

- 64 -                                    14-022670MED-OTIR /05



*Translation from Norwegian*

experience from the fertilizer sector and that he was Dr. Maini's son. It was Clauw who asked Wallace to draw up the draft agreements with Maini Junior. The Court does not doubt that Clauw had a long-term plan that made business sense for Yara's engagement in India, but the Court does not believe that Clauw was of the opinion that Maini Junior had something to contribute in that context, beyond what his father could offer; that is, strengthening Yara's position in the negotiations with Kribhco and influence into the Department of Fertilizers.

The Court also finds it has been proved that as regards India, Clauw was aware of all circumstances that rendered the act one of gross corruption. He knew about the relationship between Maini Junior and Dr. Maini, which was the reason why Maini Junior was engaged by Yara, see also the above-mentioned email:

> *As you know, Maini has been with his father the driving force of the government starting changing for more balance nutrients consumption and pushing KRIBHCO to negotiate with YARA*

He also determined the fee in question; in this respect, see Wallace's email of 21 March 2007 in which Wallace said that the compensation had to be discussed with Clauw directly.

The Court also makes reference to the fact that the agreement was kept hidden from Kribhco and the DOF. Thus, no such transparency surrounded the agreement with Maini Junior as the situation would suggest.

As mentioned above, the Court believes the arrangement must be characterized as classic corruption. Clauw knew this. He is an experienced businessman who was well aware of the corruption risk. He knew that the arrangement with Maini Junior in reality was bribery of a prominent public official. The Court is furthermore convinced that Clauw acted knowingly and intentionally.

Following the above, Clauw is sentenced in accordance with count b) of the indictment.

3. Enger:

*3. 1. Introduction*

The basis of count a) of the indictment against Enger is aiding and abetting gross corruption in Libya by having given his consent to the entry into an agreement to pay money to Dr. Ghanem's son and that Enger (together with Holba) participated in the negotiations with the NOC and signed, *inter alia*, a "Partnership Agreement" in July 2008 between Yara and the NOC, knowing that an agreement existed to pay bribes where parts of the agreement had been performed by Yara.

- 65 -                                                      14-022670MED-OTIR /05



In count b) of the indictment, the basis as regards Enger is aiding and abetting gross corruption by having consented to the agreement with Maini Junior amounting to USD 3 million and by having approved the payment of USD 1 million.

Enger has in his statement before the Court denied both charges.

As regards the Libya matter, Enger explained that he did not have knowledge of the agreement with Ghanem Junior. Nor did he know that an amount had been paid to Ghanem Junior prior to the date on which the "Partnership Agreement" was signed.

In India, he was more involved. He approved the engagement of a consultant, but he has explained that he was not aware that the consultant's father was a high-ranking public official at the Indian Department of Fertilizers. He consented to the payment to Maini Junior because he believed they had a duty to pay when they terminated the consultancy agreement.

*3.2   Enger's role in the organization and the relationship among the defendants. Remarks common to counts a) and b) of the indictment.*

Enger was the CEO of Yara from when Yara was spun off from Hydro until he retired in the autumn of 2008. Before becoming the CEO of Yara, he had headed Hydro Agri from 1 January 1999.

Enger put together his management team himself. The four defendants were all part of the corporate management; however, Clauw transferred to an advisory role on 30 June 2006 with direct reporting to Enger. Clauw left the company on 30 June 2007. It is noted in particular that Wallace as chief legal officer had a staff role with no operative responsibility. His role was to take care of the organization's needs for legal services, including contract negotiations. Wallace confirmed in court that he was not authorized to enter into agreements except when tasked to do so by the operative units or by Enger. The exception was the engagement of external legal assistance, where Wallace himself could retain and pay for such assistance.

One part of the management system was corporate management meetings every 14 days. The four defendants had offices next to each other; Clauw did however not have an office in Oslo on a permanent basis. All the defendants have explained that there was an open and informal dialogue and close ties among them as far as business matters were concerned.

Enger had an open and informal management style. The Court perceives Enger to have been a boss who was present and available. Enger has in court explained that he attached importance to delegating and that his management team were responsible for their fields without him

---

14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

*Translation from Norwegian*

getting involved in the details. Several of the witnesses who have worked for Enger have stated the same.

The combination of all the defendants being on the corporate management, the close ties among them and them in addition having offices next to each other, in the opinion of the Court indicates that the defendants kept each other informed of important projects.

These are elements that suggest that Enger knew that agreements had been entered into with the sons of prominent public officials in Libya and India and the other circumstances that made these agreements corrupt.

Enger has in court explained that he and the management of Yara attached importance to ethical guidelines and had zero tolerance for corruption. Enger was well aware of the corruption risk in Libya. Libya was a new country to Yara, but Hydro had been involved in Libya before, a fact the Court presumes Enger knew through having formed part of Hydro's corporate management for several years. That India is a corruption-prone country was also well known to all members of the corporate management. Enger has explained to the Court that Yara was "extremely focused on its reputation", but that they nonetheless had to enter countries with a risk of corruption. In such a context it was important to have the best possible routines, attitudes and regulatory framework to avoid exposure to corruption.

If Yara was to enter into agreements with close relatives of prominent public officials in corruption-prone countries, this was evidently a circumstance of which the CEO was to be informed.

If Enger did not know about the arrangement with Ghanem Junior and his father, and that Maini Junior was the son of Dr. Maini, in the opinion of the Court there can only be two reasons therefore. Either one or several of the three other defendants or other members of the corporate management have gone behind Enger's back. The Court finds this not to have been the case. Alternatively, Enger has made a conscious effort to know as little as possible about these consultancy agreements. As regards this, the Court makes reference to what is discussed below.

### 3.3. Further about the Libya matter.

#### 3.3.1   The situation concerning powers and responsibilities

The situation concerning powers and responsibilities within Yara indicates that Enger and/or Holba were aware of the consultancy agreement and the payment to Ghanem Junior. Wallace could not approve such an agreement or perform the payment without the consent of the project owner or Enger. Sooner or later the payment was to be charged to the project and as a

---

14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

consequence it is improbable that Wallace entered into the agreement and arranged the payment on his own.

Wallace has said it himself several times, also in court: He was a good soldier but he was not the commandant. There is no reason why Wallace should act on his own and go behind the back of his boss, the one in charge of the project or the other members of the corporate management. The Court can see no rational explanation why Wallace, as chief legal officer, would expose himself to the risk it would entail to enter into a corrupt agreement within the field of responsibility of a colleague belonging to the corporate management. This would both be a disloyal act and also expose Wallace to risk that he had no incentive to assume. The Court's assessment also agrees with Wallace's own statement: "I wasn't out on a frolic on my own".

There is a possibility that other members of the corporate management approved the agreements, but that cannot have been without Enger's knowledge. It is not necessarily the case that Enger knew the details of the agreement with Ghanem Junior. However, both police statements and witness statements (see below), as well as the information that Enger received about the Helang agreement, indicate that Enger knew an agreement had been entered into with a consultant for the Libya project, the kind of services involved and that a major amount had been paid.

### 3.3.2. The Helang agreement

Enger was informed of the Helang agreement. It is clear from an email from Wallace of 13 February 2006 to Mathieu Krane, where the topic is the Helang agreement, that Enger was informed of the agreement. Wallace writes in the email that Enger received a copy of:

*The other person who is aware of this and VERY interested is Thorleif Enger*

Enger has himself explained in court that he was interested in consultancy agreements in general, but that the email does not document that he knew about the Helang agreement. In the opinion of the Court this is not credible. The email shows that Wallace and Enger had talked about the Helang agreement. There is no other possible explanation for the text of the email. If Enger was interested in consultancy agreements in general and this had been communicated to the other members of the corporate management, this is an element that suggests he also knew about corresponding consultancy agreements, including the agreement with Ghanem Junior.

The assignment description in the agreements was, in the opinion of the Court, not genuine and the content of the agreements was to conceal their reality. As regards the Court's

- 68 -                                                14-022670MED-OTIR /05

Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish. Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com

*Translation from Norwegian*

assessment of the Helang agreement, reference is firstly made to Wallace's statement that he was the one who met the persons behind the company Helang in person. It was Wallace who negotiated, despite him not having any role in the project. Furthermore, no other inquiry of the company and the persons behind it are made apart from a meeting in person. The Court finds this conspicuous. It is evident also from two emails that the Helang agreement was not what it purported to be. The Court makes reference to an email of 13 February 2006 from Mattieu Krane, who at that point in time was the lawyer on the project team:

> *I refer to our little talk of this morning. Please find enclosed a first draft Engagement Letter of the Swiss/Dubai company which Yara thinks of retaining for the NOC project. Considering the little time available I have based this draft on a (much longer and complicated) standard engagement letter used by ABN-Amro*

Later that same day Wallace replies to Krane:

> *My goal here is for this to look like any other consulting/investment banking arrangement*

The lack of inquiries and the wish to make the agreement look like a consulting/banking arrangement proves that the contents of the agreement were to conceal its reality.

### 3.3.3    Police statement and transcripts from telephone wiretapping

All the defendants have been evasive in their statements before the Court as regards who knew what about the circumstances the indictment concerns. Consequently, in its assessment of the evidence the Court has in addition to the documentary evidence, attached much weight to evidence appearing prior to the court proceedings and to a lesser extent to the statements that the defendants have presented in court. The Court makes particular reference to the first police statements and the telephone conversations that were subject to communications control (wiretapping).

In his statement to the French police in May 2012, Wallace after a while wanted to *"set the story straight"*.   He then went on to explain in detail both his own involvement and that of others in Libya. The Court agrees with the prosecuting authority that Wallace's statement before the French police is more credible than his statement before the Court. The Court does not trust Wallace's statement in court that his police statement of May 2012 was *"flat out wrong"*.

In his Paris statements Wallace said that *"Enger's mentality was not to know"* and *"Enger did not ask the question and I did not answer"*. In a telephone conversation with a friend on 18

- 69 -

Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com



EXT- WALLACE-00168

*Translation from Norwegian*

May 2012, a few days after he was released from custody in Paris, Wallace said amongst other things:

> *(...) what did Thorleif know, and what did Thorleif not know. And I was very upfront saying, you know, Thorleif did not know very much, because he did not want to know very much. You know, that was my job.*

And further:

> *What did I tell Thorleif? I told him we made no direct payments. We made no written agreements. And they said, what did you say about indirect payments? I said: He didn't ask, and I didn't say anything. And that was the deal. The bottom line was, the deal was: Let's not talk about this. And everybody wants to go around saying: I knew nothing.*

In other words, Wallace explained to the police that he told Enger that Yara did not have any written agreement, nor had Yara made any direct payments. For the rest, Enger did not want to know anything. In the opinion of the Court, Wallace here describes a tacit agreement between Wallace and Enger that Enger was not to know the details about this kind of agreements and payments.

In a subsequent wiretapped telephone conversation between Wallace and Clauw on 20 May 2012, Clauw said:

> *But OK, that was what I said. I said, so I don't believe that this has happened, but if it has happened, Ken has been, everybody has been informed, I know how this management works, and it's no secret, everyone has the same information.*
>
> *(...)*
>
> *and decide on the same things*

Wallace's police statement in Paris and the excerpts of telephone conversations that are quoted above prove, in the opinion of the Court, that Enger knew much more than what he expressed in court. To the extent that the he did not have detailed knowledge of the consultancy agreement in Libya, it was because he had expressed that he did not want to have it.

### 3.3.4    Other witness statements

---

- 70 -                                                        14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



The Court has also attached significance to Ed Cavazuti's (Cavazuti) statement in court. Cavazuti headed Yara's downstream department from 2006 to 2009 and he was part of the corporate management. Cavazuti explained in court that he in January 2008, while at the airport in Munich on his way to Qatar, received a telephone call from Baysan. Baysan told Cavazuti that the company Ameropa was to make a payment on behalf of Baysan to a consultant in Libya. He said it was legal under Swiss law. Cavazuti explained that he did not understand why Baysan called him about this but he became worried and raised the issue with Enger when he was back in Oslo. He dated the conversation with Enger as being in February 2008. Cavazuti went on to explain that Enger said that Baysan talked a lot and there was no reason to take seriously what he said. Enger told him it was about someone who helped them as "investment bankers" and that he should not worry. Cavazuti told Enger that they should check out who this consultant was, to which Enger had no comment.

The Court notes that the agreements with Helang and Ghanem Junior appear to be typical "investment bankers" agreements.

Somewhat later, Wallace came to Cavazuti to talk with him about the case. It was his understanding that Enger had talked with Wallace. The contents of the conversation were unclear to him during his statement before the Court but he remembers that he recommended that they should get Nahawi to check who the consultant was.

Enger's reaction to Cavazuti's contact shows that Enger knew about the agreement with Ghanem Junior.

Cavazuti also explained in court that he sometime in June/July 2008 was summoned to Enger's office where Enger was sitting together with Holba and he was asked about "how they could pay these people". He felt uncomfortable with the question, as he presumed it was about Libya and he answered that "I suppose they may pay with goods or with money or do as they did last time".

Baysan also mentioned to Storvik (former CFO and head of "Supply and Trade") during a dinner they had together in the summer of 2007, that Baysan was having a dialogue with Wallace concerning a payment that Storvik perceived as being linked to Libya and that Enger knew about this. Storvik doubted that Enger knew this, but he did not himself take this information to Enger.

Haslestad also explained to the police that Baysan told that he had talked to Enger about the Libya matter during a flight sometime in 2006/2007. In court, Haslestad could not remember

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

his statement on this point, but also here the Court is of the opinion that it is the police statement that must carry weight, not what Haslestad stated in court.

The fact that Baysan has told several persons that he has talked with Enger about Libya indicates that Cavazuti is telling the truth.

Enger has denied having talked with Cavazuti about the payment to a consultant in Libya in February 2008 and that it was at a meeting in Enger's office in June/July 2008 with Cavazuti and Holba.

The defence counsel has submitted that Cavazuti's statements may have been influenced by the FBI having been introduced to the case. Reference is made to, *inter alia,* that the dialogue with the FBI is not transparent and that Cavazuti appears for interviews with the FBI together with two lawyers and that he also appeared before the Court with a lawyer.

The defence counsel raised the question of whether the motive for Cavazuti's statement was to avoid criminal prosecution himself. If he succeeded in establishing a set of facts according to which he had warned his superiors of blameworthy circumstances, he would have a hope of avoiding any liability himself.

The Court has assessed these objections to Cavazuti's statement, but the Court trusts Cavazuti's statement. Cavazuti's statement is supported by other evidence in the case, including Wallace's and Clauw's statements which are quoted above. Cavazuti's statement before the Court is also supported by other witnesses' statements concerning what Baysan has said about the payment. This is yet another element that indicates that Enger knew that an agreement had been entered into with Ghanem Junior and that a payment to Libya had been made long before the summer of 2008.

###### 3.3.5    Other elements
Enger did nothing with the information he received from Cavazuti, a fact that also indicates he already knew the circumstances surrounding Ghanem Junior and the payment.

The Court also finds it conspicuous that Enger was not more interested in the background of the claim that Holba told him about in the summer of 2008. The Court has above found it proved that Holba told that a payment had been made earlier. Even though they agreed to reject the payment, it would be natural for Enger to investigate the payment further by talking to Wallace. Enger was soon to leave the organization, but that cannot explain the lack of interest in investigating the further circumstances surrounding the payment and claim from Libya.

- 72 -                                    14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

Enger was still the CEO. It was his responsibility to perform further investigations. He knew which challenges the company faced in corruption-prone countries.

The only probable explanation that the Court can find as to why Enger did not investigate was that he already knew what it was. Alternatively, that he consciously did not want to know any details about a matter he understood was not compatible with the company's ethical guidelines and Norwegian and international legislation.

Enger has in court expressed that the oral agreement with Ghanem Junior and the hidden payment through Nitrochem was not in accordance with the ethical guidelines of Yara and should have been done differently. The Court excludes the possibility of Wallace having gone beyond Enger's back. The negotiations in Libya took place over a long period of time, even after Dr. Ghanem entered the picture. Enger was an involving and present leader and, as mentioned above, there was an open and informal tone among the defendants. It is inconceivable that Wallace over a long period of time kept the engagement of Ghanem Junior hidden from Enger.

Despite Enger knowing that an irregular payment had been made to Libya and that a claim for another payment had been received, Enger and Holba went to Tripoli and signed the Partnership Agreement on 17 July 2008.

### 3.3.6    Enger's motive

During the proceedings the defence counsel questioned what motive Enger would have for contributing to corruption towards the very end of his career.

The Court has not found any reason to presume that personal financial gain has been of any significance for the acts covered by the indictment.

Nonetheless, the Court finds reason to point out that corruption committed in the way that the Court has found proved above, is not necessarily motivated by personal financial gain.

The desire to head a business with great success and to satisfy owners, employees and others may be just as motivating for such conduct. One reason may also be that such conduct within a business is not easy to change in the short term. The Court presumes that such elements may underlie Enger's acts.

### 3.3.7. The significance of witnesses like Baysan, Ghanem Junior and Nahawi not having appeared in court or having been examined by judicial recording of evidence.

---

14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*





The defence counsels have emphasized that the prosecuting authority has not fulfilled its duty to elucidate the case sufficiently by ensuring that important witnesses were examined by judicial recording of evidence. The Court agrees with the defence counsels that per se it is unfortunate that the Court has not been allowed to hear the statements of these witnesses. The Court is, as is clear from what has been assessed above, still of the opinion that the case has been sufficiently elucidated.

### 3.3.8    Summary and conclusion:

Enger has in court explained that he did not know about the agreement with Ghanem Junior until after the signing of the agreement in Tripoli on 17 July 2008.

The review of the evidence above proves, in the opinion of the Court, beyond any reasonable doubt that this cannot be correct. As is evident from the presentation, this is substantiated by the fact that Enger before 17 July 2007 was informed of the Helang agreement, he had received information from Cavazuti about the payment in Switzerland, he had had a conversation with Wallace shortly after that and he had had a conversation with Holba about an additional claim. To the extent that Enger did not have detailed knowledge of the agreement and the payment, for instance the size of the amount and the method of payment, it was because he consciously tried to know as little as possible.

Thus, there is not any single documentary evidence or any single statement that has convinced the Court that Enger knew about the agreement and payment prior to July 2008. The conclusion is based on the documentary evidence, statements and the circumstances that the Court has considered, as well as on Enger's position as the CEO and the relationship among the defendants.

### 3.4    Further about the India matter

#### 3.4.1    Introduction

Enger has explained that Clauw suggested they should use an agent in India and that he approved this. Enger explained in court that he could not remember whether Clauw said that the consultant had a father who was a civil servant, but he explained that in any case he did not catch the name of the consultant.

#### 3.4.2. The agreement with Maini Junior

The Court has above found it proved that by 13 June 2007 the latest, Enger was informed of and approved the engagement of Maini Junior, see the email quoted above.

It is clear from the said email from Wallace to Clauw that Wallace has talked with Enger about Maini Junior. It is also clear that Enger has gotten to know that four other members of

- 74 -                                        14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciaba, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

the corporate management had approved the arrangement. If Enger had not perceived that Yara engaged the son of Dr. Maini, it must have been because the other members of the corporate management who were aware of this did not tell Enger who Maini Junior was. Wallace did however explain to the Court that all those who were receivers of the email were informed of the family relationship and that for this reason caution had to be displayed. This meant that they had to think about what they were asking Maini Junior for and that they had to document what they did.

The engagement of sons of prominent public officials in corruption-prone countries would raise, according to Enger's own statement, red flags. The arrangement that Wallace according to the email had cleared with Enger was, the Court believes, the draft of an agreement with Maini Junior. In connection with this, the Court makes reference to the fact that Wallace sent the draft agreement to Maini Junior the same day that he informed Clauw that Enger had approved the arrangement. Enger had also received information that Kribhco was under the control of the DOF. In this respect, the Court makes reference to a letter from Resources Int represented by Anupam Dev to Enger of 20 May 2007:

> *On top of this the majority Govt stake holding in Kribhco exposes it to direct bureaucratic control of the Deptt of Fertilizers and even political interference by the Fertilizer Minister and his office.*

Anupam Dev was Yara's agent in India. The Court cannot disregard the possibility of Anupam Dev having had an own interest in Yara not entering into a cooperation with Kribhco, but the information about Kribhco in the letter should in any case cause Enger to become even more attentive.

Enger knew that Dr. Maini was a civil servant within the DOF. In this respect, the Court makes reference to an email from Wallace of 17 August 2007 from which it is clear that Enger wanted to meet Sinha of Kribhco and Dr. Maini of the Ministry. Enger received a copy of that email. It is not probable that Yara's CEO travelled to India without knowing who he was going to meet and which positions they held. Enger had also approved the use of a consultant he knew was called Maini. It is not credible that Enger did not connect the two. Also as regards this, the Court attaches importance to Enger being an experienced businessman and industrial leader and that he was well acquainted with the corruption risk in the countries where Yara had activities.

The email to Enger from Wallace of 20 August 2007 also shows that Enger at least at that point in time knew all the relevant details surrounding the engagement of Maini Junior,

---

- 75 -                                                    14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish. Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

including the family relationship between Maini Junior and Dr. Maini and the details of the agreement that had been entered into. The following is quoted from the email:

> *Also attached is the form of representation agreement that had been negotiated and agreed by Daniel for the retention of Mr. Maini in India. We need to decide whether to go forward with this or settle on something for past services and go forward in another way. Please note that I would ordinarily rely on him to see that Kribhco actually responds in a timely manner to our inquiry about a meeting (not a given), that there is actually a meeting at the Ministry for the same time period (definitely not a given) and that the necessary invitations, etc. for visas are sent out promptly, hotels are booked, dinners arranged, etc. If we are not going to use him, I would like to know who will undertake these matters, particularly for the upcoming trip.*

Through this email, Enger was informed again not only of the content of the agreement that was entered into with Maini Junior, but also that the agreement was not bona fide. In this respect, the Court makes reference to the fact that Wallace informed Enger about what they actually used Maini Junior for, which was to make sure that Kribhco answered timely and that there would be a meeting at the Ministry, and that all other practical details would be arranged.

On 27 August 2007, through an email from Wallace, Enger got to know that Dr. Maini was to leave his position at the DOF.

Despite Clauw having left Yara, on 5 September 2007 he sent an email to Wallace with Enger copied in. Amongst other things, the following is stated in the email:

> *I am not anymore in charge but if YARA really wants to develop with KRIBHCO, you have to sign this agreement, otherwise KRIBHCO will not extend.*

And further down in the email:

> *As you know, Maini has been with his father the driving force of the government starting changing for more balance nutrients consumption and pushing KRIBHCO to negotiate with YARA.*

Enger forwarded the email to Holba and Cavazuti. Therefore, Enger must have read the email; otherwise he would not have forwarded it to them like he did. The email showed that it was Maini Junior, together with his father, who was the driving force both in terms of obtaining a position to negotiate with Kribhco and initiating a change in the fertilizer policy. At this point

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

the latest, Enger had received so much information that it was unthinkable that he did not know what kind of arrangement it was.

### 3.4.3. The payment of USD 1 million

With the knowledge that Enger had, he also approved the payment of USD 1 million to Maini Junior. Reference is made to the email of 27 September 2007 with the invoice of CYC sarl in Lebanon. In it, Wallace requests that the invoice should be charged to the legal department until he got to talk with Ombudstvedt and Cavazuti, where Enger was copied in. Enger should have stopped this payment.

Enger has claimed that he approved the payment to avoid problems arising. The payment was a compensation for an agreement broken by Yara. The Court attaches no importance to this statement. The Court finds it has been proved that Enger knew that an agreement had been entered into with the son of a civil servant at the DOF and that the contents of the agreement did not reflect the realities.

### 3.4.4. Summary and conclusion

An agreement has been entered into with the son of a prominent official who was also a member of the board of the company with which Yara was to negotiate. The son did not have the qualifications that were necessary to perform the tasks under the agreement, nor was the fee proportionate to the services he actually performed.

This was information that Enger had. The Court finds it has been proved beyond any reasonable doubt that Enger approved the entry into an agreement with Maini Junior and that he knew the contents of the agreement. The Court also finds it has been proved that Enger knew that Maini Junior was the son of Dr. Maini, who at the time was a central civil servant at the DOF. In addition, the Court finds it has been proved that Enger approved the payment of USD 1 million. He also knew the contractual relationship was not transparent towards Kribhco and the DOF.

### 3.5   Subjective guilt

#### 3.5.1   Count a) of the indictment - the Libya matter

The act of aiding and abetting is traditionally divided into physical and psychological aiding and abetting. As far as Enger is concerned, there is the question whether he can be convicted of psychological aiding and abetting or alternatively passive aiding and abetting.

Physical aiding and abetting is an act that in one way or another contributes towards the actual performance of the act, while psychological aiding and abetting entails that the perpetrator's motivation for committing the act is influenced, cf. [the book by] Magnus Matningsdal:

- 77 -                                         14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

Medvirkning til straffbare handlinger – hovedpunkter i Jussens Venner [*Aiding and abetting punishable acts - main points published in Jussens Venner*] p. 363.

> *As a point of departure, nobody can be punished for psychological aiding and abetting without the aider and abettor having positively encouraged the person to commit the act.*

Mere passiveness is normally not enough to incur liability as an aider and abettor. Johs. Andenæs mentions in Alminnelig strafferett [General Criminal Law] p. 329 that even if a person has a special duty to prevent the punishable act, mere passiveness can normally not be punished as aiding and abetting. But for the person who has such a special duty to intervene, one cannot require a positive encouragement as a condition for liability as an aider and abettor. Andenæs states on p. 329 that it must be sufficient to make him liable that he towards the guilty person expresses that he has nothing against the act, and he provides the example of the farmhand who asks the farmer whether he should do some logging a bit into the neighbour's property and the farmer answers "I don't mind". Additionally, the following is stated on p. 329:

> *Already the failure on the part of the superior to intervene may by the subordinate be perceived as a consent, and if the superior is aware of this it must be construed as psychological aiding and abetting.*

The Court has above concluded that Enger had knowledge of the consultancy agreement with Ghanem Junior and that he knew about the payment that had been made at a far earlier point in time than what he claims himself. The Court has also found it proved that to the extent Enger did not know the details of the agreement it was because he did not want to know. Despite Enger knowing what was going on, he did not prevent neither the agreement with Ghanem Junior being entered into nor the payment being made. He went to Tripoli on 18 July 2008 and signed a "Partnership Agreement" with the NOC after he knew that money had been paid to the son of the acting oil minister. The entry into the agreement with the NOC at that point in time was active aiding and abetting on the part of Enger.

The Court finds it has been proved that Enger in connection with the entry into the agreement with Ghanem Junior has expressed towards Wallace that he had nothing against the agreement being entered into. It is not decisive whether this was done expressly or tacitly. In any case, it is psychological aiding and abetting that is sufficient for Enger to be punished for aiding and abetting corruption. Enger was Wallace's superior and Enger had a duty to prevent corruption being committed on behalf of Yara. Enger cannot avoid criminal liability by consciously

---

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

avoiding getting knowledge about the details of the arrangement. Wallace was aware that Enger knew what was going on in the Libya negotiations.

Enger did not intervene, but remained passive and in addition expressed that he did not want to know; consider Wallace's statement that "Enger did not ask the question and I did not answer". This can be understood in only one way. Enger consented to Wallace doing what had to be done to obtain an agreement with the NOC; he just did not want to know about it. This is more than "I don't mind", as in the example with the farmer above. It is a tacit agreement between Enger and Wallace to the effect that Wallace was granted all powers. Wallace has several times stated that he was a good soldier, but not the commandant. Enger was the top commandant. Wallace did not act on his own. Enger has through his knowledge and lacking intervention given Wallace the precondition that was necessary to perform the active corrupt act.

Here, the Court again makes reference to Andenæs (see above) p. 329, where Andenæs states that a tacit or express consent from the one who has a special duty to prevent the punishable act means that one of the ordinary barriers to the crime has been cleared and cannot be looked upon in the same way as a corresponding consent from an outsider.

The required degree of guilt [for a conviction] is intent, cf. section 40 of the Penal Code. The liability as an aider and abettor is an independent liability. For a court to be able to convict a defendant of aiding and abetting a punishable act, the defendant must - in addition to actually having aided and abetted the crime the indictment concerns - as a general rule have displayed guilt in relation to every factual element that is a requirement for imposing a punishment.

Even though Enger did not necessarily know the details of the agreement, the Court believes he has had knowledge of the circumstances regarding the agreement and the payment that entail that an improper advantage has been given to a person in connection with the person's position. Enger has also had knowledge of the circumstances regarding the act that entailed it being a case of gross corruption. Enger knew that most probably the financial advantage concerned was not insignificant, considering also his experience from the India matter, and that it was payment for advice from a prominent public official. Despite this, he gave his consent to the entry into an agreement and he signed an agreement with the NOC.

Following the above, Enger has aided and abetted the corruption act knowingly and intentionally and he has known about and displayed guilt in relation to those circumstances of the act that are a requirement for imposing a punishment for gross corruption.

---

- 79 -                                                14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciaba, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

Following the above, the Court finds that Enger must be convicted in accordance with count a) of the indictment.

### 3.5.2   Count b) of the indictment: the India matter

The Court has above concluded that Enger approved the entry into an agreement with Maini Junior and that he knew the contents of the agreement. The Court has also found it has been proved that Enger knew that Maini Junior was the son of Dr. Maini, who at the time was a central civil servant at the DOF. Despite this, Enger approved the payment of USD 1 million. He also knew that the contractual relationship was not transparent towards Kribhco and the DOF.

The Court does not believe that Enger did not know that the offer and payment to Maini Junior were corruption. Enger knew all the relevant circumstances surrounding the engagement of Maini Junior and Dr. Maini. When he despite this approves the agreement and the payment, he has knowingly and intentionally aided and abetted gross corruption.

Enger is therefore sentenced in accordance with count b) of the indictment.

### 4. Holba

#### 4.1   Introduction

Holba is indicted with aiding and abetting corruption by having given his consent to the entry into an agreement for the payment of money to Dr. Ghanem's son and having (together with Enger) participated in the negotiations with the NOC and signed, *inter alia*, the "Partnership Agreement" with knowledge that an agreement to pay bribes existed where not all of the instalments had been paid.

