UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF FLORIDA

IN THE MATTER OF              )
THE EXTRADITION OF            )          Case No. 8:21-mj-1246-JSS
KENDRICK TAYLOR WALLACE   )

## MEMORANDUM OF LAW
## IN SUPPORT OF EXTRADITION

The United States, in fulfilling its treaty obligations to Norway, hereby respectfully responds to the Memorandum of Law in Opposition to Extradition filed by the fugitive in this case, Kendrick Taylor Wallace (Wallace) (DE 18). In support of its request for Wallace's extradition, Norway has submitted evidence "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. The Court should therefore "certify the same" to the Secretary of State, who will decide whether to surrender Wallace "according to the treaty." *Id.*[1]

To render a certification, the Court must make five findings, only one of which Wallace contests. In particular, he argues that the corruption offenses of which he has been convicted in Norway are not encompassed by the U.S.-Norway

---

[1] After the Court has completed its "limited inquiry, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender." *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 829 (11th Cir. 1993). "The Secretary exercises broad discretion and may properly consider myriad factors, including humanitarian ones, affecting both the individual defendant as well as foreign relations, which the extradition magistrate may not." *Id.* Thus, other than the sufficiency of the evidence, all matters that may be raised by the fugitive as defenses to extradition are to be considered by the Secretary of State, who "retains the final call on whether to issue a warrant of surrender." *Arias v. Warden*, 928 F.3d 1281, 1286 (11th Cir. 2019) (internal quotation marks omitted).

extradition treaty (the Treaty)[2] because they would not be criminal in the United States. He also argues that his extradition is barred by the Treaty's lapse-of-time provision because Norway failed to prosecute him within the five-year U.S. statute of limitations for bringing an indictment, even though he is wanted in Norway not to answer to an indictment but rather to serve a sentence. Neither of his arguments has merit, and they should both be rejected.

## BACKGROUND

Norway seeks the extradition of Wallace so that he may serve a seven-year term of imprisonment following his conviction on January 17, 2017, of two counts of active, aggravated corruption, in violation of Sections 276a and 276b of Norway's 1902 General Civil Penal Code.  Req. at 8.[3] His conviction was based on the following facts:

From 2004 until his retirement in the summer of 2008, Wallace served as both the Chief Legal Officer and a member of the corporate management team of Yara International ASA (Yara), one of the world's largest producers of mineral fertilizers. The company remains listed on the Oslo Stock Exchange, and the Kingdom of Norway owns 36.2 % of its shares. *Id.* As the Chief Legal Officer, Wallace was responsible for Yara's ethical guidelines and rules of good business practices.

---

[2] The Extradition Treaty between the Government of the United States of America and the Government of the Kingdom of Norway, U.S.-Nor., June 9, 1977, 31 U.S.T. 5619.

[3] Norway's extradition request is referred to herein as "Req." with citations to the Bates-labeled page numbers appearing at the bottom of each page. A copy of the request appears at Docket Entry No. 17.

Wallace prepared new guidelines, which were presented to the company's employees in November 2005.

According to the documentation provided by Norway, while serving as Yara's Chief Legal Officer, Wallace assisted the company with entering into two separate agreements to pay bribes—parts of which were in fact paid—first, to a Libyan government official and second, to an Indian government official, each in connection with negotiations to establish joint venture agreements concerning fertilizer production with state-controlled companies in Libya and India. The bribes were orchestrated under the guise of consultancy agreements with the sons of the two foreign public officials.

*First*, in or around early 2007, while Yara was negotiating a joint venture with the state-owned Libyan oil company National Oil Company (NOC), Wallace entered into an agreement to pay $4.5 million to Mohamed Ghanem (Ghanem), who was the son of Shukri Ghanem, then Libya's Minister of Petroleum and NOC's Chairman of the Board.[4] In particular, Wallace, on behalf of Yara, and Ghanem, on behalf of a company called Saudi Logistics and Support (SALT), drafted a consultancy agreement, pursuant to which Yara would pay SALT an initial retainer of $1.5 million, followed by a $3 million "closing fee," purportedly for assistance with major construction and logistics projects in the Middle East. *Id.* at 117-19, 123. At the time, Ghanem was employed at a bank in Bahrain and had limited work or

---

[4] All monetary amounts referred to herein are in U.S. dollars.

other relevant experience. *Id.* at 123. Although the draft consultancy agreement was not ultimately signed, Wallace and Ghanem entered into a similar oral agreement. *Id.* at 119. Pursuant to that oral agreement, on March 29, 2007, Yara transferred $1.5 million to a Swiss bank account held by Golden Petal Ltd., a company controlled by Ghanem. *Id.* at 119-20. In the summer of 2008, Ghanem contacted Wallace asking for additional payments in line with their oral agreement; however, by that point, Wallace had retired, and no more money was paid to Ghanem or his company. *Id.* at 122. No evidence suggests that Ghanem provided the services set forth in the draft consultancy agreement. *Id.* at 126.