#### 4.2   Holba's role in the organization and his relationship to Enger and Wallace

Holba was the head of the Downstream Division from Yara's establishment in 2006 until October 2006, when he replaced Ombudstvedt as head of the Upstream Division. Consequently, Holba was a member of the corporate management while the Libya negotiations took place. When he became the head of the Upstream Division he also became the project owner of the Libya project. He was the project owner until the final agreement was signed by Yara and the NOC in February 2009.

Holba knew the Libya project before he took over the Upstream Division in 2006. As regards this, the Court makes reference to an email from Holba to Solheim, Clauw and Sloot and others of 3 July 2002, in which he presents his comments to Yara's entry into Libya. There is also an email from Solheim to Holba, in which information is forwarded to Holba. Holba

---

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

knew about both the NOC and Omar Gazal already at this point in time. This is demonstrated, *inter alia*, by a memo of 20 February 2004 from a meeting Yara had with Gazal.

Holba has by several witnesses been described as a "hands on" project owner. The witness, Tom Østlyngen, who became the project manager after the project was moved to Oslo, explained that Holba spent quite some time on the Libya project and followed it up in a positive manner. Holba participated actively in the negotiation meetings with the NOC. After the project was moved to Oslo, the entire project team was located on the same floor. In addition to emails and other formal contacts there was also informal contact in the project.

Consequently, the Court finds it improbable that Wallace engaged a consultant and paid bribes without Holba knowing about it. It is clear that it was the project owner who held the authority to engage external advisors and incur costs in a project. This has been stated by both Holba and several of the witnesses. It is the project owner in cooperation with his project team who will be the nearest to assess the need to hire external expertise.

If Holba's statement that he did not know about the agreement and the payment until the late summer of 2008 is correct, it would in reality mean that one or several members of the corporate management of Yara entered into corrupt agreements in a project without the knowledge of the project owner. The Court does not find this to be credible, considering amongst other things Clauw's statement that when Wallace knew something which was important, then everybody in the corporate management knew it.

Holba also knew Nahawi well. He had known him for 10 years and stated in court that he spent time on talking with Nahawi about Libya. Ghanem Junior was Nahawi's contact. It is not probable that Nahawi would hide from Holba that Ghanem Junior had obtained an agreement with Yara in the Libya project.

*4.3     The dates of the agreement with and the payment to Ghanem Junior*

Wallace has explained that he got to know about Ghanem Junior during a meeting with Nahawi in Paris on 02 December 2006. This was after Holba had taken over as project owner. Wallace met Ghanem Junior in January 2007 and led the negotiations with Ghanem Junior until the oral agreement was entered into in the period February to March 2007. The payment was made on 29 March 2007. At that point in time, Holba had been project owner for several months. In the period from October 2006 until the payment was made to Ghanem Junior, the project had been discussed by the board three times and at corporate management meetings seven times. A "hands on" project owner like Holba must have been thoroughly informed of all parts of the project during that period.

---

- 81 -                                                                14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

The HoA was signed on 25 April 2007. This was an important milestone in the negotiations. The Libya project was a large and prestigious project for Yara. The activity in the project that took place prior to the signing of the HoA was thus important also to Holba. To the Court it is unthinkable that he was not fully informed of all important elements in the negotiations, including the fact that an agreement had been signed with Ghanem Junior which entailed that they received information and advice from Dr. Ghanem and that he received payment for this.

*4.4     Wallace's police statements and wiretapped telephone conversations*
The Court considers it a fact, as stated above, that Wallace told the truth when he gave evidence to the French police in May 2012. In that interview he said that Holba asked him to go to Dubai to meet Ghanem Junior. He also explained that it must have been Holba who approved the amount that was paid. The Court also makes reference to Wallace's statement about the project team's message from Dr. Ghanem that they had to "sort it out with my son". Holba was the project owner and was therefore the central receiver of this message.

In the wiretapped telephone conversation with Clauw on 14 May 2012, Wallace said:

> *I just said, you know, Mr. Holba knew about it all the time. You know. It was his prooject, it wasn't mine. I wasn't out on a frolic on my own.*

Wallace said something similar to a friend in a wiretapped telephone conversation on 18 May 2012:

> *And so I finally just said. You know what, folks. I am a good soldier, but I was not the commandant. This wasn't my project. Here's the deal. I'm still not sure it was a violation of Norwegian law, by the way. But in any event, I basically said, you know, if Mr. Holba is telling you that he knew nothing, until I came in and told him - this is bullshit.*

In another wiretapped conversation with Clauw of 20 May 2012, Wallace says:

> *Yeah, you know, and I said, you know, if, you know, the one thing that they did read to me, and I said, "that is bullshit", was when Tor basically said that the first time he knew anything about Libya was in September 2008, when I was, when I, you know - that's bullshit. It was his project.*

In the same conversation he also said:

> *Well, well, let me put it differently. Nothing I said should have made Hallgeir's life any more difficult. Tor, on the other hand, has got a lot of explaining to do.*

- 82 -                                    14-022670MED-OTIR /05

Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com



*Translation from Norwegian*

The Court attaches much evidentiary weight to the police statement in Paris after Wallace decided to "set the story straight" and to the wiretapped telephone conversations. As regards the wiretapped telephone conversations, the Court makes reference to the fact that in those conversations Wallace talks to a good colleague and to a friend. There is no reason to presume that he does not tell the truth to the two of them.

Wallace has said that his statement in Paris was influenced by him not having access to documents and that he now cannot find any support for what he said about Holba in the documents. In court he did not remember anything. In the Court's view, there is support in the documents and in the other circumstances to hold that Wallace told the truth in his police statement in May 2012. Holba took over as project owner in October 2006. Wallace went to Paris to meet Nahawi in December 2006 and he met Ghanem Junior for the first time in January 2007. Wallace did not have a budget on his own for incurring for Yara in general or this project in particular the kind of expenses we are dealing with here. Holba, as project owner, was the only one who was authorized to do so.

As stated above in the description of the facts, there was a negotiation meeting between Yara and the NOC in August 2007. At that point in time, Ghanem Junior had received a payment of USD 1.5 million and the HoA had been signed. The negotiation meeting was not successful. In an email of 7 September 2007 to Enger, Wallace and Nahawi, amongst others, Holba describes the situation as

> *(...) basically led them to re-opening all aspects of the signed HoA – to our detriment.*

It is clear that Wallace was to travel to Dubai and that he would then meet Ghanem Junior to receive information that could solve the problems and that he also brought with him the above-mentioned issue list. Wallace and Holba flew to Dubai together. Holba explained in court that he knew that Wallace was to meet a contact and that he knew that Wallace brought the issue list with him. Holba furthermore explained that he did not know who this contact was, nor did he ask. When asked in court why he did not ask who the contact was and what he could contribute, Holba answered it was not natural for him to ask Wallace about this and that there could be legitimate reasons why someone would want to keep his network to himself.

Holba was aware of the topic of the meeting with the "contact", namely the issue list. Consequently, it could not be just any contact that Wallace was to meet. There could only be need for someone who could contribute something outside of the official negotiations. In addition, Holba stated that there should be clear lines in the project. There should only be "one voice" from the project. Wallace was not part of the project team. The Libya project was

- 83 -                    14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



Holba's responsibility. In the Court's assessment, it is not credible that Holba did not know who Wallace's contact was and what this contact was to contribute.

The follow-up after the meeting with Ghanem Junior in Dubai in September 2007 shows that Holba knew more than what he expressed in court. Wallace returned with advice on how Yara should relate and it is clear that this was advice that Wallace had received from his contact.

*4.5    The spring of 2008 and whistleblowing in the summer/autumn of 2008*
Wallace explained during the police interview in Paris in May 2012 that he used the time from April to June 2008 to transfer his responsibilities to his successor. Wallace also explained in the interview that he in the course of that time period had a meeting with Holba, in which the possibility of an additional claim for payment from Ghanem Junior was discussed. Wallace explained that he did not know how it would be doable to make an additional payment.

Also as regards this, the Court relies on the police statement for the same reasons as stated above. Additionally, the Court makes reference to Cavazuti's statement about his conversation in Enger's office about how they were to pay "these people", which he stated took place in June 2008. In the Court's assessment, this shows that the issue concerning a new claim from Ghanem Junior arose already in the early summer of 2008, before the signing of the "Partnership Agreement" on 18 July 2008.

The claim from Ghanem Junior arrived on 24 July 2008; that is, just a few days after the signing of the Partnership Agreement. It was Wallace who informed Holba that the claim had arrived. Regarding this, the Court makes reference to both Holba's and Wallace's statements. According to Wallace's statement before the Court, he cannot remember whether Holba made any further questions as to what the payment concerned. Holba explained that he did not ask Wallace, nor did he make any further inquiries.

The only explanation why Holba did not investigate this any further is, in the opinion of the Court, that he already knew about both the agreement and the payment that already had been made.

Holba has explained that after having talked with Dalane he went to Enger and told him about the claim, and that he later told both Enger and Haslestad. Holba claims that the conversation with Enger and Haslestad must be considered whistleblowing and that the whistleblowing shows that he was not involved. The Court does not find that Holba has done anything in relation to the outgoing and the incoming CEO that may be considered whistleblowing.

- 84 -                                        14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



Firstly, the Court finds it proved that Enger did know about the consultancy agreement and the payment before the summer of 2008. The conversation between Enger and Holba must therefore have been a discussion about how they were to solve a problem. Secondly, Holba did not talk with Haslestad until several weeks after Haslestad took up his position. Both of these circumstances indicate that we are not dealing with a whistleblower. The most important element to the Court in relation to whether Holba is a whistleblower or not, is that despite this being his project he did nothing to investigate the claim.

Finally, the Court has also attached importance to Wallace's trip to Dubai to meet Ghanem Junior again in September 2008. At that point in time, Wallace had left the company. The Court sees little reason for Wallace to do this on his own. Someone must have asked Wallace to go to meet Ghanem Junior; that "someone" must have been Holba. Enger was also in the process of leaving Yara, the same was true of Ombudstvedt, so Holba was the only one on the project that can be imagined to ask Wallace to meet Ghanem Junior to reject the claim. Holba was also the one who risked being left with the sole responsibility for the punishable circumstances.

Following the above, the Court is convinced that Holba gave his consent to Wallace entering into an oral consultancy agreement with Ghanem Junior, which in reality was an agreement with Dr. Ghanem to receive information and advice in the negotiations with the NOC. The Court is also convinced that Holba had approved the payment of a substantial amount to Ghanem Junior and that more instalments were to be paid.

### 4.6    Subjective guilt.

As stated above, the Court has found that Holba had knowledge of the agreement to pay bribes to Ghanem Junior and that Holba participated in the negotiations with the NOC after the agreement with Ghanem Junior had been entered into. The Court has also found it proved that Holba approved the amounts in the agreement. Holba travelled together with Enger when the "Partnership Agreement" was to be signed.

In the Court's opinion, Holba has had more detailed knowledge of Wallace's acts than Enger. He was the project owner and had control of the budget and who were to be engaged in the project beyond Yara's own negotiation team.

As far as Holba was concerned, there was more than psychological aiding and abetting. He had approved the amounts that were agreed with Ghanem Junior. By sending Wallace to Ghanem Junior with the issue list, with knowledge of the agreement that had been entered into and the payment that had been made, he actively aided and abetted corruption. The same

---

14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



is true of the fact that he went together with Enger when a new agreement with the NOC on 18 July 2008 was to be signed, despite him knowing that bribes had been paid.

The Court is in no doubt that Holba has aided and abetted knowingly and intentionally. He was aware of the circumstances that entailed criminal liability under sections 276a and 276b of the Penal Code. He knew that bribes had been offered and paid to the son of a public official and he knew the amount and the other elements that cause the act to be gross corruption.

Following the above, Holba is sentenced in accordance with count a) of the indictment.

## IX      Assessment of the sentence

1. General remarks on the maximum sentence for gross corruption

The four defendants have been found guilty of gross corruption or aiding and abetting gross active corruption. For two of the defendants (Holba and Clauw), the conviction concerns one instance of payment of a bribe in the amount of 1.5 million USD (approximately 8.5 million NOK at the dollar exchange rate at the time) and 1 million USD (approximately 5.5 million NOK at the dollar exchange rate at the time), respectively. For the two other defendants, the conviction concerns two instances of bribes of a total amount of USD 2 million. Both for Libya and for India there were offers of additional payments in the amount of USD 3 million and USD 2 million, respectively.

Section 276b of the Penal Code provides that the maximum sentence for gross corruption is 10 years.

The case concerns corruption committed abroad through an offer of and payment of bribes to foreign public officials. Such corruption was and still is very widespread in the countries that this case concerns. Corruption causes major problems and is a threat to the state of law, democracy, human rights and social justice. It also leads to distortion of competition among businesses; cf. the statements in the Proposition to the Odelsting No. 78 (2002-2003) item 2.1.1. Strong grounds of general deterrence therefore apply when assessing the sentence for corruption.

Norway has ratified the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, the Council of Europe's Criminal Law Convention on Corruption and the United Nations Convention against Transnational Organized Crime. To follow up on Norway's obligations under the said conventions, new corruption provisions in the Penal Code were adopted in July 2003 (sections 276a, 276b and 276c of the Penal Code). At the same time, the maximum sentence for gross corruption was increased considerably.

- 86 -                                            14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

Bribery of foreign public officials was previously regulated by the Penal Code section 1 and carried a maximum sentence of one year. Following the amendment, the maximum sentence for simple corruption was increased to three years and the maximum sentence for gross corruption was increased to 10 years. With this, the maximum sentence for gross corruption became higher than for other crimes against property. The Penal Code Commission's grounds for increasing the sentence was that corruption, depending on the circumstances, would be more worthy of punishment and could constitute a much larger societal problem than embezzlement and theft, cf. [*the green paper*] NOU 2002: 22, item 5.3.4.

However, the ministry also states in item 7.3.2.:

> *The Ministry wants to emphasize that it is only in cases of corruption that are very serious and harmful to society that prison sentences of more than six years may be considered.*

The Parliament's Standing Committee on Justice stated the following on the sentencing level in the Recommendation to the Odelsting number 105 (2002-2003):

> *In the opinion of the Committee, as a point of departure this may seem strict, amongst other things because other gross crimes against property carry a sentence of up to six years. When the Committee nonetheless supports the proposal of 10 years, it is because corruption to a larger extent affects vital interests of society. Additionally, in the opinion of the Committee it will also be more worthy of punishment and more harmful to society than gross embezzlement and theft.*

Gross corruption may be more worthy of punishment than other economic crimes; consequently the punishment will be stricter. However, it is also clear from the preparatory works that it takes a lot if a sentence in excess of six years is to be imposed ("*forms of corruption that are very serious and harmful to society*").

In Rt-2010-1624, the Supreme Court stated the following about the sentencing level after it had been increased:

> *It is however not possible to read into the preparatory works a clear signal that an increase of the general sentencing level for gross corruption was the purpose of the amendment of the Code, except for in the most serious cases. Even though an increase of the maximum sentence per se does not indicate a general increase of sentencing levels, the expansion of the sentencing span may however contribute towards greater*

---

14-022670MED-OTIR /05

Translated by John Richard Stokbak Sciaba, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com



> *leeway in the sentencing and thus to a stricter sentencing also in other cases than the most serious ones. Moreover, in my opinion, the preparatory works' emphasis on the punishability of corruption, together with the points of view that constituted the grounds for the two above-mentioned Supreme Court judgments, provide the basis for a certain increase in sentencing levels.*

Following the above, the Court must take into consideration that a certain general increase in sentences for gross corruption has taken place after the 2003 amendment.

In the preparatory works, corruption committed abroad has not received much attention, except the statement that section 128 of the Penal Code should be amended, particularly because of the low maximum sentence and the resulting short period of limitation. As mentioned above under the assessment of impropriety, it is stated in the Proposition to the Odelsting No. 78 (2002-2003) that:

> *There may be great differences from one country to another in terms of business morals, public administration usages and custom. In the opinion of the Ministry, the assessment of impropriety cannot remain uninfluenced by the circumstances in another country where the bribe is received or performed, or where the passive briber ordinarily operates.*

Although the said element was not given much weight in the concrete assessment of impropriety in the case at hand, the Court believes it should carry substantial weight in the assessment of the sentence.

Society's general condemnation of corruption has, as previously mentioned, been subject to a development from tax deduction to strict prison sentences for the same act. This development is taken into consideration in the assessment of whether an act is improper or not; see the above-mentioned Proposition:

> *The assessment shall depend on society's perception in light of policy considerations and the fundamental values that underlie the legal provision. Consequently, the impropriety standard will not be constant but will develop on the basis of the prevailing moral views of society at any given time.*

In the opinion of the Court, sentencing must to a certain degree follow the same development.

In Libya and India there is still a "corruption culture" that is different from the business culture in most Western countries. None of these countries has ratified the OECD Convention.

- 88 -                                        14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

There is no doubt that corruption in these countries is harmful to society. The Court is nonetheless of the opinion than when a country's business morals and customs can be taken into consideration when assessing impropriety, these circumstances must also be taken into consideration when assessing the sentence.

## 2. A review of case law
There is little case law in this field. As regards corruption committed abroad, the Court is only aware of one judgment by a first instance court that is concerned with this kind of corruption. The Court shall revert to the said judgment in further detail below.

There is somewhat more case law regarding sentencing of gross corruption committed in Norway.

In Rt-2008-1473, the Supreme Court stated that the punishment for gross corruption and gross breach of trust through corruption of a total of approximately NOK 6.5 million should be about five years and six months [of imprisonment]. The Court also fixed the sentence for two co-defendants at one year and seven months. They had paid bribes of approximately NOK 900,000. The last defendant was sentenced for gross corruption for having given the main defendant approximately NOK 3 million. His sentence was set to two years and two months after a rebate for his confession. As an aggravating circumstance for the strictest sentence, importance was attached to the fact that the person concerned was the one who took the initiative and who headed the criminal activity. His activities were goal-oriented with a view to personal gain.

In the above-mentioned case (Rt- 2010- 1624), a case-handling official at the Planning and Building Office of a municipality received a total of NOK 150,000 from a real estate company owned by two brothers. Defendant A was sentenced to one year of imprisonment, while the brothers were sentenced to seven months of imprisonment. Little significance was attributed to the fact that seven years had passed since the punishable acts had been committed. Reasons of general deterrence and extensive duration of the criminal activity were considered aggravating circumstances.

Rt-2012-243 concerned four instances of passive gross corruption and breach of loyalty [relating to] central tasks in connection with the award and follow-up of contractual works for a municipal property company. Defendant A had on four occasions received a total of approximately NOK 1.5 million. The Supreme Court stated that the punishment for the corruption matter considered in isolation would entail a prison sentence of three years. The Supreme Court set (and increased) the sentence for two of the co-defendants, who both were found guilty of active gross corruption in the amount of approximately NOK 200,000. The

---

- 89 -                                           14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 · E-mail: richard.sciaba@gmail.com*



Supreme Court stated that the punishment for the active corruption should be about one year and six months. They were also convicted of breach of loyalty and received a total punishment of two years.

By Oslo District Court's judgment of 3 December 2014, four former managers at Unibuss, one former sales manager of the German bus manufacturer Man in Norway and the manager of a construction company were convicted of, *inter alia*, gross corruption. The main defendant had received bribes totalling approximately NOK 6 million, of which NOK 2.5 million had been proved to be personal gains on his hand. The court stated that the normal sentence would have been six years. When assessing the concrete sentence, the district court attached particular importance to the personal gain of each defendant, the overall scope of the corruption in which the defendant concerned had been involved, the time period during which he had operated and the number of individual acts.

In the opinion of the Court, the increase in sentencing levels for gross corruption and the grounds for this increase, seen in conjunction with more recent case law, show that sentencing levels are largely linked to the size of the amount paid or received. If considering in isolation the amounts paid and offered, the sentencing levels in the case at hand would lie somewhere between five years and seven years, depending on whether the conviction concerns one count or both counts.

As mentioned above, the Court finds that in addition to the special circumstances surrounding corruption committed abroad, there are also other differences between the corruption adjudged in the above-mentioned judgments and the kind of corruption that the case at hand concerns.

No personal gain for the defendants has been documented. The corruption has been done on behalf of a large limited liability company listed on the stock exchange, so it would be the company and not the defendants that would obtain any benefit from the bribes. In the above judgments, the active briber obtained substantial personal financial advantages.

The Court has reviewed the cases where Økokrim has issued writs prescribing an optional fine in lieu of prosecution for violation of the Penal Code section 276a, cf. section 276b, where it is foreign public officials that have been bribed. The information has been gathered from Økokrim's website.

In February 2007, Økokrim issued an indictment for gross corruption against a former CEO at SINTEF Petroleumsforsikring [*sic*] AS (the case is mentioned above under the discussion of the delimitation between sections 276a and 276c of the Penal Code) and issued a writ

---

- 90 -                                                                    14-022670MED-OTIR /05



*Translation from Norwegian*

prescribing an optional fine in lieu of prosecution against the company PF in the amount of NOK 2 million. The corruption took place in 2002 and until the end of October 2003; that is, in part before and in part after the increase in sentencing levels. The payment offered was in the amount of USD 254,426, while approximately USD 100,000 was paid before the agreement was terminated. SINTEF PF accepted the optional fine, while the CEO was acquitted by Trondheim District Court on 30 May 2007. Before the district court, the prosecutor demanded 90 days of imprisonment.

In May 2014, a writ prescribing an optional fine in lieu of prosecution was issued against the shipowning company Cabu Chartering AS, whereby the company was issued with a fine of NOK 20 million. The optional fine was accepted by the company. The case concerned the bribery of a high-ranking decision-maker in Bahrain (at minister level) in the period July 2003 to March 2004. The bribes were concealed as commissions that were paid into a bank account in Switzerland belonging to a company registered on the B. V. I. The payments totalled approximately NOK 9 million. Økokrim considered it a mitigating circumstance that the shipowning company itself notified Økokrim of the matter in August 2010 and that the company then substantively contributed towards the clarification of the case by, *inter alia*, performing its own investigation. Furthermore, Økokrim attached substantial significance to the fact that the agreement with the intermediary about a commission was a running agreement entered into before the Norwegian corruption legislation was made stricter with effect from 4 July 2003. The punishable offense for which the shipowning company was fined consisted in the company failing to terminate the agreement with the intermediary when the new corruption provisions entered into force. For the persons charged the matter was settled by a waiver of prosecution, in particular because the matter was brought to an end in the spring of 2004 and that the concerns for deterrence were sufficiently catered to through the sanctions against the company.

On 15 July 2011, Oslo District Court delivered a judgment against three persons for gross corruption. Upon entry into a contract concerning a project in Tanzania, it was presupposed that 5 % of the contract amount was to be paid to employees participating in the project. The employees worked at DAWASA, which was a public agency. The defendants had nothing to do with the corruption agreement, but became aware of it at a later stage, after which they contributed to the payments being made in the period 2004 to August 2007. The payments totalled USD 172,700. One of the defendants was convicted of aiding and abetting a total of eight transfers totalling USD 109,000. He received a sentence of six months, of which two months were suspended. Another defendant was given a 60-day suspended prison sentence for aiding and abetting the payment of USD 49,000.

---

14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



EXT- WALLACE-00190

*Translation from Norwegian*

The prosecutor expressed the view that assessing the sentence in the case was challenging because of a lack of case law regarding corruption abroad.

This Court has also found the assessment of the sentences to be difficult. The limited case law that exists with regard to corruption committed to broad shows, in the opinion of the Court, that sentences are at a very different and much lower level than for corruption committed towards public officials in Norway. The amount in the SINTEF case would according to case law regarding corruption vis-à-vis Norwegian public officials have carried an unconditional prison sentence of 2 to 3 years; the same is true of the Norconsult case. The Court must take this into consideration when assessing the sentences.

In the Norconsult case, the absence of a financial advantage for the defendants is mentioned as an element that is of significance for the sentencing. The Court is of the opinion that this element must also be of significance in the case at hand.

The Court is also of the opinion that it must be considered a mitigating circumstance that the acts were committed in countries where corruption is part of the business culture. The treatment of this kind of corruption has in a short period of time passed from not being punishable to carrying a maximum sentence of 10 years. The condemnation and blameworthiness of such acts have also undergone the same development. Although the legislature has wanted to increase the sentencing levels for this kind of corruption, the Court believes there should be an incremental increase in the sentencing. Equal treatment and predictability are important concerns in sentencing. The Court is therefore of the opinion that the punishments must be substantially reduced in relation to the sentences claimed by the prosecutor.

2.    The sentencing in the case at hand, comments common to all the defendants
It is characteristic of corruption that it is done in a highly secretive way, which is also demonstrated by the facts in the current case. Both the active and the passive briber dedicate resources to concealing their acts. As a consequence, the risk of being detected is small. The Supreme Court stated in Rt-2001-2007, where a section manager at Statoil was convicted of corruption, that where the risk of detection is small, reasons of general deterrence indicate that those cases that are uncovered should be strictly punished.

The Court finds that it must be considered an aggravating circumstance for all of the defendants that they formed part of the company's corporate management.

Together, the defendants have, in the opinion of the Court, contributed to the value of the company's anticorruption efforts becoming strongly diminished. It is of little significance to

- 92 -                                                          14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

initiate anticorruption work for Yara's 8000 employees if the corporate management itself does not take into consideration its own framework of rules. It must also be added that all the defendants had the possibility of halting the corruption of which they are now being convicted.

The Court presumes that part of the anticorruption work was handled in the way that the group's chief legal officer was to have full control of all transactions that might represents possible violations of the framework of rules.

Wallace's task appears to have been to limit the risk of detection for the corrupt agreements into which Yara chose to enter, rather than avoiding the company assuming any such risk at all. It was Wallace who to a large extent single-handedly carried out the contract negotiations with Ghanem Junior in Libya, with Maini Junior in India and also with Helang. It was also he who defined the kind of contracts that were used, contracts that gave the false impression of encompassing something else than what the assignments actually amounted to. This shows it was precisely at the corporate management level that the corrupt acts took place. It may thus seem like Yara's Code of Conduct rules applied to all but the corporate management itself.

It follows from case law, in particular Rt-2010-1624 as mentioned above, that the elements which according to the Code shall be considered when assessing whether the corruption is gross, also will be central elements for the sentencing. It is clear from the second subsection of the Penal Code's section 276b that these elements include, *inter alia*, whether the act has been committed by or in relation to a public official or any other person in breach of the special confidence placed in him by virtue of his position, office or assignment, whether it has resulted in a considerable economic advantage, whether there was any risk of considerable damage of an economic or other nature, or whether false accounting information has been recorded, or false accounting documents or false annual accounts have been prepared.

The corruption was committed in relation to central public officials. This is aggravating; see the elements in section 276b second subsection of the Penal Code. Additionally, the way the transactions were organized and carried out is an example of classic corruption.

The fact that agreements were entered into that do not reflect the real content and the way in which the payment to Ghanem Junior was concealed, demonstrate that the corruption was well planned.

The Supreme Court stated in Rt-2010-1624 that because of the weighty public concerns the size of the economic advantage will not necessarily be decisive, but the amount will be of

- 93 -                    14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



significance for the overall assessment. In the case at hand, in a Norwegian context, the amounts offered and paid both in Libya and in India are rather large. The defendants have not, in the opinion of the Court, committed corruption in order to obtain own economic gain. Therefore, the Court finds that the economic scope of the corruption should not have the same aggravating effect as appears from the case law reviewed above.

Seven years have passed since the punishable acts were committed and the case has been under investigation from 2011 and until the indictment was issued in January 2014. The investigation has been demanding and it has taken place in several jurisdictions, as is often the case when corruption has been committed abroad. The Supreme Court stated the following in Rt-2012-243:

> *Some time has now passed since the punishable acts were committed. In cases like this the element of time will nonetheless be of limited significance, cf. Rt-2010-1624 para 30: Cases concerning corruption and breach of trust are virtually always extensive and complex; the investigation is demanding. The extensive evidence and the number of parties involved make it difficult to have the cases adjudicated as quickly as one would like.*

This case has not been subject to any demurrage at Økokrim, as opposed to the above case, which had a demurrage of one year with the prosecuting authority. In connection with this, the Court also mentions that the reason for some of the time that has passed since the punishable acts were committed, is a lack of response by Yara's management after it had received indications that something was wrong in 2008. As regards this, the Court makes particular reference to the fact that neither the new CEO nor the chairman investigated the information they received about the payment in Libya in 2008. It was only after [the financial daily] Dagens Næringsliv asked questions concerning the matter in the spring of 2011 that Yara's management responded. As a consequence, the time that has passed since the punishable acts were committed will not affect the sentencing.

In the Cabu Chartering case, Økokrim found that the concern for deterrence was sufficiently catered to through a sanction imposed on the company. The Court is of the opinion that strong reasons of general deterrence suggest that the persons that have committed the corrupt acts should also receive a noticeable punishment, even if the company is issued with a large fine. This applies in particular where it is persons in the company's management that have committed the corruption. Regarding this, the Court makes reference to the circumstance that it is the defendants' acts that have inflicted upon the company the fine and the risk of loss of reputation.

---

- 94 -                                                                              14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

The Court is of the opinion that the punishment's effects of individual deterrence for all the defendants to a large extent is catered to through the issuance of an indictment and the very realization of the court hearing.

The Court also believes one must take into consideration how the very few instances found in case law have been treated by Økokrim and the courts as far as international corruption is concerned. The sentencing should be developed incrementally, not in great leaps. The general elements of sentencing that the Court has reviewed above, the sentencing in the Norconsult case seen in conjunction with the handling of the Cabu Catering [*sic*] case, in the opinion of the Court indicates that the punishments in this case as a point of departure should lie between ✱ 5 and ✱ 6 ✱ years of unconditional imprisonment, depending on whether the conviction concerns one or two counts, as well as the defendant's position within the organization.

*(✱ Corrected pursuant to the Criminal Procedure Act, section 44, 8 July 2015 by Heidi Heggdal)*

3.    The sentencing for each of the defendants

*3.1 Enger*

The Court has found Enger guilty of aiding and abetting two counts of corruption.

Consequently, the Penal Code section 62 is applicable.

Of the four defendants, the Court is of the opinion that Enger is the one that should be given the strictest sentence.   Enger was the CEO. The breach of trust towards Yara was greatest on the part of Enger. He had the possibility of stopping the corruption both in India and in Libya. It was Enger who was to ensure that the company's ethical rules and guidelines were followed. Instead, he gave his approval of the commission of corruption by members of his management team, thereby showing that corruption was accepted within Yara.