In February 2007, Ghanem informed Wallace that the Libyan government had approved the joint venture between NOC and Yara, and the companies signed a contract on April 25, 2007. *Id.* at 120-21. In September 2007, Wallace met in Dubai with Ghanem, who provided advice regarding various terms of the joint venture. Wallace shared that advice with others at Yara so that it could be used in subsequent negotiations with Ghanem's father. *Id.* at 121. The joint venture framework was finalized in February 2009. *Id.* at 123.

*Second*, in or around April 2007, while Yara was negotiating a joint venture with the Indian-controlled company Krishak Bharati Cooperative Limited (KBCL), which was overseen by the Indian Ministry of Chemicals and Fertilizers, Wallace entered into an agreement to pay $3 million over a three-year period to Gurpreteesh Singh Maini (Maini), who was the son of Jivtesh Singh Maini, then India's Additional Secretary and Financial Adviser in the Ministry of Chemicals and

Fertilizers and also a member of KBCL's board. Initially, Wallace offered to hire Maini—who had neither experience nor competence in the fertilizer industry— purportedly as Yara's agent in India for $250,000 plus additional amounts, including commissions for any sales Yara made with Maini's assistance. *Id.* at 131-32. Subsequently, Wallace revised the one-off disbursement offer to be a $3 million payment, to be made in installments of $1 million per year during the period of January 1, 2007, through December 31, 2009. *Id.* at 132. This consultancy agreement was finalized in June 2007. *Id.* at 133. The first $1 million payment was made on October 16, 2007. At Maini's request, Yara transferred the money to an account in Hong Kong belonging to Krystal Holdings & Investments Limited, a company owned by a trust, the beneficiaries of which are Maini's wife and mother. *Id.* at 137-38. No evidence suggests that Maini provided the services agreed to under the consultancy agreement, but rather that he assisted only with passing information between Yara and his father. *Id.* at 139. The venture project with KBCL was ultimately terminated in the summer of 2008.

On January 15, 2014, Wallace and three other members of Yara's management team were indicted in Norway on two counts of active, aggravated corruption, one concerning the $4.5 million bribe in Libya, and one concerning the $3 million bribe in India. They were tried before the Oslo District Court from January 5, 2015, to March 26, 2015. Wallace was present and testified in his own defense. *Id.* at 9. Almost 7,000 documents were presented to the court (although not all were entered into evidence), and 33 lay witnesses and one expert witness testified.

5

*Id.* at 102. On July 7, 2015, the Oslo District Court entered its judgment finding Wallace guilty of both counts and sentenced him to a term of imprisonment of two years and six months (with credit for the three days he had spent detained in Norway). *Id.* at 147-57, 192-93. The court also convicted Wallace's codefendants (with the exception of acquitting one codefendant of one count). *Id.* at 194.

Wallace and his codefendants appealed the judgment of the Oslo District Court to the Borgarting Court of Appeal. In so doing, pursuant to Norwegian law, Wallace and his codefendants received a new trial. *Id.* at 9. The new trial lasted from August 23, 2016, to December 2, 2016, and Wallace was present and testified in his own defense. *Id.* On January 17, 2017, the Borgarting Court of Appeal found Wallace guilty of both counts of the indictment and sentenced him to a seven-year term of imprisonment, though it acquitted Wallace's codefendants. *Id.* at 224, 238.

Wallace appealed the ruling of the Borgarting Court of Appeal, alleging procedural errors at the trial and wrongful application of the law, and challenging the length of his sentence. On September 15, 2017, the Supreme Court of Norway affirmed the ruling below. *Id.* at 256.

Although Wallace was in Norway at the time of the criminal conduct and for the majority of the criminal proceedings against him, he subsequently relocated to the United States. Norway therefore has requested that the United States extradite Wallace pursuant to the Treaty.

On March 17, 2021, the United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181 *et seq.*, filed a complaint in this

District seeking a warrant for Wallace's arrest. This Court issued the arrest warrant, which was executed on April 12, 2021.  Wallace is currently in the custody of the U.S. Marshals Service.

On April 13, 2021, Wallace filed his memorandum in opposition to extradition. DE 18. The Court has set an extradition hearing in this matter for April 15, 2021.