Enger has focused on him trusting his fellow staff members and that he had a delegating management style. However, a top manager cannot delegate his responsibility. He was responsible for the top management of the company showing the other employees of the company that the ethical guidelines were followed. His approval of the corruption that he knew was taking place was a necessary precondition for the corruption being committed. The ultimate responsibility for preventing corruption rested with Enger.

The Court does not find that the punishment will have any effect of individual deterrence as far as Enger is concerned. The circumstance that Enger was indicted and the court hearing as such have, in the opinion of the Court, a sufficient deterrent effect.

- 95 -                                    14-022670MED-OTIR /05

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

The prosecutor has presented a demand for six years of imprisonment. The Court believes that would be too strict a sentence and refers to the review of general sentencing elements above. Based on the above, the Court imposes an unconditional sentence of 3 years of imprisonment.

From this sentence there shall be a deduction of 3 days for time spent in custody.

### 3.2 Wallace

Wallace has been found guilty of two counts of gross corruption.

The Penal Code section 62 is applicable.

He was the active performer of the act. He entered into the agreements and arranged the payments.

As an aggravating circumstance, the Court has attached importance to the fact that Wallace was part of the corporate management and an experienced lawyer. He was also the one who was responsible for the work on the company's ethical guidelines. He knew that what he was doing was in breach of the guidelines that he himself had made.

As a mitigating circumstance, the Court has attached importance to the fact that Wallace was not the one giving the order. He was the good soldier who followed orders. However, like the other defendants, Wallace had the possibility of stopping the corruption.

The prosecutor has demanded a sentence of 7 years of imprisonment for Wallace. The sentence demanded by the prosecutor is, in the opinion of the Court, too strict, see above. The Court is also of the opinion that Wallace's sentence should be shorter than Enger's. Based on the above, the Court imposes an unconditional sentence of 2 years and 6 months of imprisonment.

From this sentence there shall be a deduction of 3 days for time spent in custody.

### 3.3 Holba

Holba has been found guilty of one count of aiding and abetting gross corruption.

Holba has been indicted and found guilty of only one count, which must entail a somewhat shorter sentence than for Wallace and Enger, who have been found guilty of two counts. As mentioned above, the Court has not attached importance only to the size of the amount; however, it must be given a certain weight, see the above review of the case law.

- 96 -                                                          14-022670MED-OTIR /05

Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com



*Translation from Norwegian*

As the CEO and as project owner of the Libya project, Holba had a special responsibility.

The Court finds no mitigating circumstances beyond what can be seen above.

The prosecutor has demanded a sentence of 3 years of imprisonment for Holba. As for the other defendants, the Court finds that the sentence demanded is too strict. Based on the above, the Court imposes an unconditional sentence of 2 years of imprisonment.

From this sentence there shall be a deduction of 3 days for time spent in custody.

### 3.4 Clauw
Clauw has been acquitted of the Libya matter and found guilty of gross corruption in India.

As an aggravating circumstance, the Court attaches importance to the fact that Clauw was the one who initiated the corruption in India.

For the rest there are no mitigating circumstances beyond those reviewed by the Court above.

The Court imposes an unconditional sentence of 2 years of imprisonment.

From the sentence there shall be a deduction of 3 days for time spent in custody.

The judgment is unanimous.

**CONCLUSION OF THE JUDGMENT:**

1.  Thorleif Enger, born 31.10.1943, is convicted of violation of the Penal Code section 276a, cf. section 276b, to 3 – three – years of imprisonment, cf. the Penal Code section 62. From the sentence there shall be a deduction of 3 – three – days for time spent in custody.

2.  Kendrick Taylor Wallace, born 03.08.1945, is convicted of violation of the Penal Code section 276a, cf. section 276b, to 2 – two – years and 6 – six – months of imprisonment, cf. the Penal Code section 62. From the sentence there shall be a deduction of 3 – three – days for time spent in custody.

---



*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

3.  Tor Holba, born 17.03.1956, is convicted of violation of the Penal Code section 276a, cf. section 276b, to 2 – two – years of imprisonment. From the sentence there shall be a deduction of 3 – three – days for time spent in custody.

4.  Daniel Clauw, born 27.02.1950, is acquitted of count a) of the indictment.

5.  Daniel Clauw, born 27.02.1950, is convicted of violation of the Penal Code section 276a, cf. section 276b, to 2 – two – years of imprisonment. From the sentence there shall be a deduction of 3 – three – days for time spent in custody.

****

As per agreement with the defence counsels, the judgment shall be served by mail by being sent to the defence counsels who have undertaken to serve the judgment on the defendants. As far as Wallace is concerned, the judgment shall be translated into English. As far as Clauw is concerned, the judgment shall be translated into French. That will take about two weeks. The Court and the defence counsels have agreed that they shall serve the translated judgment; consequently, the date of service will be the date on which the translated judgment is served, which also determines the date from which the time limit for appeal is calculated. The slip for acknowledgment of receipt will be sent with the judgment to all of the defence counsels and will accompany the translated judgment as far as Clauw and Wallace are concerned. The brochure "Guidance for convicted persons and information about the time limit for appeal" is enclosed with the judgment.

Court adjourned

Heidi Heggdal

Leif Helmich Pedersen                                        Morten Drake

---

- 98 -                                           14-022670MED-OTIR /05


*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*





# BORGARTING LAGMANNSRETT



KOPI

## DOM

**Avsagt:**        17.01.2017

**Saksnr.:**       15-138815AST-BORG/01

**Dommere:**

| | |
|---|---|
| Lagmann | Mette Jenssen |
| Lagdommer | Dag A. Minsaas |
| Ekstraordinær lagdommer | Egil F. Jensen |

**Meddommere:**

| | |
|---|---|
| Veileder, NAV | Kjersti Olsen |
| Postdoktor | Maria Astrup Hjort |
| Territory Manager | Jan Sverre Reidar Petterson |
| Pensjonist | Kai Fred Nærby Thune |

| | | |
|---|---|---|
| Påtalemyndighet | Økokrim | Førstestatsadvokat Marianne Djupesland |
| | | Førstestatsadvokat Bård Thorsen |
| | | Statsadvokat Helene Bærug Hansen |
| Tiltalt | Daniel Roger Clauw | Advokat Fredrik Berg |
| | | Advokat Ruth Haile Tesfazion |
| Tiltalt | Thorleif Enger | Advokat Jan Erik Teigum |
| | | Advokat Ellen Holager Andenæs |
| Tiltalt | Kendrick Taylor Wallace | Advokat Arild Dyngeland |
| | | Advokat Rune Håkon Tjomsland |
| Tiltalt | Tor Holba | Advokat Astri Aas-Hansen |
| | | Advokat Nadia Christina Hall |



TRUE COPY

**Ingen begrensninger i adgangen til offentlig gjengivelse**

Oslo statsadvokatembeter har ved tiltalebeslutning av 15. januar 2014 satt Kendrick Taylor
Wallace, født 3. august 1945, Daniel Clauw, født 27. februar 1950, Thorleif Enger, født 31.
oktober 1943, og Tor Holba, født 17. mars 1956, under tiltale for overtredelse av:

### Straffeloven § 276a, jf. § 276 b
For å ha gitt eller tilbudt noen en utilbørlig fordel i anledning stilling, verv eller oppdrag.
Med stilling, verv eller oppdrag menes også stilling, verv eller oppdrag i utlandet.
Forholdet anses som grovt blant annet fordi handlingens har gitt betydelig økonomisk
fordel, fordi det er tale om bestikkelse av utenlandsk offentlig tjenestemann eller fordi det
er benyttet uriktig regnskapsdokumentasjon.

### Grunnlag er følgende forhold:
Yara International ASA (Yara) er morselskap i et internasjonalt konsern med
virksomhet innen hovedsakelig produksjon og salg av gjødsel og har mer enn 8000
ansatte over hele verden. Selskapet har hovedkontor i Oslo og er notert på Oslo Børs.
Den norske stat eier 36,2 % av aksjene.

I perioden 2004 til oktober 2008 var Thorleif Enger konsernsjef i Yara. Kendrick
Wallace var Yaras juridiske direktør og satt i konsernledelsen i perioden 2004 til
sommeren 2008. Tor Holba satt i konsernledelsen fra 2004 til mai 2012 (fra oktober
2006 som leder for oppstrømsegmentet og prosjekteier for forhandlingene i Libya).
Daniel Clauw satt i konsernledelsen i perioden 2004 til høsten 2006 som
driftsdirektør og visekonsernsjef, deretter var han engasjert som konsulent direkte
underlagt Enger med ansvar for "growth initiatives", en posisjon han hadde frem til
september 2007.

Personer som handlet på vegne av Yara medvirket til følgende:


#### Post a)
#### Gjelder tiltalte nr. 1 Wallace, nr. 2 Clauw, nr. 3 Enger og nr. 4 Holba
I perioden 2004 til 2009 forhandlet Yara med det libyske statlige oljeselskapet
National Oil Corporation (NOC) om et samarbeid (joint venture) om
gjødselsproduksjon i Libya. En gang, trolig på nyåret 2007, inngikk Wallace på
vegne av Yara avtale om å betale USD 5 4,5 * millioner eller mer til Mohamed
Ghanem, sønn av Shukri Ghanem. Shukri Ghanem var på det tidspunktet i praksis*
oljeminister i Libya og styreleder i NOC. Avtalen hadde sammenheng med Yaras
forhandlinger med NOC og Shukri Ghanems rolle der.

Deler av det avtalte beløp, USD 1,5 millioner, ble overført til en konto i Sveits som
ble disponert av Mohamed Ghanem. Dette skjedde på følgende måte: Det sveitsiske
selskapet Nitrochem Distribution AG (Nitrochem) ble bedt om å forskuttere beløpet
for Yara, noe Nitrochem gjorde ved å overføre USD 1,5 millioner til den avtalte
kontoen 29. mars 2007. Yara refunderte deretter Nitrochem via Yaras deleide selskap
i Sveits, Balderton Fertilizer SA (Balderton). Tilbakebetalingen ble skjult gjennom
overfakturering av flere ordinære ammoniakkleveranser fra Nitrochem til Balderton,
i perioden oktober 2007 til mai 2008. De aktuelle ammoniakkleveransene ble
videresolgt fra Balderton til Yara Switzerland SA (Yara Switzerland), til en pris som

**TRUE COPY**

15-138815AST-BORG/01

også dekket inn den overpris Balderton hadde betalt for råvarene. I realiteten var det således Yara Switzerland som dekket betalingen til Ghanem.

Betalingen ble foretatt samtidig som Yara og NOC var i sluttforhandlinger om "Heads of Agreement" (HoA), som ble undertegnet i april 2007.

Både avtalen og delbetalingen utgjorde en utilbørlig fordel.

Clauw, Enger og Holba ga sin tilslutning, trolig på nyåret 2007, til at det skulle inngås avtale om å betale penger til Shukri Ghanems sønn.

Clauw medvirket videre ved å foreslå at Nitrochem på vegne av Yara kunne forskuttere betalingen på USD 1,5 millioner til Mohamed Ghanem, og ved å kontakte Nitrochem for å sørge for at dette ble gjort.

Enger og Holba deltok i forhandlingene med NOC og undertegnet blant annet "Partnership agreement" i juli 2008 mellom Yara og NOC med kunnskap om at det forelå en avtale om å betale bestikkelser der ikke alle avdragene var betalt. Den endelige avtalen mellom Yara og NOC ble undertegnet i februar 2009.

**Post b)**
**Gjelder tiltalte nr. 1 Wallace, nr. 2 Clauw, nr. 3 Enger**
I perioden fra desember 2006 til våren 2008 forhandlet Yara International ASA (Yara) med Krishak Bharati Cooperative Limited (KRIBHCO) om et samarbeid (joint venture) innen gjødselssektoren i India. Den indiske stat eide 67% av KRIBHCO som administrativt var underlagt Ministry of Chemicals & Fertilizers.

I april 2007 tilbød Wallace og Clauw på vegne av Yara å inngå en avtale med Gurpreetesh Singh Maini, sønn av Dr. Jivtesh Singh Maini. Dr. Jivtesh Singh Maini var på det tidspunkt Additional Secretary and Financial Adviser i Ministry of Chemicals & Fertilizers og styremedlem i KRIBHCO på vegne av departementet Avtaletilbudet med Gurpreetesh Singh Maini hadde sammenheng med Dr. Jivtesh Singh Mainis stilling.

Avtaletilbudet ("Representative Engagement Letter") som ble fremsatt overfor Gurpreetesh Singh Maini, innebar blant annet utbetaling av et engangsbeløp på USD 250 000 samt et tilbud om at han på nærmere bestemte betingelser skulle få USD 0,50 per metrisk tonn av alle gjødselprodukter som Yara ville komme til å selge i India. Et vilkår for avtalens varighet var at avtalen mellom Yara og Kribcho kom i stand. I et senere avtaleforslag fra Yara ble engangsbeløpet erstattet med et beløp på USD 3 millioner, som skulle utbetales med USD 1 million pr år i perioden 1. januar 2007 til 31. desember 2009.

Den 16. oktober 2007 betalte Yara USD 1 million på grunnlag av en faktura oversendt fra Gurpreetesh Singh Maini fra det libanesiske selskapet CYC s.a.r.l. Beløpet ble i stedet, og etter forespørsel fra Gurpreetesh Singh Maini, overført fra Yara til en konto i Hong Kong tilhørende selskapet Krystal Holdings & Investments Limited (British Virgin Islands), et selskap i navnet til ektefellene til Jivtesh Singh Maini og Gurpreetesh Singh Maini.

**TRUE COPY**

- 3 -                              15-138815AST-BORG/01

Både avtaletilbudet og betalingen utgjorde en utilbørlig fordel.

Enger medvirket ved å gi sin tilslutning til avtaleforhandlingene med Gurpreetesh Singh Maini og ved å godkjenne utbetalingen på USD 1 million.

(* Rettet av aktor under ankeforhandlingen, jf. strpl. § 254 tredje ledd, 23.08.2016 Marianne Djupesland.)

Oslo tingrett avsa 7. juli 2015 dom med slik domsslutning:

1.  Thorleif Enger, født 31.10.1943, dømmes for overtredelse av straffeloven § 276a, jfr. § 276b til fengsel i 3 –tre- år, jfr. straffeloven § 62. Til fradrag i straffen kommer 3 –tre- dager for utholdt varetekt.

2.  Kendrick Taylor Wallace, født 03.08.1945, dømmes for overtredelse av straffeloven § 276a, jfr. § 276b til fengsel i 2 –to- år og 6 –seks- måneder, jfr. straffeloven § 62. Til fradrag i straffen kommer 3 –tre- dager for utholdt varetekt.

3.  Tor Holba, født 17.03.1956, dømmes for overtredelse av straffeloven § 276a, jfr. 276b til fengsel i 2 –to- år. Til fradrag i straffen kommer 3 –tre- dager for utholdt varetekt.

4.  Daniel Clauw, født 27.02.1950, frifinnes for tiltalebeslutningens post a).

5.  Daniel Clauw, født 27.02.1950, dømmes for overtredelse av straffeloven § 276a, jfr. § 276b til fengsel i 2 – to – år. Til fradrag i straffen kommer 3 – tre- dager for utholdt varetekt.

Kendrick Taylor Wallace, Daniel Clauw, Thorleif Enger, Tor Holba og påtalemyndigheten ved Økokrim har anket dommen til Borgarting lagmannsrett.

Anken fra Thorleif Enger gjelder bevisbedømmelsen under skyldspørsmålet, lovanvendelsen og straffutmålingen.

Anken fra Kendrick T. Wallace gjelder bevisbedømmelsen under skyldspørsmålet og lovanvendelsen.

Anken fra Daniel Clauw gjelder bevisbedømmelsen under skyldspørsmålet, lovanvendelsen og straffutmålingen.

Anken fra Tor Holba gjelder bevisbedømmelsen under skyldspørsmålet for tiltalen post a.

Påtalemyndighetens anke gjelder bevisbedømmelsen under skyldspørsmålet for tiltalen post a for Daniel Clauw og straffutmålingen for samtlige.

TRUE COPY

Ankeforhandling ble holdt i perioden 23. august – 2. desember 2016 i Borgarting lagmannsretts hus. Samtlige tiltalte og 28 vitner ga forklaring. Øvrig bevisførsel fremgår av rettsboken.

Lagmannsretten var ved ankeforhandlingen satt med lagrette i medhold av straffeprosessloven § 352. Lagretten ble overensstemmende med tiltalebeslutningen stilt 7 hovedspørsmål og 7 tilleggsspørsmål. Spørsmålene lød:

### For tiltalte nr. 1, Wallace:

**Spørsmål 1 – hovedspørsmål (tiltalens post a)**
(For å svare ja på dette spørsmålet kreves det flere enn 6 stemmer.)

Er Kendrick T. Wallace skyldig i å ha tilbudt eller gitt noen en utilbørlig fordel i anledning stilling eller verv eller å ha medvirket til dette?

Grunnlag:
I 2006 – 2007, samtidig som Yara International ASA (Yara) forhandlet med det libyske selskapet National Oil Company (NOC) om et samarbeidsprosjekt i Libya, tilbød og/eller ga han Shukri Ghanem en utilbørlig fordel ved å inngå en avtale med sønnen Mohammed Ghanem om å betale sønnen eller sønnens selskap til sammen USD 4,5 millioner i fremtidige avdrag, og ved å medvirke til at USD 1,5 millioner ble betalt. Den utilbørlige fordelen ble tilbudt og/eller gitt i anledning av Shukri Ghanems stilling som styreleder i NOC.

**Spørsmål 2 – tilleggsspørsmål (tiltalens post a)**
(Dette spørsmålet skal bare besvares hvis spørsmål 1 er besvart bekreftende.
For å svare ja på dette spørsmålet kreves det flere enn 6 stemmer.)

Er overtredelsen i spørsmål 1 å anse som grov?

**Spørsmål 3 - hovedspørsmål (tiltalens post b)**
(For å svare ja på dette spørsmålet kreves det flere enn 6 stemmer.)

Er Kendrick T. Wallace skyldig i å ha medvirket til å tilby eller gi noen en utilbørlig fordel i anledning stilling eller verv?

Grunnlag:
I 2006 – 2007, samtidig som Yara International ASA (Yara) forhandlet om en samarbeidsavtale med det indiske kooperativet KRIBHCO, medvirket han til å tilby og/eller gi Jivtesh Maini en utilbørlig fordel ved å medvirke til at det ble inngått en avtale med sønnen Gurpreteesh Maini om å betale til sammen USD 3 millioner i fremtidige avdrag til sønnen eller et selskap som sønnen utpekte, og/eller ved å medvirke til at USD 1 millioner ble betalt. Den utilbørlige fordelen ble tilbudt og/eller gitt i anledning av Jivtesh Mainis stilling i det indiske Kjemikalie- og gjødselsdepartementet og/eller hans verv som styremedlem i KRIBHCO.

TRUE COPY

15-138815AST-BORG/01

**Spørsmål 4 – tilleggsspørsmål (tiltalens post b)**
(Dette spørsmålet skal bare besvares hvis spørsmål 3 er besvart bekreftende.
For å svare ja på dette spørsmålet kreves det flere enn 6 stemmer.)

Er overtredelsen i spørsmål 3 å anse som grov?

**For tiltalte nr. 2, Clauw:**

**Spørsmål 1 - hovedspørsmål (tiltalens post a)**
(For å svare ja på dette spørsmålet kreves det flere enn 6 stemmer.)

Er Daniel Clauw skyldig i å ha medvirket til å tilby eller gi noen en utilbørlig fordel i
anledning stilling eller verv?

Grunnlag:
I 2006 – 2007, samtidig som Yara International ASA (Yara) forhandlet med det libyske
elskapet National Oil Company (NOC) om et samarbeidsprosjekt i Libya, medvirket han til å
tilby og/eller gi Shukri Ghanem en utilbørlig fordel ved å medvirke til at det ble inngått en
avtale med sønnen Mohammed Ghanem om å betale sønnen eller sønnens selskap til
sammen USD 4,5 millioner i fremtidige avdrag, og/eller ved å medvirke til at USD 1,5
millioner ble betalt. Den utilbørlige fordelen ble tilbudt og/eller gitt i anledning av Shukri
Ghanems stilling som styreleder i NOC.

**Spørsmål 2 – tilleggsspørsmål (tiltalens post a)**
(Dette spørsmålet skal bare besvares hvis spørsmål 1 er besvart bekreftende. For å svare ja
på dette spørsmålet kreves det flere enn 6 stemmer.)

Er overtredelsen i spørsmål 1 å anse som grov?

**Spørsmål 3 - hovedspørsmål (tiltalens post b)**
(For å svare ja på dette spørsmålet kreves det flere enn 6 stemmer.)

Er Daniel Clauw skyldig i å ha medvirket til å tilby eller gi noen en utilbørlig fordel i
anledning stilling eller verv?

Grunnlag:
I 2006 – 2007, samtidig som Yara International ASA (Yara) forhandlet om en
samarbeidsavtale med det indiske kooperativet KRIBHCO, medvirket han til å tilby og/eller
gi Jivtesh Maini en utilbørlig fordel ved å medvirke til at det ble inngått en avtale med
sønnen Gurpreteesh Maini om å betale til sammen USD 3 millioner i fremtidige avdrag til
sønnen eller et selskap som sønnen utpekte, og/eller ved å medvirke til at USD 1 millioner
ble betalt. Den utilbørlige fordelen ble tilbudt og/eller gitt i anledning av Jivtesh Mainis
stilling i det indiske Kjemikalie- og gjødselsdepartementet og/eller hans verv som
styremedlem i KRIBHCO.

EXT- WALLACE-00203

### Spørsmål 4 – tilleggsspørsmål (tiltalens post b)
(Dette spørsmålet skal bare besvares hvis spørsmål 3 er besvart bekreftende. For å svare ja
på dette spørsmålet kreves det flere enn 6 stemmer.)

Er overtredelsen i spørsmål 3 å anse som grov?

**For tiltalte nr. 3, Enger:**

### Spørsmål 1 - hovedspørsmål (tiltalens post a)
(For å svare ja på dette spørsmålet kreves det flere enn 6 stemmer.)

Er Thorleif Enger skyldig i å ha medvirket til å tilby eller gi noen en utilbørlig fordel i
anledning stilling eller verv?

<u>Grunnlag:</u>
I 2006 – 2007, samtidig som Yara International ASA (Yara) forhandlet med det libyske
selskapet National Oil Company (NOC) om et samarbeidsprosjekt i Libya, medvirket han til
å tilby og/eller gi Shukri Ghanem en utilbørlig fordel ved å medvirke til at det ble inngått en
avtale med sønnen Mohammed Ghanem om å betale sønnen eller sønnens selskap til
sammen USD 4,5 millioner i fremtidige avdrag, og/eller ved å medvirke til at USD 1,5
millioner ble betalt. Den utilbørlige fordelen ble tilbudt og/eller gitt i anledning av Shukri
Ghanems stilling som styreleder i NOC.

Medvirkningen besto i at Enger, som konsernsjef i Yara, ga sin tilslutning til inngåelsen av
avtalen med Mohammed Ghanem, og/eller at han unnlot å gripe inn mot avtalen og/eller
delbetalingen.

### Spørsmål 2 – tilleggsspørsmål (tiltalens post a)
(Dette spørsmålet skal bare besvares hvis spørsmål 1 er besvart bekreftende. For å svare ja
på dette spørsmålet kreves det flere enn 6 stemmer.)

Er overtredelsen i spørsmål 1 å anse som grov?

### Spørsmål 3 - hovedspørsmål  (tiltalens post b)
(For å svare ja på dette spørsmålet kreves det flere enn 6 stemmer.)

Er Thorleif Enger skyldig i å ha medvirket til å tilby eller gi noen en utilbørlig fordel i
anledning stilling eller verv?

<u>Grunnlag:</u>
I 2006 – 2007, samtidig som Yara International ASA (Yara) forhandlet om en
samarbeidsavtale med det indiske kooperativet KRIBHCO, medvirket han til å tilby og/eller
gi Jivtesh Maini en utilbørlig fordel ved å medvirke til at det ble inngått en avtale med
sønnen Gurpreteesh Maini om å betale til sammen USD 3 millioner i fremtidige avdrag til
sønnen eller et selskap som sønnen utpekte, og/eller ved å medvirke til at USD 1 millioner
ble betalt. Den utilbørlige fordelen ble tilbudt og/eller gitt i anledning av Jivtesh Mainis
stilling i det indiske Kjemikalie- og gjødselsdepartementet og/eller hans verv som
styremedlem i KRIBHCO.

TRUE COPY

**Spørsmål 4 – tilleggsspørsmål (tiltalens post b)**
(Dette spørsmålet skal bare besvares hvis spørsmål 3 er besvart bekreftende. For å svare ja
på dette spørsmålet kreves det flere enn 6 stemmer.)

Er overtredelsen i spørsmål 3 å anse som grov?

**For tiltalte nr. 4, Holba:**

**Spørsmål 1 – hovedspørsmål (tiltalens post a)**
(For å svare ja på dette spørsmålet kreves det flere enn 6 stemmer.)

Er Tor Holba skyldig i å ha medvirket til å tilby eller gi noen en utilbørlig fordel i anledning
stilling eller verv?

Grunnlag:
I 2006 – 2007, samtidig som Yara International ASA (Yara) forhandlet med det libyske
selskapet National Oil Company (NOC) om et samarbeidsprosjekt i Libya, medvirket han til
å tilby og/eller gi Shukri Ghanem en utilbørlig fordel ved å medvirke til at det ble inngått en
avtale med sønnen Mohammed Ghanem om å betale sønnen eller sønnens selskap til
sammen USD 4,5 millioner i fremtidige avdrag, og/eller ved å medvirke til at USD 1,5
millioner ble betalt. Den utilbørlige fordelen ble tilbudt og/eller gitt i anledning av Shukri
Ghanems stilling som styreleder i NOC.

Medvirkningen besto i at Holba, som prosjekteier og medlem av Yaras konsernledelse, ga
sin tilslutning til inngåelsen av avtalen med Mohammed Ghanem, og/eller at han unnlot å
gripe inn mot avtalen og/eller delbetalingen.

**Spørsmål 2 - tilleggsspørsmål (tiltalens post a)**
(Dette spørsmålet skal bare besvares hvis spørsmål 1 er besvart bekreftende. For å svare ja
på dette spørsmålet kreves det flere enn 6 stemmer.)

Er overtredelsen i spørsmål 1 å anse som grov?

Lagretten svarte ja på alle fire spørsmål vedrørende Kendrick T. Wallace. Lagretten svarte
nei på begge hovedspørsmål vedrørende Daniel Clauw og Thorleif Enger, og nei på
hovedspørsmålet vedrørende Tor Holba.

Lagrettens kjennelse legges til grunn for dommen, jf. straffeprosessloven § 40 første ledd.

Etter prosedyre om straffespørsmålet la påtalemyndigheten ned følgende påstand:
Kendrick Taylor Wallace, født 3. august 1945, dømmes til fengsel i 7 – syv – år med
fradrag for 3 – tre – dager varetekt.

EXT- WALLACE-00205

Forsvarer for Ken Wallace la ned følgende <u>påstand</u>:

Kendrick Taylor Wallace anses på mildeste måte.

**<u>Lagmannsrettens bemerkninger:</u>**

**Daniel Clauw – frifinnelse**

Lagretten har svart nei på begge hovedspørsmål som gjelder Daniel Clauw. Lagrettens
kjennelse er lagt til grunn, og det avsies derfor frifinnelsesdom i samsvar med
straffeprosessloven § 376.

**Thorleif Enger – frifinnelse**

Lagretten har svart nei på begge hovedspørsmål som gjelder Thorleif Enger. Lagrettens
kjennelse er lagt til grunn, og det avsies derfor frifinnelsesdom i samsvar med
straffeprosessloven § 376.

**Tor Holba – frifinnelse**

Lagretten har svart nei på hovedspørsmålet som gjelder Tor Holba. Lagrettens kjennelse er
lagt til grunn, og det avsies derfor frifinnelsesdom i samsvar med straffeprosessloven
§ 376.

**Kendrick T. Wallace – straffutmåling**

<u>Innledning</u>

Etter lagrettens bekreftende svar på spørsmål 1 (hovedspørsmål) og spørsmål 2
(tilleggsspørsmål) som gjelder Ken Wallace, legges det ved straffutmålingen til grunn at
Wallace, ved å inngå avtalen med Mohamed Ghanem om betaling av til sammen USD 4,5
millioner i fremtidige avdrag, i realiteten tilbød faren, Shukri Ghanem, en utilbørlig fordel i
anledning farens verv som styreleder i NOC. På samme måte representerte utbetalingen av
USD 1,5 millioner en utilbørlig fordel til Shukri Ghanem i anledning det samme vervet.
Korrupsjonen var grov.

Etter lagrettens bekreftende svar på spørsmål 3 (hovedspørsmål) og spørsmål 4
(tilleggsspørsmål) legges det videre til grunn at Ken Wallace, ved å medvirke til inngåelsen
av en avtale med Gurpreteesh Maini om betaling av til sammen USD 3 millioner i
fremtidige avdrag, i realiteten tilbød faren, Jivtesh Maini, en utilbørlig fordel i anledning
farens stilling som Additional Secretary and Financial Advisor i det indiske Kjemikalie og
gjødselsdepartementet og hans verv som styremedlem i Kribhco. På samme måte

TRUE COPY

EXT- WALLACE-00206

representerte utbetalingen av USD 1 million en utilbørlig fordel til Jivtesh Maini i anledning hans stilling og verv. Også denne korrupsjonen var grov.

I det følgende vil lagmannsretten først gjøre nærmere rede for det faktum som straffutmålingen for Ken Wallace bygger på. Retten bemerker at bevisbedømmelsen under straffespørsmålet er underlagt det samme strenge beviskravet som ved bevisbedømmelsen under skyldspørsmålet. Deretter vil retten redegjøre for den konkrete avveiningen av relevante momenter ved fastsettelsen av straff.

<u>Generelt – Yara International ASA og de tiltaltes roller i selskapet</u>

I mars 2004 ble gjødselvirksomheten i Norsk Hydro ASA (Hydro) skilt ut som et eget selskap gjennom en fisjon. Det nye selskapet, Yara International ASA (Yara), ble børsnotert i forbindelse med utskillelsen. Allerede ved oppstarten var Yara verdens største produsent av mineralgjødsel.