<u>**ARGUMENT**</u>

## I.    **GENERAL PRINCIPLES OF EXTRADITION**

Extradition is primarily an executive responsibility with a specially defined role for a judicial officer, who is authorized by statute to determine whether to certify to the Secretary of State that the submitted evidence is "sufficient to sustain the charge." 18 U.S.C. § 3184; *see Kastnerova v. United States*, 365 F.3d 980, 984 n.5 & 986 (11th Cir. 2004). That judicial function is carried out by conducting a hearing pursuant to 18 U.S.C. § 3184. At the hearing, the Court should consider the evidence presented on behalf of the requesting country and determine whether the legal requirements for certification, as defined in the treaty, statutes and case law, have been established. If any evidence is offered by the fugitive, the Court rules on its admissibility. Once the evidentiary record is complete, the Court should make written findings of fact and conclusions of law as to each of the elements for certification. *Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir. 1973). Once the Court issues its certification, the Secretary of State then decides whether to surrender the fugitive to the requesting country. 18 U.S.C. § 3186.

The extradition hearing prescribed by 18 U.S.C. § 3184 is unique and limited in its nature. *See, e.g.*, *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828 (11th Cir. 1993). Its purpose is to decide the sufficiency of the charge under the relevant treaty, not to pass judgment on the fugitive's guilt or innocence—that is for the foreign court. *Neely v. Henkel*, 180 U.S. 109, 123 (1901); *Benson v. McMahon*, 127 U.S. 457, 463 (1888); *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1165 (11th Cir. 2005). Accordingly, an extradition hearing is not a criminal proceeding. *See, e.g.*, *Martin*, 993 F.2d at 828. Rather, it is "an administrative proceeding arising under international law for certification and approval of the State Department's decision to extradite this person at the request of a foreign government," *In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1284 (S.D. Fla. 2017), and it is governed by "the general extradition law of the United States and the provisions of the Treaty," *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450-51 (9th Cir. 1987).

Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition hearings. *See* Fed. R. Crim. P. 1(a)(5) (stating that "extradition and rendition of a fugitive" are not governed by rules); Fed. R. Evid. 1101(d)(3) (evidence rules are inapplicable to "miscellaneous proceedings such as . . . extradition or rendition"); *Afanasjev*, 418 F.3d at 1164-65. Rather, "unique rules of

wide latitude govern reception of evidence" in extradition hearings. *Sayne v. Shipley*, 418 F.2d 679, 685 (5th Cir. 1969) (citation and internal quotation marks omitted).[5]

Pursuant to 18 U.S.C. § 3190, documents transmitted by the country requesting extradition "shall be received and admitted as evidence" so long as they are "properly and legally authenticated," as confirmed by "the principal diplomatic or consular officer of the United States resident in such foreign country." 18 U.S.C. § 3190.[6] "A certification of extradition is generally based entirely on the authenticated documentary evidence provided by the requesting government." *Martinelli*, 2017 WL 3776953, at *9. Nothing more is required, and typically nothing more is provided. *See*, *e.g.*, *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d 1277, 1287 (S.D. Fla. 2011) ("It is exceedingly rare for the Government to submit anything other than documents in support of an extradition request").

Because an extradition hearing is "in the nature of a preliminary hearing," *Kastnerova*, 365 F.3d at 987, the fugitive's opportunity to challenge the evidence introduced against him is heavily circumscribed. "Generally, evidence that explains away or completely obliterates probable cause is the only evidence admissible at an extradition hearing, whereas evidence that merely controverts the existence of probable cause, or raises a defense, is not admissible." *In re Extradition of Ricardo*

---

[5]  The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[6] The documents filed in this case meet the requirements of Section 3190 because they are accompanied by a certification of the Consul from the United States Embassy in Oslo attesting to the documents' authentication.  *See* Req. at 1.

*Alberto Martinelli Berrocal*, No. 17-22197-CIV, 2017 WL 3776953, at *9 (S.D. Fla. Aug. 31, 2017) (internal quotation marks, citation, and emphasis omitted); *see also, e.g.*, *Collins v. Loisel*, 259 U.S. 309, 315-17 (1922); *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433 (S.D. Fla. 1993).

## II.    THE REQUIREMENTS FOR CERTIFICATION ARE SATISFIED

A court must certify a fugitive as extraditable where: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) there is sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought; and (5) the crimes for which surrender is requested are covered by the applicable treaty. *See In re Extradition of Jose Batista Do Nascimento*, No. 620CV2041ORL40GJK, 2021 WL 1192144, at *2 (M.D. Fla. Jan. 25, 2021); *In re Extradition of Shaw*, No. 14-cv-81475, 2015 WL 3442022, at *5 (S.D. Fla. May 28, 2015) (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)).  As explained below, each of the elements has been met in this case.

In his memorandum (DE 18), Wallace contests only the latter requirement, arguing that the Treaty does not apply to the offenses for which his extradition is requested because (1) he could not be convicted in the United States, as he was in Norway, had he committed the underlying conduct here; and (2) the U.S. statute of

limitations applicable to a prosecution for corruption here prevents his extradition.[7] As explained below, neither argument is availing.