Thorleif Enger ble ansatt som Yaras første konsernsjef. Både Ken Wallace, Daniel Clauw og Tor Holba fikk stillinger i selskapets konsernledelse. Clauw var driftsdirektør, Holba var ansvarlig for nedstrømsvirksomheten, mens Wallace var juridisk direktør. Etter en omorganisering sommeren 2006 ble Tor Holba sjef for Yaras oppstrømsvirksomhet, mens Daniel Clauw gikk av som driftsdirektør og over i en stilling som rådgiver med særskilt ansvar for Yaras vekststrategi ("special growth initiatives"). Clauw var etter dette ikke lenger en del av konsernledelsen, og han sluttet i Yara sommeren 2007. Ken Wallace forble juridisk direktør i selskapet til han gikk av med pensjon sommeren 2008. Thorleif Enger gikk av med pensjon og sluttet i Yara 1. oktober 2008.

Yara videreførte og videreutviklet de rutinene for drift av gjødselsvirksomheten som var bygget opp i Hydro. Blant annet ble Hydros etiske regelverk brukt som utgangspunkt når Yara utarbeidet egne etiske retningslinjer. Det var juridisk direktør Ken Wallace som hadde det faglige ansvaret for Yaras etiske regler og regler for god forretningsskikk, og det var Wallace som presenterte de nye retningslinjene for selskapets ansatte i november 2005.

Yara hadde en klar vekststrategi. I løpet av de første årene etter fisjonen utvidet selskapet sin virksomhet betraktelig, blant annet gjennom flere internasjonale oppkjøp. Selskapets nye prosjekter lå blant annet i Russland, Australia og Brasil. Et annet prosjekt lå i Qatar, hvor Yara var engasjert i produksjon av ammoniakk og urea gjennom en betydelig eierandel i selskapet Qafco. Det nevnes også at Yara i 2007 kjøpte den finske gjødselprodusenten Kemira GrowHow Oyj. I perioden fra 2004 til 2008 økte både omsetning og nettoresultat i Yara til mer enn det dobbelte. Selskapets aksjeverdi steg betydelig i den samme perioden.

EXT- WALLACE-00207

Faktum – tiltalebeslutningens post a), Libya

*Forhandlingene mellom Yara og National Oil Company*

Som en følge av mistanken om delaktighet i terrorhandlinger, var Libya i mange år – frem
til de første årene etter årtusenskiftet – underlagt omfattende politiske og økonomiske
sanksjoner. Da de internasjonale sanksjonene etter hvert ble opphevet, økte utenlandske
selskapers interesse for å etablere seg i landet. Kontakten mellom Yara og det statlige
libyske oljeselskapet National Oil Company (NOC) ble opprettet allerede i 2002, før Yara
ble utfisjonert fra Hydro. For Yara var tilgangen til libyske gassreserver interessant med
tanke på ny forretningsutvikling, mens man på libysk side hadde et stort behov for
utenlandske investorer i forbindelse med oppgraderingen av eldre industrianlegg – for
eksempel ureafabrikken i Marsa El Brega.

Yara og NOC diskuterte muligheten for at den delen av anlegget i Marsa El Brega som ble
brukt til gjødselproduksjon, kunne skilles ut og legges inn i et nytt selskap. Planen var et
såkalt "joint venture" hvor det nye selskapet skulle eies av NOC og Yara i fellesskap. Yara
var libyernes foretrukne samarbeidspartner, og det norske selskapet kunne først og fremst
tilføre fellesforetaket nødvendig teknisk og kommersiell kompetanse. Dessuten ville Yaras
internasjonale distribusjonssystem sikre fellesforetaket en effektiv tilgang til
verdensmarkedet.

Yara og NOC hadde flere møter i perioden frem til det ble inngått en "Memorandum of
Understanding" (MoU) i april 2004. Yara gjennomførte en besiktigelse av anleggene i
Marsa El Brega i juni 2004, og kort etter fremsatte selskapet et "business proposal" til
NOC. I oktober samme år møttes representanter fra NOC og Yara for å diskutere
etableringen av et fellesforetak, og i et møte i januar 2005 aksepterte NOC at Yara skulle
ha en eierandel i fellesforetaket på 50 %, og at eierandelen skulle øke på et senere
tidspunkt.

Etter at Shukri Mohammed Ghanem gikk av som statsminister i Libya i mars 2006,
overtok han vervet som styreleder i NOC. NOC fungerte på dette tidspunkt utvilsomt som
Libyas olje- og energidepartement. Det vises blant annet til vitneforklaringen fra Omar
Gazal, som forklarte at Libyas daværende leder Muammar al-Gaddafi hadde "kansellert"
olje- og energidepartementet, og at NOC derfor rapporterte direkte til statsministeren.

Forhandlingene mellom Yara og NOC fortsatte. Det er uomtvistet i saken at utviklingen i
drøftelsene om avtalevilkår for fellesforetaket utelukkende gikk i NOCs favør. I august
2005 var tilbudet fra norsk side basert på at Yara skulle betale USD 65 millioner for 50 %
av fellesforetaket, og at gassprisen skulle være USD 1/mmbtu. I januar 2007 var
forutsetningen for tilbudet at Yara skulle betale USD 225 millioner, og at gassprisen skulle
være minimum USD 1,30/mmbtu.

TRUE COPY

15-138815AST-BORG/01

EXT- WALLACE-00208

En prinsippavtale, "Heads of Agreement" (HoA), mellom NOC og Yara ble undertegnet 25. april 2007. Etter ytterligere forhandlinger inngikk partene "Joint Venture Framework Agreement" i februar 2008. Den såkalte "Partnership Agreement" ble undertegnet 17. juli 2008, mens det endelige avtaleverket mellom partene ble signert 9. februar 2009. Samarbeidet gikk deretter over i en operativ fase i fellesforetaket Libyan Norwegian Fertiliser Company.

*Avtalen med Mohamed Ghanem*

Mot slutten av 2006, parallelt med forhandlingene om et fellesforetak mellom Yara og NOC, ble Mohamed Ghanem, sønn av NOCs styreleder Shukri Ghanem, introdusert for Yara. Det var Zafer Nahawi, Yaras representant i Midt-Østen, som sto for introduksjonen. Ken Wallace har forklart at han første gang fikk høre om Mohamed Ghanem under et møte med Nahawi i Paris 2. desember 2006, og retten legger dette til grunn.

Ken Wallace møtte deretter Mohamed Ghanem i Bahrain i januar 2007. Det er uomtvistet at de to diskuterte mulighetene for et engasjement av Mohamed Ghanem i tilknytning til de pågående forhandlingene mellom Yara og NOC. Wallace holdt kontakten og fulgte opp diskusjonene med Mohamed Ghanem, blant annet ved å utarbeide utkast til en konsulentavtale mellom Yara og selskapet Saudi Logistics and Technical Support (SALTS). Det var Mohamed Ghanem som hadde foreslått SALTS som oppdragstaker i engasjementet for Yara. Avtaleutkastet regulerte hvilke tjenester Mohamed Ghanem/SALTS skulle levere, og hvilken kompensasjon som skulle betales for disse. Den 12. mars 2007 møttes Ken Wallace og Mohamed Ghanem igjen, denne gang i London, for å bli enige om de endelige avtalebetingelsene.

Det skriftlige avtaleutkastet som forelå da de møttes i London, ble ikke undertegnet. Wallace bestemte istedet at avtalen med Mohamed Ghanem skulle inngås muntlig. Den muntlige avtalen som ble inngått i London, hadde i det vesentlige samme innhold som det siste skriftlige utkastet til avtale med SALTS, slik Wallace forklarte i retten. Avtalen forutsatte utbetaling av totalt USD 4,5 millioner i fremtidige avdrag.

Kort tid deretter, 29. mars 2007, sørget Ken Wallace for overføring av USD 1,5 millioner til Mohamed Ghanems selskap Golden Petal Ltd. Golden Petal Ltd. er registrert på De britiske Jomfruøyer. Betalingen ble foretatt av det sveitsiske selskapet Nitrochem SA, som overførte pengene til Golden Petals konto i UBS bank i Sveits.

Det er ikke bestridt at det var Ken Wallace som tok initiativet til å overføre beløpet på USD 1,5 millioner til Mohamed Ghanem gjennom et sveitsisk selskap. Det er heller ikke omtvistet at betalingen ble gjort på denne måten for å holde den skjult. Wallace tok kontakt med Daniel Clauw og ba om hans hjelp til å få gjennomført en konfidensiell betaling.

Sveits. Clauw rettet deretter en henvendelse til Andreas Zivy, en sveitsisk
forretningsforbindelse som var styreformann i selskapet Ameropa – som igjen eide
Nitrochem. Zivy sa seg villig til å bistå Yara med betalingen.

Nitrochem foretok pengeoverføringen etter å ha fått nærmere instruksjoner om beløp,
mottaker og kontodetaljer. Det beløpet som Nitrochem utbetalte, ble senere tilbakebetalt
fra Yara Switzerland. Tilbakebetalingen skjedde gjennom overfakturering av flere båtlaster
med ammoniakk levert fra Nitrochem til selskapet Balderton Fertilisers SA (Balderton).
Yara eide halvparten av Balderton. Deretter ble ammoniakkleveranser fra Balderton
overfakturert på samme måte ved levering til Yara Switzerland. Tilbakebetalingen til
Nitrochem skjedde over en periode på drøyt 6 måneder, fra oktober 2007 til mai 2008.

Det er ikke ført bevis for at det var Ken Wallace som planla hvordan Nitrochem skulle få
tilbakebetalt sitt utlegg på USD 1,5 millioner, ei heller om Wallace kjente til detaljene i
tilbakebetalingsordningen. Dette er uansett uten betydning for straffutmålingen.

På sensommeren 2008 henvendte Mohamed Ghanem seg til Ken Wallace med krav om
ytterligere betaling i tråd med den muntlige avtalen som var inngått. Wallace, som på dette
tidspunktet hadde gått av med pensjon og ikke lenger jobbet for Yara, tok
betalingsspørsmålet opp med Tor Holba. Hva som deretter skjedde internt i Yara, og hvem
som ble underrettet om hva, er fortsatt uklart. Etter lagmannsrettens syn har detaljene i det
videre hendelsesforløpet ingen betydning for straffutmålingen i saken mot Wallace. Retten
nøyer seg derfor med å slå fast at kravet fra Mohamed Ghanem ble avvist, og at det ikke
ble utbetalt mer penger til ham eller hans selskap fra Yaras side.

Faktum – tiltalebeslutningens post b), India

*Forhandlingene mellom Yara og Krishak Bharati Cooperative*

Indisk landbruk har i mange år hatt et akselererende forbruk av urea, et gjødselprodukt som
over tid utarmer jordsmonnet. India er et av verdens største gjødselmarkeder, og det
økende behovet for en omlegging av gjødselregimet ga Yara et gunstig utgangspunkt med
tanke på forretningsutvikling i landet. Selskapet vurderte derfor å styrke sin satsing i India
gjennom produksjon og salg av balansert gjødsel, såkalt NPK-gjødsel, til indiske bønder.

Mot slutten av 2006 ble Daniel Clauw introdusert for Gurpreteesh Maini av en
forretningsforbindelse ved navn Ely Calil. Calil kjente Gurpreteesh Mainis far, Jivtesh
Maini, som var "Additional Secretary and Financial Advisor" i det indiske Kjemikalie- og
gjødselsdepartementet. Jivtesh Maini var dessuten styremedlem i kooperativet Krishak
Bharati Cooperative Limited (Kribhco), hvor den indiske staten hadde en eierandel.

TRUE COPY

EXT- WALLACE-00210

Etter møtet med Gurpreteesh Maini ble Kribhco kontaktet med tanke på et mulig samarbeid med Yara. Det første møtet mellom Yara og Kribhco fant sted i India i midten av desember 2006. Fra Yara deltok Daniel Clauw, som ledet Kribhco-prosjektet fra Yaras side, og Ken Wallace, som tidlig ble involvert i prosjektet sammen med Clauw. På denne første turen til India møtte Clauw og Wallace også Jivtesh Maini, som representerte Kjemikalie- og gjødselsdepartementet. Forhandlingene med Kribhco resulterte raskt i enighet om videre samtaler for å oppnå en bindende avtale om et langsiktig samarbeid.

Daniel Clauw fulgte opp kontakten med Kribhco, og det ble avviklet et nytt møte i India i slutten av februar 2007 hvor Clauw og Wallace deltok fra Yaras side. Wallace utarbeidet deretter forslag til en prinsippavtale (Heads of Agreement) som reflekterte partenes tanker om det fremtidige samarbeidet. En av målsettingene var blant annet å oppgradere nedlagte gjødselfabrikker for å benytte dem til produksjon av NPK. Partene hadde også en intensjon om nyetablering i land utenfor India – hvor nødvendige gassressurser var enklere tilgjengelig.

Partene undertegnet prinsippavtalen 13. april 2007, men allerede et par måneder senere reduserte Yara hastigheten i Kribhco-prosjektet. Etter at videre forhandlinger først ble satt på vent gjennom sommeren, avtalte Yara i oktober 2007 at avtalen med Kribhco skulle forlenges i ett år. Interessen for samarbeidet med Kribhco fortsatte imidlertid å avta hos Yara, og Kribhco-prosjektet ble avsluttet sommeren 2008.

*Avtalen med Gurpreteesh Maini*

Parallelt med Yaras tidlige drøftelser med Kribhco innledet Daniel Clauw og Ken Wallace en dialog om bruk av Gurpreteesh Maini som rådgiver i den videre prosessen. Forslaget om å engasjere ham kom opprinnelig fra Ely Calil. Til tross for at Gurpreteesh Maini verken hadde kompetanse eller erfaring fra gjødselsektoren, startet Yara forhandlinger om et engasjement.

Ken Wallace og Gurpreteesh Mainis advokat utvekslet flere forslag til oppdragsavtale i løpet av våren 2007. Da Gurpreteesh Maini til slutt aksepterte betingelsene i juni 2007, forpliktet Yara seg til å betale USD 1 million pr. år i tre år til Gurpreteesh Mainis selskap. Avtalen gjaldt perioden fra 1. januar 2007 til 31. desember 2009. Det var særskilt regulert at Yara skulle betale USD 750 000, hoveddelen av godtgjørelsen for det første avtaleåret, innen 1. juli 2007.

Det fremgikk ellers av oppdragsavtalen at Gurpreteesh Mainis selskap skulle være Yaras representant og strategiske rådgiver, både i drøftelsene med Kribhco og i andre prosjekter som måtte bli igangsatt i løpet av engasjementet. Etter sin ordlyd omfattet oppdraget også bistand med lokalisering av nye forretningsmuligheter, rådgivning i forretningsforhold,

EXT- WALLACE-00211

koordinering av myndighetskontakt og praktisk tilrettelegging for Yaras kommersielle aktivitet i India.

Yara betalte ikke USD 750 000 innen 1. juli 2007 som avtalt. Partene ble enige om at ny frist for betaling skulle være 1. september 2007, og at Yara da skulle betale USD 1 million. Yara betalte heller ikke innen den nye fristen. Gurpreteesh Maini purret på betalingen overfor Daniel Clauw. Selv om Clauw på dette tidspunktet hadde sluttet i Yara, tok han kontakt med Wallace på epost for å sørge for at Gurpreteesh Maini fikk betalt. Samtidig med at disse diskusjonene om betaling foregikk, fikk Yara – i en epost til Ken Wallace 17. august 2007 – informasjon fra Gurpreteesh Maini om at hans far hadde byttet jobb og ikke lenger arbeidet i Kjemikalie- og gjødselsdepartementet.

Den 18. september 2007 ga Thorleif Enger beskjed til Ken Wallace om at avtaleforholdet til Gurpreteesh Maini skulle avsluttes. Wallace tok kontakt med Gurpreteesh Maini, som påfølgende dag bekreftet at han aksepterte en godtgjørelse på USD 1 million som et endelig oppgjør for sin bistand.  Dette beløpet ble 16. oktober 2007 overført fra Yara til en konto tilhørende Krystal Holdings & Investments Ltd i Standard Chartered Bank i Hong Kong. Selskapet Krystal Holding & Investment Ltd er registrert på De britiske jomfruøyer og er eiet av The Meher Trust.  Trustens benefisienter er Gurpreteesh Mainis kone og hans mor.

Fastsettelse av straff

Innledningsvis konstaterer retten at straffeloven fra 2005 ikke fører til noe gunstigere resultat for Ken Wallace enn den gamle straffeloven. Korrupsjonsbestemmelsene i straffeloven (2005) § 387 og § 388 har samme strafferamme som straffeloven (1902) § 276a og § 276b, og det følger av spesialmotivene til § 387 og § 388 i Ot.prp. nr. 22 (2008-2009) at det var meningen å videreføre rettstilstanden. Fastsettelsen av straff skal derfor skje etter reglene i straffeloven (1902), jf. straffeloven (2005) § 3 første ledd.

Lagretten har funnet Ken Wallace skyldig i to tilfeller av grov korrupsjon eller medvirkning til grov korrupsjon. I det ene forholdet betalte Yara en bestikkelse på USD 1,5 millioner, mens det i det andre forholdet ble betalt USD 1 million. I begge forholdene representerte utbetalingene en tredjedel av det totale beløp som det var inngått avtale om å betale.

Lagmannsretten legger til grunn at hensikten med å tilby og betale bestikkelser til Shukri Ghanem i Libya var å sikre seg styrelederens velvilje – og dermed en bedre posisjon for Yara i de pågående forhandlingene med NOC. Bestikkelsen fremstår ikke som motytelse for konkrete handlinger eller unnlatelser på Shukri Ghanems side, men bærer preg av å være ren smøring. Selv om Shukri Ghanem ikke selv var direkte involvert i forhandlingene, var han en sentral premissleverandør med tanke på mulighetene for at

TRUE COPY

15-138815AST-BORG/01

samarbeidet mellom Yara og NOC skulle bli en realitet. Det vises i den forbindelse blant annet til vitnet Omar Gazal. Gazal forklarte at han – som leder av forhandlingsteamet på libysk side – løpende rapporterte til Shukri Ghanem, og at det var Shukri Ghanem som tok stilling til hva som eventuelt skulle tas videre og forelegges for det samlede styret i NOC, og deretter for statsministeren.

På samme måte legger lagmannsretten til grunn at hensikten med å tilby og betale bestikkelser til Jivtesh Maini i India var å sikre seg hans velvilje – og dermed en bedre posisjon for Yara i de pågående forhandlingene med Kribhco. Også denne bestikkelsen bærer preg av å være smøring. Selv om Jivtesh Maini ikke selv var direkte involvert i forhandlingene, var hans posisjoner både i departementet og i Kribhcos styre svært sentrale med tanke på mulighetene for få realisert et samarbeid mellom Yara og Kribhco. Det vises blant annet til vitnene C. P. Singh og B. D. Sinha, som forklarte seg om Jivtesh Mainis rolle i departementet og hans posisjon som styremedlem i Kribhco. Om styreposisjonen i Kribhco sa vitnet Sinha for eksempel at Jivtesh Maini i utgangspunktet var styremedlem på lik linje med andre styremedlemmer, men at man fra kooperativets side alltid lyttet ekstra nøye til oppfatningene fra de styremedlemmene som var utpekt av staten.

Da straffeloven (1902) § 276a, § 276b og § 276c ble vedtatt i 2003, skjedde det som et ledd i oppfølgingen av Norges internasjonale forpliktelser for bekjempelse av korrupsjonskriminalitet. I lovforarbeidene er det understreket at norsk deltakelse i det internasjonale arbeidet mot korrupsjon prioriteres høyt. Det er videre uttalt at korrupsjon utgjør en trussel mot rettsstaten, demokratiet, menneskerettighetene og sosial rettferdighet, og at korrupsjon kan hindre økonomisk utvikling og virke konkurransevridende, se Ot.prp. nr. 78 (2002-2003), punkt 2.1.1. Sterke allmennpreventive hensyn tilsier med andre ord at det reageres strengt ved overtredelse av straffelovens forbud mot korrupsjon.

Ved lovendringen i 2003 ble strafferammen for grov korrupsjon hevet til 10 år, jf. straffeloven (1902) § 276b. I lovforarbeidene er det uttalt at grov korrupsjon kan fremstå som mer straffverdig enn de fleste andre grove formuesforbrytelser, og at det unntaksvis kan være grunn til å reagere med fengselsstraffer opp mot ti år for enkeltstående grove korrupsjonshandlinger, se Ot.prp. nr. 78 (2002-2003), punkt 7.3.2. Departementet fastslo likevel følgende:

> Departementet vil understreke at det bare ved meget alvorlige og samfunnsskadelige former for korrupsjon kan være aktuelt å reagere med fengselsstraffer på mer enn seks år.

Høyesterett har i flere avgjørelser etter lovendringen kommentert spørsmålet om hevingen av strafferammen for grov korrupsjon i 2003 innebar en heving av det generelle straffenivået for korrupsjon i forhold til det som gjaldt tidligere. I Rt. 2008 side 1473 uttalte Høyesterett blant annet følgende:

EXT- WALLACE-00213

Noe klart signal om at heving av det generelle straffenivået for grov korrupsjon var et formål ved lovendringen utover de mest alvorlige tilfellene, er det imidlertid ikke mulig å lese ut av forarbeidene. Selv om en heving av strafferammen i seg selv ikke tilsier en generell heving av straffenivået, vil imidlertid utvidelsen av spennet kunne medvirke til et større spillerom i straffutmålingen og dermed til en strengere straffutmåling også utenfor de mest alvorlige tilfellene. Forarbeidenes understreking av straffverdigheten ved korrupsjon gir dessuten etter mitt syn, sammenholdt med de synspunkter som lå til grunn for de to nevnte høyesterettsdommene, grunnlag for en viss skjerpelse av straffenivået.

Ved straffeutmålingen i denne saken legges det derfor til grunn at lovendringen i 2003 innebar en viss heving av det generelle straffenivået for grov korrupsjon.

Når det gjelder straffenivået for grov korrupsjon i det omfang vi står overfor i denne saken, gir Høyesteretts dom i HR-2016-1834-A noe veiledning. I den aktuelle saken hadde den ene tiltalte, i stillingen som innkjøpsansvarlig i et busselskap, mottatt bestikkelser på rundt 3 millioner kroner fra en bussprodusent. Senere, etter å ha sluttet i selskapet og etablert egen virksomhet i samme bransje, hadde han betalt ca. 350 000 kroner i bestikkelser til den daværende innkjøpssjefen hos sin tidligere arbeidsgiver. Den andre tiltalte i saken hadde i stillingen som salgssjef for bussprodusentens norske datterselskap medvirket til utbetaling av bestikkelser på ca. 7,4 millioner kroner. Høyesterett uttalte at riktig straff for den første tiltalte var fengsel i 4 år og 6 måneder. Om straffen for den andre tiltalte sa Høyesterett at et riktig utgangspunkt var fengsel i om lag 5 år.

En annen dom fra Høyesterett som belyser straffenivået, finnes i Rt. 2012 side 243. Den ene tiltalte i saken var prosjektleder i et kommunalt foretak som eide, drev og vedlikeholdt skolebygninger. Han ble dømt for grov korrupsjon etter at han ved 4 tilfeller hadde mottatt i alt ca. 1,5 millioner kroner i bestikkelser fra personer i virksomheter med oppdrag for foretaket. Høyesterett uttalte at riktig straff for korrupsjonsforholdene var fengsel i noe over 3 år.

Den tredje avgjørelsen lagmannsretten vil trekke frem, er dommen i Rt. 2008 side 1473. Hovedmannen i denne saken hadde hatt ledende stillinger i et eiendomsforvaltningsselskap og senere i et kommunalt foretak med ansvar for utvikling, drift og forvaltning av skolebygg. Han ble dømt for grov utroskap for til sammen ca. 100 millioner kroner, og for grov korrupsjon for til sammen ca. 6,6 millioner kroner. Høyesterett sluttet seg til lagmannsrettens utgangspunkt om at korrupsjonen isolert sett ville ha medført en straff på 5 år og 6 måneder.

Ken Wallace er funnet skyldig i å ha medvirket til utbetaling av bestikkelser på til sammen ca. 14,5 millioner kroner – beregnet etter kursen på amerikanske dollar på de respektive utbetalingstidspunktene. Omfanget av de totale bestikkelsene som Wallace tilbød eller

TRUE COPY

- 17 -

15-138645/87/2/01

medvirket til å tilby, var imidlertid betydelig høyere. Beregnet etter valutakursen ved utbetaling av første avdrag under hver av avtalene, hadde avtalen under post a) en samlet verdi på ca. 27 millioner kroner, mens avtalen under post b) hadde en samlet verdi på ca. 16,5 millioner kroner.

Korrupsjonens økonomiske omfang står svært sentralt ved straffutmålingen. Sammenlignet med HR-2016-1834-A, hvor den ene av de to tiltalte medvirket til utbetaling av bestikkelser på til sammen ca. 7,4 millioner kroner, fremstår vår sak som betydelig mer alvorlig. De bestikkelsene som er utbetalt fra Yara, utgjør et samlet beløp som er nær dobbelt så stort som det utbetalte beløpet i Høyesteretts dom – hvor det ble tatt utgangspunkt i en straff på fengsel i rundt 5 år. På grunnlag av rettspraksis er det vanskelig å fastslå eksakt hvilket straffenivå som er det riktige utgangspunktet i vår sak – før det tas hensyn til betydningen av de skjerpende og formildende momenter som gjør seg gjeldende. Lagmannsretten legger imidlertid til grunn at utgangspunktet ligger et sted mellom 6 og 7 års fengsel.

Ved straffutmålingen må det tas i betraktning at Ken Wallace hadde en meget sentral rolle i korrupsjonshandlingene. I Libya-forholdet var han den som opprettet og fulgte opp den direkte kontakten med Mohamed Ghanem, og den som forhandlet med Ghanem om de nærmere avtalebetingelsene. Det var Wallace som tok beslutningen om at avtalen med Mohamed Ghanem skulle inngås muntlig, og som tok initiativet til å foreta utbetalingen på USD 1,5 millioner gjennom et sveitsisk selskap – begge deler for å holde forholdet til Mohamed Ghanem og hans far skjult. Også i India-forholdet var Wallace den operasjonelle aktøren på Yaras side. Det var Wallace som forhandlet med Gurpreetesh Maini om avtalebetingelsene og sørget for utbetaling av beløpet på USD 1 million.

Korrupsjonen både i Libya og i India bærer preg av å være godt planlagt, noe som er skjerpende. Det vises til at Wallace inngikk avtaler om konsulentbistand med to sønner for aktivt å skjule betalingen av bestikkelser til deres fedre. I Libya-forholdet tok han dessuten beslutningen om å skjule overføringen av penger gjennom et eksternt, utenlandsk selskap – i den hensikt å gjøre det spesielt vanskelig å spore bestikkelsen tilbake til Yara. Handlingene foregikk dessuten i begge tilfeller over en lengre periode på flere måneder.

I skjerpende retning må det videre legges vekt på at Ken Wallace var juridisk direktør og medlem av Yaras konsernledelse. Wallace hadde det øverste faglige ansvaret for Yaras etiske regelverk og retningslinjene for god forretningsførsel. Som leder for selskapets antikorrupsjonsarbeid var det også hans ansvar å legge til rette for at reglene ble etterlevd av Yaras organisasjon, og både kompetanse og rolle ga ham særlig gode forutsetninger for å forhindre brudd på korrupsjonslovgivningen. Den omstendighet at Wallace selv begikk grove korrupsjonshandlinger, representerer derfor et betydelig tillitsbrudd overfor selskapet og dets eiere. Hans handlinger fører også til omdømmetap for selskapet – og de er egnet til å så tvil om verdien av Yaras antikorrupsjonsarbeid.

15-138815AST-BORG/01

EXT- WALLACE-00215

Det er videre skjerpende ved straffutmålingen at korrupsjonen både i Libya og i India ble begått overfor sentrale offentlige tjenestemenn. Både Shukri Ghanem og Jivtesh Maini var viktige premissleverandører for avgjørelser av betydning for Yaras kommersielle virksomhet i de respektive landene. Særlig Shukri Ghanem satt i en svært fremskutt posisjon, ettersom NOC forvaltet enorme fellesskapsverdier i form av olje- og gassforekomster på vegne av den libyske stat.

Forsvarer har vist til at Ken Wallace ikke selv tok initiativet til korrupsjonshandlingene, og at han handlet på ordre fra noen andre i Yara. Etter forsvarers oppfatning må dette tillegges vekt som et formildende moment ved straffutmålingen.

Det er ingenting som tyder på at Wallace på eget initiativ besluttet å inngå avtaler om betaling av bestikkelser. Lagmannsretten legger til grunn at initiativet kom fra noen andre i organisasjonen, uten at bevisførselen i saken har gitt svaret på hvem dette var. Den omstendighet at korrupsjonen ikke var Wallace's eget påfunn, kan likevel ikke få nevneverdig betydning ved straffutmålingen. Ken Wallace var ingen underordnet ansatt i Yara; han var selskapets juridiske direktør. Uansett hvem som tok initiativet til bestikkelsene, kunne Wallace – med sin faglige tyngde og i kraft av sin posisjon i konsernledelsen – ha nektet å medvirke til straffbare handlinger, uten risiko for konsekvenser for seg selv. Til sammenligning vises det til at den tiltalte salgssjefen for bussprodusentens norske datterselskap i HR-2016-1834-A ble beskrevet som helt sentral i korrupsjonshandlingene – men likevel som "en liten brikke i et stort korrupt system". Wallace var ingen tilsvarende liten brikke.

I alle de tre korrupsjonsdommene fra Høyesterett som er nevnt over, ble det ved straffutmålingen tillagt vekt i skjerpende retning at de straffbare handlingene ga de tiltalte egen økonomisk vinning. I den foreliggende saken har korrupsjonen ikke gitt Ken Wallace noen form for personlig vinning eller andre fordeler, og det er ingenting som tyder på at egen vinning på noen måte har vært et mål. Dette fraværet av en ikke ubetydelig skjerpende omstendighet i vår sak sammenlignet med sentrale saker i tidligere rettspraksis, må det tas hensyn til ved fastsettelsen av straff for Wallace.