### A.    This Court Has Authority Over the Proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing prescribed by Section 3184 does not exercise "any part of the judicial power of the United States," but rather acts in a "non-institutional capacity by virtue of a special authority," *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted). Both magistrate judges and district judges may render a certification under Section 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993). Here, Section (d)(18) of the Order on Authority of United States Magistrate Judges in the Middle District of Florida expressly delegates to magistrate judges the authority to handle extradition matters. *See In re Authority of U.S. Magistrate Judges in the Middle District of Florida*, No. 8:20-mc-100-T-23 (M.D. Fla. Oct. 29, 2020). This Court is therefore authorized to conduct the hearing in this case.

---

[7] In his memorandum, Wallace identifies only the third, fourth, and fifth requirements for certification, and does not discuss the first or second.  DE 18 at 8.

**B.**     **This Court Has Jurisdiction Over Wallace**

It is well settled that the Court has jurisdiction over a fugitive found within its jurisdictional boundaries. 18 U.S.C. § 3184 (a court "may, upon complaint made under oath, charging any person found within his jurisdiction, . . . issue [its] warrant for the apprehension of the person so charged"); *Pettit v. Walshe*, 194 U.S. 205, 219 (1904). Because Wallace was arrested in Tampa, within the Middle District of Florida, this Court has jurisdiction over him.

**C.**     **The Relevant Treaty Is in Full Force and Effect**

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See* 18 U.S.C. § 3184; *see also Arias v. Warden*, 928 F.3d 1281, 1285 (11th Cir. 2019); *Kastnerova*, 365 F.3d at 987. In this case, an attorney in the Office of the Legal Adviser for the U.S. Department of State has submitted a declaration attesting there is a treaty in full force and effect between the United States and Norway. The Court must defer to the Department of State's determination in that regard. *See Arias*, 928 F.3d at 1288 (where "[Department of State] declaration set forth the United States Executive Branch's position—that the treaty remains in full force," courts "have no answer but this: the treaty remains in effect"); *Kastnerova*, 365 F.3d at 985-87; *Martinelli*, 2017 WL 3776953, at *11 (noting that "every Circuit Court, including our own, has deferred to the executive branch" as to whether an extradition treaty is in force).

12

**D.    The Evidence Establishes Probable Cause that Wallace Committed the Relevant Offenses**

To certify the evidence to the Secretary of State, the Court must conclude there is probable cause to believe that the crimes charged by Norway were committed by the person before the Court. *Castro Bobadilla*, 826 F. Supp. at 1432. The evidence is sufficient, and probable cause is established, if it would cause a "prudent man" to "believ[e] that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted). The extradition judge's probable cause determination is "not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'" *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (citation omitted).

The evidence provided by Norway in support of its request for Wallace's extradition establishes probable cause that Wallace committed the relevant offenses. Norway has provided a copy of the judgment convicting Wallace of those crimes. *See* Req. at 220-41. Nothing further is required because, in the case of a conviction, the Court's determination that there is probable cause may be based solely upon the existence of a judgment of conviction in the requesting country. *See* Article 11(4) of the Treaty (requiring requesting country to provide "the judgment of conviction and sentence, if any, imposed in the territory of the requesting State, and by a certification indicating that the sentence has not been served or indicating the part of

13

the sentence yet to be served," for the extradition of a fugitive who has been convicted but has not yet served all of his sentence); *see also, e.g.*, *Arias*, 928 F.3d at 1295 ("'[A] certified copy of a foreign conviction, obtained following a trial at which the defendant was present' constitutes sufficient evidence [to establish probable cause].") (quoting *Spatola v. United States*, 925 F.2d 615, 618 (2d Cir. 1991)); *Haxhiaj v. Hackman*, 528 F.3d 282, 290 (4th Cir. 2008) ("A foreign conviction entered after a trial at which the defendant was present suffices, in and of itself, to establish probable cause."); *Sidali v. I.N.S.*, 107 F.3d 191, 196 (3d Cir. 1997), *cert. denied*, 522 U.S. 1089 (1998).[8]

---

[8] Regardless, the evidence provided by Norway, detailed above, provides more than ample probable cause that Wallace bribed a Libyan government official and an Indian government official in violation of Section 267a and 276b of Norway's 1902 General Civil Penal Code. Those statutes provide as follows:

> Any person who . . . gives or offers any person an improper advantage in connection with a position, office or assignment shall be liable to a penalty for corruption. Position, office or assignment in the first paragraph also means a position, office or assignment in a foreign country. The penalty for corruption shall be fines or imprisonment for a term not exceeding three years. Any person who aids and abets such an offense shall be liable to the same penalty.