Forsvarer har vist til at kriminaliseringen av korrupsjon i det offentlige blant annet er begrunnet i hensynet til allmennhetens tillit til offentlig virksomhet. Slik tillit er en forutsetning for et stabilt demokrati. Ifølge forsvarer bærer verken Libya eller India preg av å være stabile demokratier, og det kan ikke sies at korrupsjonshandlinger begått i disse statene bidrar til å svekke en velfungerende offentlig administrasjon. Det er derfor anført å være formildende ved straffutmålingen at korrupsjonen er begått i land med en annen forvaltningsskikk og forretningsmoral enn i Norge.

TRUE COPY

15-138815AST-BORG/01

EXT- WALLACE-00216

Som støtte for sin anførsel har forsvarer blant annet vist til lovforarbeidenes kommentarer om utilbørlighetsvurderingen i straffeloven (1902) § 276a. I Ot.prp. nr. 78 (2002-2003) side 56 uttalte departementet følgende:

> Det kan være store forskjeller fra land til land i forretningsmoral, forvaltningsskikk og sedvane. Etter departementets oppfatning kan utilbørlighetsvurderingen ikke stå upåvirket av forholdene i et annet land hvor bestikkelsen mottas eller ytes, eller hvor den passive bestikker har sitt virke. Det er for eksempel ikke uvanlig at offentlige tjenestemenn i en del land nekter å gjøre jobben sin, med mindre de mottar penger for det. Slike betalinger omtales gjerne som "facilitation payments" og vil kunne rammes av utkastet, men bare dersom fordelen som tilbys eller gis den utenlandske tjenestemannen, er utilbørlig. En del slike betalinger kan ikke karakteriseres som utilbørlige. Den som ser seg tvunget til å betale en utenlandsk offentlig tjenestemann et mindre beløp for å få tilbake passet sitt, eller for å få lov til å reise ut av landet, kan derfor ikke straffes etter forslaget. (…)

Lagmannsretten bemerker at denne uttalelsen i forarbeidene gjelder såkalte "facilitation payments" i tilknytning til vurderingen av korrupsjonsbestemmelsens utilbørlighetskriterium. Det som omtales i sitatet, er for det første betaling til offentlige tjenestemenn på en helt annen skala – og i helt andre situasjoner – enn det som er aktuelt i vår sak. For det andre har de nevnte bemerkningene om korrupsjonsbestemmelsens objektive vilkår ikke nødvendigvis noen overføringsverdi til spørsmålet om hvilken straff som er riktig når spørsmålet om skyld allerede er avgjort.

Den omstendighet at korrupsjonen er begått i land som ikke har en like velfungerende offentlig administrasjon som den norske, og som erfaringsmessig er mer korrupsjonsutsatt, kan etter lagmannsrettens oppfatning ikke være noe formildende moment ved straffutmålingen. Som nevnt over, ble lovendringene om korrupsjon i 2003 vedtatt for å følge opp konvensjonsforpliktelser om bekjempelse av denne typen kriminalitet. Korrupsjon foregår ofte på tvers av landegrenser, og lovforarbeidene fremhever derfor viktigheten av at slike straffbare handlinger motarbeides gjennom internasjonal samhandling. Lovendringens formål tilsier derfor med styrke at straffenivået for korrupsjon begått i utlandet i utgangspunktet skal være det samme som for korrupsjon begått i Norge. Verken Høyesteretts praksis eller andre relevante rettskilder gir holdepunkter for noe annet enn en enhetlig straffutmålingspraksis, uavhengig av hvor den straffbare handlingen er begått.

Det har gått mer enn 9 år siden de straffbare handlinger ble begått. Etterforskningen startet i 2011, og tiltale ble tatt ut i januar 2014. Selv om saken har trukket ut i tid, er det ikke grunnlag for å vektlegge tidsforløpet i formildende retning ved straffutmålingen, jf. Høyesteretts uttalelser i Rt. 2012 side 243, avsnitt 50. Det vises til at etterforskningen har vært omfattende med mange involverte, og at saken har berørt flere land. Saken har ikke hatt noen ren liggetid underveis.

EXT- WALLACE-00217

Etter en samlet vurdering har lagmannsretten kommet til at straffen for Ken Wallace skal settes til fengsel i 7 år. Straffeloven (1902) § 62 får anvendelse. Til fradrag kommer 1 dager for utholdt varetekt.

Dommen er enstemmig.



- 21 -                    15-138815AST-BORG/01

EXT- WALLACE-00218

# DOMSSLUTNING:

1. Kendrick Taylor Wallace, født 3. august 1945, dømmes for overtredelse av straffeloven (1902) § 276a, jf. § 276b, jf. straffeloven § 62 til en straff av fengsel i 7 – sju – år.

   Til fradrag i straffen kommer 3 – tre – dager for utholdt varetekt.

2. Daniel Clauw, født 27. februar 1950, frifinnes.

3. Thorleif Enger, født 31. oktober 1943, frifinnes.

4. Tor Holba, født 17. mars 1956, frifinnes.

Mette Jenssen

Dag A. Minsaas

Egil F. Jensen

Kjersti Olsen

Maria Astrup Hjort

Jan Sverre Reidar Petterson

Kai Fred Nærby Thune



-22-

15-138815AST-BORG/01

*Translation from Norwegian*

TAB 2

  

# BORGARTING COURT OF APPEAL
*[Borgarting lagmannsrett]*

## JUDGMENT

**Delivered on:**     17.01.2017

**Case No:**          15-138815AST-BORG/01

**Judges:**

| | |
|---|---|
| Senior Court of Appeal Judge | Mette Jenssen |
| Court of Appeal Judge | Dag A. Minsaas |
| Extraordinary Court of Appeal Judge | Egil F. Jensen |

**Lay judges:**

| | |
|---|---|
| Counsellor, NAV[1] | Kjersti Olsen |
| Postdoctoral Researcher | Maria Astrup Hjort |
| Territory Manager | Jan Sverre Reidar Petterson |
| Retiree | Kai Fred Nærby Thune |

| | | |
|---|---|---|
| Prosecuting authority | Økokrim | Senior Public Prosecutor Marianne Djupesland |
| | | Senior Public Prosecutor Bård Thorsen |
| | | Public Prosecutor Helene Bærug Hansen |
| Defendant | Daniel Roger Clauw | Advocate Fredrik Berg |
| | | Advocate Ruth Haile Tesfazion |
| Defendant | Thorleif Enger | Advocate Jan Erik Teigum |
| | | Advocate Ellen Holager Andenæs |
| Defendant | Kendrick Taylor Wallace | Advocate Arild Dyngeland |
| | | Advocate Rune Håkon Tjomsland |
| Defendant | Tor Holba | Advocate Astri Aas-Hansen |
| | | Advocate Nadia Christina Hall |

**No restrictions on publishing**

---

[1] Norwegian Labour and Welfare Administration. Translator's remark.

*Translated by John Richard Stokbak Sciaba, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



By an indictment issued by the Public Prosecutors Office in Oslo on 15 January 2014, Kendrick Taylor Wallace, born 03 August 1945, Daniel Clauw, born 27 February 1950, Thorleif Enger, born 31 October 1943, and Tor Holba, born 17 March 1956, were indicted with violation of:

### The Penal Code section 276a, see also section 276b

For having given or offered an improper advantage in connection with a position, office or assignment. Position, office or assignment also means a position, office or assignment in a foreign country. The offence is considered gross because, among other things, the act produced considerable economic benefit, because the act concerns the bribery of a foreign public official or because incorrect accounting documentation was used.

### The indictment is based on the following:

Yara International ASA (Yara) is the parent company of an international corporate group with activities mainly within the production and sale of fertilisers, with more than 8,000 employees worldwide. The company's headquarters are located in Oslo and its shares are listed on the Oslo Stock Exchange. The Norwegian government holds 36.2% of the shares.

Thorleif Enger was President and Chief Executive Officer of Yara during the period 2004 - October 2008. Kendrick Wallace was Yara's chief legal officer and a member of the corporate management team during the period from 2004 to the summer of 2008. Tor Holba was a member of the corporate management team from 2004 until May 2012 (from October 2006 as head of the upstream segment and project owner for the negotiations in Libya). Daniel was a member of the corporate management team during the period from 2004 to the autumn of 2006 as chief operating officer and deputy CEO, after which he was engaged as a consultant responsible for growth initiatives reporting directly to Enger, a position he held until September 2007.

Persons acting on behalf of Yara were complicit in the following:

### Count a)
**Concerns defendants no. 1 Wallace, no. 2 Clauw, no. 3 Enger and no. 4 Holba**
In the period 2004 to 2009, Yara negotiated with the state-owned Libyan oil company National Oil Corporation (NOC) regarding cooperation (a joint venture) on fertiliser production in Libya. At some point, probably in early 2007, Wallace entered into an agreement on behalf of Yara to pay USD 5 4.5* million or more to Mohamed Ghanem, the son of Shukri Ghanem. At the time, Shukri Ghanem was Libya's de facto* oil minister and chairman of the NOC. The agreement was linked to Yara's negotiations with the NOC and Shukri Ghanem's role there.

A portion of the agreed amount, USD 1.5 million, was transferred to a Swiss bank account controlled by Mohamed Ghanem. This happened as follows: The Swiss company Nitrochem Distribution AG (Nitrochem) was asked to advance the amount on Yara's behalf, which Nitrochem did by transferring USD 1.5 million to the agreed account on 29 March 2007. Yara subsequently reimbursed Nitrochem via its partially-owned subsidiary in Switzerland, Balderton Fertilizer SA (Balderton). The reimbursement was concealed by over-invoicing several ordinary deliveries of ammonia from Nitrochem to Balderton in the period from October 2007 to May 2008. The ammonia deliveries in question were then sold from Balderton to Yara Switzerland SA (Yara Switzerland) at a price which also covered the overcharge for the commodities paid by Balderton.

15-138815AST-BORG/01

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

EXT- WALLACE-00221

Thus, in reality it was Yara Switzerland that covered the payment to Mr. Ghanem.

The payment was made at the same time as Yara and the NOC were in the final stages of negotiating a "Heads of Agreement" (HoA), which was signed in April 2007.

Both the agreement and the partial payment constituted an improper advantage.

Clauw, Enger and Holba consented, probably in early 2007, to entering into a deal to pay money to Shukri Ghanem's son.

Clauw further assisted in the acts by proposing that Nitrochem could, on behalf of Yara, advance the USD 1.5 million payment to Mohamed Ghanem and by contacting Nitrochem to ensure that this was done.

Enger and Holba participated in the negotiations with the NOC and signed, *inter alia*, a "Partnership Agreement" between Yara and the NOC in July 2008, knowing that an agreement had been made to pay bribes of which not all the instalments had been paid. The final agreement between Yara and the NOC was signed in February 2009.

**Count b)**
**Concerns defendants no. 1 Wallace, no. 2 Clauw, no. 3 Enger**
In the period from December 2006 to the spring of 2008, Yara International ASA (Yara) negotiated with Krishak Bharati Cooperative Limited (KRIBHCO) regarding cooperation (a joint venture) within the fertiliser sector in India. The Government of India held 67 % of the shares in KRIBHCO, with the administrative responsibility being allocated to the Ministry of Chemicals & Fertilizers.

In April 2007, Wallace and Clauw, on behalf of Yara, offered to make a deal with Gurpreetesh Singh Maini, the son of Dr Jivtesh Singh Maini. Dr Jivtesh Singh Maini was at the time Additional Secretary and Financial Adviser in the Ministry of Chemicals & Fertilizers and a member of the board of KRIBHCO on behalf of the Ministry. The offer of an agreement with Gurpreetesh Singh Maini was made in connection with Dr Jivtesh Singh Maini's position.

The offer of an agreement ("Representative Engagement Letter") which was presented to Gurpreetesh Singh Maini entailed, *inter alia*, an offer to pay USD 250,000 as a one-off payment, and an offer to pay him, on certain conditions, USD 0.50 per metric ton on all fertilizer products sold by Yara in India. One of the conditions for the duration of the agreement was that an agreement between Yara and Kribhco would be reached. In a later draft agreement from Yara, the one-off payment offer was replaced by an amount of USD 3 million, to be paid in instalments of USD 1 million per year during the period 1 January 2007 - 31 December 2009.

On 16 October 2007, Yara paid an amount of USD 1 million on the basis of an invoice forwarded by Gurpreetesh Singh Maini from the Lebanese company CYC s.a.r.l. On Gurpreetesh Singh Maini's request, the amount was instead transferred from Yara to an account in Hong Kong belonging to the company Krystal Holdings & Investments Limited (British Virgin Islands), a company registered in the names of the spouses of Jivtesh Singh Maini and Gurpreetesh Singh Maini.

Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris
Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com

Both the offer of an agreement and the payment constituted an improper advantage.

Enger assisted by consenting to the negotiations with Gurpreetesh Singh Maini and by approving the payment of USD 1 million.

(\* Amended by the prosecutor in the course of the appeal hearing; see the Criminal Procedure Act, section 254 third subsection, 23.08.2016 Marianne Djupesland.)

Oslo District Court delivered a judgment on 07 July 2015 with the following conclusion:

1.  Thorleif Enger, born 31.10.1943, is convicted of violation of the Penal Code section 276a, cf. section 276b, to 3 – three – years of imprisonment, cf. the Penal Code section 62. From the sentence there shall be a deduction of 3 – three – days for time spent in custody.

2.  Kendrick Taylor Wallace, born 03.08.1945, is convicted of violation of the Penal Code section 276a, cf. section 276b, to 2 – two – years and 6 – six – months of imprisonment, cf. the Penal Code section 62. From the sentence there shall be a deduction of 3 – three – days for time spent in custody.

3.  Tor Holba, born 17.03.1956, is convicted of violation of the Penal Code section 276a, cf. section 276b, to 2 – two – years of imprisonment. From the sentence there shall be a deduction of 3 – three – days for time spent in custody.

4.  Daniel Clauw, born 27.02.1950, is acquitted of count a) of the indictment.

5.  Daniel Clauw, born 27.02.1950, is convicted of violation of the Penal Code section 276a, cf. section 276b, to 2 – two – years of imprisonment. From the sentence there shall be a deduction of 3 – three – days for time spent in custody.

Kendrick Taylor Wallace, Daniel Clauw, Thorleif Enger, Tor Holba and the prosecuting authority represented by Økokrim have appealed the judgment to Borgarting Court of Appeal.

The appeal by Thorleif Enger concerns the assessment of evidence in relation to the issue of guilt, the application of the law and the sentence imposed.

The appeal by Kendrick T. Wallace concerns the assessment of evidence in relation to the issue of guilt and the application of the law.

The appeal by Daniel Clauw concerns the assessment of evidence in relation to the issue of guilt, the application of the law and the sentence imposed.

The appeal by Tor Holba concerns the assessment of evidence in relation to the issue of guilt under count a) of the indictment.

The appeal by the prosecuting authority concerns the assessment of evidence in relation to the issue of guilt under count a) of the indictment for Daniel Clauw, and the sentences imposed with regard to all of the defendants.

*Translated by John Richard Stokbak Sciaba, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

EXT- WALLACE-00223

*Translation from Norwegian*

The appeal hearing took place during the period 23 August - 2 December 2016 at the premises of Borgarting Court of Appeal. All defendants and 28 witnesses testified. Such additional evidence was presented as appears in the court record.

During the appeal hearing the Court of Appeal sat with a jury pursuant to section 352 of the Criminal Procedure Act. In agreement with the indictment, the jury was presented with 7 primary questions and 7 additional questions. The questions were of the following wording:

**As regards defendant no. 1, Wallace:**

**Question 1 – primary question (count a) of the indictment)**
(An answer in the affirmative to this question requires more than 6 votes.)

Is Kendrick T. Wallace guilty of having offered or given someone an improper advantage in connection with a position or office, or of complicity therein?

Basis:
In 2006-2007, while Yara International ASA (Yara) was negotiating with the Libyan company National Oil Company (NOC) for a cooperation project in Libya, he offered and/or gave Shukri Ghanem an improper advantage by entering into an agreement with his son Mohammed Ghanem, to pay the son or the son's company a total of USD 4.5 million in future instalments, and by complicity in the payment of USD 1.5 million. The improper advantage was offered and/or given in connection with Shukri Ghanem's position as chairman of the NOC.

**Question 2 – additional question (count a) of the indictment)**
(This question is only to be answered if question 1 has been answered in the affirmative. An answer in the affirmative to this question requires more than 6 votes.)

Is the violation in question 1 to be considered an aggravated one?

**Question 3 – primary question (count b) of the indictment)**
(An answer in the affirmative to this question requires more than 6 votes.)

Is Kendrick T. Wallace guilty of complicity in offering or giving someone an improper advantage in connection with a position or office?

Basis:
In 2006-2007, while Yara International ASA (Yara) was negotiating a cooperation agreement with the Indian cooperative KRIBHCO, he was complicit in offering and/or giving Jivtesh Maini an improper advantage by being complicit in the entry into an agreement with his son Gurpreteesh Maini to pay a total of USD 3 million in future instalments to the son or a company designated by the son, and/or was complicit in the payment of USD 1 million. The improper advantage was offered and/or given in connection with Jivtesh Maini's position at the Indian Ministry of Chemicals and Fertilizers and/or his position as a KRIBHCO board member.

15-138815AST-BORG/01

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

EXT- WALLACE-00224

*Translation from Norwegian*

### Question 4 – additional question (count b) of the indictment)
(This question is only to be answered if question 3 has been answered in the affirmative. An answer in the affirmative to this question requires more than 6 votes.)

Is the violation in question 3 to be considered an aggravated one?

**As regards defendant no. 2, Clauw:**

### Question 1 – primary question (count a) of the indictment)
(An answer in the affirmative to this question requires more than 6 votes.)

Is Daniel Clauw guilty of complicity in offering or giving someone an improper advantage in connection with a position or office?

Basis:
In 2006-2007, while Yara International ASA (Yara) was negotiating with the Libyan company National Oil Company (NOC) for a joint venture project in Libya, he was complicit in offering and/or giving Shukri Ghanem an improper advantage by being complicit in the entry into an agreement with his son Mohammed Ghanem to pay the son or the son's company a total of USD 4.5 million in future instalments, and/or by being complicit in the payment of USD 1.5 million. The improper advantage was offered and/or given in connection with Shukri Ghanem's position as chairman of the NOC.

### Question 2 – additional question (count a) of the indictment)
(This question is only to be answered if question 1 has been answered in the affirmative. An answer in the affirmative to this question requires more than 6 votes.)

Is the violation in question 1 to be considered an aggravated one?

### Question 3 – primary question (count b) of the indictment)
(An answer in the affirmative to this question requires more than 6 votes.)

Is Daniel Clauw guilty of complicity in offering or giving someone an improper advantage in connection with a position or office?

Basis:
In 2006-2007, while Yara International ASA (Yara) was negotiating a cooperation agreement with the Indian cooperative KRIBHCO, he was complicit in offering and/or giving Jivtesh Maini an improper advantage by being complicit in the entry into an agreement with his son Gurpreteesh Maini to pay a total of USD 3 million in future instalments to the son or a company designated by the son, and/or was complicit in the payment of USD 1 million. The improper advantage was offered and/or given in connection with Jivtesh Maini's position in the Indian Ministry of Chemicals and Fertilizers and/or his position as a KRIBHCO board member.

15-138815AST-BORG/01

*Translated by John Richard Stokbak Sciaba, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

EXT- WALLACE-00225

*Translation from Norwegian*

**Question 4 – additional question (count b) of the indictment)**
(This question is only to be answered if question 3 has been answered in the affirmative. An answer in the affirmative to this question requires more than 6 votes.)

Is the violation in question 3 to be considered an aggravated one?

**As regards defendant no. 3, Enger:**

**Question 1 – primary question (count a) of the indictment)**
(An answer in the affirmative to this question requires more than 6 votes.)

Is Thorleif Enger guilty of complicity in offering or giving someone an improper advantage in connection with a position or office?

Basis:
In 2006-2007, while Yara International ASA (Yara) was negotiating with the Libyan company National Oil Company (NOC) for a joint venture project in Libya, he was complicit in offering and/or giving Shukri Ghanem an improper advantage by being complicit in the entry into an agreement with his son Mohammed Ghanem to pay the son or the son's company a total of USD 4.5 million in future instalments, and/or by being complicit in the payment of USD 1.5 million. The improper advantage was offered and/or given in connection with Shukri Ghanem's position as chairman of the NOC.

The complicity consisted in Enger, as CEO of Yara, granting his consent to the agreement being entered into with Mohammed Ghanem and/or his failure to intervene against the agreement and/or the part payment.

**Question 2 – additional question (count a) of the indictment)**
(This question is only to be answered if question 1 has been answered in the affirmative. An answer in the affirmative to this question requires more than 6 votes.)

Is the violation in question 1 to be considered an aggravated one?

**Question 3 – primary question (count b) of the indictment)**
(An answer in the affirmative to this question requires more than 6 votes.)

Is Thorleif Enger guilty of complicity in offering or giving someone an improper advantage in connection with a position or office?

Basis:
In 2006-2007, while Yara International ASA (Yara) was negotiating a cooperation agreement with the Indian cooperative KRIBHCO, he was complicit in offering and/or giving Jivtesh Maini an improper advantage by being complicit in the entry into an agreement with the son Gurpreteesh Maini to pay a total of USD 3 million in future instalments to the son or a company designated by the son, and/or was complicit in the payment of USD 1 million. The improper advantage was offered and/or given in connection with Jivtesh Maini's position at the Indian Ministry of Chemicals and Fertilizers and/or his position as a KRIBHCO board member.

15-138815AST-BORG/01

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

EXT- WALLACE-00226

*Translation from Norwegian*

### Question 4 – additional question (count b) of the indictment)
(This question is only to be answered if question 3 has been answered in the affirmative. An answer in the affirmative to this question requires more than 6 votes.)

Is the violation in question 3 to be considered an aggravated one?

**As regards defendant no. 4, Holba:**

### Question 1 – primary question (count a) of the indictment)
(An answer in the affirmative to this question requires more than 6 votes.)

Is Tor Holba guilty of complicity in offering or giving someone an improper advantage in connection with a position or office?

Basis:
In 2006-2007, while Yara International ASA (Yara) was negotiating with the Libyan company National Oil Company (NOC) for a joint venture project in Libya, he was complicit in offering and/or giving Shukri Ghanem an improper advantage by being complicit in the entry into an agreement with his son Mohammed Ghanem to pay the son or the son's company a total of USD 4.5 million in future instalments, and/or by being complicit in the payment of USD 1.5 million. The improper advantage was offered and/or given in connection with Shukri Ghanem's position as chairman of the NOC.

The complicity consisted in Holba, as project owner and member of Yara's corporate management, granting his consent to the agreement being entered into with Mohammed Ghanem and/or his failure to intervene against the agreement and/or the part payment.

### Question 2 – additional question (count a) of the indictment)
(This question is only to be answered if question 1 has been answered in the affirmative. An answer in the affirmative to this question requires more than 6 votes.)

Is the violation in question 1 to be considered an aggravated one?

The jury answered in the affirmative all questions concerning Kendrick T. Wallace. The jury answered in the negative both primary questions concerning Daniel Clauw and Thorleif Enger, and it answered in the negative the primary question concerning Tor Holba.

The jury's verdict is accepted as the basis for the judgment; see the Criminal Procedure Act, section 40 first subsection.

Following its closing argument on the assessment of the sentence, the prosecuting authority submitted the following demand for judgment:

Kendrick Taylor Wallace, born 03 August 1945, is to be sentenced to 7 - seven - years of imprisonment, with a deduction of 3 - three - days for time spent in custody.

15-138815AST-BORG/01

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

EXT- WALLACE-00227

*Translation from Norwegian*

The defence counsel of Ken Wallace submitted the following <u>demand for judgment</u>:

Kendrick Taylor Wallace is to be treated as leniently as possible.

### The Court of Appeal notes:

### Daniel Clauw — acquittal

The jury has answered in the negative both primary questions concerning Daniel Clauw. The jury's verdict is accepted as the basis for the judgment and as a consequence a judgment of acquittal is pronounced in accordance with section 376 of the Criminal Procedure Act.

### Thorleif Enger — acquittal

The jury has answered in the negative both primary questions concerning Thorleif Enger. The jury's verdict is accepted as the basis for the judgment and as a consequence a judgment of acquittal is pronounced in accordance with section 376 of the Criminal Procedure Act.

### Tor Holba — acquittal

The jury has answered in the negative the primary question concerning Tor Holba. The jury's verdict is accepted as the basis for the judgment and as a consequence a judgment of acquittal is pronounced in accordance with section 376 of the Criminal Procedure Act.

### Kendrick T. Wallace - assessment of the sentence

<u>Introduction</u>

Following the jury's answers in the affirmative to question 1 (primary question) and question 2 (additional question) concerning Ken Wallace, for the purpose of the assessment of the sentence it is considered a fact that Wallace, by entering into the agreement with Mohamed Ghanem for the payment of a total of USD 4.5 million in future instalments, in reality offered the father, Shukri Ghanem, an improper advantage in connection with the father's office as chairman of the NOC. In the same way, the payment of USD 1.5 million represented an improper advantage to Shukri Ghanem in connection with that same office. The corruption was gross.

Following the jury's answers in the affirmative to question 3 (primary question) and question 4 (additional question), it is furthermore considered a fact that Ken Wallace, by being complicit in the entry into an agreement with Gurpreteesh Maini for the payment of a total of USD 3 million in future instalments, in reality offered the father, Jivtesh Maini, an improper advantage in connection with the father's position as Additional Secretary and Financial Advisor at the Indian Ministry of Chemicals and Fertilizers and his office as a member of the board of Kribhco.

- 9 -

15-138815AST-BORG/01

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

*Translation from Norwegian*

In the same way, the payment of USD 1 million represented an improper advantage to Jivtesh Maini in connection with his position and office. This too was an instance of gross corruption.

Below, the Court of Appeal shall first provide a further presentation of the factual basis on which the assessment of the sentence for Ken Wallace relies. The Court notes that the assessment of evidence in relation to the issue of sentencing is subject to the same strict evidentiary requirements as the assessment of evidence in relation to the issue of guilt. Next, the Court shall proceed to present the concrete assessment of relevant elements for the determination of the sentence.

General remarks – Yara International ASA and the defendants' roles in the company

In March 2004, the fertiliser business of Norsk Hydro ASA (Hydro) was spun off as a separate company through a demerger. The new company, Yara International ASA (Yara), was listed on the stock exchange in connection with the spin-off. Yara was the world's largest producer of mineral fertiliser already at its inception.

Thorleif Enger was hired as Yara's first CEO. Both Ken Wallace, Daniel Clauw and Tor Holba got positions within the company's corporate management. Clauw was chief operating officer, Holba was in charge of downstream activities, while Wallace was chief legal officer. Following a reorganisation in the summer of 2006, Tor Holba became head of Yara's upstream activities, while Daniel Clauw left the position as chief operating officer and took up a position as an advisor with a special responsibility for Yara's growth strategy ("special growth initiatives"). Following this, Clauw was no longer part of the corporate management and he left Yara in the summer of 2007. Kendrick Wallace remained the company's chief legal officer until he retired in the summer of 2008. Thorleif Enger retired and left Yara on 1 October 2008.

Yara continued and further developed the operational routines for the fertiliser business that had been built up within Hydro. Amongst other things, Hydro's ethics framework was used as a starting point when Yara prepared its own ethical guidelines. It was the chief legal officer Ken Wallace who had technical responsibility for Yara's ethical guidelines and rules of good business practices, and it was Wallace who presented the new guidelines to the company's employees in November 2005.

Yara had a clear growth strategy. In the course of the first years after the demerger the company expanded its activities significantly, also through several international acquisitions. The company's new projects were located in Russia, Australia and Brazil, amongst other places. Another project was located in Qatar, where Yara was involved in the production of ammonia and urea through a significant equity share in the company Qafco. It is also noted that Yara in 2007 acquired the Finnish fertiliser producer Kemira GrowHow Oyj. In the period from 2004 to 2008, Yara's turnover and net result more than doubled. The company's market capitalisation increased substantially during the same period.

---

15-138815AST-BORG/01

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

EXT- WALLACE-00229

*Translation from Norwegian*

Facts - count a) of the indictment, Libya

*The negotiations between Yara and the National Oil Company*

As a consequence of the suspicion of participation in acts of terrorism, Libya was for many years - until the first years of the new millennium - subject to extensive political and economic sanctions. When international sanctions were gradually lifted there was an increase in the interest among international companies for establishing themselves in the country. The contact between Yara and the state-owned Libyan oil company National Oil Company (NOC) was established as early as in 2002, prior to Yara being spun off from Hydro. To Yara, the access to Libyan gas reserves was interesting with a view to developing new business, while on the Libyan side there was a great need for foreign investors in connection with the upgrading of older industrial plants - for instance the urea plant at Marsa El Brega.

Yara and NOC discussed the possibility of splitting off the part of the Marsa El Brega plant that was used for producing fertiliser and placing it under a new company. The plan was a so-called joint venture where the new company was to be jointly owned by NOC and Yara. Yara was the Libyans' preferred cooperation partner and the Norwegian company could primarily contribute the necessary technical and commercial competence to the joint venture. Moreover, Yara's international distribution system would ensure the joint venture efficient access to world markets.

Yara and NOC had several meetings during the period until a Memorandum of Understanding (MoU) was signed in April 2004. Yara performed an inspection of the plants at Marsa El Brega in June 2004, and shortly afterwards the company presented a business proposal to the NOC. In October of that year, representatives of the NOC and Yara met to discuss the establishment of a joint venture, and in a meeting in January 2005, the NOC accepted that Yara was to have a 50 % ownership share of the joint venture and that this share would increase at a later stage.

After Shukri Mohammed Ghanem [*sic*] resigned as prime minister of Libya in March 2006, he assumed the office of chairman of the NOC. At the time, the NOC undoubtedly functioned as Libya's oil and energy ministry. Reference is made to, *inter alia*, the witness testimony of Omar Gazal, who explained that Libya's then leader Muammar al-Gaddafi had "cancelled" the Ministry of Oil and Energy and that as a consequence, the NOC reported directly to the prime minister.