Req. at 264-65 (Section 276a(b) of Norway's 1902 General Civil Penal Code).

> Gross corruption shall be punishable by imprisonment for a term not exceeding ten years. Any person who aids and abets such an offense shall be liable to the same penalty. In deciding whether corruption is gross, importance shall be attached to, inter alia, whether the act has been committed by or in relation to a public official or any other person in breach of the special confidence placed in him by virtue of his position, office or assignment, whether it has resulted in a considerable economic advantage, whether there was any risk of considerable damage of an economic or other nature, or whether false accounting information has been recorded, or false accounting documents or false annual accounts have been prepared.

*Id.* at 265 (Section 276b of Norway's 1902 General Civil Penal Code).

**E.      The Crimes of Conviction Are Covered by the Treaty**

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty. Article 1 of the applicable treaty in this case provides for the return of fugitives charged with, or convicted of, an extraditable offense, as that term is defined under the Treaty.

Article 2(1) of the Treaty contains a list enumerating extraditable offenses. Here, the offenses for which Wallace stands convicted fall under item 28 of the Schedule of Offenses referenced in Article 2(1), which applies to "offense[s] against the laws relating to bribery, including soliciting, offering and accepting bribes."

In assessing whether the crimes for which extradition is requested are covered by any item on the list, the Court should examine the description of criminal conduct provided by Norway in support of its charges and decide whether that conduct constitutes an offense among those listed in Article 2(1). *Factor v. Laubenheimer*, 290 U.S. 276, 299-300 (1933). An offense is "extraditable," regardless of whether it is expressly designated on the Treaty's list, so long as the underlying conduct constitutes one of the enumerated offenses. *See, e.g.*, *id.*; *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986) (treaty that listed "murder" as extraditable encompassed offenses charged as "war crimes"); *Polo v. Horgan*, 828 F. Supp. 961, 964-65 (S.D. Fla. 1993) (treaty that listed "fraud" as extraditable encompassed offenses charged as "embezzlement" and "unfaithful management").

Further, Article 2(1)(a) & (b) of the Treaty provides that an offense is extraditable only when the laws of Norway and the United States provide a possible

penalty of deprivation of liberty for a period of more than one year, or by the death penalty.[9] The crimes for which Wallace's extradition is requested meet this dual criminality requirement. *See Arias*, 928 F.3d at 1292-93 (noting that "courts ask whether the conduct that the government describes would violate our laws if it occurred in this country"); *Gallo-Chamorro v. United States*, 233 F.3d 1298, 1306 (11th Cir. 2000); *United States v. Cardoso*, No. 04-mc-128, 2005 WL 1228826, at \*3 (M.D. Fla. May 10, 2005) ("Acts are considered criminal in the United States if they would be unlawful under federal statutes, the law of the state where the accused is found, or by a preponderance of the states.") (citation omitted). Wallace has in fact been punished by a term of imprisonment longer than one year under Norwegian law. Moreover, the description of criminal conduct provided by Norway in support of the conviction, if it had been committed here, would be a felony under U.S. law, including, for example, the anti-bribery provision of the Foreign Corrupt Practices Act (FCPA), 15 U.S.C. § 78dd-2.

That statute provides, in relevant part:

It shall be unlawful for any domestic concern,[10] other than an issuer which is subject to section 78dd–1 of this title, or for any officer, director, employee, or agent of such domestic concern or any stockholder thereof acting on behalf of such domestic concern, to make

---

[9] Article 2(2) of the Treaty also requires that the time remaining for Wallace to serve on his sentence must be at least four months. He has not yet served any of his seven-year sentence.

[10] "The term 'domestic concern' means—(A) any individual who is a citizen, national, or resident of the United States; and (B) any corporation, partnership, association, joint-stock company, business trust, unincorporated organization, or sole proprietorship which has its principal place of business in the United States, or which is organized under the laws of a State of the United States or a territory, possession, or commonwealth of the United States." 15 USC § 78dd-2(h)(1).

use of the mails or any means or instrumentality of interstate commerce[11] corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to—

. . .

(3) any person, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, to any foreign official . . . for purposes of—

(A)(i) influencing any act or decision of such foreign official . . . in his or its official capacity, (ii) inducing such foreign official . . . to do or omit to do any act in violation of the lawful duty of such foreign official . . . , or (iii) securing any improper advantage; or

(B) inducing such foreign official . . . to use his or its influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality, in order to assist such domestic concern in obtaining or retaining business for or with, or directing business to, any person.