The negotiations between Yara and the NOC continued. It is an uncontested fact in the case that the discussions on contractual terms and conditions for the joint venture developed unilaterally in favour of the NOC. In August 2005, the offer from the Norwegian side was based on Yara paying USD 65 million for 50% of the joint venture and the gas price being set to USD 1/mmbtu. In January 2007, the conditions for the offer were that Yara was to pay USD 225 million and that the gas price was to be minimum USD 1.30/mmbtu.

*Translated by John Richard Stokkak Sciabà. Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*



*Translation from Norwegian*

An agreement in principle, "Heads of Agreement" (HoA), between the NOC and Yara was signed on 25 April 2007. Following additional negotiations, the parties signed a "Joint Venture Framework Agreement" in February 2008. The so-called "Partnership Agreement" was signed on 17 July 2008, while the final contractual framework between the parties was signed on 9 February 2009. The cooperation then proceeded to an operational phase in the joint venture Libyan Norwegian Fertiliser Company.

*The agreement with Mohamed Ghanem*

Towards the end of 2006, in parallel with the negotiations on a joint venture between Yara and the NOC, Mohamed Ghanem, the son of NOC's chairman Shukri Ghanem, was introduced to Yara. It was Zafer Nahawi, Yara's representative in the Middle East, who made the introduction. Ken Wallace has explained that the first time he got to hear about Mohamed Ghanem was during a meeting with Nahawi in Paris on 02 December 2006, and the Court relies on this as a fact.

Ken Wallace then met Mohamed Ghanem in Bahrain in January 2007. It is uncontested that the two of them discussed the possibilities of engaging Mohamed Ghanem in connection with the ongoing negotiations between Yara and the NOC. Wallace kept in contact and followed up the discussions with Mohamed Ghanem, including by preparing a draft consultancy agreement between Yara and the company Saudi Logistics and Technical Support (SALTS). It was Mohamed Ghanem who had suggested SALTS as the one taking on the assignment for Yara. The draft agreement regulated which services should be delivered by Mohamed Ghanem/SALTS and the compensation to be paid for them. On 12 March 2007, Ken Wallace and Mohamed Ghanem met again, this time in London, to agree on the final terms and conditions of the agreement.

The written draft agreement that existed when they met in London was not signed. Instead, Wallace decided the agreement with Mohamed Ghanem was to be entered into orally. The oral agreement entered into in London was essentially of the same content as the last written draft for an agreement with SALTS, as explained by Wallace in court. The agreement presupposed the payment of a total of USD 4.5 million in future instalments.

Shortly thereafter, on 29 March 2007, Ken Wallace procured the transfer of USD 1.5 million to Mohamed Ghanem's company Golden Petal Ltd. Golden Petal Ltd. is registered on the British Virgin Islands. The payment was effected by the Swiss company Nitrochem SA, which transferred the money to Golden Petal's account with the UBS bank in Switzerland.

It is not contested that it was Ken Wallace who took the initiative to transferring the amount of USD 1.5 million to Mohamed Ghanem through a Swiss company. Nor is it contested that the payment was done in this way in order to conceal it. Wallace contacted Daniel Clauw and asked for his help to carry out a confidential payment in Switzerland.

15-138815AST-BORG/01

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

EXT- WALLACE-00231

*Translation from Norwegian*

Clauw then directed a request to Andreas Zivy, a Swiss business connection who was the chairman of the company Ameropa - which in turn owned Nitrochem. Zivy said he was willing to assist Yara with the payment.

Nitrochem carried out the money transfer after having received further instructions as to the amount, recipient and account details. The amount paid by Nitrochem was later reimbursed by Yara Switzerland. The reimbursement was done by over-invoicing several shiploads of ammonia delivered by Nitrochem to the company Balderton Fertilisers SA (Balderton). Yara owned half of Balderton. Next, ammonia supplies from Balderton were over-invoiced in the same way upon delivery to Yara Switzerland. The repayment to Nitrochem took place over a period in excess of 6 months, from October 2007 to May 2008.

No proof has been provided that it was Ken Wallace who planned how Nitrochem was to be reimbursed for its disbursement of USD 1.5 million, nor whether Wallace was familiar with the details of the repayment scheme. In any case, it is of no significance for the assessment of the sentence.

In the late summer of 2008, Mohamed Ghanem contacted Ken Wallace, demanding additional payment in line with the oral agreement that had been entered into. Wallace, who at this point had retired and no longer worked for Yara, raised the payment issue with Tor Holba. It remains unclear what happened next internally within Yara, who were notified and of what were they notified. In the opinion of the Court of Appeal, the details of the further course of events are of no significance for the assessment of the sentence in the case against Wallace. Therefore, the Court limits itself to noting that the claim from Mohamed Ghanem was rejected and no more money was paid by Yara to him or his company.

Facts - count b) of the indictment, India

*The negotiations between Yara and Krishak Bharati Cooperative*

Indian agriculture has for many years had an accelerating consumption of urea, a fertiliser product that over time depletes the soil. India is among the world's largest fertiliser markets, and the increasing need for a change in the fertiliser regime gave Yara a beneficial starting point with a view to business development in the country. As a consequence, the company considered strengthening its efforts in India through the production and sale of balanced fertilisers, so-called NPK fertilisers, to Indian farmers.

In late 2006, Daniel Clauw was introduced to Gurpreteesh Maini by a business connection by the name of Ely Calil. Calil knew Gurpreteesh Maini's father, Jivtesh Maini, who was "Additional Secretary and Financial Advisor" at the Indian Ministry of Chemicals and Fertilizers. Moreover, Jivtesh Maini was a member of the board of the Krishak Bharati Cooperative Limited (Kribhco), in which the Indian State had an ownership share.

15-138815AST-BORG/01

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

EXT- WALLACE-00232

*Translation from Norwegian*

After the meeting with Gurpreteesh Maini, Kribhco was contacted with a view to possible cooperation with Yara. The first meeting between Yara and Kribhco took place in India in mid-December 2006. Yara's participants were Daniel Clauw, who headed the Kribhco project on the part of Yara, and Ken Wallace, who became involved in the project at an early stage together with Clauw. On this first trip to India, Clauw and Wallace also met with Jivtesh Maini, who represented the Ministry of Chemicals and Fertilizers. The negotiations with Kribhco quickly led to an agreement to continue conversations in order to arrive at a binding agreement on long-term cooperation.

Daniel Clauw followed up on the contact with Kribhco and a new meeting took place in India in late February 2007, in which Clauw and Wallace participated on the part of Yara. Wallace then prepared a proposal for an agreement in principle (Heads of Agreement) reflecting the parties' thoughts on the future cooperation. One amongst several goals was to upgrade mothballed fertiliser plants to use them for the production of NPK. The parties also had the intention of creating start-ups in countries outside of India, where the necessary gas resources were more readily available.

The parties signed the Heads of Agreement on 13 April 2007, but already a couple of months later Yara slowed the pace of the Kribhco project. After putting further negotiations on hold throughout the summer, Yara agreed in October 2007 that the agreement with Kribhco was to be extended by one year. However, Yara's interest in the cooperation with Kribhco continued to wane and the Kribhco project was terminated in the summer of 2008.

*The agreement with Gurpreteesh Maini*

In parallel with Yara's early discussions with Kribhco, Daniel Clauw and Ken Wallace initiated a dialogue on using Gurpreteesh Maini as an advisor in the further process. The proposal to hire him was originally presented by Ely Calil. Despite the fact that Gurpreteesh Maini had neither competence nor experience from the fertiliser industry, Yara initiated negotiations regarding an engagement.

Ken Wallace and Gurpreteesh Maini's lawyer exchanged several draft engagement agreements in the course of the spring of 2007. When Gurpreteesh Maini finally accepted the terms and conditions in June 2007, Yara undertook to pay USD 1 million annually for three years to Gurpreteesh Maini's company. The term of the agreement was from 01 January 2007 to 31 December 2009. There was a separate provision stating that Yara was to pay USD 750 000, the bulk of the remuneration for the first year of the agreement, within 01 July 2007.

The engagement agreement also stated that Gurpreteesh Maini's company was to be Yara's representative and strategic advisor, both in the discussions with Kribhco and in any other projects that might be initiated during the term of the engagement. According to its wording, the assignment also included assistance in locating new business opportunities, business-related advice, coordination of contact with the authorities and practical facilitation of Yara's commercial activities in India.

15-138815AST-BORG/01

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris
Tel. (+47) 917.22.768 · E-mail: richard.sciaba@gmail.com*

EXT- WALLACE-00233

*Translation from Norwegian*

Yara did not pay USD 750 000 within 1 July 2007 as agreed. The parties agreed that the new time limit for payment was to be 1 September 2007 and that Yara then would pay USD 1 million. Yara did not pay within that new time limit either. Gurpreteesh Maini gave Daniel Clauw a reminder of the payment. Even though Clauw at that point had left Yara, he contacted Wallace by email to make sure that Gurpreteesh Maini received payment. While these discussions concerning payment were taking place, Yara - in an email to Ken Wallace on 17 August 2007 - received information from Gurpreteesh Maini that his father had changed jobs and no longer worked at the Ministry of Chemicals and Fertilizers.

On 18 September, Thorleif Enger told Ken Wallace to terminate the contractual relationship with Gurpreteesh Maini. Wallace contacted Gurpreteesh Maini, who the next day confirmed that he accepted a compensation of USD 1 million as a final settlement for his assistance. On 16 October 2007, this amount was transferred from Yara to an account belonging to Krystal Holdings & Investments Limited with the Standard Chartered Bank in Hong Kong. The company Krystal Holding & Investment Ltd is registered on the British Virgin Islands and is owned by The Meher Trust. The beneficiaries of the trust are Gurpreteesh Maini's wife and mother.

Determination of the sentence

By way of introduction, the Court notes that the Penal Code 2005 does not lead to a more beneficial result for Ken Wallace than the old Penal Code. The corruption provisions of the Penal Code 2005, sections 387 and 388, have the same penalty range as the Penal Code 1902, sections 276a and 276b, and its follows from the special travaux préparatoires of sections 387 and 388 in the proposition to the Odelsting No. 22 (2008-2009) that the intention was to leave the legal state unchanged. As a consequence, the determination of the sentence is to be done pursuant to the provisions of the Penal Code 1902, see also the Penal Code 2005, section 3 first subsection.

The jury has found Ken Wallace guilty of two counts of gross corruption or complicity in gross corruption. In the one instance, Yara paid a bribe of USD 1.5 million, while in the second instance USD 1 million was paid. In both instances, the payments represented a third of the total amount that had been agreed to be paid.

The Court of Appeal considers it a fact that the purpose of offering and paying bribes to Shukri Ghanem in Libya was to secure the chairman's good will and thus also a better position for Yara in the ongoing negotiations with the NOC. The bribe does not come across as valuable consideration in return for specific acts or omissions on the part of Shukri Ghanem; instead, it shows signs of pure greasing. Even though Shukri Ghanem was not himself directly involved in the negotiations, he was a central provider of input with a view to the possibilities of the cooperation between Yara and the NOC becoming a reality.

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

EXT- WALLACE-00234



In connection with this, reference is made to, *inter alia*, the witness Omar Gazal. Gazal explained that he – as head of the negotiating team on the Libyan side – continuously reported to Shukri Ghanem, and that it was Shukri Ghanem who decided what, if anything, was to be taken further and presented to the full board of the NOC, and then to the Prime Minister.

Similarly, the Court of Appeal considers it a fact that the purpose of offering and paying bribes to Jivtesh Maini in India was to secure his good will and thus also a better position for Yara in the ongoing negotiations with Kribhco. Also this bribe bears the signs of greasing. Even though Jivtesh Maini was not himself directly involved in the negotiations, his positions both at the Ministry and on the board of Kribhco were very central with a view to the possibilities of implementing a corporation between Yara and Kribhco. Reference is made, *inter alia*, to the witnesses C. P. Singh and B. D. Sinha, who testified about Jivtesh Maini's role at the Ministry and his position as a Kribhco board member. With regard to the position on the Kribhco board, the witness Sinha said for instance that as a point of departure, Jivtesh Maini was a board member on a par with other board members, but that the cooperative always paid particular attention to those board members who had been appointed by the Government.

When sections 276a, 276b and 276c of the Penal Code 1902 were adopted in 2003, it happened as part of the follow-up of Norway's international obligations to fight corruption crime. In the travaux préparatoires of the Penal Code it is emphasized that Norwegian participation in international anticorruption efforts has high priority. Furthermore, it is stated that corruption is a threat to the state of law, democracy, human rights and social justice and that corruption may prevent economic development and distort competition; see Proposition to the Odelsting No 78 (2002-2003), item 2.1.1. In other words, strong reasons of general deterrence indicate that violations of the Penal Code's prohibition of corruption should be met with strict sanctions.

When the Penal Code was amended in 2003, the maximum sentence for gross corruption was increased to 10 years; see the Penal Code 1902 section 276b. In the travaux préparatoires it is stated that gross corruption may seem more punishable than most other kinds of crime against property and that in exceptional cases there may be reason to impose prison sentences of up to ten years for individual gross acts of corruption; see Proposition to the Odelsting No 78 (2002-2003), item 7.3.2. The Ministry did however state the following:

> The Ministry wants to emphasize that it is only in cases of corruption that are very serious and harmful to society that prison sentences of more than six years may be considered.

The Supreme Court has in several of its decisions after the amendment of the Penal Code, commented upon the question of whether the increase of the maximum sentence for gross corruption in 2003 entailed an increase in the general sentencing level for corruption compared to what had previously applied. In Rt. [*Rettstidende - Supreme Court Law Reports*] 2008 page 1473, the Supreme Court stated the following, among other things:

*Translated by John Richard Stokbak Sciaba, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

EXT- WALLACE-00235

*Translation from Norwegian*



It is however not possible to read into the preparatory works a clear signal that an increase of the general sentencing level for gross corruption was the purpose of the amendment of the Code, except for in the most serious cases. Even though an increase of the maximum sentence per se does not indicate a general increase of sentencing levels, the expansion of the sentencing span may however contribute towards greater leeway in the sentencing and thus to a stricter sentencing also in other cases than the most serious ones. Moreover, in my opinion, the preparatory works' emphasis on the punishability of corruption, together with the points of view that constituted the grounds for the two above-mentioned Supreme Court judgments, provide the basis for a certain increase in sentencing levels.

Consequently, for the purpose of determining the sentence in the current case the Court considers it a fact that the 2003 amendment entailed a certain increase in the general sentencing level for gross corruption.

As regards the sentencing level for gross corruption of the extent found in the case at hand, the Supreme Court's judgment in HR-2016-1834-A provides some guidance. In the case concerned, one of the defendants, holding the position of procurement manager with a bus company, had received bribes of about NOK 3 million from the bus manufacturer. Later, after having left the company and established his own business within the same industry, he had paid bribes of approximately NOK 350,000 to the then procurement manager of his former employer. The other defendant in the case had in his position as sales manager of the bus manufacturer's Norwegian subsidiary been complicit in the payment of bribes of about NOK 7.4 million. The Supreme Court stated the correct sentence for the first defendant to be 4 years and 6 months of imprisonment. As regards the sentence for the second defendant, the Supreme Court stated that the correct starting point would be approximately 5 years of imprisonment.

Another judgment by the Supreme Court that provides guidance to the sentencing level is to be found in Rt. 2012 page 243. One of the defendants in the case was a project manager at a municipal enterprise that owned, operated and maintained school buildings. He was convicted of gross corruption after having received a total of about NOK 1.5 million on four occasions as bribes from persons within businesses that performed assignments for the enterprise. The Supreme Court stated the correct sentence for the acts of corruption to be a prison sentence somewhat in excess of 3 years.

The third ruling the Court of Appeal wants to highlight is the judgment in Rt. 2008 page 1473. The main man in the said case had held leading positions in a real estate management company and later in a municipal enterprise responsible for the development, operation and management of school buildings. He was convicted of gross breach of trust with regard to a total amount of approximately NOK 100 million and of gross corruption with regard to a total amount of approximately NOK 6.6 million. The Supreme Court seconded the Court of Appeal's point of departure that the corruption, if considered in isolation, would have led to a sentence of 5 years and 6 months.

Ken Wallace has been found guilty of being complicit in the payment of bribes totalling about NOK 14.5 million - calculated on the basis of the USD exchange rates on the respective dates of payment. The scope of the total bribes that Wallace offered or was complicit in offering was however significantly higher.

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

EXT- WALLACE-00236



Calculated at the exchange rate at the payment of the first instalment under each of the agreements, the agreement under count a) had an overall value of approximately NOK 27 million, while the agreement under count b) had an overall value of approximately NOK 16.5 million.

The economic scope of the corruption is a most central element when assessing the sentence. Compared to [the Supreme Court judgment] HR-2016-1834-A, where one of the two defendants was complicit in the payment of bribes totalling about NOK 7.4 million, our case appears considerably more serious. The bribes paid out by Yara total an amount almost twice as large as the amount paid out in the Supreme Court judgment, where a prison sentence of about 5 years was taken as a starting point. It is difficult to determine on the basis of caselaw the exact sentencing level that would be the correct starting point in the case at hand - before considering the significance of the aggravating and mitigating circumstances that apply. The Court of Appeal does however consider the starting point to be between 6 and 7 years of imprisonment.

When assessing the sentence, it must be taken into consideration that Ken Wallace had a very central role in the acts of corruption. In the Libya matter, he was the one who established and followed up the direct contact with Mohamed Ghanem and the one who negotiated the further terms and conditions of the agreement with Ghanem. It was Wallace who took the decision that the agreement with Mohamed Ghanem was to be done orally and who took the initiative to making the payment of USD 1.5 million through a Swiss company - both done to keep the relationship with Mohamed Ghanem and his father hidden. Also as regards the India matter, Wallace was the operational actor on the part of Yara. It was Wallace who negotiated the terms and conditions of the agreement with Gurpreteesh Maini and made sure that the USD 1 million payment was made.

The corruption in both Libya and India comes across as being well-planned, which is aggravating. Reference is made to the fact that Wallace entered into agreements on consultancy assistance with two sons in order to actively hide the payment of bribes to their fathers. In the Libya matter he also took the decision to hide the transfer of money through an external foreign company - with the purpose of making it particularly difficult to trace the bribe back to Yara. Moreover, in both instances the acts took place over a considerable time period of several months.

Additionally, the fact that Ken Wallace was the chief legal officer and member of Yara's corporate management must be considered an aggravating circumstance. Wallace held the ultimate technical responsibility for Yara's ethical framework and the guidelines for good business practices. As the head of the company's anticorruption efforts it was also his responsibility to facilitate compliance with the rules by Yara's organisation, and both his competence and his role provided him with a particularly good foundation for preventing breaches of the anticorruption legislation. The circumstance that Wallace himself committed gross acts of corruption therefore also represents a significant breach of trust towards the company and its owners. His acts also lead to a loss of reputation for the company and they may well sow doubts about the value of Yara's anticorruption efforts.

15-138815AST-BORG/01

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish. Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

EXT- WALLACE-00237

*Translation from Norwegian*

Furthermore, for the purpose of the assessment of the sentence it is aggravating that in both Libya and India the corruption was committed vis-à-vis central public officials. Both Shukri Ghanem and Jivtesh Maini were important providers of input for decisions of significance for Yara's commercial activities in the respective countries. Shukri Ghanem in particular held a very prominent position, since the NOC managed enormous public assets in the shape of oil and gas deposits on behalf of the Libyan State.

The counsel for the defence has pointed out that Ken Wallace did not himself take the initiative to the acts of corruption and that he acted on the orders of somebody else within Yara. In the opinion of the defence counsel this must carry weight as a mitigating circumstance when the sentence is to be assessed.

There is nothing to suggest that Wallace on his own initiative decided to enter into agreements on the payment of bribes. The Court of Appeal presumes the initiative came from somebody else within the organisation, but the evidence in the case has not provided any answer as to who did so. The circumstance that the corruption was not Wallace's own idea can nevertheless not be of any considerable significance for the assessment of the sentence. Ken Wallace was no subordinate employee of Yara; he was the company's chief legal officer. Independently of who took the initiative to the bribes, Wallace could - with his professional authority and by virtue of his position in the corporate management - have refused to contribute to punishable acts, without risking any consequences for him. By way of comparison, reference is made to the fact that the indicted sales manager of the bus manufacturer's Norwegian subsidiary in Ø-2016-1834-A was described as altogether central in the acts of corruption - but nonetheless described as "a small pawn in a large corrupt system". Wallace was no such small pawn.

In all of the three above-mentioned corruption judgments pronounced by the Supreme Court, when determining the sentence it was considered an aggravating circumstance that the punishable acts produced personal economic gain for the defendants. In the case at hand, the corruption has not produced any kind of personal economic gain or other advantages for Ken Wallace, and there is nothing to indicate that personal economic gain has been an objective in any way. This absence of a not insignificant aggravating circumstance in our case compared to central cases in previous caselaw must be taken into consideration when determining the sentence for Wallace.

The defence counsel has made reference to the fact that corruption in the public sector has been made a crime out of concern for, *inter alia*, the general public's trust in public undertakings. Such trust is a prerequisite for a stable democracy. According to the defence counsel, neither Libya nor India bears the hallmarks of a stable democracy, and one cannot say that acts of corruption committed in those states contribute to weakening a well-functioning public administration. As a consequence, it is argued to be a mitigating circumstance for the purpose of the assessment of the sentence that the corruption was committed in countries with a different public management practice and business ethics than in Norway.

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

EXT- WALLACE-00238

In support of his submission, the defence counsel has made reference to, *inter alia*, the comments in the travaux préparatoires on the assessment of improperness under section 276a of the Penal Code 1902. In the Proposition to the Odelsting No. 78 (2002-2003) page 56, the Ministry stated the following:

> There may be great differences from one country to another in terms of business morals, public administration usages and custom. In the opinion of the Ministry, the assessment of impropriety cannot remain uninfluenced by the circumstances in another country where the bribe is received or performed, or where the passive briber ordinarily operates. For instance, it is not uncommon that public servants in some countries refuse to do their job unless they receive money for doing so. Such payments are often referred to as "facilitation payments" and may be unlawful under the draft provision, but only if the advantage offered or given to the foreign public servant is an improper one. Some of these payments cannot be characterised as improper. The one who finds himself forced to pay a foreign public servant a minor amount to have his passport returned or to be allowed to leave the country, can therefore not be punished pursuant to the draft provision. (...)

The Court of Appeal notes that this statement in the travaux préparatoires concerns so-called "facilitation payments" in relation to the assessment of the corruption provision's improperness criterion. What is described in the quotation is, firstly, payments to public servants at a completely different scale - and in completely different situations - than what our case is concerned with. Secondly, the above-mentioned remarks about the objective requirements for the applicability of the corruption provision do not necessarily have any transfer value to the question of what punishment is the correct one when the question of guilt is already decided.

The circumstance that the corruption was committed in countries that do not have an equally well-functioning public administration as the Norwegian one and which by experience is more prone to corruption, cannot in the opinion of the Court of Appeal be a mitigating circumstance for the assessment of the sentence. As mentioned above, the amendments in 2003 to the Penal Code were adopted to follow up on convention obligations to combat this kind of crime. Corruption often takes place across national borders; as a consequence, the travaux préparatoires emphasise the importance of countering such punishable acts through concerted international action. The purpose of the amendment of the Penal Code thus strongly suggests that the sentencing level for corruption committed abroad as a general rule should be the same as for corruption committed in Norway. Neither the caselaw of the Supreme Court nor other relevant sources of law provide any basis for anything but a uniform sentencing practice, independently of where the punishable act has been committed.

More than 9 years have passed since the punishable acts were committed. The investigation started in 2011 and the indictment was issued in January 2014. Even though the case has dragged on, there is no basis for attaching importance to the time passed as a mitigating circumstance when assessing the sentence; see the statements of the Supreme Court in Rt. 2012 page 243, paragraph 50. Reference is made to the fact that the investigation has been extensive with many parties involved, and the case has affected several countries. There has not been any case delay due to pure inaction in the course of the case processing.

EXT- WALLACE-00239

*Translation from Norwegian*

Upon an overall assessment, the Court of Appeal has concluded that the sentence for Ken Wallace is to be set to 7 years of imprisonment. The Penal Code 1902 section 62 is applicable. From this sentence there shall be a deduction of 3 days for time spent in custody.

The judgment is unanimous.



15-138815AST-BORG/01

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

EXT- WALLACE-00240

*Translation from Norwegian*

## CONCLUSION OF JUDGMENT:

1. Kendrick Taylor Wallace, born 03 August 1945, is convicted of violation of the Penal Code 1902 section 276a, see section 276b, see the Penal Code section 62, to a punishment of 7 – seven – years of imprisonment.

From the sentence there shall be a deduction of 3 – three – days for time spent in custody.

2. Daniel Clauw, born 27 February 1950, is acquitted.

3. Thorleif Enger, born 31 October 1943, is acquitted.

4. Tor Holba, born 17 March 1956, is acquitted.


Mette Jenssen              Dag A. Minsaas                     Egil F. Jensen


Kjersti Olsen                                          Maria Astrup Hjort


Jan Sverre Reidar Petterson                    Kai Fred Nærby Thune

Document in agreement with signed original.
Hans Kåre Hauan, signed electronically.

15-138815AST-BORG/01

*Translated by John Richard Stokbak Sciabà, Government Authorized Translator English – Norwegian - Spanish, Candidatus Juris*
*Tel. (+47) 917.22.768 • E-mail: richard.sciaba@gmail.com*

EXT- WALLACE-00241



# NORGES HØYESTERETT

Den 15. september 2017 avsa Høyesterett dom i

**HR-2017-1776-A, (sak nr. 2017/674), straffesak, anke over dom,**

Kendrick Taylor Wallace              (advokat Arild Dyngeland)

mot

Den offentlige påtalemyndighet        (statsadvokat Helene Bærug Hansen)

## S T E M M E G I V N I N G :

1) Dommer **Arntzen:** Saken gjelder straffutmåling ved domfellelse for to tilfeller av grov korrupsjon begått i utlandet.

2) I mars 2004 ble gjødselvirksomheten i Norsk Hydro ASA skilt ut som et eget selskap. Det nye selskapet, Yara International ASA (Yara), har hovedkontor i Oslo. Selskapet er notert på Oslo børs, og den norske stat eier 36,2 prosent av aksjene.

3) Kendrick Taylor Wallace var juridiske direktør i Yara fra oppstart og frem til han gikk av med pensjon sommeren 2008.

4) Den 15. januar 2014 ble Wallace og tre andre i konsernets ledelse satt under tiltale av Økokrim for to tilfeller av aktiv grov korrupsjon, jf. straffeloven 1902 § 276a, jf. § 276b. Det ene forholdet gjaldt tilbud om 4,5 millioner USD til en offentlig tjenestemann i Libya, mens det andre forholdet gjaldt tilbud om 3 millioner USD til en offentlig tjenestemann i India.

5) Oslo tingrett avsa dom 7. juli 2015. Wallace ble dømt i samsvar med tiltalen til fengsel i to år og seks måneder.

6) Også de øvrige tiltalte ble dømt – den ene til fengsel i tre år og de to andre til fengsel i to år.

**TRUE COPY**

7) Både de domfelte og påtalemyndigheten anket til Borgarting lagmannsrett, som avsa dom 17. januar 2017 med slik domsslutning vedrørende Wallace.

> **"Kendrick Taylor Wallace, født 3. august 1945, dømmes for overtredelse av straffeloven (1902) § 276a, jf. § 276b, jf. straffeloven § 62 til en straff av fengsel i 7 – sju – år.**
>
> **Til fradrag i straffen kommer 3 – tre – dager for utholdt varetekt."**

8) De øvrige tiltalte ble frifunnet.

9) Det store spriket i straffutmålingen mellom tingretten og lagmannsretten kan i hovedsak tilskrives ulikt syn på betydningen av at bestikkelsene fant sted overfor tjenestemenn i korrupsjonsutsatte land. Tingretten la også vekt på at straffutmålingen for denne typen korrupsjon bør være gjenstand for en gradvis opptrapping.

10) Wallace anket over lagmannsrettens saksbehandling, lovanvendelse og straffutmåling. Høyesteretts ankeutvalg har tillatt anken over straffutmålingen fremmet basert på det faktum som er lagt til grunn av lagmannsretten.

11) *Mitt syn på saken*

12) Saken behandles etter bestemmelsene i straffeloven 1902, jf. HR-2016-1834-A avsnitt 15.

13) Det skal utmåles straff for to tilfeller av aktiv grov korrupsjon eller medvirkning til slik korrupsjon. Med "aktiv" korrupsjon menes det å gi eller tilby en utilbørlig fordel, i motsetning til "passiv" korrupsjon, som innebærer å kreve, motta eller akseptere tilbud om en slik fordel.

14) Korrupsjonen som fant sted i Libya, gjelder avtale om overføring av et beløp tilsvarende 27 millioner kroner etter datidens valutakurs, hvorav en tredjedel faktisk ble utbetalt. Dette forholdet er beskrevet slik i tiltalens post a:

> **"I perioden 2004 til 2009 forhandlet Yara med det libyske statlige oljeselskapet National Oil Corporation (NOC) om et samarbeid (joint venture) om gjødselsproduksjon i Libya. En gang, trolig på nyåret 2007, inngikk Wallace på vegne av Yara avtale om å betale USD 4,5 millioner eller mer til Mohamed Ghanem, sønn av Shukri Ghanem. Shukri Ghanem var på det tidspunktet i praksis oljeminister i Libya og styreleder i NOC. Avtalen hadde sammenheng med Yaras forhandlinger med NOC og Shukri Ghanems rolle der.**
>
> **Deler av det avtalte beløp, USD 1,5 millioner, ble overført til en konto i Sveits som ble disponert av Mohamed Ghanem. Dette skjedde på følgende måte: Det sveitsiske selskapet Nitrochem Distribution AG (Nitrochem) ble bedt om å forskuttere beløpet for Yara, noe Nitrochem gjorde ved å overføre USD 1,5 millioner til den avtalte kontoen 29. mars 2007. Yara refunderte deretter Nitrochem via Yaras deleide selskap i Sveits, Balderton Fertilizer SA (Balderton). Tilbakebetalingen ble skjult gjennom overfakturering av flere ordinære ammoniakkleveranser fra Nitrochem til Balderton, i perioden oktober 2007 til mai 2008. De aktuelle ammoniakkleveransene ble videresolgt fra Balderton til Yara Switzerland SA (Yara Switzerland), til en pris som også dekket inn den overpris Balderton hadde betalt for råvarene. I realiteten var det således Yara Switzerland som dekket betalingen til Mohamed Ghanem.**
>
> **Betalingen ble foretatt samtidig som Yara og NOC var i sluttforhandlinger om 'Heads of Agreement' (HoA), som ble undertegnet i april 2007."**



TRUE COPY

15) Domfellelsen bygger på at Wallace ved inngåelsen av avtalen med Mohamed Ghanem om fremtidige utbetalinger på tilsammen 4,5 millioner USD, i realiteten tilbød faren, Shukri Ghanem, en utilbørlig fordel. Fordelen ble tilbudt i anledning Shukri Ghanems verv som styreleder i det statlige libyske oljeselskapet NOC. På det aktuelle tidspunktet fungerte NOC som Libyas olje- og energidepartement etter at daværende leder Muammar al-Gaddafi hadde "kansellert" olje- og energidepartementet. Ved utbetalingen av 1,5 millioner USD til sønnen, fikk Shukri Ghanem en utilbørlig fordel.