15 U.S.C. § 78dd-2(a). Here, Wallace was convicted of offering, and paying, money, in his capacity as an officer of a public Norwegian company, to the sons of officials in Libya and India in an attempt to secure joint ventures with state-owned companies in those countries. As the Borgarting Court of Appeal in Norway held, Wallace intended the money to secure "an improper advantage" in negotiations regarding the joint ventures, and the money was "in reality" offered to the officials themselves in connection with their positions in the foreign governments and in the state-owned companies. Req. at 224, 228. Accordingly, the conduct of which

---

[11] Article 2(5) of the Treaty provides that dual criminality may be satisfied irrespective of "when the use of the mails or means of interstate communication or transport may be required for the purposes of granting jurisdiction to a federal tribunal of the United States."

Wallace was convicted would amount to an FCPA violation had it been committed here, thereby satisfying the Treaty's dual criminality requirement.

### F. Wallace's Arguments Regarding Lack of Dual Criminality and the U.S. Statute of Limitations Are Meritless

Contrary to Wallace's arguments (DE 18 at 17-25), Norway's request for his extradition satisfies both the dual-criminality requirement and the lapse-of-time provision of the Treaty. The Court should therefore find that the requirement for certification that the offenses be covered by the Treaty has been met.

> 1. The Conduct Underlying Wallace's Conviction Would Be Criminal in the United States Despite the Supreme Court's Interpretation of "Official Act"

As explained above, the conduct of which Wallace was convicted in Norway would also be punishable in the United States, as required for dual criminality under Article 2(1)(a) & (b) of the Treaty. Wallace's argument that dual criminality is lacking because the Norwegian offenses "did not require any proof of a specific official act or decision made by a foreign official that was linked to the benefit [offered]" (DE 18 at 25) misses the mark for at least three reasons.

*First*, as explained above, the dual criminality inquiry is conduct-based. A requesting country need not establish that its crimes are identical to ours. Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins*, 259 U.S. at 312. In short, the law

"does not require that the *elements* . . . for foreign offenses be identical to ours," but rather that the "*charged conduct*" constitute a criminal offense under U.S. law. *Arias*, 928 F.3d at 1292-93 (emphases added).

Accordingly, even assuming Wallace were correct that the relevant U.S. law requires certain proof that Norwegian law does not, that would not defeat dual criminality. *See, e.g.*, *United States v. Knotek*, 925 F.3d 1118, 1132 (9th Cir. 2019) ("[M]any courts have found two crimes to be substantially analogous [so as to satisfy dual criminality] despite differences in their required elements."). "The fact that the [requesting country's] law is broader than ours, and thus punishes conduct that would not be unlawful here, is of no consequence, so long as the particular conduct [the fugitive] is charged with is prohibited in both countries." *Man-Seok Choe v. Torres*, 525 F.3d 733, 738 (9th Cir. 2008). In *Man-Seok Choe*, the Ninth Circuit rejected the fugitive's contention that dual criminality was lacking because a Korean bribery statute criminalized "conduct that we would consider mere lobbying." *Id.* at 737-38. Although some similarity is required, "the elements of the analogous offenses need not be identical," and "[t]he two laws are analogous because they both punish acts of the same general character" and because the actual "conduct charged" falls within both statutes. *Clarey v. Gregg*, 138 F.3d 764, 766 (9th Cir. 1998); *see also, e.g.*, *In re Extradition of Russell*, 789 F.2d 801, 803-04 (9th Cir. 1986) (rejecting fugitive's argument that dual criminality was lacking where an overt act was not required under Australia's conspiracy law, as it is under the U.S. law, because the conduct underlying the Australian charges included evidence establishing overt acts); *In re*

19

*Extradition of Lui*, 939 F. Supp. 934, 947 & n.11 (D. Mass. 1996) (rejecting fugitive's argument that "dual criminality [for bribery charges] is not satisfied because United States law imposes a stricter standard of intent than Hong Kong law").

*Second*, Wallace is incorrect that the standard for an "official act" set forth in *McDonnell v. United States*, 136 S. Ct. 2355, 2372 (2016), applies to FCPA bribery. *See United States v. Ng Lap Seng*, 934 F.3d 110, 130 (2d Cir. 2019) ("[18 U.S.C.] § 201(a)(3)'s definition of 'official act,' which informs the *McDonnell* standard, does not delimit the *quid pro quo* elements of [18 U.S.C.] § 666 and FCPA bribery"), *cert. denied*, 141 S. Ct. 161 (2020).[12] *McDonnell* did not address the FCPA, but rather it concerned the federal bribery statute, 18 U.S.C. § 201, which criminalizes a public official's receipt of anything of value in return for being influenced in the performance of any official act. 136 S. Ct. at 2365 (citing 18 U.S.C. § 201(b)(2)). In particular, "[t]he issue in [*McDonnell*] [wa]s the proper interpretation of the term 'official act.'" *Id*. at 2367. However, that term does not appear in the FCPA, which includes more expansive language than that of Section 201. And the FCPA's provision for liability in the case of "securing any improper advantage" would be rendered meaningless were *McDonnell* to apply, because another provision of the statute already prohibits corrupt payments intended to "influenc[e] any act or