16) Korrupsjonen som fant sted i India, gjelder avtale om overføring av beløp tilsvarende 18 millioner kroner etter datidens valutakurs, hvorav en tredjedel faktisk ble utbetalt. Dette forholdet er beskrevet slik i tiltalens post b:

> "I perioden fra desember 2006 til våren 2008 forhandlet Yara International ASA (Yara) med Krishak Bharati Cooperative Limited (KRIBHCO) om et samarbeid (joint venture) innen gjødelssektoren i India. Den indiske stat eide 67% av KRIBHCO som administrativt var underlagt Ministry of Chemicals & Fertilizers.
>
> I april 2007 tilbød Wallace og Clauw på vegne av Yara å inngå en avtale med Gurpreetesh Singh Maini, sønn av Dr. Jivtesh Singh Maini. Dr. Jivtesh Singh Maini var på det tidspunkt Additional Secretary and Financial Adviser i Ministry of Chemicals & Fertilizers og styremedlem i KRIBHCO på vegne av departementet.
>
> Avtaletilbudet med Gurpreetesh Singh Maini hadde sammenheng med Dr. Jivtesh Singh Mainis stilling.
>
> Avtaletilbudet ('Representative Engagement Letter') som ble fremsatt overfor Gurpreetesh Singh Maini, innebar blant annet utbetaling av et engangsbeløp på USD 250 000 samt et tilbud om at han på nærmere bestemte betingelser skulle få USD 0,50 per metrisk tonn av alle gjødselprodukter som Yara ville komme til å selge i India. Et vilkår for avtalens varighet var at avtalen mellom Yara og Kribcho kom i stand. I et senere avtaleforslag fra Yara ble engangsbeløpet erstattet med et beløp på USD 3 millioner, som skulle utbetales med USD 1 million pr år i perioden 1. januar 2007 til 31. desember 2009.
>
> Den 16. oktober 2007 betalte Yara USD 1 million på grunnlag av en faktura oversendt fra Gurpreetesh Singh Maini fra det libanesiske selskapet CYC s.a.r.l. Beløpet ble i stedet, og etter forespørsel fra Gurpreetesh Singh Maini, overført fra Yara til en konto i Hong Kong tilhørende selskapet Krystal Holdings & Investments Limited (British Virgin Islands), et selskap i navnet til ektefellene til Jivtesh Singh Maini og Gurpreetesh Singh Maini."

17) Domfellelsen bygger på at Wallace ved inngåelse av avtalen med Gurpreetesh Maini om fremtidig betaling av til sammen 3 millioner USD, i realiteten tilbød faren, Jivtesh Maini, en utilbørlig fordel. Fordelen ble tilbudt i anledning Jivtesh Mainis stilling som Additional Secretary and Financial Advisor i det indiske Kjemikalie- og gjødselsdepartementet og hans verv som styremedlem i kooperativet Krishak Bharati Cooperative Limited (Kribhco). Ved utbetalingen av 1 million USD til sønnen, fikk Jivtesh Maini en utilbørlig fordel.

18) Saken gjelder grenseoverskridende korrupsjon, og et sentralt spørsmål er om straffutmålingen skal være *mildere* fordi bestikkelsene skjedde overfor tjenestemenn i korrupsjonsutsatte land.

19) Bestemmelsene om korrupsjon i §§ 276a og 276b, som er videreført i straffeloven 2005 §§ 387 og 388, ble sommeren 2003 tilføyd straffeloven 1902 kapittel 26 om bedrageri

TRUE COPY

4

utroskap og korrupsjon. Tidligere ble korrupsjon regnet som en egen kategori av utroskap ("utroskap ved korrupsjon") under straffeloven §§ 275 og 276. Lovendringen bygger på en utredning fra Straffelovrådet, NOU 2002: 22. Av mandatet framgår det at arbeidet med nye bestemmelser om korrupsjon i stor grad var foranlediget av det internasjonale samarbeidet som Norge har vært involvert i på området. I mandatet står blant annet følgende om dette:

> **"Korrupsjon er ofte vanskelig å etterforske, særlig over landegrensene. Internasjonalt samarbeid i form av koordinert straffelovgivning og gjensidig juridisk bistand er derfor et viktig ledd i kampen mot korrupsjon. Gjennom deltakelse bl.a. i Europarådet og OECD har Norge vært med på å utarbeide og forpliktet seg til å følge internasjonale regelverk mot korrupsjon."**

20) Europarådets strafferettslige konvensjon mot korrupsjon av 4. november 1998 ble ratifisert av Norge 29. august 2003. I henhold til konvensjonens artikkel 5 forplikter statene seg til å straffesanksjonere aktiv og passiv bestikkelse som involverer offentlig tjenestemann fra en annen stat. Konvensjonen omfatter også bestikkelser i privat sektor, jf. artikkel 7 og 8. I henhold til artikkel 19 skal statene "fastsette effektive, forholdsmessige og forebyggende sanksjoner og tiltak, herunder straff" for slike overtredelser.

21) OECDs konvensjon om bekjempelse av korrupsjon og bestikkelser av utenlandske offentlige tjenestemenn i forbindelse med internasjonale forretningstransaksjoner av 21. november 1997 ble ratifisert av Norge 4. desember 1998. Konvensjonen forplikter statene til å straffesanksjonere aktiv korrupsjon og bestikkelse av utenlandsk offentlig tjenestemann, jf. artikkel 1. I henhold til reaksjonsbestemmelsen i artikkel 3 skal straffesanksjonene ikke bare være "effektive, forholdsmessige og avskrekkende", men også *"sammenlignbare* med dem som benyttes for korrupsjon og bestikkelser overfor partenes egne offentlige tjenestemenn" (min utheving). Foranlediget av denne konvensjonen ble korrupsjon begått overfor blant annet utenlandsk offentlig tjenestemann gjort straffbar i 1999 gjennom tilføyelsen av andre ledd i straffeloven § 128.

22) Norge deltok også under utarbeidelsen av FNs konvensjon mot korrupsjon av 31. oktober 2003, som ble ratifisert 9. juni 2006.

23) Oppfølgningen av det internasjonale samarbeidet mot korrupsjon er viet en sentral plass i forarbeidene til de nye straffebestemmelsene om korrupsjon. I Ot.prp. nr. 78 (2002–2003) kapittel 1 om hovedinnholdet i proposisjonen står det eksempelvis dette om de mer overordnede hensyn:

> **"Internasjonalt samarbeid er en forutsetning for at korrupsjonskriminalitet, som ofte foregår på tvers av landegrensene, skal kunne bekjempes på en effektiv måte. Flere mellomstatlige organisasjoner har i de senere år lagt ned et omfattende arbeid i å utvikle konvensjoner og andre virkemidler som tar sikte på å bekjempe korrupsjonen og dens skadevirkninger.**
>
> **Korrupsjon utgjør en trussel mot rettsstaten, demokratiet, menneskerettighetene og sosial rettferdighet, og kan også hindre økonomisk utvikling og virke konkurransevridende. Norske myndigheter prioriterer derfor høyt å delta aktivt i det internasjonale samarbeidet mot korrupsjon. Det er også sentralt å sikre effektive virkemidler for å motvirke korrupsjon nasjonalt."**



TRUE COPY

24) Justiskomiteen sluttet seg til at det av disse grunner var "viktig at korrupsjon effektivt og aktivt bekjempes, både nasjonalt og internasjonalt", jf. Innst. O. nr. 105 (2002–2003) kapittel 1. I forlengelsen av dette uttalte komiteen følgende om oppfølgningen av Norges internasjonale forpliktelser:

> "Mellomstatlig samarbeid og tiltak for å bekjempe korrupsjon er høyt prioritert internasjonalt. Komiteen vil derfor at Norge følger opp sine forpliktelser om tiltak mot korrupsjon i henhold til konvensjoner inngått med OECD, Europarådet og FN. Det er etter komiteens syn viktig at vi på nasjonalt nivå har et regelverk som klart angir hva som er straffbar korrupsjon. Komiteen ønsker at Norge skal være et foregangsland innen kampen mot korrupsjon på alle nivå, og at vårt lovverk på området kan være normdannende internasjonalt."

25) Så langt konstaterer jeg at den nye korrupsjonslovgivningen ikke bare tok sikte på å ivareta interesser på nasjonalt nivå. Et sentralt formål med å bekjempe grenseoverskridende korrupsjon var å bidra til den samfunnsmessige og økonomiske utviklingen også i andre land. Dette perspektivet er senere fulgt opp i St.meld. nr. 35 (2003–2004) "Felles kamp mot fattigdom", der det i kapittel 3.8 blant annet står dette om korrupsjonsbekjempelse:

> "Det følger av tenkningen om sammenheng i politikken og av norsk engasjement og forpliktelser i utviklingspolitikken, at en fra norsk side til en hver tid har en aktiv politikk mot korrupsjon. En streng lovgivning og en robust håndheving er nødvendig for å redusere risikoen for at norske aktører, bevisst eller ubevisst, bidrar til å skade offentlig finanser og politisk kultur i andre land."

26) Det er ingen holdepunkter i forarbeidene for at korrupsjon skal straffes mildere når den er begått overfor en tjenestemann i et korrupsjonsutsatt land. Den omstendighet at selve utilbørlighetsvurderingen under skyldspørsmålet vil kunne være avhengig av bedrifts- eller forvaltningskulturen i ulike land – jeg viser særlig til omtalen av "facilitation payments" i Ot.prp. nr. 78 (2002–2003) side 35–36 – rokker ikke ved dette. Når det først er konstatert en straffbar overtredelse, tilsier lovens formål at ellers like tilfeller behandles likt. En relativisering av det strafferettslige vern avhengig av hvilket land som er berørt av korrupsjonshandlingen, er det etter mitt syn ikke rettskildemessig dekning for.

27) Jeg går så over til å vurdere straffutmålingsmomentene i saken opp mot Høyesteretts praksis i tilknytning til straffeloven 1902 § 276b, jf. § 276a.

28) Strafferammen for grov korrupsjon ble i 2003 hevet fra fengsel i seks til ti år. Korrupsjonshandlingene Wallace er dømt for skal bedømmes som to selvstendige straffbare forhold etter straffeloven § 62 første ledd. Strafferammen utvides da med det dobbelte. Bestemmelsen er også førende for utmålingen av den felles frihetsstraffen innenfor den utvidede strafferammen, jf. Rt-2008-1473 avsnitt 33.

29) Som påpekt i Rt-2011-477 avsnitt 23 og i HR-2016-1834-A avsnitt 27, vil de individualpreventive og de allmennpreventive hensynene kunne variere fra sak til sak. De allmennpreventive hensyn gjør seg imidlertid normalt sterkt gjeldende ved straffutmålingen for både aktiv og passiv korrupsjon. Det dreier seg om en form for "gjensidig" økonomisk kriminalitet som vil kunne være vanskelig å avdekke – ikke minst i land med en utbredt korrupsjonskultur. I tillegg kommer at slik kriminalitet ofte gjelder betydelige økonomiske verdier.

TRUE COPY

6

30) I likhet med Straffelovrådet la departementet i Ot.prp. nr. 78 (2002–2003) kapittel 7.3.2 til grunn at "grove korrupsjonshandlinger kan fremstå som mer straffverdige enn de fleste andre grove formuesforbrytelser". Dette illustreres av Rt-2012-243 der straffenivået for passiv korrupsjon på halvannen millioner kroner ble angitt til fengsel i "noe over tre år" (avsnitt 43), mens straffen for utroskap på over åtte millioner kroner ble angitt til fengsel i "mellom to år og seks måneder og tre år" (avsnitt 47).

31) Den avgjørelsen som ligger nærmest forholdene i vår sak i omfang, er straffutmålingen for en av de domfelte i HR-2016-1834-A. En salgssjef i et privat selskap hadde gjort seg skyldig i medvirkning til aktiv grov korrupsjon overfor ledelsen i et heleid kommunalt selskap (Unibuss). Under henvisning til at det offentliges oppgaver strekker seg lenger enn offentlig myndighetsutøvelse i tradisjonell forstand, ble forholdet bedømt etter den strengere normen som gjelder for korrupsjonshandlinger overfor offentlig tjenestemann, jf. avsnitt 34. Salgssjefen ble ansett som "en liten brikke i et stort korrupt system", selv om han "over flere år [var] en helt sentral person for den korrupsjonen som skjedde i Norge", jf. avsnitt 54. Høyesterett tok utgangspunkt i en straff på rundt fem års fengsel for medvirkning til utbetalinger på nærmere 7,4 millioner kroner. Domfelte hadde selv mottatt drøye 242 000 kroner i personlig vinning. Ved straffutmålingen ble det tatt hensyn til at drøye 2,2 millioner kroner gjaldt utbetalinger som fant sted før de nye korrupsjonsbestemmelsene trådte i kraft, og som følgelig ble bedømt etter en "noe mildere" norm om grov utroskap til korrupsjon.

32) Med dette som bakteppe går jeg over til å behandle korrupsjonshandlingen i Libya.

33) Korrupsjonen er begått overfor en høytstående offentlig tjenestemann. Jeg minner om at Shukri Ghanem var styreleder i det statlige oljeselskapet NOC, som i følge lagmannsretten "utvilsomt" fungerte som Libyas olje- og energidepartement på det aktuelle tidspunkt. Den omstendighet at bestikkelsen skjedde overfor en tjenestemann med en så vidt fremskutt posisjon – i realiteten på ministernivå – gjør i seg selv forholdet svært alvorlig.

34) Wallace var på sin side juridisk direktør og medlem av Yaras konsernledelse. Han hadde derved en fremtredende posisjon i selskapet, og dessuten en helt sentral rolle i planleggingen og gjennomføringen av korrupsjonshandlingen. Lagmannsretten fant riktignok ingen holdepunkter for at han på eget initiativ besluttet å inngå avtaler om å betale bestikkelser. Han kunne imidlertid i kraft av sin posisjon ha nektet å medvirke til de straffbare handlingene uten risiko for at dette ville få negative konsekvenser for egen stilling. Til forskjell fra den domfelte salgssjefen i HR-2016-1834-A mente lagmannsretten at Wallace *ikke* var "en liten brikke" i et stort korrupt system. Det var han som hadde kontakt med Mohamed Ghanem, og som utarbeidet den utilbørlige "konsulentavtalen". Det var også han som bestemte at avtalen skulle inngås muntlig, og som tok initiativet til å foreta utbetalingen av det første avdraget på halvannen millioner USD gjennom et eksternt, utenlandsk selskap. Fremgangsmåten ble valgt for å holde forholdet til Mohamed Ghanem og hans far skjult. Dette viser at forholdet var grundig planlagt med et fast forsett om å gjennomføre korrupsjonshandlingene.

35) Det er videre av helt sentral betydning for straffutmålingen at det dreier seg om et så vidt stort beløp. Avtalen gikk ut på overføring av et samlet beløp tilsvarende 27 millioner kroner. All den stund det foreligger en fullbyrdet korrupsjonshandling i det øyeblikk det fremsettes *tilbud* om en utilbørlig fordel, kan det ikke tillegges særlig vekt at beløpet som

faktisk ble utbetalt begrenset seg til 9 millioner kroner. Også tilsagn om fremtidige utbetalinger skaper bindinger og bidrar til den "smøring" som lagmannsretten har funnet bevist. At det senere ble satt en stopper for de videre avdragsbetalingene, kan heller ikke tilskrives Wallace, som på det tidspunktet hadde nådd pensjonsalderen og sluttet i selskapet.

36) Jeg mener etter dette at Libyaforholdet isolert sett kvalifiserer for en straff på rundt seks års fengsel. Det dreier seg om et betydelig høyere beløp enn i HR-2016-1834-A, og både Wallace og Shukri Ghanem hadde langt mer fremskutte posisjoner enn de involverte i den saken. I vår sak er det riktignok ikke snakk om personlig vinning, men hele forholdet skal til gjengjeld vurderes i tråd med den noe strengere normen som ble etablert ved lovendringen i 2003.

37) Jeg går så over til å behandle korrupsjonshandlingen i India.

38) Korrupsjonen er begått overfor en sentral offentlig tjenestemann. Som jeg allerede har vært inne på, tjenestegjorde Jivtesh Maini som sekretær og finansrådgiver for det indiske Kjemikalie- og gjødselsdepartementet. Han var dessuten styremedlem utpekt av regjeringen i Kribhco, hvor den indiske staten hadde en betydelig eierandel. I følge lagmannsretten lyttet de øvrige styremedlemmene "ekstra nøye" til styremedlemmer utpekt av regjeringen.

39) Lagmannsretten la til grunn at Wallace var den "operasjonelle aktøren" på Yaras side. Det var han som forhandlet med Gupreteesh Maini, Jivtesh Mainis sønn, om betingelsene i "oppdragsavtalen". Jeg er enig med lagmannsretten i at også denne korrupsjonen bærer preg av å være "godt planlagt", noe som understreker forholdets alvor.

40) Korrupsjonshandlingen gjelder videre et betydelig beløp tilsvarende 18 millioner kroner fordelt over tre år. Etter at Jivtesh Maini gikk over i annen virksomhet sommeren 2007, besluttet konserndirektøren i Yara at avtaleforholdet med sønnen skulle avsluttes. Den omstendighet at de resterende avdragene ikke ble utbetalt kan på denne bakgrunn ikke tilskrives Wallace. Wallace sørget senere for at 1 million USD ble utbetalt som endelig oppgjør for ytet bistand. Beløpet ble overført til et selskap på De britiske jomfruøyer, som var eiet av en trust med ektefellene til Jivtesh og Gurpreetesh Maini som benefisienter.

41) Jeg mener etter dette at Indiaforholdet isolert sett kvalifiserer for en straff på rundt fem års fengsel. Sammenlignet med HR-2016-1834-A dreier det seg om et langt høyere beløp. På den annen side mottok Wallace ikke noen personlig vinning eller fordel.

42) Forsvarer har gjort gjeldende at ingen av de to korrupsjonshandlingene har hatt noen påviselige negative konsekvenser eller skadevirkninger. Forhandlingene i Libya hadde utviklet seg ensidig i NOCs favør til tross for korrupsjonshandlingen, mens samarbeidsavtalen mellom Yara og Kribhco ble skrinlagt sommeren 2008. De underliggende samarbeidsavtalene om produksjon av Yaras kunstgjødsel var dessuten av potensiell stor samfunnsmessig betydning for både Libya og India.

43) Jeg finner ikke grunn til å legge særlig vekt på disse momentene i formildende retning. Hensikten med å tilby og betale bestikkelser til Shukri Ghanem i Libya og til Jivtesh Maini i India var å sikre seg deres velvilje – og derved bedre Yaras stilling med hensyn til muligheten for å få realisert de aktuelle samarbeidsprosjektene. Som det fremgår av HR-2016-1834-A avsnitt 38, er det *risikoen* for skade som er avgjørende etter de aktuelle korrupsjonsbestemmelsene, jf. også Rt-2012-243 avsnitt 41 og Rt-2010-1624 avsnitt 25.

TRUE COPY

8

Dette har blant annet sammenheng med at skadevirkningene av korrupsjon kan være vanskelige å måle. Skadene begrenser seg heller ikke til de direkte økonomiske virkningene, men omfatter også mer indirekte skadevirkninger som tillits- og omdømmetap. Som jeg allerede har vært inne på, vil grenseoverskridende korrupsjon dessuten kunne bidra til å opprettholde en korrupsjonskultur i vedkommende land med de skadevirkninger det innebærer. Jeg peker eksempelvis på risikoen for at investeringsviljen i korrupsjonsutsatte land undergraves. Det har naturlig nok heller ingen betydning for straffutmålingen at korrupsjonen ble begått i "den gode saks tjeneste" i den forstand at de underliggende samarbeidsavtalene kunne vært av stor betydning for de to landene.

44) De straffbare handlingene ble begått i 2007, men det er ikke dokumentert liggetid under etterforskningen eller i domstolene. Tidsforløpet kan da ikke tillegges vekt ved straffutmålingen, jf. Rt-2012-243 avsnitt 50.

45) Lagmannsretten fastsatte straffen for de to korrupsjonshandlingene til fengsel i sju år. Ved straffutmålingen ble det på samme måte som i HR-2016-1834-A hvor korrupsjonshandlingene hadde rammet samme selskap, tatt utgangspunkt i korrupsjonshandlingenes samlede beløp. I vår sak dreier det seg imidlertid om to klart atskilte straffbare forhold begått til ulik tid hvor personer uten noen forbindelse med hverandre var mottakere av bestikkelsene. I tråd med straffeloven § 62 skal det da som allerede nevnt, foretas separate vurderinger av straffenivået for det enkelte forhold før det fastsettes en samlet straff. Etter mitt syn tilsier en slik vurdering her en straff i området fengsel i åtte til ni år, jf. Matningsdal, Kommentarutgave til Straffeloven 2005, side 752 og 753, med henvisning til straffutmålingspraksis ved domfellelse for flere straffbare forhold (realkonkurrens).

46) Når jeg likevel finner at anken bør forkastes, har det sammenheng med at påtalemyndigheten ikke påsto straffen skjerpet i forhold til lagmannsrettens dom, og at det heller ikke fra Høyesteretts side ble gitt signal om en mulig straffskjerpelse.

47) Jeg stemmer for denne

D O M :

Anken forkastes.

| | |
|---|---|
| 48) Dommer **Kallerud**: | Jeg er i det vesentlige og i resultatet enig med førstvoterende. |
| 49) Dommer **Bårdsen**: | Likeså. |
| 50) Dommer **Bull**: | Likeså. |
| 51) Dommer **Matningsdal**: | Likeså. |

52) Etter stemmegivningen avsa Høyesterett denne



9



D O M :

Anken forkastes.

Riktig utskrift bekreftes:





TRUE COPY

EXT- WALLACE-00250

*Translated from the Norwegian original*





# THE SUPREME COURT
# OF NORWAY

On 15 September 2017, the Supreme Court passed the following judgment in

HR-2017-1776-A, (case no. 2017/674), criminal case, appeal against the sentence;

Kendrick Taylor Wallace                    (Advocate Arild Dyngeland)

versus

The Public Prosecuting Authority           (Senior Public Prosecutor Helene Bærug Hansen)

### VOTING:

1) Justice Arntzen: The case concerns the fixing of the sentence following the defendant's conviction on two counts of aggravated corruption committed abroad.

2) In March 2004, Norsk Hydro ASA's fertilizer division was demerged. The demerged company, Yara International ASA (Yara), is headquartered in Oslo. Yara is listed on the Oslo Stock Exchange, and the Norwegian state owns 36.2 per cent of the shares.

3) Kendrick Taylor Wallace was Chief Legal Officer of Yara from its establishment until he retired in the summer of 2008.

4) On 15 January 2014, Wallace and three other members of the group's senior management team were indicted by the Norwegian National Authority for Investigation and Prosecution of Economic and Environmental Crime (Økokrim) on two counts of active, aggravated corruption, cf. the Penal Code 1902 section 276a, cf. section 276b. The first count concerned the offer of USD 4.5 million to a public official in Libya, while the second concerned the offer of USD 3 million to a public official in India.

5) Oslo District Court passed its judgment on 7 July 2015. In the judgment, Wallace was convicted as charged and sentenced to two years and six months' imprisonment.

True translation certified                Page 1 of 9                        29.09.17
Eystein Myking
Government Authorized Translator

*Translated from the Norwegian original*

6) His three co-defendants were also convicted and sentenced to three, two and two years' imprisonment, respectively.

7) Both the defendants and the prosecuting authority appealed to Borgarting Court of Appeal, which on 17 January 2017 passed its judgment, which concluded as follows with respect to Wallace:

> "Kendrick Taylor Wallace, born 3 August 1945, is sentenced, for contravention of the Penal Code (1902) section 276a, jf. section 276b, jf. section 62, to 7 – seven – years' imprisonment.
>
> 3 – three – days spent in custody on remand will be deducted from the sentence."

8) The other defendants were acquitted.

9) The large difference in the sentencing between the district and appeal court, is to a large extent due to differing views of the importance placed on the fact that the bribes were offered/paid to public officials abroad. The district court also emphasized that sentencing for this type of corruption should be graded depending on the size of the bribe.

10) Wallace appealed against the appeal court's judgment on procedural grounds, application of law and the sentencing. The Appeals Committee of the Supreme Court allowed the appeal based on the facts of the case as assessed by the appeal court.

11) *My opinion*

12) The case will be adjudicated based on the provisions of the Penal Code 1902, cf. Supreme Court judgment HR-2016-1834-A paragraph 15.

13) The Court is tasked with fixing the sentence for two counts of active, aggravated corruption or complicity in the same. "Active" corruption is defined as giving or offering an undue advantage as opposed to "passive" corruption, which is defined as demanding, receiving or accepting such advantage.

14) The corruption that took place in Libya concerns an agreement to transfer an amount of about NOK 27 million, based on the prevailing exchange rates at the time, of which a third was actually paid. This offence is described in Count 1 of the charges:

> "From 2004 to 2009, Yara negotiated with the state-owned Libyan oil company National Oil Company (NOC) to establish a joint venture within the fertiliser industry in Libya. At some point, most probably in the beginning of 2007, Mr Wallace entered into an agreement on behalf of Yara to pay USD 4.5 million or more to Mohamed Ghanem, the son of Shukri Ghanem. At the time, Shukri Ghanem was de facto Minister for Petroleum in Libya and Chairman of the Board of NOC. The agreement was linked to Yara's negotiations with the NOC and Shukri Ghanem's role in these negotiations.
>
> A part of the agreed amount, USD 1.5 million, was transferred to a Swiss bank account belonging to Mohamed Ghanem. This happened as follows: The Swiss

True translation certified
Eystein Myking
Government Authorized Translator

Page 2 of 9

29.09.17

EXT- WALLACE-00252

*Translated from the Norwegian original*

company Nitrochem Distribution AG (Nitrochem) was asked to advance the amount on Yara's behalf, something which Nitrochem did by transferring USD 1.5 million to the agreed account on

29 March 2007. Yara then reimbursed Nitrochem via its subsidiary in Switzerland, Balderton Fertilizer SA (Balderton). The reimbursement was concealed by overcharging for a number of deliveries of ammonia from Nitrochem to Balderton from October 2007 to May 2008. The ammonia was then sold on from Balderton to Yara Switzerland SA (Yara Switzerland) at a price that covered the premium paid by Balderton. In this way, Yara Switzerland covered the payment to Mohamed Ghanem.

The payment was made at the same time that Yara and the NOC were in the final stages of negotiating a "Heads of Agreement" (HoA), which was signed in April 2007.

15)    The conviction is based on an assessment that Wallace, by agreeing future pay-outs of USD 4.5 million to Mohamed Ghanem, in reality was offering his father, Shukri Ghanem, an undue advantage. The advantage was offered as a result of Shukri Ghanem's role as chair of the board of the Libyan state-owned oil company, NOC. At the time, the NOC doubled as Libya's ministry of oil and energy after the country's then leader, Muammar al-Gaddafi had "cancelled" the Ministry of Petroleum and Energy. Through the payment of USD 1.5 million to his son, Shukri Ghanem received an undue advantage.

16)    The corruption that took place in India concerns an agreement to transfer an amount of about NOK 18 million, based on the prevailing exchange rates at the time, of which a third was actually disbursed. This offence is described in Count 2 of the charges:

"From December 2006 until the spring of 2008, Yara negotiated with Krishak Bharati Cooperative Limited (Kribhco) to establish a joint venture within the fertiliser industry in India. Kribhco was owned 67% by the Indian government and sorted administratively under the Ministry of Chemicals & Fertilizers.

In April 2007, Wallace and Clauw, on behalf of Yara, offered to make a deal with Gurpreetesh Singh Maini, the son of Dr Jivtesh Singh Maini. Dr. Jivtesh Singh Maini was at the time Additional Secretary and Financial Adviser in the Ministry of Chemicals & Fertilizers and a member of the board of Kribhco on behalf of the ministry.

The offer to Gurpreetesh Singh Maini was linked to Dr. Jivtesh Singh Maini's position.

The offer ('Representative Engagement Letter') which was presented to Gurpreetesh Singh Maini, involved, among other things, a lump sum payment of

USD 250,000 and that he, on specified conditions, would receive USD 0.50 per metric ton of all fertiliser products sold by Yara in India. One of the conditions for the duration of the agreement was that Yara and Kribcho came to an agreement to



*Translated from the Norwegian original*

establish the above-mentioned joint venture. In a later draft agreement from Yara, the offer was increased to USD 3 million, to be paid in amounts of USD 1 million per year during the period 1 January 2007–31 December 2009.

**On 16 October 2007, Yara settled an invoice for USD 1 million forwarded by Gurpreetesh Singh Maini from the Lebanese company CYC s.a.r.l. On Gurpreetesh Singh Maini's request, Yara transferred the amount to an account in Hong Kong belonging to Krystal Holdings & Investments Limited, a company registered in the British Virgin Islands to the wives of Jivtesh Singh Maini and Gurpreetesh Singh Maini."**

17)  The conviction is based on an assessment that Wallace, by agreeing future pay-outs of USD 3 million to Gurpreetesh Maini, in reality was offering his father, Jivtesh Maini, an undue advantage. The advantage was offered due to Jivtesh Maini's position as Additional Secretary and Financial Adviser in the Ministry of Chemicals & Fertilizers and member of the board of Krishak Bharati Cooperative Limited (Kribhco). Through the payment of USD 1 million to his son, Jivtesh Maini received an undue advantage.