---

[12] The Eleventh Circuit has also flatly rejected attempts by defendants to graft *quid pro quo* requirements onto other federal statutes. *See, e.g.*, *United States v. McNair*, 605 F.3d 1152, 1188 (11th Cir. 2010) ("[W]e now expressly hold there is no requirement in [18 U.S.C.] § 666(a)(1)(B) or (a)(2) that the government allege or prove an intent that a specific payment was solicited, received, or given in exchange for a specific official act, termed a *quid pro quo*.").

decision of such foreign official in his official capacity." *See* 15 U.S.C. § 78dd-2(a)(3)(A)(i) & (iii). These provisions are not redundant. *See United States v. Kay*, 359 F.3d 738, 754 (5th Cir. 2004) (The FCPA "prohibits payments to foreign officials not just to buy any act or decision, and not just to induce the doing or omitting of an official function . . . but also the making of a payment to such a foreign official to secure an 'improper advantage' that will assist in obtaining or retaining business.") (citations omitted).

*Third*, even if the *McDonnell* standard did apply, Norway's evidence establishes that Wallace's misconduct was in fact intended to influence an official act, namely, the state-owned companies' decision to enter into joint ventures. Thus, Wallace's argument regarding dual criminality is unavailing.

2.      No Statute of Limitations Bars Wallace's Extradition

Wallace's argument that he cannot be extradited on the Norwegian conviction because of the U.S. statute of limitations applicable to the prosecution of his crimes is similarly unavailing. Article 7(1)(b) of the Treaty provides that extradition "shall not be granted . . . [w]hen the prosecution or the enforcement of the penalty for the offense for which extradition is sought has become barred by lapse of time according to the laws of the requesting or requested State." This provision corresponds to Article 1 of the Treaty, which allows for the extradition of two categories of people: those "charged with" and those "convicted of" extraditable offenses.[13]  When

---

[13] Relatedly, under Article 11(3) and (4) of the Treaty, the country requesting extradition is required to provide different sets of documentary evidence depending on whether the person

considering the Treaty's lapse-of-time provision, the Court must thus take into account the nature of the request at issue (for prosecution or enforcement of penalty).

The language of the provision, which expressly requires consideration of when prosecution or enforcement "has become" barred by lapse of time, refers to the point in time at which the extradition request is being considered. If extradition is being sought for prosecution of an offense, it will be barred if such prosecution has become barred by lapse of time; alternatively, if extradition is being sought for enforcement of a penalty, extradition will be barred if the enforcement of that penalty has become barred due to a lapse of time.

Here, because Norway seeks Wallace's extradition to enforce the sentence of imprisonment imposed upon him, Article 7(1)(b) bars extradition only if the applicable limitations periods for the enforcement of that sentence have lapsed. They have not. Norway has explained that under its law, the sentence imposed on Wallace may be executed up until fifteen years from when it became final on September 15, 2017. Req. at 13. No limitations period applies to the enforcement of sentences under U.S. law. *See, e.g.*, *Martinez v. United States*, 828 F.3d 451, 458 (6th Cir. 2016) (en banc) (stating that limitations periods pertaining to the enforcement of penalties are "generally unknown in the United States" even though common in civil law countries); *Yapp v. Reno*, 26 F.3d 1562, 1568 (11th Cir. 1994) (noting that, in comparison to the United States, civil law countries often have statutes of limitations

─────────────────────

sought has been "charged but not yet convicted" or "convicted but . . . not served all of his or her sentence."

that refer to the time period by which a person must begin serving his sentence); *Restatement (Third) of Foreign Relations Law* § 476 cmt. e (1987) (discussing lapse-of-time provisions in extradition treaties and stating that "[u]nder the law of the United States and of most common law countries, there is no period of limitations for enforcement of sentences, so that if a person is duly convicted and escapes, either from confinement or pending confinement, he may be returned to serve out his sentence, regardless of when he is captured or when a request is made for his extradition"). Accordingly, the enforcement of Wallace's sentence has not become barred under either Norwegian or U.S. law, and Wallace does not argue otherwise.

Instead, Wallace argues that Article 7(1)(b) bars extradition because the five-year U.S. limitations period applicable to the prosecution of corruption offenses lapsed before the Norwegian government issued its indictment against him. DE 18 at 17-21. However, none of the cases Wallace cites supports the notion that, for a post-conviction extradition request, courts should consider the statute of limitations applicable to the timing of the underlying prosecution.