18)  The case concerns cross-border corruption, and a key issue is whether the penalty should be reduced because the bribes were paid to officials in countries were corruption is prevalent.

19)  The provisions covering corruption, sections 276 a and 276b, which are included in the Penal Code of 2005 sections 387 and 388, were added to the Penal Code 1902, Chapter 26, containing provisions concerning fraud, breach of trust and corruption, in the summer of 2003. Before this, corruption was classified as a separate category of breach of trust ("breach of trust by corruption") under the Penal Code sections 275 and 276. The legislative change was made based on an evaluation by the Permanent Commission on Criminal Law, presented in Official Norwegian Reports 2002 no. 22. From the mandate for the commission's work, it is apparent that the change came about as a result of the international cooperation in the field that Norway has been a part of. Among other things, the mandate specifies:

> **"Corruption is often difficult to investigate, particularly cross-border corruption. International cooperation in the shape of coordinated criminal legislation and mutual legal assistance are therefore important aspects in combatting corruption. Through it participation in the Council of Europe and the OECD, Norway has taken part in the preparation of, and committed itself to adhere to, an international body of rules against corruption."**

20)  The Council of Europe's Criminal Law Convention on Corruption of 4 November 1998 was ratified by Norway on 29 August 2003. According to the Convention, article 5, the member states undertake to penalise active and passive bribery of public officials of another state. The convention also comprises bribery in the private sector, cf. articles 7 and 8. According to article 19, the states shall provide effective, proportionate and dissuasive sanctions and measures, including penalties for such offences.

21)  The OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions of 21 November 1997 was ratified by Norway on 4 December 1998. The convention obliges the signatory states to make active bribery of foreign public officials a

True translation certified                    Page 4 of 9                                      29.09.17
Eystein Myking
Government Authorized Translator

*Translated from the Norwegian original*

criminal offence, cf. article 1. With respect to the sanctions established in article 3, the sanctions should not only be "effective, proportionate and dissuasive," but also "comparable to those applicable to the bribery of the Party's own public officials" (my emphasis). As a result of this convention, corruption of foreign public officials was made a criminal offence through the addition of subsection 2 of the Penal Code (1902) section 128.

22)   Norway was also involved the preparation of the UN Convention against Corruption of 31 October 2003, which Norway ratified on 9 June 2006.

23)   The following up of and adherence to the international cooperation against corruption has been given extensive coverage in the preparatory works to the new penal provisions criminalising corruption. In Parliamentary proposition no. 78 (2002–2003), Chapter 1, describing the main contents of the proposition, states the following about the general considerations:

> "Effective combatting of corruption, which often takes place across borders, is dependent upon international cooperation. In recent years a number of inter-governmental organisations have invested a large amount of work in developing conventions and other measures aimed at combatting corruption and the damage it causes.
>
> Corruption poses a threat to the rule of law, democracy, human rights and social justice, and can be detrimental to economic development and distort market competition. Norwegian authorities therefore prioritise active participation in the international cooperation to combat corruption. It is also of key importance to secure effective measures against corruption at home."

24)   For these reasons, the parliamentary standing committee on justice agreed that it was "important that corruption be combatted effectively, both at home and abroad", cf. parliamentary recommendation no. 105 (2002–2003), chapter 1. The committee also stated the following about Norway's follow-up of its international obligations:

> "International cooperation and measures to combat corruption is given high priority internationally. The Committee therefore wants Norway to follow up on its obligations to take measures against corruption as laid out in conventions issued by the OECD, Council of Europe and UN, and ratified by Norway. The Committee believes that it is important that we have national legislation that clearly defines what constitutes criminal corruption. It is the Committee's desire for Norway to set an example to be followed in the fight against corruption at all levels and that our national legislation sets an international standard."

25)   At this point I note that the new anti-corruption legislation did not confine itself to providing for national interests. A key purpose of fighting cross-border corruption was to contribute to societal and economic development in other countries as well. This aspect was later followed up in White Paper no. 35 (2003–2004) "Our Shared Fight Against Poverty", where it is stated in chapter 3.8:

> "It follows from the idea of coherent policies and Norway's involvement and obligations in developmental policies, that Norway maintains an active anti-



---

True translation certified                Page 5 of 9                              29.09.17
Eystein Myking
Government Authorized Translator

*Translated from the Norwegian original*

corruption policy. Strict legislation and robust enforcement are necessary to reduce the risk that Norwegian actors, intentionally or not, contribute to damaging public finances and political culture abroad."

26) There is nothing in the preparatory works to support the notion that bribery of a foreign public official in a country prone to corruption should be punished less severely. The fact that the assessment of impropriety under the assessment of guilt may be influenced by the corporate and government culture in individual countries – I am particularly referring to the discussion of "facilitation payments" in Parliamentary proposition no. 78 (2002–2003), pp 35–36 – does not alter this. When a criminal infraction of the law has been established, the purpose of the act indicates that similar offences are to be dealt with in a similar manner. In my opinion, there is no support in sources of law for the relativization of criminal-law protection depending on the country affected by the corruption.

27) I will now go on to discuss the sentencing aspects of the case relative to Supreme Court practice in relation to the Penal Code 1902 section 276b cf. section 276a.

28) In 2003, the maximum penalty for aggravated corruption was raised from six to ten years' imprisonment. The two offences Wallace has been convicted of must be assessed as two separate offences in accordance with the Penal Code section 62 subs. 1. As a result of this, the maximum penalty is doubled. The provision also provides guidance for the fixing of the combined sentence within the extended maximum penalty, cf. Supreme Court Reports 2008 p. 1473 paragraph 33.

29) As noted in Supreme Court Reports 2011 p. 477 paragraph 23 and in Supreme Court Judgment HR-2016-1834-A paragraph 27, the requirements of specific and general deterrence may vary from case to case. However, the requirements of general deterrence will normally be salient in fixing of the sentence for both active and passive bribery. Corruption is a form of "mutual" economic crime that can be very hard to detect – not the least in countries where corruption is prevalent. Also, the amounts of money involved are often considerable.

30) Like the Permanent Commission on Criminal Law, the Ministry, in its Parliamentary proposition no. 78 (2002–2003), chapter 7.3.2, argued that "aggravated acts of corruption may be more censurable than most other aggravated property crimes". This view is reflected in Supreme Court Reports 2012 p. 243, where a suitable punishment for passive corruption of NOK 1.5 million was indicated to be "just over three years" (paragraph 43), while the punishment for embezzlement of more than NOK 8 million was indicated to be "between two years and six months and three years' imprisonment" (paragraph 47).

31) The adjudication which most resembles the scope of the present case, is the sentencing of one of the defendants in Supreme Court Judgment HR-2016-1834-A. A sales manager in a private company had been found guilty of complicity to active, aggravated bribery of the management of a wholly owned municipal buss company (Unibuss). With reference to an argument that the scope of public responsibilities extend beyond exercise of authority in the traditional sense, the sentence was fixed in accordance with the stricter norm that applies to bribery of a public official, cf. paragraph 34. The sales manager was considered "a small pawn in a large system of corruption", even though he "for several years played a key role in the corruption that was committed in Norway", cf. paragraph 54. The Supreme Court settled on a sentence of about five

---

True translation certified
Eystein Myking
Government Authorized Translator

Page 6 of 9

29.09.17

*Translated from the Norwegian original*

years' imprisonment as suitable for complicity in payments of almost NOK 7.4 million in bribes. The defendant had received payments of about NOK 242,000 personally. In fixing the sentence, the Court took into account that just over NOK 2.2 million concerned payments made before the new corruption provisions came into force, which were dealt with in accordance with the "somewhat milder" norm for aggravated breach of trust by corruption.

32)   On this background, I will proceed to discuss the act of corruption in Libya.

33)   The bribes were offered and paid to a high-ranking public official. I repeat that Shukri Ghanem was chair of the board of the state-owned oil company NOC, which, according to the appeals court, "undoubtedly" functioned as the ministry of oil and gas in Libya at the time. The fact that the person bribed was such a high-ranking public official – in reality at cabinet level – in itself makes the offence very serious.

34)   Wallace, on the other hand, was chief legal officer and a member of Yara's senior management team. He thus held a prominent position in the company and played a key role in the planning and execution of the bribery. The appeals court found no grounds for believing that he acted on his own initiative when he decided to enter into agreements to pay bribes. He could, however, as CLO, have refused to participate in the bribery without risking any repercussions for himself. Contrary to the convicted sales manager in case HR-2016-1834-A, the court of appeal was of the opinion that Wallace was not "a small pawn" in a large corrupt system. He was the one who maintained contact with Mohamed Ghanem and who prepared the improper "consultancy agreement". It was also Wallace who decided that the agreement would be made orally and who initiated the payment of the first instalment of USD 1.5 million through an external company abroad. This strategy was chosen to keep the relationships with Mohamed Ghanem and his father secret. This demonstrates that the offence was planned in detail with a clear intent of going through with the bribery.

35)   Key to the sentencing is also the fact that the amount involved is so large. The agreement was to pay a total amount of about NOK 27 million. Because an act of corruption is considered to have been committed once an offer of an undue advantage has been made, little importance can be given to the fact that the amount paid was limited to NOK 9 million. The promise of future payments also creates bonds which contribute to the corruption that the court of appeal found proven. Nor can it be attributed to Wallace's actions that the payment of the later instalments was stopped, as he had retired and left Yara when this happened.

36)   In my opinion, the act of bribery in Libya itself qualifies for a penalty of around six years' imprisonment. We are talking about amounts far exceeding those in HR-2016-1834-A and both Wallace and Shukri Ghanem held much more prominent positions than the persons involved in that case. It should be noted that personal gain is not an issue in the present matter. However, the offence must be adjudicated based on the somewhat stricter norm laid down by the legislative change in 2003.

37)   I will now go on to discuss the act of corruption in India.

38)   The bribes were offered and paid to a key public official. As noted above, Jivtesh Maini was secretary and financial adviser to the Ministry of Chemicals & Fertilizers in India. He was also a government-appointed member of the board of Kribhco, in which the Indian state held a large

EXT- WALLACE-00257

Yes

*Translated from the Norwegian original*

ownership interest. According to the appeals court, the other board members listened "extra closely" to members appointed by the government.

39) Borgarting Court of Appeal considered Wallace the "operational actor" on Yara's side. It was Wallace who negotiated the terms of the "engagement agreement" with Gurpreetesh Maini, Jivtesh Maini's son. I agree with the court of appeal that this offence also carry signs of having been "well planned", something which emphasises the seriousness of the offence.

40) The act also involves a considerable amount, NOK 18 million spread over three years. When Jivtesh Maini shifted to a different business during the summer of 2007, Yara's CEO decided to terminate the agreement with Gurpreetesh. The fact that the remaining instalments were not disbursed, can therefore not be ascribed to Wallace. Wallace later arranged for the payment of USD 1 million as a final settlement for services rendered. This amount was transferred to a company in the British Virgin Islands owned by a trust whose beneficiaries were the wives of Jivtesh and Gurpreetesh Maini.

41) In my opinion, the act of bribery in India itself qualifies for a penalty of around five years' imprisonment. The amount involved is far larger than in HR-2016-1834-A. On the other hand, Wallace did not receive any personal gain or advantage.

42) Wallace's counsel argues that neither of the acts has had any demonstrable negative consequences or effects. The negotiations in Libya were progressing steadily in Yara's favour despite the bribery, and the cooperation agreement between Yara and Kribhco was terminated in the summer of 2008. In addition, the underlying cooperation agreements concerning production of Yara's fertiliser products were potentially greatly beneficial to society in general both in Libya and India.

43) I find no reason to give much regard to these arguments as mitigating factors. The express purpose of offering and paying bribes to Shukri Ghanem in Libya and Jivtesh Maini in India was to secure their favour and thereby improving Yara's chances of realising the projects. As is evident from HR-2016-1834-A paragraph 38, it is the risk of damage which is determining under the corruption provisions in question, see also Supreme Court Reports 2012 p. 243 paragraph 41 and 2010 p. 624 paragraph 25. This is due in part because the damaging effects of corruption can be hard to measure. Nor are the damages limited to the direct economic effects, but also include indirect harm, e.g. loss of trust or reputation. And, as mentioned above, cross-border bribery can contribute to sustain a culture of corruption in the countries affected with all the damaging effects this has, for example that the willingness to invest in countries prone to corruption will be undermined. That the offences were committed "for the greater good" in the sense that the underlying cooperation agreements could have been of great benefit to the two countries, will of course have no effect on sentencing.

44) The criminal acts were committed in 2007. However, no delays on part of the police or courts have been documented. The time passed can therefore not be taken into account when fixing the sentence, cf. Supreme Court Reports 2012 p. 243 paragraph 50.

45) Borgarting Court of Appeal fixed the sentence for the two counts of corruption to seven years' imprisonment. In fixing the sentence the court, as in HR-2016-1834-A where the offences were committed to the detriment of one company, based its decision on the total sum involved in the



True translation certified
Eystein Myking
Government Authorized Translator

Page 8 of 9

29.09.17

EXT- WALLACE-00258

*Translated from the Norwegian original*

briberies. In the present case, however, concerns two clearly distinct offences committed at different times and the recipients of the bribes were unknown to each other. It follows, as mentioned above, that, in accordance with the Penal Code section 62, a separate assessment of the appropriate punishment must be made for each offence before fixing a combined sentence. In my opinion, an appropriate combined sentence would be eight to nine years' imprisonment, cf. Matningsdal, Comments to the Penal Code 2005, pp. 752–753, with reference to sentencing practice for several offences (objective concurrence).

46)   When I in spite of this find that the appeal should be rejected, this is due to the fact that the prosecuting authority did not submit a claim for a longer prison sentence than the one fixed by the court of appeal, nor did the Supreme Court signal a possible increase of the sentence.

47)   I vote for the following

DECISION:

that the appeal be rejected.

48)   Justice **Kallerud**:                    I agree, in essence and with regard to the result,
                                               with the judge casting the leading vote.

49)   Justice **Bårdsen**:                     I concur.

50)   Justice **Bull**:                        I concur.

51)   Justice **Matningsdal**:                 I concur.

52)   Following the vote, the Supreme Court passed the following

JUDGMENT:

The appeal is rejected.

Correct printout verified.
[stamp and signature]



True translation certified          Page 9 of 9                              29.09.17
Eystein Myking
Government Authorized Translator

TAB 4

**Service Form A**

(Service with acknowledgement of receipt)                    Case no.    **56/11-60**

SERVICE ON

| | |
|---|---|
| **Kendrick Taylor Wallace**<br>**5002 South Elberon St**<br>**Tampa**<br>**FL 33611**<br>**USA** | **ØKOKRIM**<br>Post Box 8193 Dep<br>0034 OSLO<br>Tel:  +47 23 29 10 00<br>Fax: +47 23 29 10 01<br><br>(name of authority, street and postal address<br>plus phone number) |

The enclosed document(s):    **The Supreme Court's judgment of 15 September 2017**

(description of the document(s)

are deemed to have been served on you:    **9 October 2017**

That the document has been served means that it has reached you in such a way that you can acquaint yourself with its contents.

If you receive this letter later than the above-mentioned date, and wish to invoke this fact, you must immediately notify our office either by telephone or by letter. You must state the reason for the delay.

**Please note:**
You are requested to inform us **as soon as possible** that this letter has been received by completing the receipt below and returning it to us.

| Oslo, Norway | 2 October 2017 | _Gine Kirkeberg_ |
|---|---|---|
| (place) | (date) | Gine Kirkeberg |

If you have any questions regarding this service, you may contact our office by telephone or in person.

-----------Cut here----------

### RECEIPT FOR ACKNOWLEDGEMENT OF SERVICE

| | | | |
|---|---|---|---|
| Number: | _____ | Workplace: | _____ |
| Name: | **Kendrick Taylor Wallace** | Work phone: | _____ |
| Pertains to: | **The Supreme Court's judgment of**<br>**15 September 2017** | Mobile phone: | +1 (813) 226-7790 |
| Case no.: | **56/11-60** | E-mail: | ktw45osl6@yahoo.com |

The document(s) as mentioned above have been received:

Tampa, FL USA          2 October 2017          _Kendrick Wallace_
(place)                      (date)                      (signature)

TRUE COPY



**DET KONGELIGE**
**JUSTIS- OG POLITIDEPARTEMENT**

*Ministry of Justice and the Police*

Act of 22 May 1902 No. 10

Published by:
Ministry of Justice and the Police

Additional copies may be ordered from:
Government Administration Services
Kopi- og distribusjonsservice
www.publikasjoner.dep.no
E-mail: publikasjonsbestilling@dss.dep.no
Fax: + 47 22 24 27 86

Publication code: G-0384 E
Printed by: Kopi- og distribusjonsservice - 03/06 - 1500

# The General Civil Penal Code

With subsequent amendments, the latest
made by Act of 21 December 2005 No. 131



EXT- WALLACE-00261

If the convicted person has been kept in custody abroad pending trial, the court will decide to what extent this period shall be deducted from the sentence.

Section 60 a. If a criminal act has been committed as part of the activity of an organized criminal group, the maximum penalty laid down in the penal provision shall be increased to double its prescribed limit, but not by more than five years' imprisonment.

An organized criminal group is here defined as an organized group of three or more persons whose main purpose is to commit an act that is punishable by imprisonment for a term of not less than three years, or whose activity largely consists of committing such acts.

An increase of the maximum penalty pursuant to the present provision shall be applicable in relation to statutory provisions that give legal effect to the penalty limit, unless it is otherwise provided.

Section 61. If a previously convicted person again commits a criminal act of the same nature as that for which he has previously been convicted, the maximum penalty laid down in the penal provision shall be increased to double its prescribed limit, unless it is otherwise provided in the penal provision itself. An increase of the maximum penalty pursuant to the present provision shall only be applicable in relation to statutory provisions that give legal effect to the penalty limit if it is so provided in the present code.

The first paragraph applies only if the convicted person has reached 18 years of age at the time of the commission of the previous criminal act and has committed the new criminal act after the sentence for the act previously committed has been fully or partly executed. If the new criminal act is a felony, the first paragraph shall not apply if the new act is committed more than six years after the sentence for the previous offence has been served completely, unless it is otherwise provided. If the new criminal act is a misdemeanour, no more than two years shall have lapsed after the sentence has been served completely. The provisions of this paragraph shall apply also when an increased penalty for a repetition of offences is laid down in the penal provision.

The court may allow previous sentences imposed in other countries to serve as a basis for an increased penalty in the same way as sentences imposed in Norway.

Section 62. If any person has by one or more acts committed more than one felony or misdemeanour punishable by imprisonment or detention, a joint custodial sentence shall be imposed which must be more severe than the highest minimum penalty prescribed for any of the felonies or misdemeanours and must in no case be more than twice the highest penalty prescribed for any of them. The joint custodial penalty shall normally take the form of imprisonment when any of the criminal acts would have been punishable thereby.

The provisions of the first paragraph shall apply correspondingly to a sentence imposed jointly with a community sentence. If a community sentence is imposed as well as a sentence of immediate imprisonment, the latter shall be taken into account in assessing the community sentence.

If any of the felonies or misdemeanours should have been punished by imprisonment, the same supplementary penalties shall be imposed in the case of detention as would have applied in the case of imprisonment.

Section 63. If any person has by one or more acts committed more than one felony or misdemeanour punishable by fines, a joint fine shall be imposed which must be more severe than that which any one of the felonies or misdemeanours should have incurred.

The court may, when some of the felonies or misdemeanours should have been punished by a custodial sentence and others by fines, regard the felonies or misdemeanours for which fines are prescribed as aggravating circumstances instead of pronouncing sentence for them.

Section 64. If any person who has already been sentenced is convicted of a felony or misdemeanour committed before the sentence was pronounced, the provisions of sections 62 and 63 shall as far as possible be applied in determining the penalty. In this case a custodial sentence of less than 14 days may be imposed.

The provisions of the first paragraph shall also apply when the convicted person during the probation period following a suspended sentence is found guilty of a criminal act committed before the suspended sentence was pronounced. The court may then give a collective sentence for both acts or a separate sentence for the act last adjudicated. If a collective suspended sentence is given for both acts, the court will determine a new probation period, which is to run from the date a legally enforceable judgment is delivered in the new case.

allegation declared null and void in accordance with the provisions of sections 251 and 253.

Section 71. A custodial sentence shall cease to apply after the expiry of the following periods of limitation:

five years for imprisonment for a term not exceeding one year,

10 years for imprisonment for a term exceeding one year but not exceeding four years,

15 years for imprisonment for a term exceeding four years but not exceeding eight years,

20 years for imprisonment for a specified period exceeding eight years but not exceeding 20 years,

30 years for imprisonment for a term exceeding 20 years.

If the penalty is detention, the same periods of limitation as for imprisonment shall apply.

If execution of a prison sentence is partly deferred in accordance with section 52, No. 2, the period of limitation shall run separately for the deferred and the undeferred part of the sentence.

If the custodial sentence has been shortened by release on probation, the period of limitation shall be calculated on the basis of the period of imprisonment remaining. The same applies when the execution is interrupted in any other way.

Section 72. The period of limitation shall run from the date the judgment is legally enforceable.

If execution cannot be commenced because the convicted person is serving another custodial sentence in or outside the realm, the period of limitation shall not run during that period. The same applies when the convicted person is serving a community sentence in or outside the realm in accordance with a court judgment.

If execution of the sentence is deferred by a suspended sentence or pardon, the period of limitation shall not run in the probation period.

Section 73. The running of the period of limitation pursuant to section 71 is interrupted when execution of the sentence is commenced or when the convicted person is arrested in order to ensure execution.

Section 73 a. A sentence of preventive detention shall cease to apply on the expiry of the same periods of limitation as apply to a custodial sentence. The period of limitation shall be calculated according to the length of the time limits determined pursuant to section 39 e, first paragraph, first sentence. Special sanctions imposed on persons who are not accountable for their acts, cf. sections 39 and 39 a, shall cease to apply on the expiry of a period of limitation of 20 years. Sections 71, final paragraph, 72 and 73 shall apply correspondingly in so far as they are appropriate.

Section 73 b. A community sentence imposed shall cease to apply on the expiry of the same periods of limitation as apply to a custodial sentence. The period of limitation shall be calculated according to the length of the alternative custodial sentence determined pursuant to section 28 a, second paragraph. Sections 71, final paragraph, final sentence, 72, 73 and 74, fourth paragraph, shall apply correspondingly in so far as they are appropriate.

Section 74. A fine imposed is time-barred 10 years after the decision becomes legally enforceable.

Statutory limitation of a fine is of no effect as regards an execution lien, garnishee order or any other security that is established before the expiry of the period of limitation.

If execution is deferred pursuant to any provision in a suspended sentence or through a pardon, the period of limitation shall not run during the probation period.

Imprisonment in default of payment of a fine shall be remitted after five years, unless execution of the sentence has been commenced before the expiry of the said period.

A confiscation order shall cease to apply after five years. Confiscation of proceeds, including confiscation pursuant to section 34 a, shall not, however, cease before 10 years. The provision in the second paragraph shall apply correspondingly to claims for confiscation.

Section 75. Execution of sentence lapses with the death of the offender.

Claims for confiscation lapse with the death of the person liable. Proceedings for confiscation of the proceeds of a criminal act, including confiscation pursuant to sections 34 a and 37 a, second paragraph, may, however, be instituted.

A sentence of confiscation may be executed after the death of the convicted person if it is so decided by order of the court that has adjudicated

37

Any person who

1. at the conclusion of an insurance contract conceals or gives incorrect information concerning circumstances which he is aware of and must realize are of importance to the insurer,

2. in order that he himself or another person shall be paid an amount insured or an amount guaranteed that is secured by an insurance contract makes a report of damage that is palpably disproportionate to the damage incurred,

shall be liable to fines or imprisonment for a term not exceeding three years or both.

Any person who aids and abets any felony mentioned in this section shall be liable to the same penalty.

Section 273. Any person who spreads incorrect or misleading information in order to influence the prices of goods, securities or other objects, or who aids and abets thereto, shall be liable to imprisonment for a term not exceeding four years. Fines may be imposed in addition to a sentence of imprisonment. Under especially extenuating circumstances fines alone may be imposed.

A penalty pursuant to this section is not applicable to any act that is covered by section 2-8 of Act of 19 June 1997 No. 79 relating to securities trading.

Section 274. Any person who in any invitation to participate in the founding or expansion of a company limited by shares, a public limited company or any other company with economic aims, or in connection with obtaining loans for such a company, gives incorrect or misleading information of significance for evaluating the enterprise shall be liable to imprisonment for a term not exceeding four years. Fines may be imposed in addition to a sentence of imprisonment. Under especially extenuating circumstances fines alone may be imposed.

Any officer or employee of such a company shall be liable to the same penalty as is prescribed in the first paragraph if he publishes incorrect or misleading information of significance for evaluating the company, or gives such information to the company's members or creditors, to any of its organs, or to a public authority. The same applies to other persons who through undertaking assignments for the company are aware of its condition.

Any person who aids and abets such a felony mentioned in the first and second paragraphs shall be liable to the same penalty.

Any person who through gross negligence becomes guilty of any of the offences mentioned in this section shall be liable to fines or imprisonment for a term not exceeding six months.

A penalty pursuant to this section is not applicable to any act that is covered by section 2-8 of Act of 19 June 1997 No. 79 relating to securities trading.

Section 275. Any person who, for the purpose of obtaining for himself or another person an unlawful gain or inflicting damage, neglects another person's affairs which he manages or supervises or acts against the other person's interests shall be guilty of breach of trust.

The penalty for breach of trust is imprisonment for a term not exceeding three years. Fines may be imposed in addition to a sentence of imprisonment. Any person who aids and abets such an offence shall be liable to the same penalty. Under especially extenuating circumstances fines alone may be imposed.

A penalty pursuant to this section shall not be applicable to an act that comes under section 255, cf. section 256 or section 176 a, cf. section 276 b.

Section 276. The penalty for gross breach of trust is imprisonment for a term not exceeding six years. Fines may be imposed in addition to a sentence of imprisonment. Any person who aids and abets such an offence shall be liable to the same penalty.

In deciding whether a breach of trust is gross, particular importance shall be attached to whether the act has caused considerable economic damage, whether it has been committed by a public official or any other person in breach of the special confidence placed in him by virtue of his position or activity, whether the offender has recorded false accounting information, prepared false accounting documents or false annual accounts, whether he has destroyed, rendered useless or concealed recorded accounting information or accounting material, books or other documents, or whether he has knowingly caused material loss or endangered any person's life or health.

Section 276 a. Any person who

a) for himself or other persons requests or receives an improper advantage or accepts an offer thereof in connection with a position, office or assignment, or

b) gives or offers any person an improper advantage in connection with a position, office or assignment

shall be liable to a penalty for corruption.

Position, office or assignment in the first paragraph also mean a position, office or assignment in a foreign country.

EXT- WALLACE-00264

The penalty for corruption shall be fines or imprisonment for a term not exceeding three years. Any person who aids and abets such an offence shall be liable to the same penalty.

**Section 276 b.** Gross corruption shall be punishable by imprisonment for a term not exceeding 10 years. Any person who aids and abets such an offence shall be liable to the same penalty.

In deciding whether the corruption is gross, importance shall be attached to, inter alia, whether the act has been committed by or in relation to a public official or any other person in breach of the special confidence placed in him by virtue of his position, office or assignment, whether it has resulted in a considerable economic advantage, whether there was any risk of considerable damage of an economic or other nature, or whether false accounting information has been recorded, or false accounting documents or false annual accounts have been prepared.

**Section 276 c.** Any person who
a) for himself or other persons requests or receives an improper advantage or accepts an offer thereof in return for influencing the conduct of any position, office or assignment, or
b) gives or offers any person an improper advantage in return for influencing the conduct of a position, office or assignment
shall be liable to a penalty for trading in influence.

Position, office or assignment in the first paragraph also mean a position, office or assignment in a foreign country.

Trading in influence shall be punishable by fines or imprisonment for a term not exceeding three years. Any person who aids and abets such an offence shall be liable to the same penalty.

**Section 277.** Any person who causes any person loss or exposes him thereto by unlawfully disposing of an object by a juristic act after another person has acquired or in return for full or partial payment has been promised ownership of or the right to use the object, or of a claim that has been transferred to another person, or of a promissory note that has fully or partially been paid, or who aids and abets thereto, shall be liable to fines or imprisonment for a term not exceeding three years or both.

**Section 278.** Any person who unlawfully disposes of a chattel that is subject to a seller's lien, cf. sections 3-15 and 3-22 of the Mortgages and Pledges Act, and thereby causes the seller loss or exposes him thereto shall be liable to fines or imprisonment for a term not exceeding six months. Under especially aggravating circumstances imprisonment for a term not exceeding three years may be imposed.

Any person who causes another person loss or exposes him thereto by unlawfully disposing of a claim or an object which he owns or possesses and on which another person has a lien or other security shall be liable to the same penalty as is prescribed in the first paragraph.

Any person who aids and abets any felony mentioned in this section shall be liable to the same penalty.

**Section 279.** (Repealed by Act of 4 July 2003 No. 78.)

**Section 280.** A public prosecution pursuant to sections 270, 271, 275, 276 and 277 will only be instituted when requested by the aggrieved person when the felony has been committed against any of the offender's next-of-kin unless it is required in the public interest. Section 264, third paragraph shall, however, apply correspondingly.

The felonies mentioned in sections 270, 275 and 277 shall not be prosecuted in any case except on the application of the aggrieved person unless the offender by abusing the confidence or credulity of the public has been guilty of felonies against several persons or prosecution is otherwise required in the public interest.

Felonies contrary to section 278, first paragraph, shall not be subject to public prosecution unless it is so requested by the aggrieved person and is deemed to be required in the public interest.

Felonies contrary to section 278, second paragraph, shall not be subject to public prosecution except when requested by the aggrieved person.

**Chapter 27. Felonies in relation to debts**

**Section 281.** Any debtor who wilfully or through gross negligence inflicts considerable loss on his creditors by
a) gambling or any other hazardous activity,
b) any other frivolous conduct,
c) excessive consumption, or
d) grossly improper business dealings

EXT- WALLACE-00265



# Tab 6