As an initial matter, the cases Wallace cites involving fugitives sought for prosecution are inapposite. *See* DE 18 at 10 (citing *In re Assarsson*, 687 F.2d 1157, 1162-63 (8th Cir. 1982)); *id.* at 17 (citing *Sainez v. Venables*, 588 F.3d 713, 716 (9th Cir. 2009); *In re Extradition of Nunez*, No. 10-24020-MC, 2011 WL 281030, at *4 (S.D. Fla. Jan. 26, 2011)). Moreover, in the post-conviction cases he cites (which are two unpublished decisions from another district), the courts rejected the fugitives' arguments and did not deny extradition based on the expiration of the statutes of

limitations for prosecution. *See id.* at 10-11 (citing *In re Extradition of Ernst*, No. 97 CRIM.MISC.1PG.22, 1998 WL 51130, at *6 (S.D.N.Y. Feb. 5, 1998); and *In re Extradition of Harrison*, No. 03 CR. MISC. 01, 2004 WL 1145831, at *3 (S.D.N.Y. May 21, 2004)). In *Ernst*, the court rejected the fugitive's lapse-of-time defense because "*the enforcement of the conviction* is not time-barred under Swiss law." 1998 WL 51130, at *6 (emphasis added). There, the court determined that the current U.S.-Swiss extradition treaty, which requires consideration of only the law of the requesting country (and thus not U.S. law on limitations), applied. *Id.* Although the court discussed the timeliness of the Swiss prosecution when considering (and rejecting) the fugitive's argument that the earlier U.S.-Swiss treaty (which required consideration of both countries' law) applied, any such discussion is mere dicta. *See id.* at *3-6. Similarly, in *Harrison*, the court simply rejected the fugitive's argument that the foreign prosecution was commenced after the expiration of the relevant U.S. limitations period, without addressing whether consideration of that limitations period was proper in the first place. 2004 WL 1145831, at *3.

Wallace cites no case in which a court has denied extradition of a convicted fugitive because the foreign prosecution was not commenced within the applicable U.S. statute of limitations—and the government is aware of none.[14] Accordingly, this

---

[14] Moreover, even if the Court did consider the five-year U.S. statute of limitations for bringing a corruption prosecution, it is unclear that that time period did in fact lapse prior to Wallace's indictment, as Wallace asserts. It may have been tolled, for example, while Norway was seeking evidence from other countries, pursuant to 18 U.S.C. § 3292.

Court should reject Wallace's attempt to avoid extradition based on the Treaty's lapse-of-time provision.

   3.   Any Ambiguity as to Whether the Crimes Are Covered by the Treaty Must Be Resolved in Favor of Extradition

To the extent there is any ambiguity regarding whether the two offenses for which Wallace has been convicted are dually criminal, or satisfy the lapse-of-time provision, so as to be encompassed by the Treaty, the Court is bound by the general canon of extradition law requiring that extradition treaties must be construed liberally in favor of extradition. As the Supreme Court articulated in *Factor v. Laubenheimer*, "if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred." 290 U.S. at 293-94; *see also, e.g.*, *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 14 (1936); *Vardy v. United States*, 529 F.2d 404, 406 (5th Cir. 1976).  At least seven U.S. courts of appeals have observed that *Factor* demands that ambiguities in an extradition treaty must be construed in favor of the state signatories—that is, in favor of surrendering a fugitive to the requesting country. *United States v. Trabelsi*, 845 F.3d 1181, 1191 (D.C. Cir.), *cert. denied*, 138 S. Ct. 194 (2017); *Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc); *Nezirovic v. Holt*, 779 F.3d 233, 239 (4th Cir. 2015); *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997); *Ludecke v. U.S. Marshal*, 15 F.3d 496, 498 (5th Cir. 1994); *United States v. Wiebe*, 733 F.2d 549, 554 (8th Cir. 1984); *Cucuzzella v. Keliikoa*, 638 F.2d 105, 107 n.3 (9th Cir. 1981). Accordingly, because extradition treaties should be

"interpreted with a view to fulfil our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

## CONCLUSION

For the foregoing reasons, the United States requests that the Court certify the extradition of Wallace for the Secretary of State's decision on his surrender to Norway.

Respectfully submitted,

KARIN HOPPMANN
Acting United States Attorney

By:   */s/ John Cannizzaro*
John Cannizzaro
Assistant United States Attorney
Florida Bar No. 25790
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: John.Cannizzaro@usdoj.gov

**U.S. v. Kendrick Taylor Wallace**                    **Case No. 8:21-MJ-1246-JSS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 14, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Matthew J. Mueller, Esquire

<u>*/s/ John Cannizzaro*</u>
John Cannizzaro
Assistant United States Attorney
Florida Bar No. 25790
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: John.Cannizzaro@usdoj.gov

27